**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW MEXICO**

THE CINCINNATI INSURANCE
COMPANY,

     Plaintiff,

  v.

SIRI SINGH SAHIB CORPORATION
INC.,

and

SIKH DHARMA INTERNATIONAL,

and

UNTO INFINITY, LLC,

and

SIRI SINGH SAHIB OF SIKH
DHARMA,

     Defendants.

Case No. 1:24-cv-00579

Judge

## COMPLAINT FOR DECLARATORY JUDGMENT

For its Complaint against Defendants Siri Singh Sahib Corporation ("SSSC"), Sikh Dharma International ("SDI"), Unto Infinity, LLC ("Unto"), and Siri Singh Sahib of Sikh Dharma ("SSSSD"), Plaintiff The Cincinnati Insurance Company ("CIC") states the following.

## INTRODUCTION

1.     This is an insurance coverage action seeking declaratory relief pursuant to 28 U.S.C. §§ 2201, 2202, and 1332 in which CIC seeks various declarations with respect to whether there is coverage for several related matters under two nearly identical insurance policies issued to SSSC and SDI affording directors and officers liability coverage and employment practices liability coverage.

**PARTIES**

2.      CIC is an insurance company duly organized and existing under the laws of the State of Ohio with its principal place of business located in Ohio.

3.      SSSC is an Oregon non-profit corporation with its principal place of business located in New Mexico.

4.      SDI is a California non-profit corporation with its principal place of business located in New Mexico.

5.      Unto is an Oregon limited liability company with its principal place of business located in New Mexico whose members are citizens of Oregon or New Mexico.

6.      Siri Singh Sahib of Sikh Dharma is a California corporation with its principal place of business located in Los Angeles, California.

**JURISDICTION AND VENUE**

7.      The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1). There is complete diversity of citizenship between CIC and Defendants, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

8.      Venue is proper in this District and Division pursuant to 28 U.S.C. § 1391(b)(1) because Defendants are in this District and Division.

**FACTUAL ALLEGATIONS**

**Pre-SSSC Application Knowledge**

9.      Upon information and belief, Harbhajan Singh Khalsa Yogiji ("Yogi Bhajan"), a spiritual leader and yoga instructor, formed several non-profit and for-profit companies (including SSSC and SDI) in the United States before his death in 2004 in order to spread the Sikh religion and Kundalini Yoga.

10.     Upon information and belief, in or around October 2019, Pamela Dyson aka Premka Kaur S. Khalsa ("Premka"), a former student and employee of Yogi Bhajan, created a website (www.premkamemoir.com) that indicated that Premka would be releasing a memoir entitled "White Bird in a Golden Cage" (the "Book") in or around January 2020 in which Premka stated that she had been sexually abused by Yogi Bhajan.

### The SSSC Application

11.     Upon information and belief, on or about December 8, 2019, Satwant Singh Khalsa ("Satwant"), SSSC's Executive Director, completed a Not-For-Profit Select Insurance Policy Application on behalf of SSSC (the "SSSC Application") and submitted it to CIC. A true and correct copy of the SSSC Application is attached hereto as "Exhibit 1."

12.     In the SSSC Application, SSSC was asked: "Does any **Insured Person** know of any act, error, omission, or other circumstance which could reasonably give rise to a claim being made against any **Insured** under the proposed insurance? (If 'Yes', attach details)" (the "SSSC Application Question"). SSSC checked the box marked "No" in response to the SSSC Application Question. (Ex. 1 § 7.)

13.     The SSSC Application states:

The **Entity** and the **Insured Persons** declare, to the best of their knowledge and belief, that the statements set forth herein are true. . . . The undersigned agrees that this application, its attachments and any materials submitted herewith are true, complete and accurate as of the date thereof and that no material or relevant facts have been suppressed or misstated. These representations shall be the basis of the contract should a policy be issued and shall be deemed attached to and shall form part of the policy. The application, its attachments and any materials submitted therewith are considered physically attached to the policy and will be deemed incorporated therein. . . .

The undersigned, on behalf of the **Entity** and all **Insured Persons**, agrees that if the information in the Declarations and representations contained in this application and its attachments materially changes between the date of this application and the inception of the proposed coverage, the undersigned will immediately report in writing to the Underwriter such change, and the

3

> Underwriter may withdraw or modify any outstanding quotations or agreements to bind coverage. The undersigned acknowledges and agrees that the Underwriter's receipt of such written report, prior to inception of the proposed coverage, is a condition precedent to coverage.

(Ex. 1 at Notices.)

14.     In Exhibit 1 to the SSSC Application, SSSC represented to CIC: "The Siri Singh Sahib Corporation is the parent of a number of non-profit and for-profit companies. However, it is only seeking management liability coverage (D&O) for itself, and its disregarded subsidiary, Unto Infinity. This is because the operational subsidiaries are diverse in nature and arrange their own insurance." (Ex. 1 to Ex. 1.)

15.     In connection with the execution of the SSSC Application, on December 9 2019, Satwant sent a letter to CIC on behalf of SSSC, in which he stated: "Although we have a number of subsidiaries, we are only seeking coverage for the SSSC and Unto Infinity, LLC and our answers to the questions reflect that." A true and correct copy of the December 9, 2019 letter is attached hereto as "Exhibit 2."

### Pre-SSSC Policy Knowledge

16.     Upon information and belief, on or about December 18, 2019, Premka created a Facebook page for the Book.

17.     Upon information and belief, on or about December 28, 2019, two Facebook users shared a picture of the cover of the Book and posted comments inferring and/or alleging sexual abuse by Yogi Bhajan.

### The SSSC Policy

18.     Based upon the representations and warranties contained in the SSSC Application, CIC issued Pillar Policy No. EMN 056 41 27 to SSSC (the "SSSC Policy") effective for the period from January 1, 2020 to January 1, 2023 (the "SSSC Policy Period"). A

true and correct copy of the SSSC Policy is attached hereto as "Exhibit 3."

19.     Subject to the SSSC Policy's terms, conditions, limitations, exclusions, and endorsements, the SSSC Policy provides coverage under a Nonprofit Organization Directors and Officers Liability Coverage Part (the "D&O Coverage Part") and an Employment Practices Liability Coverage Part (the "EPL Coverage Part"). (Ex. 3 at Declarations.)

20.     Insuring Agreement A of the D&O Coverage Part states that CIC "will pay on behalf of the **insured persons** all **loss** which they shall be legally obligated to pay, except for such **loss** which the **organization** actually pays as indemnification, resulting from any **claim** first made during the **policy period**, or any **extended reporting period** included in or endorsed to the policy, for a **wrongful act**." (Ex. 3 at D&O Coverage Part § I(A).)

21.     Insuring Agreement B of the D&O Coverage Part states that CIC "will pay on behalf of the **organization** all **loss** which the **organization** is required to pay as indemnification to the **insured persons** resulting from any **claim** first made during the **policy period**, or any **extended reporting period** included in or endorsed to the policy, for a **wrongful act**." (Ex. 3 at D&O Coverage Part § I(B).)

22.     Insuring Agreement C of the D&O Coverage Part states that CIC "will pay on behalf of the **organization** all **loss** which the **organization** is required to pay resulting from any **claim** first made during the **policy period**, or any **extended reporting period** included in or endorsed to the policy, against the **organization** for a **wrongful act**." (Ex. 3 at D&O Coverage Part § I(C).)

23.     "Claim" is defined in the D&O Coverage Part to mean, in relevant part, a written demand for monetary damages or non-monetary relief against any "insured" and a civil proceeding commenced by the filing of a complaint or similar pleading against any "insured," including any appeal therefrom, among other things. (Ex. 3 at D&O Coverage Part § II(A), as

amended by Amended Definition of Claim Endorsement.)

24.     "Organization" is defined in the D&O Coverage Part to mean the "named insured" and any "subsidiary." (Ex. 3 at D&O Coverage Part § II(O).)

25.     The "named insured" of the SSSC Policy is listed in the Declarations as SSSC. (Ex. 3 at Declarations.)

26.     "Subsidiary" is defined in the General Provisions Applicable to All Liability Coverage Parts (the "General Provisions") to mean "any entity in which the **named insured** owns, directly or indirectly, more than 50% of the outstanding securities or voting rights representing the present right to vote for election of directors, trustees, managers (if a limited liability company) or equivalent positions and any such entity in its capacity as a **debtor in possession**." (Ex. 3 at General Provisions § I(R).)

27.     "Insured persons" is defined in the D&O Coverage Part to mean:

1.  **Directors and officers**;

2.  All natural persons who were, now are, or shall become an **employee** or committee member, whether or not they were, are or shall be compensated, of the **organization**;

3.  All natural persons who were, now are, or shall become members or volunteers of the **organization** while acting on behalf of the **organization** in a voluntary capacity at the direction of the **directors and officers**; and

4.  Any natural person who is an independent contractor as determined by federal, state or local law, but only while acting in the capacity as such for the **organization** pursuant to an express written agreement between the independent contractor, or any entity on behalf of the independent contractor, and the **organization** and only if the **organization** agrees in writing to provide indemnification to such independent contractor; provided, however, that any coverage under this Coverage Part for any such independent contractor shall be excess of any indemnification or insurance otherwise available to such independent contractor from any other source.

5.  Students and interns

6.  Any natural person who is an independent contractors as determined by federal, state or local  law, but only while acting in the capacity as such for the

**organization** pursuant to an express written agreement between the independent contractor, or any entity on behalf of the independent contractor;

but only for acts with respect to their duties for service to the **organization**.

(Ex. 3 at D&O Coverage Part § II(L), as amended by Amended Definition of Insured Persons Endorsement.)

28.     "Loss" is defined in the D&O Coverage Part to mean, in pertinent part, "**defense costs** and the total amount of monetary damages which the **insured** becomes legally obligated to pay on account of any **claim** for a **wrongful act** with respect to which coverage hereunder applies, including damages, judgments, settlements, prejudgment and postjudgment interest, and punitive or exemplary damages or the multiplied portion of any multiplied damage award if insurable under the applicable law most favorable to the insurability of punitive, exemplary or multiplied damages," with certain exceptions. (Ex. 3 at D&O Coverage Part § II(N).)

29.     "Wrongful act" is defined in the D&O Coverage Part to mean:

any actual or alleged error, misstatement, misleading statement, act, omission, neglect or breach of duty including any **personal injury** or **publishers liability** committed, attempted or allegedly committed or attempted on or after the Retroactive Date, if any, set forth in the Nonprofit Organization Directors and Officers Liability Coverage Part Declarations and prior to the end of the **policy period** by:

1.  Any of the **insured persons** in the discharge of their duties solely in their capacity as **insured persons** of the **organization**;

2.  Any of the **insured persons** of the **organization** in the discharge of their duties solely in their capacity in an **outside position** in any **outside organization**;

3.  Any of the **insured persons** solely by reason of their status as such; or

4.  The **organization**.

(Ex. 3 at D&O Coverage Part § II(W).)

30.     Section VI of the D&O Coverage Part states that CIC "will have the right and duty to select counsel and defend the **insureds** against any **claim**; however, we will have no duty to defend the **insureds** against any **claim** to which this insurance does not apply." (Ex. 3 at D&O Coverage Part § VI(A).)

31.     The D&O Coverage Part contains an "Assault Exclusion," which states that CIC is "not liable to pay, indemnify or defend any **claim** based upon, arising out of, or in consequence of any allegations of sexual assault, physical abuse or any threat of bodily harm or abuse" (the "D&O Assault Exclusion"). (Ex. 3 at D&O Coverage Part § III, as amended by Assault Exclusion Endorsement.)

32.     Insuring Agreement A of the EPL Coverage Part states that CIC "will pay on behalf of the **insureds** all **loss** which they shall be legally obligated to pay resulting from any **employment claim** or **immigration claim** first made during the **policy period**, or any **extended reporting period** included in or endorsed to the policy, for an **employment wrongful act** or **immigration wrongful act**" (the "Employment Claim Insuring Agreement") (Ex. 3 at EPL Coverage Part § I(A).)

33.     Insuring Agreement B of the EPL Coverage Part states that, "[i]f Optional Third Party Liability is purchased as set forth in the Employment Practices Liability Coverage Part Declarations, [CIC] will pay on behalf of the **insureds** all **loss** which they shall be legally obligated to pay resulting from any **third party claim** first made during the **policy period**, or any **extended reporting period** included in or endorsed to the policy, for a **third party wrongful act**" (the "Third Party Claim Insuring Agreement") (Ex. 3 at EPL Coverage Part § I(B).)

34.     "Claim" is defined in the EPL Coverage Part to mean "an **employment claim**, an **immigration claim** or a **third party claim**." (Ex. 3 at EPL Coverage Part § II(B).)

35.     "Employment claim" is defined in the EPL Coverage Part to mean a written demand for monetary damages or non-monetary relief which is brought by or on behalf of any past, present or prospective "employee(s)" of the "organization" against any of the "insureds" and a civil proceeding commenced by the filing of a complaint or similar pleading which is brought by or on behalf of any past, present or prospective "employee(s)" of the "organization" against any of the "insureds," including any appeal therefrom, among other things. (Ex. 3 at EPL Coverage Part § II(E).)

36.     "Third party claim" is defined in the EPL Coverage Part to mean a written demand for monetary damages or non-monetary relief which is brought by or on behalf of any "third party" against any of the insureds and a civil proceeding commenced by the filing of a complaint or similar pleading which is brought by or on behalf of any "third party" against any of the "insureds," included any appeal therefrom, among other things. (Ex. 3 at EPL Coverage Part § S.)

37.     "Insured" is defined in the EPL Coverage Part to mean the "organization" and the "insured persons." (Ex. 3 at EPL Coverage Part § II(J).)

38.     "Organization" is defined in the EPL Coverage Part to mean the "named insured" and any "subsidiary." (Ex. 3 at EPL Coverage Part § II(N).)

39.     "Insured persons" is defined in the EPL Coverage Part to mean:

1.  All natural persons who were, now are, or shall become an officer or a duly elected or appointed member of the board of directors, trustees, regents, managers, governors, a **LLC manager** or an equivalent position of the **organization**;

2.  All natural persons who were, now are, or shall become an **employee** or committee member, whether or not they were, are or shall be compensated, of the **organization**;

3.  All natural persons who were, now are, or shall become members or volunteers of the **organization**, if the **organization** is nonprofit in nature,

while acting on behalf of the **organization** in a voluntary capacity at the direction of the board of directors, trustees, regents, managers, governors, or an equivalent position; and

4.  Any natural person who is an independent contractor as determined by federal, state or local law, but only while acting in the capacity as such for the **organization** pursuant to an express written agreement between the independent contractor, or any entity on behalf of the independent contractor;

but only for acts with respect to their duties for service to the **organization**.

(Ex. 3 at EPL Coverage Part § II(K), as amended by Amended Definition of Insured Persons Endorsement.)

40.     "Employee" is defined in the EPL Coverage Part as including, but not limited to, "full-time, part-time, seasonal, volunteer, students, interns, contingent or leased workers as determined by the federal, state or local law. **Employee** does not include independent contractors as determined by federal, state or local law." (Ex. 3 at EPL Coverage Part § II(D), as amended by Amended Definition of Employee Endorsement.)

41.     "Third-party" is defined in the EPL Coverage Part to mean "any natural person who is not an **employee** of the **organization**." (Ex. 3 at EPL Coverage Part § II(R).)

42.     "Loss" is defined in the EPL Coverage Part to mean, in pertinent part, "**defense costs** and the total amount of monetary damages which the **insured** becomes legally obligated to pay on account of any **claim** for a **wrongful act** with respect to which coverage hereunder applies, including damages (including back pay and front pay), judgments, settlements, prejudgment and postjudgment interest, and punitive or exemplary damages or the multiplied portion of any multiplied damage award if insurable under the applicable law most favorable to the insurability of punitive, exemplary or multiplied damages," with certain exceptions. (Ex. 3 at EPL Coverage Part § II(M).)

43.     "Employment wrongful act" is defined in the EPL Coverage Part to mean, in relevant part, "any actual or alleged error, misstatement, misleading statement, act, omission, neglect or breach of duty committed for . . . [v]iolation of any federal, state or local law that concerns employment discrimination . . . [i]ncluding . . . [s]exual harassment involving unwelcome sexual advances, requests for sexual favors or other conduct of a sexual nature . . . including any actual or alleged assault, battery, or loss of consortium in connection [therewith]," among other things. (Ex. 3 at EPL Coverage Part § II(F).)

44.     "Third party wrongful act" is defined in the EPL Coverage Part to mean:

any actual or alleged error, misstatement, misleading statement, act, omission, neglect or breach of duty committed, attempted or allegedly committed or attempted on or after the Retroactive Date, if any, set forth in the Employment Practices Liability Coverage Part Declarations and prior to the end of the **policy period** by and **insured** or any person for whose acts the **insured** is legally liable for:

1.  Discrimination by any **insured** against a **third party** in violation of any applicable federal, state or local statute, ordinance or common law;

2.  Sexual or other harassment solely and entirely of a verbal or nonphysical nature by any **insured** against any third party which violates the civil rights of the **third party**, including unwelcome verbal or nonphysical sexual advances or requests for sexual favors; or

3.  **Wrongful eviction** when arising out of discrimination or harassment by any **insured** against a **third party** in violation of any applicable federal, state or local statute, ordinance or common law.

(Ex. 3 at EPL Coverage Part § II(T), as amended by Third Party Liability Assault Exclusion Endorsement.)

45.     Section VI of the EPL Coverage Part states that CIC "will have the right and duty to select counsel and defend the **insureds** against any **claim**; however, we will have no duty to defend the **insureds** against any **claim** to which this insurance does not apply." (Ex. 3 at EPL Coverage Part § VI(A).)

46.     The EPL Coverage Part contains an "Assault Exclusion," applicable to the Third Party Liability Insuring Agreement, which states that CIC is "not liable to pay, indemnify or defend any **claim** based upon, arising out of, or in consequence of, or in any way involving any actual or alleged physical touching or bodily contact of a **third party** by any **insured**" (the "EPL Assault Exclusion"). (Ex. 3 at EPL Coverage Part § III, as amended by Third Party Liability Assault Exclusion Endorsement.)

47.     Section II(C) of the General Provisions states that CIC is:

not liable to pay, indemnify or defend any **claim** based upon, arising out of, or in consequence of, or in any way involving any **wrongful act** committed, attempted or allegedly committed or attempted prior to the **policy period** of the applicable Coverage Part if:

1.  Prior to the earlier of the following dates:

    a.  The inception of the applicable Coverage Part;

    b.  The inception of the original Coverage Part of which the applicable Coverage Part is a renewal or replacement; or

    c.  The Continuity Date, if any, stated in the Declarations for the applicable Coverage Part;

    any **executive** knew that such **wrongful act** is or would reasonably be regarded as the basis of a **claim**; or

2.  There is a previous policy number under which the **insureds** are entitled to coverage for such **claim**.

(the "Prior Knowledge Exclusion"). (Ex. 3 at General Provisions § II(C).)

48.     "Executive" is defined in the D&O and EPL Coverage Parts to mean "any natural person who was, now is or shall become the Chief Executive Officer, Chief Financial Officer or person of equivalent position to any of the foregoing of the **organization**." (Ex. 3 at D&O Coverage Part § II(I), as amended by Definition of Executive Amendatory Endorsement and EPL Coverage Part § II(I), as amended by Definition of Executive Amendatory Endorsement.)

49.     Section VIII of the General Provisions states, in relevant part, as follows:

The **application** is the basis of this policy and is incorporated into and constitutes a part of this policy. It is agreed by the **insureds** that the statements in the **application** are their representations, that they are material and that this policy is issued in reliance upon the truth of such representations provided.

In the event that the **application** contains any misrepresentation or omission with respect to a specific **wrongful act** or the knowledge of any of the **insureds** of any matter which such **insured** has reason to believe may give rise to a future **claim** made with the intent to deceive or which materially affects the acceptability of the risk or hazard assumed by [CIC], then no coverage shall be afforded for any **claim** based upon, arising out of or in consequence of any such misrepresentation or omission. Such misrepresentation or omission shall not be imputed to any other **insureds** for purposes of determining the validity of this policy to such other **insureds** except:

1.  Any **insured person** who knew that the statement or representation was not true as of the inception date of coverage;

2.  The **organization** with respect to any **executiv**e who knew that the statement or representation was not true as of the inception date of coverage; and

3.  The **organization** if the signer of the **application** knew that the statement or representation was untrue.

(the "Warranty Exclusion"). (Ex. 3 at General Provisions § VIII.)

50.     "Application" is defined in the General Provisions as "[t]he Application Form for this policy;" "[a]ny materials submitted with the Application Form which shall be maintained on file with [CIC] and shall be deemed to be attached hereto as if physically attached;" and "[a]ny warranty or representation provided to [CIC] within the last three years in connection with any policy of which this policy is a renewal or replacement." (Ex. 3 at General Provisions § I(A).)

51.     Section X of the General Provisions states:

This insurance is primary except when all or any part of **loss** is also insured under any other valid and collectible prior or current policy. If any other insurance issued by another insurer (with the exception of insurance issued by us, any of our affiliated companies, or any of our predecessors or their affiliated companies) applies to any **claim**, then this insurance is excess over that other insurance, whether primary, excess, contingent or on any other basis, unless that other insurance was purchased specifically to apply excess over the limits provided in

this policy. Furthermore, with respect to any coverage that may be provided for any **claim** for actual or alleged **personal injury**, such **claims** shall be specifically excess of any similar coverage provided by the **organization's** General Liability Policy.

When this policy is excess:

**A.**     We will have no duty to defend any **claim** when any other insurer has that duty. If another insurer fails to defend and we incur costs as a result of such failure, we will be entitled to the **insureds'** rights against such other insurer; and

**B.**     We will pay only our share of the amount of the **loss**, if any, that exceeds the sum of:

1.     The total amount that all such other insurance would pay for the **loss** in the absence of this policy; and

2.     The total of all deductible and self-insured amounts under all such other insurance.

(the "Other Insurance Provision"). (Ex. 3 at General Provisions § X.)

52.     Section V of the General Provisions states, in relevant part:

As conditions precedent to coverage under this policy:

. . .

**B.**     The **insureds** shall provide us with all information, assistance and cooperation which we reasonably request and agree that in the event of a **claim** the **insureds** will do nothing which may prejudice our position or our potential or actual rights of recovery. The failure of any **insured person** to do so shall not impair the rights of any other **insured person** under this policy.

**C.**     The **insureds** shall not settle any **claim**, incur any **defense costs** or otherwise assume any obligation or admit any liability with respect to any **claim** without our prior written consent. We shall be entitled to full information and all particulars we may request in order to reach a decision as to such consent. We shall not be liable for any settlement, **defense costs**, assumed obligation or admission to which we have not consented.

(the "Cooperation Clause"). (Ex. 3 at General Provisions § V.)

14

**Pre-SDI Application Knowledge**

53.     Upon information and belief, the Book was published on or about January 21, 2020.

54.     Upon information and belief, in or around January 2020, SSSC and/or SDI formed the Collaborative Response Team ("CRT") to investigate and respond to allegations concerning Yogi Bhajan's alleged conduct.

55.     Upon information and belief, on or about February 18, 2020, the CRT publicly announced that it deemed the allegations concerning Yogi Bhajan to be "credible." The announcement was signed by five members of the CRT, including Gurujot Kaur Khalsa ("Gurujot"), SDI's Chief Executive Officer.

**The SDI Application**

56.     On or about February 19, 2020, Gurujot (the same individual who represented SDI on the CRT) completed a Pillar Policy Application for Nonprofit Organizations on behalf of SDI (the "SDI Application") and submitted it to CIC. A true and accurate copy of the SDI Application is attached hereto as "Exhibit 4."

57.     In the SDI Application, SDI was asked: "Regarding any coverage being requested, in the past 3 years, has the Applicant or any subsidiary . . . [b]een made aware of any fact, circumstance or situation which may result in a claim being filed against the Applicant for this insurance?" (the "SDI History Application Question"). SDI checked the box marked "no" in response to the SDI History Application Question. (Ex. 4 at History § 1(b).)

58.     In the SDI Application, SDI was asked: "Is any person proposed for this insurance cognizant of any act, error, or omission which he/she has reason to suppose might afford valid grounds for any future claim such as would fall within the scope of the proposed insurance?" (the "SDI Prior Knowledge Application Question" or, together with the SDI History Application

Question, the "SDI Application Questions"). SDI checked the box marked "no" in response to the SDI Prior Knowledge Application Question.

59.      The SDI Application states:

No fact, circumstance or situation indicating the probability of a claim or action against which indemnification would be afforded by the proposed insurance is now known by any person(s) or entity(ies) proposed for this insurance other than that which is disclosed in this application. It is agreed by all concerned that if there be knowledge of any such fact, circumstance, or situation, any claim subsequently emanating therefrom shall be excluded from coverage under the proposed insurance.

The undersigned authorized agent of the person(s) and entity(ies) proposed for this insurance for the purpose of this application represents that to the best of his knowledge the statements herein are true; and it is agreed that this application shall be the basis of the contract and be incorporated therein should the insurer evidence its acceptance of this application by issuance of a policy. This application will be attached to and will become part of such policy, if issued.

(Ex. 4 at Prior Knowledge/Representation Declarations.)

**Pre-SDI Policy Knowledge**

60.      Upon information and belief, on or about March 3, 2020, SSSC commissioned "An Olive Branch" to perform a third-party independent investigation into the allegations of sexual abuse against Yogi Bhajan.

**The SDI Policy**

61.      Based upon the representations and warranties contained in the SDI Application, CIC issued Pillar Policy No. EMN 057 09 06 to SDI (the "SDI Policy" or, together, with the SSSC Policy, the "CIC Policies") effective for the period from April 9, 2020 to March 8, 2023 (the "SDI Policy Period"). A true and correct copy of the SDI Policy is attached hereto as "Exhibit 5."

62.      Subject to the SDI Policy's terms, conditions, limitations, exclusions, and endorsements, the SDI Policy provides coverage under a D&O Coverage Part and an EPL

Coverage Part). (Ex. 5 at Declarations.)

63.    The "named insured" of the SDI Policy is listed in the Declarations as SDI. (Ex. 5 at Declarations.)

64.    The SDI Policy contains the same terms and conditions as those set forth in paragraphs 20 through 24 and 26 through 52 above contained in the SSSC Policy. (*See* Ex. 5.)

## Other Insurance Policies

65.    Upon information and belief, Fireman's Fund Insurance Companies ("FFIC") issued several portfolio policies containing commercial general liability ("CGL") coverage, among other coverages, to SSSC, SDI, and others effective for the period from approximately December 31, 1993 to January 1, 1999 (the "FFIC Policies").

66.    Upon information and belief, Transcontinental Insurance Company ("Transcontinental"), Continental Casualty Company ("CCC"), and/or Transportation Insurance Company ("TIC") issued several tailored commercial package policies containing CGL coverage, among other coverages, to SSSC effective for the period from approximately January 1, 2001 to January 1, 2004 (the "SSSC CNA Policies").

67.    Upon information and belief, TIC, American Casualty Co. of Reading, PA ("ACO"), and/or CCC issued several insurance policies containing property and liability coverage to SDI effective for the period from approximately April 10, 2014 to January 1, 2020 (the "SDI CNA Policies or, together with the SSSC CNA Policies, the "CNA Policies").

68.    Upon information and belief, United States Fire ("USF") issued a CGL policy to SSSC and others effective for the period from approximately August 24, 1981 to August 24, 1982, among other policies (the "USF Policies").

69.    Upon information and belief, The Travelers Indemnity Company of Connecticut f/k/a The Travelers Indemnity Company of Rhode Island and the Charter Oak Fire Insurance

Company issued several CGL policies to SSSC, SDI, and others for the period from approximately November 1, 1985 to November 1, 1990 (the "Travelers Policies" or, together with the FFIC Policies, the CNA Policies, and the USF Policies, the "Other Insurance Policies").

## The Satsunderta Lawsuit

70.    On or about August 7, 2020, Satsunderta Khalsa ("Satsunderta") filed a lawsuit against SDI, SSSC, Unto, SSSSD, and others, Case No. 20STCV29859, in the Superior Court of Los Angeles, California (the "Satsunderta Lawsuit").

71.    Upon information and belief, on or about August 10, 2020, An Olive Branch published a 76-page report that was published on the CRT's website, which indicated that SSSC was "embarking on a program of Compassionate Reconciliation based on the proven principles of Restorative Justice," over objections from CIC.

72.    On or about December 2, 2020, Satsunderta filed a First Amended Complaint in the Satsunderta Lawsuit (the "Satsunderta FAC"). A true and correct copy of the Satsunderta FAC is attached hereto as "Exhibit 6."

73.    In the Satsunderta Lawsuit, Satsunderta alleges that the defendants were operated as a cult to lure people in to take all of their assets and money, and to provide Yogi Bhajan access to girls and women that he could abuse verbally, emotionally, spiritually, and sexually. (Ex. 6 ¶ 16.)

74.    Satsunderta alleges in the Satsunderta FAC that Yogi Bhajan sexually, verbally, and physically abused her on multiple instances since the age of eight. (Ex. 6 ¶¶ 25-34.)

75.    In the Satsunderta Lawsuit, Satsunderta alleges that defendants knew or had reason to know that Yogi Bhajan had engaged in unlawful sexually-related conduct with minors in the past, but concealed and condoned it. (Ex. 6 ¶¶ 37-41.)

76.     The Satusunderta Lawsuit asserts the following causes of action against the defendants: (1) child sexual abuse/sexual battery; (2) intentional infliction of emotional distress; (3) negligence; (4) violations of Cal. Civil Code §§ 51.9 and 52; and (5) violations of Cal. Penal Code 11166. (Ex. 6 ¶¶ 43-96.) Satsunderta seeks to recover general and special damages (including future lost earnings), punitive damages, treble damages, and costs. (*Id.* at 21.)

77.     After the Satsunderta Lawsuit was tendered to CIC for coverage under the SSSC Policy, CIC agreed to defend SSSC in the Satsunderta Lawsuit subject to a full and complete reservation of its rights under the SSSC Policy and at law, including its right to recoup defense costs should it later be determined that there is no coverage for the Satsunderta Lawsuit under the SSSC Policy. CIC appointed counsel to defend SSSC in the Satsunderta Lawsuit pursuant to its right and duty to do so under the SSSC Policy and subject to its reservation of rights.

78.     During the course of the Satsunderta Lawsuit, SSSC issued a Statement of Acknowledgement of Harm that admitted liability in connection with the allegations in the Satsunderta Lawsuit, over objection from CIC set forth in writing on August 13, 2021.

79.     After the Satsunderta Lawsuit was tendered to CIC for coverage under the SDI Policy, CIC denied coverage to SDI for the Satsunderta Lawsuit based upon the SDI Policy's Warranty Exclusion and Prior Knowledge Exclusion.

## The Claimant Letters

80.     Between approximately July 2020 and December 2022, SSSC, SDI, and other entities and individuals affiliated with Yogi Bhajan received several letters from various attorneys representing approximately nineteen individuals (the "Letter Claimants") who assert that they suffered physical, mental, and/or sexual abuse at the hands of Yogi Bhajan, Yogi Bhajan entities, and/or individuals employed by Yogi Bhajan entities (the "Claimant Letters").

81.     None of the Letter Claimants alleged in the Claimant Letters that they were employed by SSSC or SDI.

82.     After the Claimant Letters were tendered to CIC for coverage under the CIC Policies, CIC denied coverage for the Claimant Letters because the D&O Assault Exclusion precludes coverage under the D&O Coverage Part, the EPL Assault Exclusion precludes coverage under the Third Party Liability Insuring Agreement of the EPL Coverage Part, and there is no coverage under the Employment Claim Insuring Agreement of the EPL Coverage Part because the Claimant Letters do not allege an "employment claim" as that term is defined in the CIC Policies.

**The IHRP Program**

83.     On or about December 13, 2022, SSSC, Unto, and SDI sent a letter to CIC in which they indicated that they had formed the "Independent Healing and Reparations Program" ("IHRP"), which was purportedly formed by SSCC, Unto, and SDI to provide a process for alleged victims of Yogi Bhajan to resolve their claims.

84.     SSSC, Unto, and SDI demanded that CIC indemnify them for any payments made to claimants who participated in the IHRP (the "IHRP Claimants").

85.     In response, CIC adopted and incorporated its prior coverage position with respect to the Claimant Letters as being equally applicable to claims submitted to the IHRP.

86.     Between approximately July 2023 and January 2024, SSSC and Unto provided CIC with over 440 "IHRP Claim Determination Letters" (the "IHRP Matters").

87.     On or about December 29, 2023, SSSC and Unto advised CIC that they had agreed to pay ███████ in connection with claims submitted under the IHRP.

88.     On or about February 20, 2024, CIC advised SSSC and Unto that there was no coverage for the IHRP Matters or any payments made in connection with the IHRP Matters

because the IHRP Matters are not a Claim as defined in the EPL Coverage Part of the CIC Policies, because the D&O Assault Exclusion precludes coverage under the D&O Coverage Part, because the EPL Assault Exclusion precludes coverage under the Third Party Liability Insuring Agreement of the EPL Coverage Part, and there is no coverage under the Employment Claim Insuring Agreement of the EPL Coverage Part because the IHRP Matters do not allege an "employment claim" as that term is defined in the CIC Policies.

89.     On or about May 1, 2024, counsel for SSSC, Unto, and SDI sent a letter to counsel for CIC providing notice of the claims of: (1) eight claimants represented by Justice Law Collaborative, LLC; (2) three claimants who declined the administrators' determinations in the IHRP; and (3) ten individuals who asked to participate in the IHRP after the registration deadline, and requesting CIC's participation in a mediation with the foregoing claimants and individuals.

90.     On or about May 9, 2024, counsel for CIC sent a letter to counsel for SSSC and Unto declining to participate in a mediation with the claimants and individuals identified in the May 1, 2024 letter because there is no coverage for those matters under the Policies for the reasons set forth in CIC's February 20, 2024 letter, among others. CIC also invited SSSC and Unto to participate in non-binding mediation to resolve any coverage disputes as to the IHRP Matters and other matters that have been submitted to CIC for coverage under the CIC Policies.

**The Hayes Lawsuit**

91.     On or about December 14, 2023, Kathleen Hayes, Sumpuran Khalsa, Mahan Kirn Khalsa, and others (collectively, the "Hayes Plaintiffs") filed a lawsuit against Unto, SSSC, SDI, SSSSD, and others, Case No. 23STCV30533, in the Superior Court for the County of Los Angeles, California (the "Hayes Lawsuit"). A copy of the complaint filed in the Hayes Lawsuit is attached hereto as "Exhibit 7."

92.     The Hayes Plaintiffs allege that, between approximately 1984 to 2004, they suffered exploitation and sexual abuse within Yogi Bhajan's network, which they refer to as "the 3HO community" and "Sikh Dharma community."

93.     The Hayes Lawsuit alleges that Yogi Bhajan maintained a group of women to be his close personal staff, including some who just turned 18, and that many of the women who worked on his staff were instructed to work at one or more of the entities, including several of the defendant entities, at Yogi Bhajan's direction.

94.     According to the Hayes Plaintiffs, Yogi Bhajan would select who worked for each entity and in which department within each entity.

95.     The Hayes Plaintiffs assert causes of action for: (1) negligence; (2) negligent hiring/retention/supervision; (3) sexual harassment; (4) intentional infliction of emotional distress; and (5) sexual battery. The Hayes Plaintiffs seek to recover compensatory and punitive damages, interest, fees and costs.

96.     After the Hayes Lawsuit was tendered to CIC for coverage under the CIC Policies, on or about May 9, 2024, CIC denied coverage for the Hayes Lawsuit because the D&O Assault Exclusion precludes coverage under the D&O Coverage Part, the EPL Assault Exclusion precludes coverage under the Third Party Liability Insuring Agreement of the EPL Coverage Part, and there is no coverage under the Employment Claim Insuring Agreement of the EPL Coverage Part because the Hayes Lawsuit does not allege an "employment claim" as that term is defined in the CIC Policies.

**The Tolling Agreement Matter**

97.     On or about June 27, 2023, an attorney informed SSSC that his client had been sexually abused by individuals under the control of Yogi Bhajan in or around 2001 and inquired whether SSSC would agree to enter into an agreement to toll his client's claims against SSSC

(the "Tolling Agreement Matter").

98.     After the Tolling Agreement Matter was tendered to CIC for coverage under the SSSC Policy, CIC denied coverage for the Tolling Agreement Matter because the D&O Assault Exclusion precludes coverage under the D&O Coverage Part, the EPL Assault Exclusion precludes coverage under the Third Party Liability Insuring Agreement of the EPL Coverage Part, and there is no coverage under the Employment Claim Insuring Agreement of the EPL Coverage Part because the Tolling Agreement Matter does not allege an "employment claim" as that term is defined in the SSSC Policy.

### COUNT ONE – DECLARATORY JUDGMENT AS TO SDI WARRANTY EXCLUSION

99.     CIC hereby adopts by reference the allegations contained in paragraph 1 through 99 of this Complaint as if fully set forth herein.

100.     An actual, present, and justiciable controversy exists concerning whether the Warranty Exclusion contained in the SDI Policy bars coverage for the Satsunderta Lawsuit, the Claimant Letters, the IHRP Matters, the Hayes Lawsuit, and/or the Tolling Agreement Matter (collectively, the "Matters") under the SDI Policy.

101.     CIC requests that the Court declare that the Warranty Exclusion contained in the SDI Policy bars coverage for the Matters and, as a result, CIC has no duty to defend and/or indemnify Defendants under the SDI Policy in connection with the Matters.

### COUNT TWO – DECLARATORY JUDGMENT AS TO SSSC WARRANTY EXCLUSION

102.     CIC hereby adopts by reference the allegations contained in paragraphs 1 through 101 of this Complaint as if fully set forth herein.

103.     An actual, present, and justiciable controversy exists concerning whether the Warranty Exclusion contained in the SSSC Policy bars coverage for the Matters under the SSSC

Policy.

104.     CIC requests that the Court declare that the Warranty Exclusion contained in the SSSC Policy bars coverage for the Matters and, as a result, CIC has no duty to defend and/or indemnify Defendants under the SSSC Policy in connection with the Matters, and is entitled to recoup from SSSC and Unto any and all amounts paid in defense of the Satsunderta Lawsuit on behalf of SSSC and Unto.

## COUNT THREE – DECLARATORY JUDGMENT AS TO SDI PRIOR KNOWLEDGE EXCLUSION

105.     CIC hereby adopts by reference the allegations contained in paragraphs 1 through 104 of this Complaint as if fully set forth herein.

106.     An actual, present, and justiciable controversy exists concerning whether the Prior Knowledge Exclusion contained in the SDI Policy bars coverage for the Matters under the SDI Policy.

107.     CIC requests that the Court declare that the Prior Knowledge Exclusion contained in the SDI Policy bars coverage for the Matters and, as a result, CIC has no duty to defend and/or indemnify Defendants under the SDI Policy in connection with the Matters.

## COUNT FOUR – DECLARATORY JUDGMENT AS TO SSSC PRIOR KNOWLEDGE EXCLUSION

108.     CIC hereby adopts by reference the allegations contained in paragraphs 1 through 107 of this Complaint as if fully set forth herein.

109.     An actual, present, and justiciable controversy exists concerning whether the Prior Knowledge Exclusion contained in the SSSC Policy bars coverage for the Matters under the SSSC Policy.

110.     CIC requests that the Court declare that the Prior Knowledge Exclusion contained in the SSSC Policy bars coverage for the Matters and, as a result, CIC has no duty to defend

and/or indemnify Defendants under the SSSC Policy in connection with the Matters, and is entitled to recoup from SSSC and Unto any and all amounts paid in defense of the Satsunderta Lawsuit on behalf of SSSC and Unto.

## COUNT FIVE – DECLARATORYJUDGMENT AS TO D&O ASSAULT EXCLUSION

111.    CIC hereby adopts by reference the allegations contained in paragraphs 1 through 110 of this Complaint as if fully set forth herein.

112.    An actual, present, and justiciable controversy exists concerning whether the D&O Assault Exclusion contained in the Policies bars coverage for all or portions of the Matters under the D&O Coverage Part of the CIC Policies.

113.    CIC requests that the Court declare that the D&O Assault Exclusion bars coverage for all or portions of the Matters and, as a result, CIC has no duty to defend and/or indemnify Defendants under the D&O Coverage Part of the CIC Policies in connection with the Matters.

## COUNT SIX – DECLARATORY JUDGMENT AS TO EPL ASSAULT EXCLUSION

114.    CIC hereby adopts by reference the allegations contained in paragraphs 1 through 113 of this Complaint as if fully set forth herein.

115.    An actual, present, and justiciable controversy exists concerning whether the EPL Assault Exclusion contained in the Policies bars coverage for all or portions of the Matters under the Third Party Liability Insuring Agreement of the EPL Coverage Part of the CIC Policies.

116.    CIC requests that the Court declare that the EPL Assault Exclusion bars coverage for all or portions of the Matters and, as a result, CIC has no duty to defend and/or indemnify Defendants under the Third Party Liability Insuring Agreement of the EPL Coverage Part of the CIC Policies in connection with the Matters.

## COUNT SEVEN – DECLARATORY JUDGMENT AS TO SDI EMPLOYMENT CLAIM INSURING AGREEMENT

117.     CIC hereby adopts by reference the allegations contained in paragraphs 1 through 116 of this Complaint as if fully set forth herein.

118.     An actual, present, and justiciable controversy exists concerning whether Satsunderta, the Letter Claimants, the IHRP Claimants, and/or the Hayes Plaintiffs (collectively, the "Underlying Claimants") are or were "employees" of SDI and, therefore, whether the Matters constitute an "employment claim" as that term is defined in the EPL Coverage Part of the SDI Policy.

119.     CIC requests that the Court declare that the Underlying Claimants are not and were not "employees" of SDI and, therefore, the Matters are not an "employment claim" as that term is defined in the EPL Coverage Part of the SDI Policy and, as a result, CIC has no duty to defend and/or indemnify Defendants under the Employment Claim Insuring Agreement of the EPL Coverage Part of the SDI Policy in connection with the Matters.

## COUNT EIGHT – DECLARATORY JUDGMENT AS TO SSSC EMPLOYMENT CLAIM INSURING AGREEMENT

120.     CIC hereby adopts by reference the allegations contained in paragraphs 1 through 119 of this Complaint as if fully set forth herein.

121.     An actual, present, and justiciable controversy exists concerning whether the Underlying Claimants are or were "employees" of SSSC and, therefore, whether the Matters constitute an "employment claim" as that term is defined in the EPL Coverage Part of the SSSC Policy.

122.     CIC requests that the Court declare that the Underlying Claimants are not and were not "employees" of SSSC and, therefore, the Matters are not an "employment claim" as that term is defined in the EPL Coverage Part of the SSSC Policy and, as a result, CIC has no

duty to defend and/or indemnify Defendants under the Employment Claim Insuring Agreement of the EPL Coverage Part of the SSSC Policy in connection with the Matters, and is entitled to recoup from SSSC and Unto any and all amounts paid in defense of the Satsunderta Lawsuit on behalf of SSSC and Unto.

## COUNT NINE – DECLARATORY JUDGMENT AS TO NO COVERAGE FOR SSSSD UNDER SSSC POLICY

123.    CIC hereby adopts by reference the allegations contained in paragraphs 1 through 122 of this Complaint as if fully set forth herein.

124.    An actual, present, and justiciable controversy exists concerning whether SSSSD is an "insured" under the SSSC Policy and, therefore, whether SSSSD is entitled to coverage under the SSSC Policy in connection with the Matters.

125.    CIC requests that the Court declare that SSSSD is not an "insured" under the SSSC Policy and, as a result, CIC has no duty to defend and/or indemnify SSSSD under the SSSC Policy in connection with the Matters.

## COUNT TEN – DECLARATORY JUDGMENT AS TO IHRP MATTERS NOT CONSTITUTING A CLAIM UNDER POLICIES

126.    CIC hereby adopts by reference the allegations contained in paragraphs 1 through 125 of this Complaint as if fully set forth herein.

127.    An actual, present, and justiciable controversy exists concerning whether the IHRP Matters constitute a Claim as that term is defined in the D&O Coverage Part and EPL Coverage Part of the CIC Policies.

128.    CIC requests that the Court declare that the IHRP Matters do not constitute a Claim as that term is defined in the D&O Coverage Part and EPL Coverage Part of the CIC Policies and, as a result, CIC has no duty to defend and/or indemnify Defendants under the CIC Policies in connection with the IHRP Matters.

**COUNT ELEVEN – DECLARATORY JUDGMENT AS TO OTHER INSURANCE PROVISION**

129.     CIC hereby adopts by reference the allegations contained in paragraphs 1 through 128 of this Complaint as if fully set forth herein.

130.     An actual, present, and justiciable controversy exists concerning whether the Other Insurance Provision bars and/or limits coverage for all or portions of the Matters under the CIC Policies.

131.     CIC requests that the Court declare that the CIC Policies are excess over the Other Insurance Policies by virtue of the operation of the Other Insurance Provision and, as a result, CIC has no duty to defend and/or indemnify Defendants under the CIC Policies in connection with the Matters until such time as the limits of liability of the Other Insurance Policies are exhausted.

**COUNT TWELVE – DECLARATORY  JUDGMENT AS TO COOPERATION CLAUSE**

132.     CIC hereby stops by reference the allegations contained in paragraphs 1 through 131 of this Complaint as if fully set forth herein.

133.     CIC has been substantially prejudiced as a result of Defendants' failure to cooperate with CIC in the defense of the Satsunderta Lawsuit.

134.     An actual, present, and justiciable controversy exists concerning whether the Cooperation Clause bars and/or limits coverage for the Satsunderta Lawsuit under the SSSC Policy.

135.     CIC requests that the Court declare that Defendants have breached the Cooperation Clause contained in the SSSC Policy, that CIC has been substantially prejudiced as a result of Defendants' failure to cooperate and, as a result, CIC has no duty to defend and/or indemnify Defendants under the SSSC Policy in connection with the Satsunderta Lawsuit and is

entitled to recoup from SSSC and Unto any and all amounts paid in defense of the Satsunderta Lawsuit on behalf of SSSC and Unto.

## PRAYER FOR RELIEF

**WHEREFORE,** CIC prays that this Court enter an Order:

1.      declaring that the Warranty Exclusion contained in the SDI Policy bars coverage for the Matters and, as a result, CIC has no duty to defend and/or indemnify Defendants under the SDI Policy in connection with the Matters;

2.      declaring that the Warranty Exclusion contained in the SSSC Policy bars coverage for the Matters and, as a result, CIC has no duty to defend and/or indemnify Defendants under the SSSC Policy in connection with the Matters, and is entitled to recoup from SSSC and Unto any and all amounts paid in defense of the Satsunderta Lawsuit on behalf of SSSC and Unto;

3.      declaring that the Prior Knowledge Exclusion contained in the SDI Policy bars coverage for the Matters and, as a result, CIC has no duty to defend and/or indemnify Defendants under the SDI Policy in connection with the Matters;

4.      declaring that the Prior Knowledge Exclusion contained in the SSSC Policy bars coverage for the Matters and, as a result, CIC has no duty to defend and/or indemnify Defendants under the SSSC Policy in connection with the Matters, and is entitled to recoup from SSSC and Unto any and all amounts paid in defense of the Satsunderta Lawsuit on behalf of SSSC and Unto;

5.      declaring that the D&O Assault Exclusion bars coverage for all or portions of the Matters and, as a result, CIC has no duty to defend and/or indemnify Defendants under the D&O Coverage Part of the Policies in connection with the Matters;

6.      declaring that the EPL Assault Exclusion bars coverage for all or portions of the Matters and, as a result, CIC has no duty to defend and/or indemnify Defendants under the Third Party Liability Insuring Agreement of the EPL Coverage Part of the Policies in connection with the Matters;

7.      declaring that the Underlying Claimants are not and were not "employees" of SDI and, therefore, the Matters are not an "employment claim" as that term is defined in the EPL Coverage Part of the SDI Policy and, as a result, CIC has no duty to defend and/or indemnify Defendants under the Employment Claim Insuring Agreement of the EPL Coverage Part of the SDI Policy in connection with the Matters;

8.      declaring that the Underlying Claimants are not and were not "employees" of SSSC and, therefore, the Matters are not an "employment claim" as that term is defined in the EPL Coverage Part of the SSSC Policy and, as a result, CIC has no duty to defend and/or indemnify Defendants under the Employment Claim Insuring Agreement of the EPL Coverage Part of the SSSC Policy in connection with the Matters, and is entitled to recoup from SSSC and Unto any and all amounts paid in defense of the Satsunderta Lawsuit on behalf of SSSC and Unto;

9.      declaring that SSSSD is not an "insured" under the SSSC Policy and, as a result, CIC has no duty to defend and/or indemnify SSSSD under the SSSC Policy in connection with the Matters;

10.     declaring that the IHRP Matters do not constitute a Claim as that term is defined in the D&O Coverage Part and EPL Coverage Part of the Policies and, as a result, CIC has no duty to defend and/or indemnify Defendants under the Policies in connection with the IHRP Matters;

11.     declaring that the CIC Policies are excess over the Other Insurance Policies by virtue of the operation of the Other Insurance Provision and, as a result, CIC has no duty to defend and/or indemnify Defendants under the CIC Policies in connection with the Matters until such time as the limits of liability of the Other Insurance Policies are exhausted;

12.     declaring that Defendants have breached the Cooperation Clause contained in the SSSC Policy, that CIC has been substantially prejudiced as a result of Defendants' failure to cooperate and, as a result, CIC has no duty to defend and/or indemnify Defendants under the SSSC Policy in connection with the Saundra Lawsuit and is entitled to recoup from SSSC and Unto any and all amounts paid in defense of the Satsunderta Lawsuit on behalf of SSSC and Unto.

13.     awarding CIC its costs, expenses, attorneys' fees together with pre- and post-judgment interest to the greatest extent allowed by law; and

14.     awarding CIC all other relief that the Court deems just and equitable.

DATED:  June 7, 2024                                    Respectfully submitted,

                                                        LEWIS BRISBOIS BISGAARD & SMITH LLP

                                                        */s/ Nicholas A. Govea*
                                                        Nicholas A. Govea
                                                        8801 Horizon Boulevard, NE, Suite 300
                                                        Albuquerque, New Mexico  87113
                                                        Telephone: (505) 828-3600
                                                        Facsimile:  (505) 828-3900
                                                        Nick.Govea@lewisbrisbois.com

                                                        *Counsel for Plaintiff*



# Not-For-Profit Select Insurance Policy Application

**THE LIABILITY COVERAGE PARTS, IF PURCHASED, ARE ON A CLAIMS MADE AND REPORTED BASIS AND COVER ONLY CLAIMS FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD OR THE EXTENDED REPORTING PERIOD OR RUN-OFF COVERAGE PERIOD, IF EXERCISED, AND REPORTED TO THE UNDERWRITER AS REQUIRED BY THE POLICY.  THE LIMITS OF LIABILITY AND ANY RETENTION SHALL BE REDUCED BY AMOUNTS INCURRED AS DEFENSE COSTS.  PLEASE READ CAREFULLY.**

**INSTRUCTIONS**

1. THIS APPLICATION ONLY APPLIES TO NOT-FOR-PROFIT ORGANIZATIONS.

2. THIS APPLICATION MUST BE COMPLETED IN FULL INCLUDING ALL REQUIRED ATTACHMENTS.

3. THIS APPLICATION AND ALL ATTACHMENTS SHALL BE DEEMED TO BE ATTACHED TO AND FORM A PART OF THE POLICY IF ISSUED.

4. THE TERMS **CLAIM, CLIENT, COMPUTER SYSTEMS, EMPLOYEES**, **EMPLOYEE BENEFIT PLAN, ENTITY, INSURED PERSON(S**), **INSUREDS, MANAGERS, MESSENGER, MONEY, OUTSIDE POSITION, PLAN, POLICYHOLDER, PROPERTY, SECURITIES, SUBSIDIARY**, AND UNDERWRITER HAVE THE SAME MEANING IN THIS APPLICATION AS IN THE POLICY.

5. IF THIS IS A RENEWAL FOR ANY COVERAGE PART, PLEASE DO NOT ANSWER QUESTION 7 FOR SUCH COVERAGE PART.

6. COVERAGE PARTS REQUESTED:

    ☒ Management and Entity Liability          ☒ Employment Practices and Third Party Discrimination Liability

    ☐ Fiduciary Liability                                  ☐ Crime

7. IF THE **POLICYHOLDER** AND ITS **SUBSIDIARIES** PROVIDE MEDICAL SERVICES, PLEASE COMPLETE THE APPROPRIATE SUPPLEMENT.

**If you want to learn more about the compensation Zurich pays agents and brokers visit:**
**http://www.zurichnaproducercompensation.com or call the following toll-free number:  (866) 903-1192.**

**This Notice is provided on behalf of Zurich American Insurance Company and its underwriting subsidiaries.**

1. **GENERAL INFORMATION**

| | | |
|---|---|---|
| a. | Name of **Policyholder:** | Siri Singh Sahib Corporation |
| b. | Address: | PO Box 1669 |
| | | Santa Cruz, NM 87567 |
| c. | State of Incorporation / Organization: | OR |
| d. | Date Established: | 9/29/1997 |
| e. | Website Address: | www.ssscorp.org |
| f. | Insurance Contact: | Satwant Singh Khalsa |
| | Title: | Executive Director |
| | Phone Number: | 703-481-4747 |
| | E-mail address: | satwant@ssscorp.org |

2. **OWNERSHIP AND OPERATIONAL INFORMATION**
(Please respond regardless of what Coverage Parts are requested)

| | | | |
|---|---|---|---|
| a. | Does another entity own or control the **Policyholder**? (if "Yes", attach details) | ☐ Yes | ☒ No |
| b. | Does the **Policyholder** now have tax-exempt status under the U.S. Internal Revenue Code? | ☒ Yes | ☐ No |
| | If yes, has there been or is there now pending any dispute as to the tax-exempt status of any such **Entity**? (if "Yes", attach details) | ☐ Yes | ☒ No |
| c. | Does the **Policyholder** have any **Subsidiaries** or control or sponsor, directly or indirectly through one or more **Subsidiaries**, any other organization? (if "Yes", attach details including not-for-profit tax status of each entity). **See Exhibit 1** | ☒ Yes | ☐ No |
| d. | Is any such entity a for profit organization, joint venture or partnership? (if "Yes", attach details) **See Exhibit 1** | ☒ Yes | ☐ No |
| e. | Does the **Policyholder** or any **Subsidiary** lobby or sponsor a political action committee? (if "Yes", attach details) | ☐ Yes | ☒ No |
| f. | Nature of operations of **Policyholder** and **Subsidiaries**: Policyholder and subs are religious or non-profit corporations dedicated to spreading the teachings of the Sikh Religion | SIC Code: 8661 | |
| g. | Indicate if the **Policyholder** or any **Subsidiary** provides professional services to others, including but not limited to any of the following: (if "Yes", attach details) | ☐ Yes | ☒ No |
| | i.  medical services (if "Yes", please complete Healthcare Supplement) | ☐ Yes | ☒ No |
| | ii.  childcare services | ☐ Yes | ☒ No |
| | iii.  standard setting, accrediting, credentialing or licensing? | ☐ Yes | ☒ No |

Exhibit 1

h. Does the **Policyholder** or any **Subsidiary** publish any print or electronic media, including books, magazines, periodicals, blogs or newsletters?
(if "Yes", attach details) **See Exhibit 1**
☒ Yes  ☐ No

i. Does the **Policyholder** or any **Subsidiary** promote, administer or sponsor any insurance programs for its members?
(if "Yes", attach details)
☐ Yes  ☒ No

j. Please provide the following financial information (only answer if an audited financial statement does not exist):

| | |
|---|---|
| Total assets: | $18,859,261 |
| Current assets: | $17,736,475 |
| Total liabilities: | $91,531 |
| Current liabilities: | $91,531 |
| Fund balance: | $18,767,731 |
| Total Revenues/Contributions: | $524,233 |
| Net Income or Net Loss: | $(495,243) |
| Cashflow from operations: | $N/A |

k. What percentage of revenue does the **Policyholder** or any **Subsidiary** receive from government sources:
0%

l. In the next 12 months is the **Policyholder** or any **Subsidiary** contemplating, or in the past 24 months has any such **Entity** completed, any merger, acquisition or consolidation?
(if "Yes", attach details)
☒ Yes  ☐ No

m. Is any **Insured Person** indebted to the **Entity**?
(if "Yes", attach details)
☐ Yes  ☒ No

n. Is any **Insured Person** serving in an **Outside Position**?
(if "Yes", attach details) **See Exhibit 1**
☒ Yes  ☐ No

o. Total Number of independent directors who left the board of the **Policyholder** in the past five (5) years:
8

p. Is the **Policyholder** or any **Subsidiary** incorporated under the laws of a jurisdiction outside the United States or does the **Policyholder** or any **Subsidiary** have assets in or obtain revenues from such a jurisdiction?
(if "yes", please complete Multi-National Insurance Proposition Questionnaire for the relevant Coverage Part(s))
☐ Yes  ☒ No

q. Has the **Policyholder** or any **Subsidiary** been the subject of any bankruptcy proceeding or legal or financial reorganization in the past two (2) years?
(if "Yes", attach details)
☐ Yes  ☒ No

r. Does the **Policyholder** or any **Subsidiary** make any representations to consumers, customers or investors regarding any such **Entity** or its products "green" status, the management of its carbon footprint or that it otherwise runs its operations in an environmentally conscious manner?
(if "Yes", attach details)
☐ Yes  ☒ No

s. Has the **Policyholder** or any **Subsidiary** filed within the last 12 months, or are any of them in the process of filing, any corporate climate change related or environmental disclosures (other than in connection with the Securities and Exchange Commission), including, but not limited to, submissions made to the Carbon Disclosure Project (CDP),
☐ Yes  ☒ No

Exhibit 1

FTSE 4 Good, CERES or ABI Climate Wise?

(if "Yes", attach details, including the entities or programs to whom submissions were provided)

**3. EMPLOYMENT INFORMATION**

(Please complete only if the Employment Practices and Third-Party Discrimination Liability Coverage Part is requested)

a.  **Employee** Count (include leased, seasonal, volunteers and independent contractors):

|  | Full Time | Part Time | Union | Volunteer |
|---|---|---|---|---|
| Total U.S.: | 3 | 6 |  | 14 (all Board Members) |
| California: |  |  |  |  |
| Total for Florida, Texas, Michigan: |  |  |  |  |
| Total Non-U.S.: | 1 |  |  | 3 (Board Members) |

b.  Total number of terminations (not including lay-offs, reductions-in-force or downsizings) within last 3 years: 0

c.  Turnover rate (separations/average # of employees) within last 3 years:

| Prior Year | Prior Year – 1 | Prior Year - 2 |
|---|---|---|
| 0 | 0 | 0 |

d.  Percentage of employees with compensation:

| | |
|---|---|
| Less than $50,000/year: | 50% |
| Between $50,000 and $100,000/year: | 30% |
| Between $100,000 and $250,000/year: | 20% |
| Greater than $250,000/year: | 0% |

e.  Has the **Policyholder** had within the last 3 years or anticipate in the next 2 years any facility closings, consolidations, layoffs or staff reductions which will result in the termination of more than 5% of the workforce at any one business location?　☐ Yes　☒ No
   If yes, how many employees will be (were) affected?

f.  When an employee is discharged, is officer approval required and are human resource personnel directly involved?　☒ Yes　☐ No

g.  Is outside counsel consulted for all terminations prior to their occurrence?　☒ Yes　☐ No
   (if "No", attach details)

h.  Does the **Policyholder** have a human resources or personnel department?　☐ Yes　☒ No
   If no, who performs such functions? *We have utilized an HR consultant in the past along with inside and outside counsel to advise us*

i.  Does the **Policyholder** use an employment application for all applicants for employment?　☐ Yes　☒ No

j.  Does the **Policyholder** use any tests to screen applicants for employment or existing employees for continued employment or promotion?　☐ Yes　☒ No

k.  What percentage of employees have direct contact with the general public?　0%

l.  Does the **Policyholder** have an employee handbook? (If no, skip to next question.)　☐ Yes　☒ No

Exhibit 1

| | | |
|---|---|---|
| If yes, is it distributed to all employees? | ☐ Yes | ☐ No |
| If yes, do employees certify in writing that they have reviewed the handbook and agree to comply with the policies and procedures set forth therein? | ☐ Yes | ☐ No |

***NOTE: We have been a very small organization from an employee perspective and did not have a formal HR department. We are currently working on an employee***

***handbook and formal policies as we have started to add headcount.  We expect to finalize those in 2020.***

| | | | |
|---|---|---|---|
| m. | Does the **Policyholder** have a human resources manual or equivalent written management guidelines? | ☐ Yes | ☒ No |
| n. | Did outside legal counsel review these policies prior to implementation? | ☐ Yes | ☒ No |
| o. | Does the **Policyholder** provide formal training in these policies for its supervisors? | ☐ Yes | ☒ No |

4. **PLAN INFORMATION**

   (Please complete only if the Fiduciary Liability Coverage Part is requested)

   a.  For the three largest **Plans** (by asset size), please provide the following information (only answer if an audited financial statement does not exist and attach a separate sheet if there are more than two **Plans** sponsored by the **Policyholder** and its **Subsidiaries**):

   | | **Plan 1** | **Plan 2** |
   |---|---|---|
   | Name: | | |
   | Type: | | |
   | Year of financial information supplied below: | | |
   | Total Assets: | | |
   | Total Liabilities: | | |
   | Number of Participants: | | |
   | Investment Manager: | | |
   | Plan Administrator: | | |

   b.  If there is no independent investment manager, who is responsible for making investment decisions?

   c.  How are health and welfare plan benefits provided?     ☐ Self Funded     ☐ Insurance     ☐ Mini Med

       If insured, please identify the insurer(s):

   | | | | |
   |---|---|---|---|
   | d. | Have there been any **Plan** mergers within the last 24 months?<br>(if "Yes", attach details) | ☐ Yes | ☐ No |
   | e. | Has any **Plan** been terminated  or frozen within the last 24 months?<br>(if "Yes", attach details) | ☐ Yes | ☐ No |
   | f. | Have the **Plans** been reviewed to assure that there are no violations of prohibited transactions and party-in-interest rules?<br>(if "Yes", attach details) | ☐ Yes | ☐ No |

Exhibit 1

g. In the opinion of the **Plans'** actuary, are all **Plans** adequately funded in accordance with ERISA?

(if "No", attach details)

☐ Yes
☐ No
☐ No funded **Plans**

h. Does each **Plan** conform to the standards of eligibility, participation, vesting, funding and other provisions of ERISA?

(if "No", attach details)

☐ Yes
☐ No
☐ No funded **Plans**

i. Are there any outstanding delinquent contributions?

(if "Yes", attach details)

☐ Yes   ☐ No

j. Has any **Plan** experienced any event reportable to the U.S. Pension Benefit Guaranty Corporation?

(if "Yes", attach details)

☐ Yes   ☐ No

k. Does any **Plan** hold or invest in any securities of **Policyholder** or any **Subsidiary**?

(if "Yes", attach details)

☐ Yes   ☐ No

**5. CRIME INFORMATION**

(Please complete only if a quote for Crime Coverage Part is requested)

a.

| Coverage(s) Requested: | Limit | Deductible |
|---|---|---|
| Employee Theft | | |
| Clients' Property | | |
| Forgery or Alteration: Checks Forgery | | |
| Forgery or Alteration: Credit, Debit or Charge Card Forgery | | |
| On Premises | | |
| In Transit | | |
| Computer Fraud | | |
| Funds Transfer Fraud | | |
| Money Orders and Counterfeit Money | | |
| Electronic Data or Computer Programs Restoration Costs | | |
| Investigation Expenses | | |

b.

| Countries of operations | Type of Operations | Locations | Employees | Revenues |
|---|---|---|---|---|
| | | | | $ |
| | | | | $ |
| | | | | $ |

c. Of the total **Employees** listed above:

i. Please list the total number of Officers and Management Positions:
   Officers   and   Management   Positions   include   directors,   trustees,   president,

administrators and **Managers** who handle funds or other property of **Employee Benefit Plans** subject to ERISA.

  ii. Please list the total number of all Other Class 1 **Employees:**

    Other Class 1 **Employees** include **Employees** who handle, have custody or maintain records of **Money, Securities** or **Property,** i.e. cashiers, bookkeepers, collectors, janitors, **Messengers,** receiving & shipping clerks, truck drivers, salespeople etc.

c.  Are the **Policyholder** and its **Subsidiaries'** books/financial statements audited by an independent C.P.A.?   ☐ Yes  ☐ No
(if "Yes", attach details)

d.  Did the CPA firm or internal audit staff identify any material weaknesses or significant deficiencies in internal controls during the current or prior year?   ☐ Yes  ☐ No
(if "Yes", attach details)

e.  How often does the internal audit department audit locations:

f.  Has the auditing firm made any recommendations that have not been adopted?   ☐ Yes  ☐ No
(if "Yes", attach a description and corrective measures and implementation timeframe)

g.  Are background checks performed on all new hires?   ☐ Yes  ☐ No

  i.  employment background   ☐ Yes  ☐ No

  ii.  credit checks   ☐ Yes  ☐ No

  iii.  arrests/convictions for any felony or misdemeanor offenses   ☐ Yes  ☐ No

  iv.  drug testing   ☐ Yes  ☐ No

h.  Do the **Policyholder** and its **Subsidiaries** maintain a written anti-fraud policy that is distributed to all **Employees**?   ☐ Yes  ☐ No

i.  Are **Employees'** building access cards denied immediately upon termination and are all procurement, credit cards, etc. cancelled?   ☐ Yes  ☐ No
(if "No", attach details)

j.  Are bank accounts reconciled on a monthly basis?   ☐ Yes  ☐ No
If "No," how often:

k.  Do **Employees** who reconcile the monthly bank statements also perform the following:   ☐ Yes  ☐ No

  i.  approve or disburse payments   ☐ Yes  ☐ No

  ii.  receive checks or handle deposits   ☐ Yes  ☐ No

  iii.  have access to electronic or mechanical signatures   ☐ Yes  ☐ No

l.  Is countersignature of checks required?   ☐ Yes  ☐ No
If "Yes," over what amount:  $

m.  Is the responsibility for authorizing vendors, approving invoices and processing payments assigned to different individuals?   ☐ Yes  ☐ No

n.  Are background checks performed on vendors in order to determine ownership and financial capability prior to doing business with them?   ☐ Yes  ☐ No

o.  Is an approved vendor list utilized and updated as needed?   ☐ Yes  ☐ No

p.  What is the maximum amount of cash, checks and negotiable securities at any one location: $

q.  Are preauthorization controls maintained for all programmers and operators?   ☐ Yes  ☐ No

r.  Is there a formal written policy regarding procedures for funds transfers?   ☐ Yes  ☐ No

s.  Is approval by more than one person required to initiate a funds transfer?   ☐ Yes  ☐ No

Exhibit 1

| | | |
|---|---|---|
| t. Are funds transfer instructions subject to a verification and authentication process? | ☐ Yes | ☐ No |
| u. Is there an exposure of precious metals or stones (such as gold, silver, copper, platinum, industrial diamonds or similar high-value materials)? | ☐ Yes | ☐ No |

i.  if Yes, what is the average value:                                          $

ii. if Yes, what is the maximum value at each location:                          $

Please attach a separate sheet explaining internal physical controls and security procedures.

| | |
|---|---|
| v. Attach a separate sheet listing the Employee Benefit Plans required to be bonded and subject to the Employee Retirement Income Security Act of 1974, the Pension Protection Act of 2006 and any amendments thereto. | ☐ No such plans to be covered |

w. Complete these questions only if applying for Electronic Data or Computer Programs Restoration Costs.

| | | |
|---|---|---|
| i. Is firewall technology used at all internet points of presence and do formal firewall configuration standards exist? | ☐ Yes | ☐ No |
| ii. Do the **Policyholder** and **Subsidiaries** utilize anti-virus software on all systems commonly affected by viruses, particularly personal computers and servers? | ☐ Yes | ☐ No |
| iii. Does a business continuity and disaster recovery plan exist? | ☐ Yes | ☐ No |
| iv. Are system backup and recovery procedures documented and tested for all mission critical systems? | ☐ Yes | ☐ No |

x. Complete these questions only if applying for Clients' Property Coverage.

| | | |
|---|---|---|
| i. Do any Clients require the Entity to be bonded or carry crime insurance? If "Yes," attach details regarding type of services/work that will be performed for **Clients**? | ☐ Yes | ☐ No |
| ii. Do the **Policyholder** and **Subsidiaries** have custody or control over its Clients' funds, accounts or Property (including **Money, Securities,** inventory, high value **Property**)? (if "Yes", attach details) | ☐ Yes | ☐ No |
| iii. Do the **Policyholder** and **Subsidiaries** have access to any of its **Clients'** accounting, payroll or purchasing systems (including banking systems, funds transfer systems, **Computer Systems,** sensitive computer data, etc.)? (if "Yes", attach details) | ☐ Yes | ☐ No |

## 6.  LOSS HISTORY

a. For each Coverage Part under which coverage is requested, has the **Policyholder**, any **Subsidiary** or any of their **Insured Persons** (in any capacity) ever been involved in the following?  If "Yes" please attach details.

| | | |
|---|---|---|
| i. Any proceeding alleging infringement of patents, copyrights, trademarks or other forms of intellectual property: | ☐ Yes | ☒ No |
| ii. Any proceeding alleging violation of any, antitrust, unfair business practice, consumer protection or employment practices law (whether statutory or common): | ☐ Yes | ☒ No |
| iii. Any civil, criminal, administrative or regulatory proceeding or investigation relating to any environmental law, including any such proceeding or investigation related to any emission or release which allegedly contributed to global warming or climate changes and any retaliation against any employee related thereto: | ☐ Yes | ☒ No |
| iv. Any other civil, criminal, administrative or regulatory proceeding or investigation: | ☒ Yes | ☐ No |

**See Exhibit 2 – Background Info**

b.  If the Employment Practices and Third Party Discrimination Liability Coverage Part is requested, if the **Policyholder** or any **Subsidiary** is a federal contractor, has any such **Entity** been the subject of an audit conducted by the Office of Federal Contract Compliance Program?    ☐ Yes   ☒ No

(if "Yes", attach details) ***NOTE: One of our for-profit subsidiaries is a Federal Contractor but we are only seeking Employment Practices coverage for the Siri Singh Sahib Corporation.***

c.  If the Employment Practices and Third Party Discrimination Liability Coverage Part is requested, are any proposed **Insureds** currently required to comply with any judicial or administrative agreement, order, decrees or judgment relating to employment?    ☐ Yes   ☒ No

(if "Yes", attach details)

d.  If the Fiduciary Liability Coverage Part is requested, has there been any assessment of fees, fines or penalties against any **Insured** under any voluntary compliance resolution program or similar voluntary settlement program?    ☐ Yes   ☐ No

(if "Yes", attach details)

e.  If the Crime Coverage Part is requested, has there been any employee theft, burglary, robbery and forgery, computer theft or other crime losses discovered by the **Policyholder** and its **Subsidiaries** in the last six years?    ☐ Yes   ☐ No

(if "Yes", attach details and any corrective measures taken to mitigate future losses of this type)

f.  Has any notice of claim or potential claim been made or reported under the provisions of any prior Directors and Officers Liability, Employment Practices Liability, Fiduciary Liability or Crime insurance policy or coverage part?    (if "Yes", attach details) **See Exhibit 1**    ☒ Yes   ☐ No

g.  Have any loss payments been made in connection with any such notice?    ☐ Yes   ☒ No

(if "Yes", attach details)

7.  (IF THIS IS A RENEWAL FOR ANY COVERAGE PART, PLEASE SKIP THIS QUESTION.)

Does any **Insured Person** know of any act, error, omission, or other circumstance which could reasonably give rise to a claim being made against any **Insured** under the proposed insurance?    ☐ Yes   ☒ No

(if "Yes", attach details)

Without prejudice to any of the Underwriter's rights or remedies, it is understood and agreed that if such act, error, omission or circumstance exists, whether or not disclosed, any **Claim** arising therefrom or related thereto shall be excluded from coverage under the proposed insurance.

Coverage Part(s) for which response is provided:

☐ Management and Entity Liability    ☒ Employment Practices and Third Party Discrimination Liability
☐ Fiduciary Liability

8.  a.  Identify the expiring primary insurance carried by the **Policyholder**:

| Insurance Carrier | Policy Limits | Retention | Premium (Optional) |
|---|---|---|---|
| D&O:Zurich | $3,000,000 | $50,000 | |
| Employment: | | | |
| Fiduciary: | | | |
| Crime: | | | |

b.  Identify the total Limits of Liability available under the expiring Directors and Officers Liability insurance program (include any Side A only and any Independent Director policies):    $3,000,000

c.   Total Directors and Officers Liability Insurance limits anticipated for this policy period (including Side A only and Independent Director policies):     $3,000,000

d.   Has any Directors and Officers Liability, Employment Practices Liability, Fiduciary Liability or Crime insurance policy or Coverage Part or similar policy been declined, non-renewed or canceled during the past three years?   ☐ Yes   ☒ No
(if "Yes", attach details)

## 9.   ATTACHMENTS

The following information must be attached to this application if it exists:

- **Policyholder's** most recent audited financial statement **– We do not have audited financials**
- The names and occupations of the **Policyholder's** board of directors and trustees **See Exhibit 3 – SSSC Directors**
- For the three largest **Plans**, including, but not limited to any funded **Plans**, most recent Form 5500 and audited financial statement

Exhibit 1

**NOTICES**

The **Entity** and the **Insured Persons** declare, to the best of their knowledge and belief, that the statements set forth herein are true. The signing of this application does not bind the Underwriter, the **Policyholder** or its **Insured Persons** to effect insurance. The undersigned agrees that this application, its attachments and any materials submitted therewith are true, complete and accurate as of the date thereof and that no material or relevant facts have been suppressed or misstated. These representations shall be the basis of the contract should a policy be issued and shall be deemed attached to and shall form part of the policy. The application, its attachments and any materials submitted therewith are considered physically attached to the policy and will be deemed incorporated therein. The Underwriter is hereby authorized to make any investigation and inquiry in connection with this application that it deems necessary. The discovery of any fraud, intentional concealment, or misrepresentation of any material fact will render this policy, if issued, void at inception.

The undersigned, on behalf of the **Entity** and all **Insured Persons**, agrees that if the information in the Declarations and representations contained in this application and its attachments materially changes between the date of this application and the inception of the proposed coverage, the undersigned will immediately report in writing to the Underwriter such change, and the Underwriter may withdraw or modify any outstanding quotations or agreements to bind coverage. The undersigned acknowledges and agrees that the Underwriter's receipt of such written report, prior to inception of the proposed coverage, is a condition precedent to coverage.

**FRAUD WARNINGS**

Any person who knowingly and with intent to defraud any insurance company or another person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime and subjects the person to criminal and civil penalties. (Not applicable in AL, AR, CO, DC, FL, KS, KY, LA, MD, ME, NJ, NM, NY, OH, OK, PA, PR, RI, TN, TX, VA, WA, and WV.)

In **Arkansas, Louisiana, Rhode Island, or West Virginia**: Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

In **Alabama**: Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or who knowingly presents false information in an application for insurance is guilty of a crime and may be subject to restitution fines or confinement in prison, or any combination thereof.

In **Colorado**: It is unlawful to knowingly provide false, incomplete, or misleading facts or information to an insurance company for the purpose of defrauding or attempting to defraud the company. Penalties may include imprisonment, fines, denial of insurance and civil damages. Any insurance company or agent of an insurance company who knowingly provides false, incomplete, or misleading facts or information to a policyholder or claimant for the purpose of defrauding or attempting to defraud the policyholder or claimant with regard to a settlement or award payable from insurance proceeds shall be reported to the Colorado division of insurance within the department of regulatory agencies.

In **District of Columbia**: Warning: It is a crime to provide false or misleading information to an insurer for the purpose of defrauding the insurer or any other person. Penalties include imprisonment and/or fines. In addition, an insurer may deny insurance benefits if false information materially related to a claim was provided by the applicant.

In **Florida**: Any person who knowingly and with intent to injure, defraud, or deceive any insurer files a statement of claim or an application containing any false, incomplete, or misleading information is guilty of a felony of the third degree.

In **Kansas**: Any person who knowingly and with intent to defraud any insurance company or another person presents, causes to be presented, or prepares with knowledge or belief that it will be presented any written statement as part of, or in support of, an application for the issuance of or the rating of an insurance policy or a claim for payment or other benefit containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime and subjects the person to criminal and civil penalties.

In **Kentucky**: Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime.

Exhibit 1

In **Maine, Tennessee, Virginia, or Washington**: It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties may include imprisonment, fines or a denial of insurance benefits.

In **Maryland**: Any person who knowingly or willfully presents a false or fraudulent claim for payment of a loss or benefit or who knowingly or willfully presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

In **New Jersey**: Any person who includes any false or misleading information on an application for an insurance policy is subject to criminal and civil penalties.

In **New Mexico**: ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR KNOWINGLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO CIVIL FINES AND CRIMINAL PENALTIES.

In **New York**: Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime and shall also be subject to a civil penalty not to exceed five thousand dollars and the stated value of the claim for each such violation.

In **Ohio**: Any person who, with intent to defraud or knowing that he is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deceptive statement is guilty of insurance fraud.

In **Oklahoma**: WARNING: Any person who knowingly, and with intent to injure, defraud or deceive any insurer, makes any claim for the proceeds of an insurance policy containing any false, incomplete or misleading information is guilty of a felony.

In **Pennsylvania**: Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties.

In **Puerto Rico**: Any person who has committed fraud, as defined in the law, shall incur a felony, and if convicted, shall be sanctioned for each violation by a penalty of a fine of not less than five thousand dollars ($5,000), nor more than ten thousand dollars ($10,000), or a penalty of imprisonment for a fixed term of three (3) years, or both penalties. If there were aggravating circumstances, the fixed penalty thus established may be increased up to a maximum of five (5) years; if extenuating circumstances are present, it may be reduced to a minimum of two (2) years. In addition to the penalties provided in this chapter, any person who, as a result of the fraud thus committed is benefited in any way to obtain insurance, or in the payment of a loss pursuant to an insurance contract, shall be imposed the payment of restitution of the amount of money resulting from the fraud. Every violation shall have a prescription term of (5) five years.

In **Texas**: Any person who knowingly presents a false or fraudulent claim for the payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison.

In **Vermont**: Any person who knowingly presents a false statement in an application for insurance may be guilty of a criminal offense and subject to penalties under state law.

MUST BE SIGNED BY THE PRESIDENT, CHIEF EXECUTIVE OFFICER, CHIEF FINANCIAL OFFICER OR IN-HOUSE GENERAL COUNSEL OF THE **POLICYHOLDER** ON BEHALF OF ALL **INSUREDS**.

SIGNATURE _____     TITLE   **Executive Director** _____

DATE      **12/8/19** _____

AGENT'S NAME                      _____
AGENT'S SIGNATURE
Required in Florida and New Hampshire     _____

Exhibit 1

AGENT'S LICENSE NO.

AGENT'S COMPANY

Exhibit 1

Exhibit 1 - Additional Information - Siri Singh Sahib Corporation – December 9, 2019

The Siri Singh Sahib Corporation is the parent of a number of non-profit and for-profit companies.  However, it is only seeking management liability coverage (D&O) for itself, and its disregarded subsidiary, Unto Infinity. This is because the operational subsidiaries are diverse in nature and arrange their own insurance.

**Answers to Questions from Policy Application**

**2c & d. The SSSC, directly or indirectly, controls or sponsors the non-profit and for-profit entities and organizations shown on the attached organizational chart.**

Non-profit entities are shown in blue or gray

For-profit entities are shown in green or peach (yellow entities are all for- profit entities soon to be dissolved)

All for-profit joint ventures /partial ownership are shown in orange

See the Key on the bottom of the chart for reference

See Exhibit 1-A Siri Singh Sahib Corporation Global Organization Chart 2019

**2h.**  The SSSC publishes a newsletter a few times per year, which is sent to a global email list of approximately 9000.

**2l.** We are in the process of dissolving one non-profit entity, namely Sikh Dharma Stewardship (SDS).  We do not consider this to be a merger, acquisition, or consolidation but rather an internal transfer of assets. SDS will be dissolved and its membership interest will be passed to the constituent corporation, Sikh Dharma International.

We have recently completed the dissolution of the Siri Singh Sahib of Sikh Dharma. We have placed the real property formerly owned directly by SSS of SD and LYB Foundation into separate real property LLC's for liability purposes.  LYB Foundation is now serving as the member of these LLC's while the SSSC remains the member of the LYB Foundation.

**2n.**  The board members of the LYB Foundation are 100% identical to the SSSC board members. Some of the  SSSC Trustees serve as Directors and/or Officers on some of our non-profit and for-profit subsidiary entities as follows:

One SSSC board member is a director of KIT Holding, BV.

The SSSC has appointed three of its board members to the KIIT Company, Inc. Board.

1

Exhibit 1

Exhibit 1 - Additional Information - Siri Singh Sahib Corporation – December 9, 2019

> At SSSC's recommendation, KIIT has appointed one of SSSC's board members to the EWTC, LLC board and one of SSSC's board members to the Akal Security, Inc. board.

> The SSSC has appointed two of its board members to the board of LYF Management, LLC and two different SSSC board members sit on the board of Sikhnet, Inc.

> The SSSC has appointed three different board members to serve as a member of each of the following boards: Kundalini Research Institute, 3HO Foundation International, and Sikh Dharma Education International.

> SSSC's two ex-officio board members are on the Sikh Dharma International board of directors and one elected SSSC board member is the CEO of Sikh Dharma International.

*2o.* Approximately, one-half of the 15 elected members of the SSSC board of trustees stands for election every two and one-half years.

*6f.* One of our subsidiaries, 3HO Foundation International, received a letter from someone alleging discrimination.  Although, the SSSC was not named in the letter as a cause of the discrimination, it was copied on the letter. The SSSC, therefore, exercising an abundance of caution, notified its previous insurer, Ironshore, on November 26, 2013, the last day the policy was in force of the potential exposure. There was no follow-up on that claim but we did receive one other letter, this time addressed to the SSSC referencing that previous incident, in May 2015, which we have passed on to Ironshore.  We have heard nothing since.



Siri Singh Sahib Corporation (OR)
Unto Infinity LLC (OR)
LYB Foundation (OR)
KIT Holding BV (Netherlands)
Sikhnet, Inc. (NM)
Sikh Dharma International (CA)
LYF Sacred Collection, LLC (DE)
Legacy of Yogiji Support Foundation (Netherlands)
KIIT Company, Inc. (NV)
Yogi Tea GmbH (Germany)
Yogi Tea Foundation (Germany)
Sikh Dharma of Altamonte Spring, FL
LYF Guru Ram Das Ashram LA, LLC (DE)
LYF Secretariat LA, LLC (DE)
Raj Yog Takht, Inc.. dba Yoga West (CA)
European 3HO Foundation Stichting (Netherlands)
Sikh Dharma Brotherhood of the Bay Area
LYF Guru Arjan Dev Ashram LA, LLC (DE)
Teapak Srl (Italy)
Sikh Dharma of Colorado
LYF Siri Gurbani Sadan LA, LLC (DE)
Kundalini Research Institute (CA)
Sikh Dharma of Georgia
LYF Saturn Street LA, LLC (DE)
Sikh Dharma Stewardship, LLC (OR)
KIIT Renewable Energy, LLC (NV)
Solar Assets, LLC (DE)(50% owner)
YB Teachings, LLC (NM) (75% owner)
Sikh Dharma of Houston, Texas
LYF Guru Ram Das Puri, LLC (DE)
Sustainable Products, LLC (NV)(55% owner)
Sikh Dharma of Kansas City, MO
LYF HGRD Complex, LLC (DE)
Sikh Dharma of Phoenix
East West Tea Company, LLC (OR)
Doh Cup Chai, LLC (OR)(Choice Tea)
Sikh Dharma Education International (NM)
Sikh Dharma of Massachusetts
LYF Ranch and Estates, LLC (DE)
Sikh Dharma of New Mexico
KIT Natural Products & Services PVT LTD (India)
GTO Properties, LLC (OR)(Oregon Building)
3HO Foundation International (CA)
Sikh Dharma of Oregon
LYF Nanak Nivas, LLC (DE)
Sikh Dharma of San Diego
LYF Ram Das Nivas, LLC (DE)
Akal Security, Inc. (NM)
KYEF 3HO (India) (MPA & Das Mesh Sadan)
Sikh Dharma of Washington
LYF Sukh Nivas, LLC (DE)
NCR, LLC (NM )(MD Building )
Protective Services Training Academy, LLC (MD)
Stichting 3HO (Netherlands)
Sikh Dharma of Southern California
LYF 29 Highway 106, LLC (DE)
LYF KWTC General, LLC (DE)
Chateau Anand SCI (France)
LYF Orchard, LLC (DE)
Lion Leasing & Financing (LLF), LLC (NM)
Sabre IMT, LLC (NM)
LYF Heber Camp, LLC (DE)
La Fontaine SCI (France)
LYF Management, LLC (DE)
XiarTech, Inc. (VA)(51% owner)
Coastal International Security, Inc.. (SC)
Ashram in Amsterdam
Guru Ram Das Nivas, LLC (DE) (SSSC 70% owner, SDSC 30% owner)
US Non-Profit
US For-Profit
US For-Profit Partial Ownership
European/Indian Non-Profit
European/Indian For-Profit
Soon to be Dissolved

Exhibit 1

Exhibit 2 - Background Information - Siri Singh Sahib Corporation –December 9, 2019

Question 6 a iv Loss History

**Background:**

Siri Singh Sahib Corporation (SSSC) is seeking Directors and Officers (D & O) Liability for itself and its disregarded subsidiary Unto Infinity, LLC (UI). SSSC, through UI and UI's subsidiaries, including KIIT Company, Inc. and KIT Holding, BV, is responsible for the management of a worldwide network of for-profit and non-profit companies.

SSSC is presently covered through a policy with Zurich. Most of the other subsidiary and related organizations identified below have D & O coverage.

The **Applicant, Siri Singh Sahib Corporation (SSSC)**, is an Oregon non-profit religious organization incorporated in September 1997, although it was not operational until approximately October 2004 when the Siri Singh Sahib of Sikh Dharma (SSS of SD) died. It has received an Internal Revenue Service determination letter recognizing it as an organization described in Section 501(c)(3) of the Internal Revenue Code of 1986 ("Code"). SSSC is currently the sole member of Unto Infinity (UI).

A brief history of the organization and the litigation leading to the Applicant's current management is as follows. Beginning in 1969, the Siri Singh Sahib Bhai Sahib Harbhajan Singh Khalsa Yogiji (the Siri Singh Sahib or Yogi Bhajan), a Sikh who had emigrated from the Punjab in Northern India, founded the Sikh Dharma (literally, way of the Sikh) religious community in the United States. He also founded the Healthy, Happy, Holy Organization (3HO), which teaches Kundalini Yoga and meditation. Over the next 30 plus years, the Sikh Dharma/3HO community expanded in the U.S., and extended to Canada, Central and South America, Europe, Japan, China, India, Asia, Australia, and Africa and gave rise to nonprofit entities and for-profit companies around the world.

The Siri Singh Sahib died on October 6, 2004, leaving a group of four staff members in charge of the worldwide organization through UI. They added a fifth member early in 2005 and one of the original four resigned in 2008. In 2006 and 2007, mass firings and reorganizations occurred in the US and Europe and many rumors circulated of self-dealing and inappropriate transfers of assets. In September 2009, a lawsuit was started in Multnomah County, Oregon against the four remaining UI managers seeking to have them removed from office (Case No. 0909-13281). In 2010, the litigation uncovered a restructuring of East West Tea Company, LLC (EWTC) that took place in 2007 that resulted in 90% of the ownership of the for-profit company being transferred to five members of its management team (including one who was also a member of UI) for $100. At that point, the Attorney General for the State of Oregon brought suit in Multnomah County, Oregon, against the original UI defendants as well as the EWTC management team (Case No. 1010-14518); this suit was consolidated with the original suit.

SSSC/UI as well as other related non-profit entities in the U.S. and the for-profit EWTC in the U.S. (including its then European subsidiary KIT Holding BV) were named as defendants in one or both of these suits.

1

Exhibit 1

Exhibit 2 - Background Information - Siri Singh Sahib Corporation –December 9, 2019

The consolidated cases went to trial in June 2011. While only one of the SSSC/UI directors was also a member of the EWTC management team, all of the SSSC/UI directors were found by the court to have breached their fiduciary duties to UI and KIIT and were ordered to repay to UI and KIIT the $36 million the five members of the EWTC management team were found to have been unjustly enriched by over the past four years.

New management of Applicant SSSC and two of its subsidiaries, UI and KIIT, and some other related entities were put in place as part of the settlement of the two lawsuits in Multnomah County, Oregon.  The four UI defendants agreed to resign from SSSC, UI and KIIT.  The same four individuals were the only current directors of each of these entities.  The resigning managers named a new SSSC board and the new SSSC named a new UI board which immediately named a new KIIT board, which in turn named a new EWTC board.

**Prior Activities/Knowledge**

Two members of the SSSC board are members of the SDI board or officers of the corporation, namely Sardarni Guru Amrit Kaur Khalsa (the Siri Sikdar Sahiba), and Gurujot Kaur Khalsa. They were sued for breach of fiduciary duty by SDI following which they were fired after bringing the 2009 Multnomah County case against UI. That case was dismissed with prejudice in July 2012 and they were reinstated in their positions at SDI

SSSC Board member, Bibiji Inderjit Kaur Puri, the Siri Singh Sahib's widow and the Bhai Sahiba of Sikh Dharma International, is a plaintiff or defendant in several state and federal cases involving her interests in her late husband's assets including the Yogi Tea trademark.

Bibiji Inderjit Kaur Puri, brought suit in Federal District Court on behalf of SSSC and UI for the 2007 transaction and seeking to have her placed on the UI board and for her and her three adult children to be placed on the SSSC board and seeking payment for board compensation (although the boards are not currently compensated).  Her claims were denied on the pleadings and she appealed to the Ninth Circuit Court of Appeals. That Court issued a ruling ~~this~~ in the Spring of 2017 that remanded the case for further proceedings on a narrower group of issues.  The Federal District Court in September, 2017 ~~further~~ narrowed the issues and parties remaining in the case following a series of motions to dismiss. After discovery and further briefing, in April of 2018 the Federal District Court ruled on summary judgment motions against Bibiji on the remaining issues of board seats and board compensation. Bibiji appealed all the rulings made on remand in May of 2018. ~~The issues of board seats and board compensation remain.~~ Oral argument before the Ninth Circuit Court of Appeals was held in November, 2019 and the parties are awaiting a ruling from that Court which is expected within the next six months.

Bibiji Inderjit Kaur Puri also sued EWTC in Federal District Court in 2008 for trademark infringement and other violations of patent law when EWTC ceased paying her royalties

2

Exhibit 1

Exhibit 2 - Background Information - Siri Singh Sahib Corporation –December 9, 2019

under a 75-year license agreement for Yogi Tea that started in 2004. Bibiji and the Yogi Bhajan Administrative Trust each own 50% of the Yogi Tea trademark. Bibiji prevailed in arbitration and the license agreement was voided. The Trust re-licensed its interest in the Yogi Tea mark to EWTC and further litigation ensued between it and Bibiji There are also ongoing state court cases between Bibiji and the Trust regarding other assets of the Siri Singh Sahib in various stages of appeal and remand.

Bibiji has not yet re-licensed the Yogi Tea trademark to EWTC. The Federal Court's 2017 ruling affirming the Trust's license agreement with EWTC was reversed on procedural grounds by the Ninth Circuit Court of Appeals and remanded to the Federal District Court in August, 2019 of this year. Currently, the parties are filing motions in Federal District Court regarding various aspects of the remand and proceedings are expected to take a couple of years to get to the point of another order in this case. Settlement discussions between Bibiji and the various involved related entities are ongoing.

Bibiji also sued Hearthside over intellectual property issues related to the sale of Golden Temple cereal division by the former EWTC management team. That litigation has been settled.

**No claims for losses have been made since the current board was installed and D&O coverage was obtained (2012).**

3

Exhibit 1

Exhibit 3 - SSSC Trustees - Siri Singh Sahib Corporation – December 9, 2019

Amrit Singh Khalsa - Manager, LYF Management, LLC – Subsidiary Property Management entity
Bhai Sahiba Bibiji Inderjit Kaur - Sikh Dharma International, Minister and Religious Leader
Dharm Singh Khalsa (Andrew Segal) -Owner, Bakery and Restaurant
Guru Amrit Singh Khalsa - Owner, Mortgage Processing and Business Support Services Firm
Guru Darbar Singh Khalsa- Computer Support, Los Alamos National Labs
Gurujodha Singh Khalsa - Attorney
Gurujot Kaur Khalsa - CEO, Sikh Dharma International
Gurusangat Singh Khalsa - Retired
Gurutej Singh Khalsa - Consultant, Author, Yoga and Fitness Teacher
Dr. Harjot Kaur Singh - Physician
Krishna Kaur Khalsa- Yoga Teacher
Kulwant Kaur Khalsa – Director, Non-Profit Organization
Sahaj Singh Khalsa – Paramedic Program Director/College Professor
Sardarni Guru Amrit Kaur Khalsa - Sikh Dharma International, Minister and Religious Leader
Sat Bachan Kaur Khalsa - Owner, Jewelry Company
Sat Hari Singh Khalsa - Yoga Teacher and Trainer
Viriam Singh Khalsa - Consultant, Dept. of Youth Services Lane County, OR

Exhibit 1



December 9, 2019

To whom it may concern,

The Siri Singh Sahib Corporation (SSSC), and its subsidiary, Unto Infinity, LLC, are requesting Directors and Officers insurance beginning January 1, 2020.

During our current six years of coverage from Zurich and previous coverage from Ironshore, we have not suffered any claims nor incurred any losses.

Although we have a number of subsidiaries, we are only seeking coverage for the SSSC and Unto Infinity, LLC and our answers to the questions reflect that.

Since the installation of the new Board of Directors of the Siri Singh Sahib Corporation in 2012, processes and procedures have been implemented and operations are running smoothly.

We would also like to see a quote for Employment Practices and Third Party Discrimination Liability.

Thank you.

Sincerely,


Satwant Singh Khalsa
Executive Director

Exhibit 2

# e-CLAS Banner Page

## Environment: PRODUCTION

**Policy Number:**    EMN 056 41 27

**Effective Date:**    01-01-2020

**Named Insured:**    SIRI SINGH SAHIB CORPORATION INC

30-005

USI SOUTHWEST, INC.
4100 OSUNA RD NE STE 2-203
ALBUQUERQUE, NM 87109-4442

**Thank you for placing this coverage with The Cincinnati Insurance Companies!**

Exhibit 3

# Commission Schedule

**Policy Number:**     EMN 056 41 27                    **Effective Date:** 01-01-2020

**Named Insured:**

SIRI SINGH SAHIB CORPORATION INC

**Premium**                                             **Commission**

$20,191 ANNUAL/INST                                      15%

**IA 4991 06 17**

Exhibit 3



The Cincinnati Insurance Companies

**Management Liability**

# TOOLS TO HELP YOU MANAGE RISK

Along with the superior Pillar™ management liability insurance you purchase to protect your organization, you receive access to risk management tools at no additional cost to help you with the complex issues covered by your policy. These practical tools can help mitigate potential claims, possibly eliminate them altogether or provide help in the event claims occur.

Depending on the coverage options you purchase, you may also gain access to services provided by risk management specialists who can answer questions related to managing your community association, employment practices issues, cyber liability exposures or workplace violence incidents. Most of these services are also available at no additional cost.

☐ **Community Association Helpline:** As a Pillar policyholder, you can call a toll-free helpline, 844-458-9556, for assistance reducing or avoiding a potential wrongful acts loss related to managing your community association. Please have your Pillar Directors & Officers policy number ready before you call. When you place your call, leave a message including your name, complete contact information, policy number and your question or concern. A helpline lawyer will call you back, usually within one business day. Please be advised that each helpline call is limited to one hour. There is no additional charge for using this policyholder helpline.

☒ **Employment Practices Helpline:** Do you have questions about how to handle employment situations? Pillar policyholders whose coverage includes Cincinnati's employment practices liability insurance may call our toll-free Employment Connection helpline, 888-811-3427, for guidance from an attorney prior to making employment-related decisions. We offer eligible policyholders an unlimited number of calls seeking advice on employment policies and procedures.

☐ **Cyber Risk Management Portal:** Cincinnati's cyber policyholders may access eRiskHub, an online portal that provides news, information and tools to help mitigate a breach or hacking event, virus infection or other cyberattack. On eRiskHub, you will find information about privacy laws, compliance and breach response guides including compliance resources, notification letter examples, and credit bureau and government agency notifications. Other data risk management expertise may be engaged to help diagnose and repair virus infections and other common computer problems. Some services offered may extend beyond what the policy covers and include an additional charge. Please visit *https://eriskhub.com/cic* to set up an account using the access code provided with your policy or available from your agent to begin exploring this valuable resource.

For information, coverage availability in your state, quotes or policy service, please contact your local independent agent recommending coverage.



*Everything Insurance Should Be®*

Exhibit 3

☒ **Workplace Violence Hotline:** After a covered workplace violence event, Pillar policyholders who have added Cincinnati's optional workplace violence expense coverage to their EPLI policy can receive help to create a response and begin the recovery process. Simply call the toll-free, 24-hour hotline, 877-841-1082. It's monitored by Black Swan Solutions, a business unit of Empathia, Inc., which is an industry-leading crisis support organization. Coverage also reimburses recovery expenses for security, public relations, counselors and lost salaries, wages and business income. While policyholders are not obligated to use Black Swan Solutions, this resource is available if you need them.

☐ **Kidnap, Ransom and Extortion:** Success attracts respect, recognition and rewards, yet may leave you vulnerable to kidnapping and extortion attempts. This policy option pays for the vital services of Control Risks Group, a kidnap extortion and crisis management consulting firm. Experts help manage all aspects of the situation, work toward the safe return of the victim and negotiate ransom requests. They also try to identify those responsible, assess the circumstances and search for a motive.

## Selecting the right company

With Cincinnati's Pillar management liability coverage, know that you have an exceptional insurance program from a company offering:

- A management team specifically dedicated to keeping your program on the leading edge
- Superior claims service provided by Cincinnati professionals
- High financial strength rating from A.M. Best Co., reflecting our ability to pay claims and keep our promises.
- For qualifying accounts, multi-year policy terms are available in most states for many coverages, saving you the added time and expense of annual renewals

Your agent recommending Cincinnati can provide more details, answer questions and add the coverage you need.

Thank you for trusting your agent and Cincinnati to protect your business.



*Everything Insurance Should Be®*

Our loss control service is advisory only. We assume no responsibility for management or control of customer loss control activities or for implementation of recommended corrective measures. These materials were gathered from trade services and public information. We have not tried to identify all exposures. We do not warrant that this information is consistent with the underwriting guidelines of The Cincinnati Insurance Company and its subsidiaries or with any federal, state or local law, regulation or ordinance.

This is not a policy. For a complete statement of the coverages and exclusions, please see the policy contract. "The Cincinnati Insurance Companies", "Cincinnati Insurance" and "Cincinnati" refer to member companies of the insurer group providing property and casualty coverages through The Cincinnati Insurance Company or one of its wholly owned subsidiaries – The Cincinnati Indemnity Company or The Cincinnati Casualty Company. Each insurer has sole financial responsibility for its own products. Not all subsidiaries operate in all states. Do not reproduce or post online, in whole or in part, without written permission. Best's ratings are under continuous review and subject to change and/or affirmation. To confirm the current rating, please visit *www.ambest.com*. © 2019 The Cincinnati Insurance Company. 6200 S. Gilmore Road, Fairfield, OH 45014-5141.

Exhibit 3

 cinfin.com



# NOTICE TO POLICYHOLDERS
# DIRECT BILL ACCOUNT CREDIT PROCEDURE

This is a notice of how an account credit will be applied to your policy or to all of the policies being billed as single account.

**Account Credits**

**A.** If your account is comprised of **a single policy** and an endorsement or premium audit results in a credit (return premium), the credit is applied to that policy. If your account does not have a future installment due at the time the endorsement or audit is processed, the credit is refunded to the payor listed for your account. If you do not wish for credits to be automatically applied to future unpaid installments, please contact us to request a refund. Please note that the amount of the refund may vary based upon the date you contact us and your billing schedule.

**B.** If your account is comprised of **more than one policy** and an endorsement or premium audit results in a credit (return premium), the credit is applied in the following manner:

- Payments previously applied to your account are deferred.

- The credit that results from the endorsement or audit is applied to the policy generating the credit.

- The payments that were deferred are then reapplied to the account in order to satisfy the amount due.

- Any excess payment that results from the credit is applied proportionately to your policies with a future payment or installment due.

- If you do not wish for credits to be automatically applied to future unpaid installments, please contact us to request a refund. Please note that the amount of the refund may vary based upon the date you contact us and your billing schedule.

- If your account does not have a future installment or payment due at the time the endorsement or audit is processed, the credit is refunded to the payor listed for your account.

(Does not apply to audit return premium for payors located in New York; Does not apply to premiums due more than 30 days from the date of processing for payors located in New Hampshire. These credits are automatically refunded to the payor)

To request a refund, contact us at:

| Mailing Address | Toll free phone number | Electronic mail |
|---|---|---|
| The Cincinnati Insurance Company<br>PO Box 14529<br>Cincinnati, OH 45250-0529 | 877-942-2455 | CinciBill@cinfin.com |

**IA 4407 03 13**

Exhibit 3

# DISCLOSURE OF DIRECT BILL FEES AND CHARGES

NO COVERAGE IS PROVIDED BY THIS DISCLOSURE, nor can it be construed to replace any provision of your policy. YOU SHOULD READ YOUR POLICY AND REVIEW YOUR DECLARATIONS PAGE CAREFULLY for complete information on the coverages provided.

Your insurance premium is being paid directly to us rather than to your insurance agency. We appreciate your prompt payment of the premium. Please note that these fees apply only in the event your payment is late, is returned to us for insufficient funds, or if your policy was previously canceled for nonpayment of premium and has been reinstated at either your or your agents request. We are not required to reinstate a policy once cancellation for nonpayment of premium has become effective. The decision to reinstate coverage is solely at the discretion of the company.

Not all fees are applicable in all states. The types of fees are listed below.  Following the description of each fee, we list the states where the fee applies and the amount of the fee.  Fees are not levied in KY, MD, MT and NC.

**Non-Sufficient Funds (NSF) Charge:** The first time a premium payment is returned due to Non-Sufficient Funds (NSF), the premium due is the installment amount. For each succeeding return of payment while continuously insured with The Cincinnati Insurance Companies, a charge is added to your next account statement. The amount of the charge is determined by the fees filed with and approved by the state where the payor of your account is located.

$10 AK, FL, NJ, RI, and SC;

$15 MA;

$20 NY; and

$25 AL, AZ, AR, CA, CO, CT, DE, DC, GA, HI, ID, IL, IN, IA, KS, LA, ME, MI, MN, MS, MO, NE, NV, NH, NM, ND, OH, OK, OR, PA, SD, TN, TX, UT, VT, VA, WA, WI, WV and WY.

**Reinstatement Charge:** The first time your account is reinstated for nonpayment of premium, the premium due is the installment amount. For each succeeding reinstatement due to nonpayment of premium while continuously insured with The Cincinnati Insurance Companies, a charge is added to your next account statement. The amount of the charge is determined by the fees filed with and approved by the state where the payor of your account is located.

$10 AK, RI, and SC;

$15 MA;

$20 NY; and

$25 AL, AZ, AR, CA, CO, CT, DE, DC, GA, HI, ID, IL, IN, IA, KS, LA, ME, MI, MN, MS, MO, NE, NV, NH, NM, ND, OH, OK, OR, PA, SD, TN, TX, UT, VT, VA, WA and WY.

**Late Charge:** A charge is added to your next account statement each time your payment is received and processed after the due date as shown on the account statement. This fee will not apply to Electronic Funds Transfer (EFT). The amount of the charge is determined by the fees filed with and approved by the state where the payor of your account is located.

$10 AK, FL, RI, and SC;

$15 MA; and

$25 AL, AZ, AR, CA, CO, CT, DE, DC, GA, HI, ID, IL, IN, IA, KS, LA, ME, MI, MN, MS, MO, NE, NV, NH, NM, ND, OH, OK, OR, PA, SD, TN, TX, UT, VT, VA, WA, WI and WY.

Exhibit 3



# The Cincinnati Insurance Company
### A Stock Insurance Company

**Headquarters**: 6200 S. Gilmore Road, Fairfield, OH 45014-5141
**Mailing address**: P.O. Box 145496, Cincinnati, OH 45250-5496
*www.cinfin.com* ■ 513-870-2000

# PILLAR
# COMMON POLICY DECLARATIONS

Billing Method: **DIRECT BILL**

Policy Number: **EMN 056 41 27**

Named Insured:  **SIRI SINGH SAHIB CORPORATION INC**

Mailing Address:  **PO BOX 1669**
**SANTA CRUZ, NM 87567-1669**

Principal Address: **123 MAIN STREET**
**SANTA CRUZ, NM 87567-1669**

Previous Policy Number: **NEW**

Policy Period:     (At 12:01 AM standard time at your principal address shown above.)

FROM: **01-01-2020**          TO: **01-01-2023**

Agency: **USI SOUTHWEST, INC. 30-005**
City, State: **ALBUQUERQUE, NM**

Shared Annual Aggregate Limit of Liability: **N/A**

 Applicable to all **claims** under the following liability coverage parts:

In return for the payment of the premium and subject to all the terms and conditions of this policy, we agree with you to provide the insurance as stated in this policy.

Forms applicable to all coverage parts:

| | | |
|---|---|---|
| ML400 | 01/16 | SUMMARY OF PREMIUMS CHARGED |
| ML101 | 01/18 | GENERAL PROVISIONS |
| IA4234 | 01/15 | POLICYHOLDER NOTICE TERRORISM INSURANCE COVERAGE |
| ML458 | 01/16 | CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM |
| ML490NM | 03/16 | NEW MEXICO CHANGES - CANCELLATION AND NONRENEWAL |

```
ML491NM    03/16  NEW MEXICO CHANGES - PILLAR POLICY PROGRAM
IA450A     11/87  EXTENDED REPORTING AMENDATORY ENDORSEMENT
IA450B     11/87  STATE INCONSISTENCY ENDORSEMENT
IA4427     02/13  NOTICE OF LOSS CONTROL SERVICES
IP446      08/01  NOTICE TO POLICYHOLDERS
IA4338     05/11  SIGNATURE ENDORSEMENT
```

Coverage part declarations:

ML505 01/16     NONPROFIT ORGANIZATION DIRECTORS AND OFFICERS LIABILITY COVERAGE
                PART DECLARATIONS

ML512 01/16     EMPLOYMENT PRACTICES LIABILITY COVERAGE PART DECLARATIONS

---

01-06-2020 17:14

**ML 501 01 16**

EMN 056 41 27
Exhibit 3

| Policy Number: **EMN 056 41 27** | Effective Date: **01-01-2020** |

# SUMMARY OF PREMIUMS CHARGED

**THIS POLICY CONSISTS OF THE FOLLOWING COVERAGE
PARTS FOR WHICH A PREMIUM CHARGE IS INDICATED**

| | |
|---|---|
| NONPROFIT ORGANIZATION DIRECTORS & OFFICERS LIABILITY | $ 17,819 |
| EMPLOYMENT PRACTICES LIABILITY | $ 2,372 |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| Installment Charge | $ |
| Total | $ 20,191 |

| Payment Plan | First Installment | Remaining Installments |
|---|---|---|
| SEMI-ANNUAL | $ * | $ * |

SEE BILLING STATEMENT MAILED SEPARATELY

**ALL OTHER TERMS AND CONDITIONS REMAINS UNCHANGED**

ML 400 01 16

Exhibit 3

# GENERAL PROVISIONS APPLICABLE TO
# ALL LIABILITY COVERAGE PARTS

These General Provisions apply only to those Coverage Parts which include a liability coverage, which shall include all Coverage Parts other than Crime Coverage. Furthermore, any reference to the "policy" in these General Provisions refers to all Coverage Parts other than Crime Coverage.

Throughout this policy, the words "we", "us" and "our" refer to the Company providing this insurance.

In consideration of the payment of the premium, in reliance on all statements in the **application** and all other information provided to us and subject to all the provisions of this policy, including the Declarations, we and the **insureds** agree as set forth below.

## SECTION I - DEFINITIONS

Where set forth in bold type in this policy, whether in singular or in plural, the following terms shall have the meanings indicated.

**A.** **Application** means:

    **1.** The Application Form for this policy;

    **2.** Any materials submitted with the Application Form which shall be maintained on file with us and shall be deemed to be attached hereto as if physically attached; and

    **3.** Any warranty or representation provided to us within the last three years in connection with any policy of which this policy is a renewal or replacement.

**B.** **Claim** has the meaning set forth in the applicable coverage part.

**C.** **Debtor in possession** means a "debtor in possession" as that term is defined in Title 11 of the United States Code, as amended.

**D.** **Defense costs** has the meaning set forth in the applicable coverage part.

**E.** **Domestic partner** means a natural person who is not otherwise an insured, in a committed relationship with an **insured person**, which is legally recognizable as a marriage, civil union or domestic partnership in the state where the **claim** is made or suit is filed and the legal existence of the relationship is verifiable by legal, government documentation existing prior to the date of the **wrongful act** complained of in the **claim**.

**F.** **Executive** has the meaning set forth in the applicable coverage part.

**G.** **Extended reporting period** means the periods of time described in Section **XIX** of the General Provisions.

**H.** **Insured persons** has the meaning set forth in the applicable coverage part.

**I.** **Insured** has the meaning set forth in the applicable coverage part.

**J.** **Interrelated** means all events or incidents which have as a common nexus any:

    **1.** Fact, circumstance, situation, event, transaction, or cause; or

    **2.** Series of causally connected facts, circumstances, situations, events, transactions or causes.

**K.** **Loss** has the meaning set forth in the applicable coverage part.

**L.** **Named insured** means the entity or entities shown in the applicable Declarations as a Named Insured and any such entity in its capacity as a **debtor in possession**.

**M.** **Organization** has the meaning set forth in the applicable coverage part.

**N.** **Personal injury** has the meaning set forth in the applicable coverage part.

**O.** **Policy period** means the period from the inception date to the expiration date as set forth in the Declarations, or to the earlier date of cancellation of the applicable Coverage Part.

Exhibit 3

**P.** **Policy year** means the period within the **policy period** from the inception date as set forth in the Declarations to the succeeding anniversary date exactly 1 year later at 12:01 AM standard time, and **policy year** means any subsequent annual period between anniversary dates at 12:01 AM standard time thereafter. In the event of a **policy period** less than 1 year, the **policy year** will be the same as the **policy period**.

In the event of an odd term **policy period** longer than 1 year, the **policy year** is the period from the inception date to the next chronological date which precedes the expiration date by exactly 1 or more years at 12:01 AM standard time. If there are subsequent annual periods remaining in the **policy period** after that date at 12:01 AM standard time, such annual periods will each be a **policy year**.

However, if after the issuance of this Coverage Part, any **policy year** is extended for an additional period of less than 12 months, that additional period of time will be deemed to be part of the last preceding **policy year**.

**Q.** **Pollutants** mean any solid, liquid, gaseous or thermal irritant or contaminant including smoke, vapor, soot, fumes, acid, alkalis, chemicals, asbestos products, petroleum products and their by-products and waste. Waste includes material to be recycled, reconditioned or reclaimed. **Pollutants** does not mean noise. **Pollutants** include but are not limited to substances that are generally recognized in industry or government to be harmful or toxic to persons, property or the environment. regardless of whether the injury or damage is caused directly or indirectly by the **pollutants** and whether:

  **1.** The insured is regularly or otherwise engaged in activities which taint or degrade the environment; or

  **2.** The insured uses, generates or produces the **pollutant**.

**R.** **Subsidiary** means any entity in which the **named insured** owns, directly or indirectly, more than 50% of the outstanding securities or voting rights representing the present right to vote for election of directors, trustees, managers (if a limited liability company) or equivalent positions and any such entity in its capacity as a **debtor in possession**.

**S.** **Wrongful Act** has the meaning set forth in the applicable coverage part.

---

## SECTION II – EXCLUSIONS

**A.** <u>Nuclear</u>

We are not liable to pay, indemnify or defend any **claim** based upon, arising out of, in consequence of, or in any way involving the hazardous properties, including radioactive, toxic or explosive properties, of any nuclear material. Nuclear material means any source material, special nuclear material, or by-product materials as those terms are defined under the Atomic Energy Act of 1954 or any amendments thereto.

**B.** <u>Pollution</u>

We are not liable to pay, indemnify or defend any **claim** for:

  **1.** The actual, alleged, or threatened exposure to discharge, generation, storage, transportation, discharge, dispersal, seepage, migration, emission, release, treatment, removal, disposal or escape of **pollutants**; or

  **2.** Any request, demand, order or statutory or regulatory requirement that the **named insured** or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, **pollutants**; or

  **3.** Any demand by or on behalf of any governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, **pollutants**.

However, as it applies to any Directors and Officers Liability Coverage (including Educators Legal Liability), this exclusion shall not apply to any **claim** to which Insuring Agreement **A.** solely applies.

**C.** <u>Prior Knowledge</u>

We are not liable to pay, indemnify or defend any **claim** based upon, arising out of, or in consequence of, or in any way involving any **wrongful act** committed, attempted or allegedly committed or attempted prior to the **policy period** of the applicable Coverage Part if:

  **1.** Prior to the earlier of the following dates:

    **a.** The inception of the applicable Coverage Part;

    **b.** The inception of the original Coverage Part of which the applicable Coverage Part is a renewal or replacement; or

    **c.** The Continuity Date, if any, stated in the Declarations for the applicable Coverage Part;

    any **executive** knew that such **wrongful act** is or would reasonably be regarded as the basis of a **claim**; or

**2.** There is a previous policy under which the **insureds** are entitled to coverage for such **claim**.

**D.** <u>Prior Notice</u>

We are not liable to pay, indemnify or defend any **claim** based upon, arising out of, in consequence of, or in any way involving:

**1.** Any **wrongful act** or any fact, circumstance or situation which has been the subject of any accepted notice given prior to the **policy period** under any policy or coverage part of which this policy is a direct or indirect renewal or replacement; or

**2.** Any other **wrongful act** whenever occurring, which, together with a **wrongful act** which has been the subject of such accepted notice, would constitute **interrelated wrongful acts**.

**E.** <u>Prior or Pending Proceeding</u>

We are not liable to pay, indemnify or defend any **claim** based upon, arising out of, or in consequence of, or in any way involving any prior or pending demand or civil, criminal, administrative or regulatory proceeding against any **Insured** as of the Prior or Pending Date stated in the Declarations of the applicable coverage part or any fact, circumstance, situation, transaction or event underlying or alleged in such litigation, regardless of the legal theory asserted in such **claim**.

**F.** <u>Telephone Consumer Protection Act</u>

We are not liable to pay, indemnify or defend any **claim** for any actual or alleged violation of:

**1.** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law; or

**2.** The CAN-SPAM Act of 2003, including any amendment of or addition to such law; or

**3.** Any statute, ordinance or regulation, other than the TCPA or CAN-SPAM Act of 2003, that prohibits or limits the sending, transmitting, communicating or distribution of material or information.

**G.** <u>War and Military Action</u>

We are not liable to pay, indemnify or defend any **claim** based upon, arising out of, in consequence of, or in any way involving:

**1.** War, including undeclared or civil war; or

**2.** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**3.** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these;

regardless of any other cause or event that contributes concurrently or in any sequence to the injury or damage.

With respect to any action that comes within the terms of this exclusion and involves nuclear reaction or radiation, or radioactive contamination, this War and Military Action Exclusion supersedes Exclusion **A.** above.

---

## SECTION III - SEVERABILITY OF EXCLUSIONS

With respect to determining the applicability of the above Exclusions, no **wrongful act** or knowledge possessed by any one of the **insureds** shall be imputed to any other **insureds** to determine if coverage is available, unless indicated otherwise.

## SECTION IV - LIMITS OF INSURANCE, DEDUCTIBLES, MULTIPLE CLAIMS AND EXHAUSTION

**A.** If a single **claim** is covered under more than one Coverage Part, then our maximum liability for all **loss** resulting from such **claim** shall be the largest applicable Limit of Insurance available under any one of the applicable Coverage Parts.

**B.** The Deductibles for each Coverage Part apply separately to the respective Coverage Parts. If a single **claim** is covered under more than one Coverage Part, the applicable Deductibles shall be applied separately to the part of the **claim** covered by each Coverage Part but the sum of such Deductibles shall not exceed the largest applicable Deductible. The Deductibles shall be borne by the **insureds** uninsured and at their own risk.

**C.** If the aggregate Limit of Insurance for a particular Coverage Part is exhausted, then all of our obligations under that Coverage Part shall be deemed to be completely fulfilled and extinguished as of the date of such exhaustion. If the Shared Annual Aggregate Limit of Liability, if so set forth on the Common Policy Declarations, is exhausted, then all of our obligations under the policy for the remainder of the annual period as described in **SECTION IV.D.** below shall be deemed to be completely fulfilled and extinguished as of the date of such exhaustion.

**D.** The Limits of Insurance of each Coverage Part and the Shared Annual Aggregate Limit of Liability, if so set forth on the Common Policy Declarations, apply separately to each **policy year**. If the **policy period** of the respective Coverage Part is extended after issuance for an additional period of less than 12 months, the additional period will be deemed part of the last preceding period of the respective Coverage part for purposes of determining the Limits of Insurance.

**E.** Regardless of the number of policies or Coverage Parts involved, all **claims** based upon or arising out of the same **wrongful act** or any **interrelated wrongful acts** shall be considered a single **claim**. Each **claim** shall be deemed to be first made at the earliest of the following times:

  **1.** When notice of the earliest **claim** arising out of such **wrongful act** or **interrelated wrongful acts** is received in writing by an **insured** or by us, whichever comes first; or

  **2.** When notice of a **wrongful act** giving rise to such **claim** is given pursuant to Section **VI** of the General Provisions.

**F.** In the event that more than one of the **insureds** is included in the same **claim**, the total amount of **loss** resulting from such **claim** and the Deductible shall be apportioned pro-rata among the **insureds** in proportion to their respective **loss** unless otherwise mutually agreed upon by the **insureds** and us.

## SECTION V - DUTIES OF THE INSUREDS IN THE EVENT OF A CLAIM

As conditions precedent to coverage under this policy:

**A.** The **insureds** shall give us written notice of any **claim** made against any of the **insureds** for a **wrongful act** as soon as practicable after any **executive** of the **named insured** has knowledge of such **claim**, and shall cooperate and provide information as we may reasonably require, including but not limited to providing a description of the **claim**, the nature of the alleged **wrongful act**, the nature of the alleged injury, the names of the claimants, and the manner in which the **insureds** first became aware of the **claim**. As soon as practicable, the **insureds** shall furnish us with copies of reports, investigations, pleadings and other papers in connection with the **claim**.

**B.** The **insureds** shall provide us with all information, assistance and cooperation which we reasonably request and agree that in the event of a **claim** the **insureds** will do nothing which may prejudice our position or our potential or actual rights of recovery. The failure of any **insured person** to do so shall not impair the rights of any other **insured person** under this policy.

**C.** The **insureds** shall not settle any **claim**, incur any **defense costs** or otherwise assume any obligation or admit any liability with respect to any **claim** without our prior written consent. We shall be entitled to full information and all particulars we may request in order to reach a decision as to such consent. We shall not be liable for any settlement, **defense costs**, assumed obligation or admission to which we have not consented.

If the **insureds** fail to provide notice of any **claim** to us as required under this Section, we shall not be entitled to deny coverage for the **claim** based solely upon late notice unless we can demonstrate that our interests were materially prejudiced by reason of such late notice.

This Section does not apply to the Cincinnati Data Defender™ Coverage Form, the Cincinnati Network Defender™ Coverage Form or the Cincinnati Cyber Defense™ Coverage Form.

## SECTION VI - NOTICE OF A WRONGFUL ACT

If prior to the end of the **policy period** of the applicable Coverage Part, any of the **insureds** first become aware of a specific **wrongful act** they believe is likely to give rise to a **claim**, and if any of the **insureds** give us written notice as soon as practicable, but prior to the end of the **policy period** of the applicable Coverage Part, of:

**A.** The specific **wrongful act**;

**B.** The injury or damage which has or may result therefrom; and

**C.** The circumstances by which the **insureds** first became aware thereof;

then any **claim** subsequently made arising out of such **wrongful act** shall be deemed to have been made when notice of the **wrongful act** was first given.

## SECTION VII - DIRECTION OF CORRESPONDENCE TO US

All notices and other materials provided to us pursuant to the terms of this policy shall be directed to the Management Liability Claims Manager at one of the following addresses:

**A.** claimsmaindesk@cinfin.com

**B.** The Cincinnati Insurance Company
P.O. Box 145496
Cincinnati, OH 45250-5496

## SECTION VIII - APPLICATION

The **application** is the basis of this policy and is incorporated into and constitutes a part of this policy. It is agreed by the **insureds** that the statements in the **application** are their representations, that they are material and that this policy is issued in reliance upon the truth of such representations provided.

In the event that the **application** contains any misrepresentation or omission with respect to a specific **wrongful act** or the knowledge of any of the **insureds** of any matter which such **insured** has reason to believe may give rise to a future **claim** made with the intent to deceive or which materially affects the acceptability of the risk or hazard assumed by us, then no coverage shall be afforded for any **claim** based upon, arising from or in consequence of any such misrepresentation or omission. Such misrepresentation or omission shall not be imputed to any other **insureds** for purposes of determining the validity of this policy to such other **insureds** except:

**1.** Any **insured person** who knew that the statement or representation was not true as of the inception date of coverage;

**2.** The **organization** with respect to any **executive** who knew that the statement or representation was not true as of the inception date of coverage; and

**3.** The **organization** if the signer of the **application** knew that the statement or representation was untrue.

We shall not be entitled under any circumstances to void or rescind this policy with respect to any **insured**.

## SECTION IX - CHANGES IN EXPOSURE

### A. Change in Ownership of Named Insured

If during the **policy period** of the applicable Coverage Part:

**1.** The **named insured** consolidates with or merges into another entity such that such **named insured** is not the surviving entity;

**2.** Another entity or person or group of entities and/or persons acting in concert acquires more than 50% ownership of the **named insured** or voting rights which result in ownership or voting control by the other organization(s) or person(s) of more than 50% of the outstanding securities or voting rights

representing the present right to vote for the election of directors, trustees or managers (if a limited liability company) of the **named insured**;

then, subject to all the other provisions of this policy, coverage under the applicable Coverage Part shall continue to apply to such **named insured** and its **insureds** until the end of the applicable **policy period** or any applicable **extended reporting period**, but only with respect to **claims** for **wrongful acts** committed, attempted or allegedly committed or attempted prior to such transaction. The **named insured** shall give written notice to us as soon as practicable, but in no event later than 90 days after such transaction.

## B. Cessation of Subsidiaries

If during the **policy period** of the applicable Coverage Part any entity ceases to be a **subsidiary** as defined in the applicable Coverage Part, then, subject to all the other provisions of this policy, coverage under the applicable Coverage Part shall continue to apply to such entity and its **insureds** until the end of the applicable **policy period** or any applicable **extended reporting period**, but only with respect to **claims** for **wrongful acts** committed, attempted or allegedly committed or attempted prior to the date such entity ceases to be a **subsidiary**. The **named insured** shall give written notice to us as soon as practicable, but in no event later than 90 days after the entity ceases to be a **subsidiary**.

## C. Acquisition or Formation of Entity

If during the **policy period** of the applicable Coverage Part the **named insured** newly acquires or forms another entity over which such **named insured** maintains more than 50% ownership for the purpose of coverage under the Coverage Part applicable to such **named insured**, the newly acquired or formed entity shall be deemed to be a **subsidiary**; however, coverage shall be excess of any indemnification or insurance otherwise available to such newly acquired or formed entity from any other source. Furthermore, coverage does not apply to **claims** for **wrongful acts** committed, attempted or allegedly committed or attempted prior to the date the **named insured** acquired or formed the entity unless we agree, after presentation of a complete application and all appropriate information, to provide coverage by endorsement for such **claims** and the **named insured** pays any additional premium we require for the endorsement.

## SECTION X - OTHER INSURANCE ISSUED BY ANOTHER INSURER

This insurance is primary except when all or any part of **loss** is also insured under any other valid and collectible prior or current policy. If any other insurance issued by another insurer (with the exception of insurance issued by us, any of our affiliated companies, or any of our predecessors or their affiliated companies) applies to any **claim**, then this insurance is excess over that other insurance, whether primary, excess, contingent or on any other basis, unless that other insurance was purchased specifically to apply excess over the limits provided in this policy. Furthermore, with respect to any coverage that may be provided for any **claim** for actual or alleged **personal injury**, such **claims** shall be specifically excess of any similar coverage provided by the **organization's** General Liability Policy.

When this policy is excess:

**A.** We will have no duty to defend any **claim** when any other insurer has that duty. If another insurer fails to defend and we incur costs as a result of such failure, we will be entitled to the **insureds'** rights against such other insurer; and

**B.** We will pay only our share of the amount of the **loss**, if any, that exceeds the sum of:

  **1.** The total amount that all such other insurance would pay for the **loss** in the absence of this policy; and

  **2.** The total of all deductible and self-insured amounts under all such other insurance.

## SECTION XI - SPOUSE AND LEGAL REPRESENTATIVE EXTENSION

The liability coverage parts in this policy will, subject to all other terms, conditions and exclusions of the applicable Coverage Part and the General Provisions, be extended to apply to **claims** for the **wrongful acts** of an **insured person** made against:

**A.** The spouse or **domestic partner** of an **insured person** but only to the extent such person is a party to any **claim** solely in such person's capacity as a spouse or **domestic partner** of an **insured person** and only if the **claim** seeks damages recoverable from marital community property jointly held by the **insured person** and the spouse or **domestic partner**, or property transferred from the **insured person** to the spouse; or

Exhibit 3

**B.** Their estates, heirs, legal representatives or assigns in the event of their death, incapacity or bankruptcy.

We have no obligation to make any payment for **loss** in connection with any **claim** against a spouse, **domestic partner**, estates, heirs, legal representatives or assigns of an **insured person** for any actual or alleged, error, misstatement, misleading statement, act, omission, neglect or breach of duty committed, attempted or allegedly committed or attempted by such spouse, **domestic partner**, estates, heirs, legal representatives or assigns.

## SECTION XII - MEDIATION AND ALLOCATION

**A.** Any dispute including but not limited to tort claims or contract claims between an **insured** and us arising out of or relating to this policy shall be submitted to non-binding mediation prior to commencement of an action between the parties. The mediator shall be chosen by agreement. If the parties cannot agree upon a mediator, the mediator shall be chosen by the American Arbitration Association.

**B.** If both **loss** covered by this policy and loss not covered by this policy are incurred in a **claim** for which coverage is afforded, either because a **claim**:

   **1.** Against an **insured** includes both covered and uncovered matters, we will pay 100% of **defense costs** and all remaining loss will be allocated between covered **loss** and uncovered loss based upon the relative legal exposure to the parties to such matters; or

   **2.** Is made against both an **insured** and others, we will pay **defense costs** for our **insured**, and all remaining loss will be allocated between covered **loss** and uncovered loss based upon the relative legal exposure to the parties to such matters.

**C.** If we and the **insureds** cannot agree as to matters in **B.** above prior to a judgment or finding in the civil or administrative proceeding dealing with **claims** against the **insureds**, the parties agree that they will, to the extent it is within their control, require that the allocation between covered **loss** and uncovered loss is made in such civil or administrative proceeding. Such efforts shall include but are not limited to the submission of special interrogatories to the finder of fact in such proceeding. Such efforts shall not require us to become a party to such civil or administrative proceeding.

**D.** Notwithstanding **C.** above, if we and the **insureds** cannot agree as to matters in Section **B.** above prior to a judgment or finding in any civil or administrative proceeding in which such issues are decided, we may at any time before or after mediation under **A.** above settle all **claims** against any or all **insureds**. Following such settlement, any dispute between us and the **insureds** as to the proper allocation of covered and uncovered matters under **B.** above shall be submitted to non-binding mediation prior to the commencement of an action between the parties. In any event, only one mediation as to the same issues shall be required.

## SECTION XIII - ACTION AGAINST US

**A.** No action shall be taken against us unless, as a condition precedent thereto, there has been full compliance with all of the terms of this policy and until the obligation of the **insureds** to pay shall have been finally determined, either by an adjudication against them or by written agreement of the **insureds**, the claimant and us. Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this policy to the extent of the insurance afforded by this policy. Bankruptcy or insolvency of an **insured** or of an **insured's** estate shall not relieve us of any of our obligations hereunder.

**B.** No person or organization shall have any right under this policy to join us as a party to any **claim**. Neither the **insureds** nor their legal representative shall implead us in any **claim**.

This Section does not apply to the Cincinnati Data Defender™ Coverage Form, the Cincinnati Network Defender™ Coverage Form or the Cincinnati Cyber Defense™ Coverage Form.

## SECTION XIV - SUBROGATION

In the event of any payment under this policy, we shall be subrogated to all of the rights to recovery of the **insureds** to the extent of such payment. The **insureds** shall execute all papers required and shall do everything that may be necessary to secure and preserve such rights, including the execution of such documents as may be necessary to enable us to effectively bring suit in the name of the **insureds**.

Exhibit 3

## SECTION XV - CHANGES IN THIS POLICY

No change or modification of, or assignment of interest under this policy shall be effective except when made by us through a written endorsement to this policy.

## SECTION XVI - CONFORMITY TO STATUTE

Any terms of this policy which are in conflict with the terms of any applicable laws construing this policy are hereby amended to conform to such laws.

## SECTION XVII - ENTIRE AGREEMENT

By acceptance of this policy, we and the **insureds** agree that this policy (including the **application**) and any written endorsements attached hereto constitute the entire agreement between the parties.

## SECTION XVIII - REPRESENTATION BY NAMED INSURED

The first **named insured** shall act on behalf of all of the **insureds** in purchasing this policy and for any purposes under the policy.

## SECTION XIX - EXTENDED REPORTING PERIODS

**A.** Upon termination of any Coverage Parts for any reason, other than nonpayment of premium, the **named insured** shall be provided a 90 day Automatic Extended Reporting Period and have the option to replace the 90 day Automatic Extended Reporting Period with a 12 month Optional Extended Reporting Period. The **named insured** may also request an Optional Extended Reporting Period with a term longer than 12 months, which may be provided solely at our discretion.

    **1.** Automatic Extended Reporting Period

    A 90 day Automatic Extended Reporting Period is automatically provided without additional charge. The Automatic Extended Reporting Period starts immediately after the end of the **policy period** of the applicable Coverage Part.

    **2.** Optional Extended Reporting Periods

        **a.** The **named insured** shall have the option to purchase a 12 month Extended Reporting Period to replace the 90 day Automatic Extended Reporting Period for an additional premium equal to 75% of the expiring annual premium for the applicable Coverage Part.

        **b.** Additional Optional Extended Reporting Periods may be available for an additional premium charge if an Extended Reporting Period longer than 12 months is desired. It is solely our decision whether to permit the first **named insured** to purchase an Extended Reporting Period with a term longer than 12 months.

    The first **named insured** must give us a written request of their intent to purchase an Optional Extended Reporting Period within 60 days after the **policy period** of the applicable Coverage Part or that option shall terminate. The Optional Extended Reporting Period will not go into effect unless the first **named insured** pays the additional premium promptly when due.

**B.** The Extended Reporting Periods do not extend the **policy period** or change the scope of coverage provided. They extend the **claims** reporting period.

**C.** The Extended Reporting Periods extend coverage to **claims** first made during the length of time covered by the applicable Extended Reporting Period provided the **wrongful act** was committed, attempted or allegedly committed or attempted prior to the end of the **policy period** of the applicable Coverage Part, and all such **claims** shall be subject to all other terms, conditions and exclusions of the applicable Coverage Part and the General Provisions. Such **claims** must be reported in writing to us prior to the expiration of the applicable Extended Reporting Period.

**D.** The Extended Reporting Period, regardless of length does not reinstate or increase the Limits of Insurance of the applicable Coverage Part or the Shared Annual Aggregate Limit of Liability, if so set forth on the Common Policy Declarations. Our total liability shall not exceed the Limit of Insurance shown in the applicable Declarations for the last **policy year** in which coverage is provided hereunder.

Exhibit 3

**E.** Any Extended Reporting Period will immediately terminate on the effective date and time of any other insurance issued to the **insureds** which replaces this insurance. The entire premium for any Extended Reporting Period shall be fully earned at the commencement of any Extended Reporting Period.

**F.** If the terms under this section are invoked under the Cincinnati Data Defender™ Coverage Part, the Cincinnati Network Defender™ Coverage Part or the Cincinnati Cyber Defense™ Coverage Part, the provisions contained in this Section shall apply only to the following Insuring Agreements:

   **1.** Insuring Agreement **B** - Defense and Liability of the Cincinnati Data Defender™ Coverage Part;

   **2.** Insuring Agreement **B** - Network Security and Electronic Media Liability of the Cincinnati Network Defender™ Coverage Part; or

   **3.** Insuring Agreements **E** - Data Compromise Liability, **F** - Network Security Liability and **G** - Electronic Media Liability of the Cincinnati Cyber Defense™ Coverage Part.

## SECTION XX - COVERAGE TERRITORY

This policy applies to any **claim** for a **wrongful act** committed, attempted or allegedly committed or attempted anywhere in the world unless indicated otherwise. However, if insurance provided by this policy would be in violation of any United States economic or trade sanctions, such insurance shall be null and void.

This Section does not apply to the Cincinnati Data Defender™ Coverage Form, the Cincinnati Network Defender™ Coverage Form or the Cincinnati Cyber Defense™ Coverage Form.

## SECTION XXI - LIBERALIZATION

If we adopt any revision that would broaden the coverage under this insurance and would be effective during the **policy period** without additional premium, the broadened coverage will immediately apply to this insurance as of the latter of:

   **1.** The date we implemented the change in the headquarters state which is the basis upon which the policy was issued; or

   **2.** The date the applicable Coverage Part became effective.

## SECTION XXII - PARENT COMPANY FRANCHISOR EXTENSION

Upon written request of the president, chairperson or equivalent position of the **named insured,** we shall extend coverage under this policy to **defense costs** resulting from any **claim** made against a parent company or franchisor of the **named insured** or any **subsidiary** but only if and so long as:

   **1.** The **claim** arises out of a **wrongful act** actually or allegedly committed solely by an **insured**;

   **2.** The **insured** is included as a co-defendant in addition to the parent company or franchisor; and

   **3.** The **insured** as well as the parent company or franchisor are represented by the same counsel in connection with such **claim**.

For the purposes of this extension, a parent company or franchisor shall include:

   **1.** Any entity other than a natural person which owns more than 50% of the outstanding securities or voting rights representing the present right to vote for election of directors, trustees, managers (if a limited liability company) or equivalent of a **named insured** or **subsidiary**; or

   **2.** Any franchisor who has granted to an **insured** under a franchise agreement any franchise or franchise rights to allow the **insured** to operate as a franchisee or a franchised dealer.

This Section does not apply to the Cincinnati Data Defender™ Coverage Form, the Cincinnati Network Defender™ Coverage Form or the Cincinnati Cyber Defense™ Coverage Form.

# POLICYHOLDER NOTICE
# TERRORISM INSURANCE COVERAGE

Your policy (or the policy proposed to you) contains coverage for certain losses caused by terrorism.

<u>**Premium:**</u>

In accordance with the federal Terrorism Risk Insurance Act, we are required to notify you of the portion of the premium, if any, attributable to the coverage for terrorist acts certified under the Terrorism Risk Insurance Act.

- The portion of your premium that is attributable to coverage for terrorist acts certified under the Act is

   $ 0           .

<u>**Federal Participation:**</u>

The Act also requires us to provide disclosure of federal participation in payment of terrorism losses.

- Under your policy, any losses caused by certified acts of terrorism would be partially reimbursed by the United States Government, Department of Treasury, under a formula established by federal law. Under this formula, the federal share equals a percentage, as specified in the Schedule below, of that portion of the amount of such insured losses that exceeds the applicable insurer retention. However, if aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year, the Treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion.

- **Schedule:**

| Federal Share of Terrorism Losses | |
|---|---|
| Percentage | Calendar Year |
| 85% | 2015 |
| 84% | 2016 |
| 83% | 2017 |
| 82% | 2018 |
| 81% | 2019 |
| 80% | 2020 |

<u>**Cap on Insurer Participation:**</u>

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

<u>**NOTE:**</u>   **THIS NOTICE IS PROVIDED TO SATISFY THE REQUIREMENTS UNDER THE TERRORISM RISK INSURANCE ACT FOR POLICYHOLDER DISCLOSURE: (1) AT THE TIME OF OUR OFFER OF COVERAGE <u>AND</u> (2) AT THE TIME COVERAGE IS ISSUED.**

**IA 4234 01 15**

Exhibit 3

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

**GENERAL PROVISIONS APPLICABLE TO ALL LIABILITY COVERAGE PARTS**

**A.** **SECTION I - DEFINITIONS** is amended to add the following:

**Certified act of terrorism** means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act. The criteria contained in the Terrorism Risk Insurance Act for a **certified act of terrorism** include the following:

1. The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

2. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**B.** **CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM**

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

**C.** **APPLICATION OF OTHER EXCLUSIONS**

The terms and limitations of any terrorism exclusion, or the inapplicability, omission or absence of a terrorism exclusion does not serve to create coverage for any **loss** which would otherwise be excluded under this policy, such as **losses** excluded by:

1. Exclusions that address war, warlike action, insurrection, rebellion, revolution, military action, nuclear hazard, nuclear materials, nuclear reaction, radiation, or radioactive contamination;

2. Exclusions that address pollutants, contamination, deterioration, fungi or bacteria; or

3. Any other exclusion,

regardless if the **certified act of terrorism** contributes concurrently or in any sequence to the **loss**.

**D.** **SUNSET CLAUSE**

If the federal Terrorism Risk Insurance Act expires or is repealed, then this endorsement is null and void for any act of terrorism that takes place after the expiration or repeal of the Act.

All other provisions of the policy remain unchanged except as herein expressly modified.

Includes copyrighted material of Insurance Services Office, Inc., and American Association of Insurance Services, Inc., with their permission.

**ML 458 01 16**

Exhibit 3

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

---

# NEW MEXICO CHANGES - CANCELLATION AND NONRENEWAL

---

This endorsement modifies insurance provided under the following:

**PILLAR POLICY PROGRAM**

The following provision is added:

**CANCELLATION AND NONRENEWAL**

**A.** The first **named insured** may cancel this policy or any of its Coverage Parts by mailing or delivering to us advance written notice of cancellation.

**B.** **Permissible Reasons and Notice Period**

  **1.** If this policy is in effect less than 60 days, we may cancel for any reason by mailing or delivering to the first **named insured** written notice of cancellation at least 10 days before the effective date of cancellation.

  **2.** If this policy is in effect 60 days or more, we may cancel only for one or more of the following reasons:

   **a.** Nonpayment of premium.

   **b.** There has been a substantial change in the risk assumed by us since the policy was issued.

   **c.** The policy was obtained through material misrepresentation, fraudulent statements, omissions or concealment of fact material to the acceptance of the risk or to the hazard assumed by us.

   **d.** Willful and negligent acts or omission by the **insured** have substantially increased the hazards insured against.

   **e.** The **named insured** presented a claim based on fraud or material misrepresentation.

  **3.** If we cancel subject to **B.2.** above, we will mail or deliver to the first **named insured** written notice of Cancellation at least:

   **a.** 10 days before the effective date of cancellation, for the reason set forth in **B.2.a.**

   **b.** 60 days before the effective date of cancellation, for a reason set forth in **B.2.b.**, **B.2.c.**, **B.2.d.** or **B.2.e.** Such notice may only be sent for cancellation effective at a policy anniversary at the end of a **policy year.**

   The written notice will state the reason for cancellation, except that such statement may be omitted from a notice mailed to an additional insured or lien holder under this policy.

**C.** We will mail or deliver our notice to the first **named insured's** last mailing address known to us.

**D.** Notice of cancellation will state the effective date of cancellation. The **policy period** will end on that date.

**E.** If this policy is cancelled, we will send the first n**amed insured** any premium refund due. The refund will be pro rata. The cancellation will be effective even if we have not made or offered a refund.

**F.** If notice is mailed, proof of mailing will be sufficient proof of notice.

**G.** If we decide not to renew this policy or a particular Coverage Part, we will mail or deliver to the first **named insured** written notice of the nonrenewal not less than 30 days before:

  **1.** The expiration date of this policy; or

  **2.** The end of a **policy year**, if the policy is written for a term of more than one year.

All other provisions of the policy remain unchanged except as herein expressly modified.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

Exhibit 3

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

<div style="border:1px solid black; text-align:center;">

# NEW MEXICO CHANGES -
# PILLAR POLICY PROGRAM

</div>

This endorsement modifies insurance provided under the following:

**BANKERS PROFESSIONAL LIABILITY COVERAGE**
**COMMUNITY ASSOCIATION DIRECTORS AND OFFICERS LIABILITY COVERAGE**
**EDUCATORS LEGAL LIABILITY COVERAGE**
**EMPLOYMENT PRACTICES LIABILITY COVERAGE**
**FIDUCIARY LIABILITY COVERAGE**
**FINANCIAL INSTITUTIONS DIRECTORS AND OFFICERS LIABILITY COVERAGE**
**GENERAL PROVISIONS APPLICABLE TO ALL LIABILITY COVERAGE PARTS**
**HEALTHCARE INSTITUTIONS DIRECTORS AND OFFICERS LIABILITY COVERAGE**
**NONPROFIT ORGANIZATION DIRECTORS AND OFFICERS LIABILITY COVERAGE**
**PRIVATELY HELD COMPANY DIRECTORS AND OFFICERS LIABILITY COVERAGE**
**TRUST SERVICES ERRORS AND OMISSIONS COVERAGE**

**A.** Paragraph **D.** of **SECTION XIX - EXTENDED REPORTING PERIODS** of the **GENERAL PROVISIONS APPLICABLE TO ALL LIABILITY COVERAGE PARTS** is deleted in its entirety and replaced by the following:

**D.** If the Optional Extended Reporting Period endorsement is in effect, we will provide a Supplemental Aggregate Limit of Insurance, but only for **claims** first made during the Optional Extended Reporting Period. The Supplemental Aggregate Limit of Insurance will be equal to the dollar amount of the aggregate Limit of Insurance shown in the Declarations for the applicable Coverage Part or the Shared Annual Aggregate Limit of Liability, if so set forth on the Common Policy Declarations.

**B.** The following provision is added to **GENERAL PROVISIONS APPLICABLE TO ALL LIABILITY COVERAGE PARTS**:

**ACCOUNTING**

We shall, upon written request, provide to the first **named insured** an accounting of **defense costs** actually expended.

**C.** **SECTION VI - DEFENSE, INVESTIGATION AND SETTLEMENT** of all Coverage Parts is deleted in its entirety and replaced by the following:

**SECTION VI - DEFENSE, INVESTIGATION AND SETTLEMENT**

**A.** We defend the **insureds** against any **claim**; however, we will have no duty to defend the **insureds** against any **claim** to which this insurance does not apply. The **insureds** may select defense counsel with our consent, which consent shall not be unreasonably withheld, or the **insureds** may consent to our choice of defense counsel, which consent shall not be unreasonably withheld. The **insureds** may participate in and assist in the direction of any **claim**.

**B.** We may make any investigation we deem necessary and may, with the consent of the **insureds** named in connection with the **claim**, which consent shall not be unreasonably withheld, make any settlement of any **claim** we deem expedient. If the **insureds** withhold consent to such settlement, our liability for all **loss** in connection with such **claim** shall not exceed:

**1.** The amount of the proposed settlement plus **defense costs** incurred up to the date of the **insured's** refusal to consent to the proposed settlement; plus

**2.** 90% of any settlement or judgment in excess of the proposed settlement amount referenced in **B.1.** above plus 90% of any **defense costs** incurred after the date the **insureds** refused to consent to the proposed settlement, subject in all events to the applicable Limit of Insurance and Deductible for such **claim**. The remaining 10% of any settlement or judgment in excess of the proposed settlement amount referenced in **B.1.** above plus 10% of any **defense costs** incurred after the date the **insureds** refused to consent to the proposed settlement shall be borne by the **insureds**, uninsured and at their own risk.

Exhibit 3

**C.** Our right and duty to defend end when we have used up the applicable Limit of Insurance in the defense or payment of damages, judgments or settlements of covered **claims**.

All other provisions of the policy remain unchanged except as herein expressly modified.

Exhibit 3

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

<div style="border:1px solid black">

# EXTENDED REPORTING
# AMENDATORY ENDORSEMENT

</div>

This endorsement modifies insurance provided under the following:

**GENERAL PROVISIONS APPLICABLE TO ALL LIABILITY COVERAGE PARTS**

**SECTION XIX – EXTENDED REPORTING PERIODS, A. 2** is deleted in its entirety and replaced with the following:

**2.** Optional Extended Reporting Periods

 **a.** The **named insured** shall have the option to purchase a 12 month Extended Reporting Period to replace the 90 day Automatic Extended Reporting Period for an additional premium equal to 75% of the expiring annual premium for the applicable Coverage Part.

 **b.** Additional Optional Extended Reporting Periods may be available for an additional premium charge if an Extended Reporting Period longer than 12 months is desired. It is solely our decision whether to permit the first **named insured** to purchase an Extended Reporting Period with a term longer than 12 months. If such coverage is agreed upon, the **named insured** will have the option to purchase a three year Extended Reporting Period for an additional premium equal to 150% of the expiring annual premium or a six year Extended Reporting Period for an additional premium of 225% of the expiring annual premium for the applicable Coverage Part.

The first **named insured** must give us a written request of their intent to purchase an Optional Extended Reporting Period within 60 days after the **policy period** of the applicable Coverage Part or that option shall terminate. The Optional Extended Reporting Period will not go into effect unless the first **named insured** pays the additional premium promptly when due.

All other provisions of the policy remain unchanged except as herein expressly modified.

**IA 450 11 87 A**

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## STATE INCONSISTENCY ENDORSEMENT

This endorsement modifies insurance provided under the following:

**GENERAL PROVISIONS APPLICABLE TO ALL LIABILITY COVERAGE PARTS**

**GENERAL PROVISIONS APPLICABLE TO ALL LIABILITY COVERAGE PARTS** is amended to add the following:

It is understood and agreed that in the event that there is an inconsistency between a state amendatory endorsement attached to this policy and any other term or condition of this policy, then where permitted by law we shall apply whichever of such inconsistent terms and conditions which are more favorable to the **insured**.

All other provisions of the policy remain unchanged except as herein expressly modified.

**IA 450 11 87 B**

Exhibit 3

# NOTICE OF LOSS CONTROL SERVICES

The Cincinnati Insurance Companies provide certain loss prevention services to policyholders at no additional cost. These services are designed to prevent or reduce the impact of potential loss causing events or conditions related to the type(s) of insurance coverage you have purchased from us. One of these services that you can receive is described below:

Employment Practices Liability (EPL) Toll-Free Hot Line

Have a question on how to handle an employment situation? Simply call The Cincinnati Insurance Companies Employment Connection at 1-888-811-3427 for assistance. We offer policyholders an unlimited number of calls seeking advice on employment policies and procedures.

The services provided are advisory in nature. While this program is offered as a resource in developing or maintaining a loss prevention program, you should consult competent legal counsel to design and implement your own program. No liability is assumed by reason of the services, access or information provided. All services are subject to change without notice. Use of the EPL Toll-Free Hot Line will not be deemed to satisfy any notice of claim or notice of wrongful act provision contained in any policy.

**IA 4427 02 13**

Exhibit 3

# THE CINCINNATI INSURANCE COMPANY
# THE CINCINNATI CASUALTY COMPANY
# THE CINCINNATI INDEMNITY COMPANY

## NOTICE TO POLICYHOLDERS

Please be advised that in your application for insurance you disclosed information to The Cincinnati Insurance Company, The Cincinnati Casualty Company and The Cincinnati Indemnity Company.  The information disclosed in the application and all information subsequently collected by any of these companies may be shared among all three.

**IP 446 08 01**

Exhibit 3

# SIGNATURE ENDORSEMENT

IN WITNESS WHEREOF, this policy has been signed by our President and Secretary in the City of Fairfield, Ohio, but this policy shall not be binding upon us unless countersigned by an authorized representative of ours. The failure to countersign does not void coverage in Arizona, Virginia and Wisconsin.

Secretary                              President

The signature on any form, endorsement, policy, declarations, jacket or application other than the signature of the President or Secretary named above is deleted and replaced by the above signatures.

**IA 4338 05 11**

Exhibit 3

# The Cincinnati Insurance Company

A Stock Insurance Company

## NONPROFIT ORGANIZATION
## DIRECTORS AND OFFICERS LIABILITY
## COVERAGE PART DECLARATIONS

**THIS COVERAGE PART PROVIDES CLAIMS-MADE COVERAGE, WHICH APPLIES ONLY TO CLAIMS FIRST MADE DURING THE POLICY PERIOD OR ANY APPLICABLE EXTENDED REPORTING PERIOD. TO THE EXTENT IT IS NOT OTHERWISE INDICATED, THE LIMIT OF INSURANCE TO PAY DAMAGES OR SETTLEMENTS WILL BE REDUCED AND MAY BE EXHAUSTED BY DEFENSE COSTS, AND DEFENSE COSTS WILL BE APPLIED AGAINST THE DEDUCTIBLE. IN NO EVENT WILL WE BE LIABLE FOR DEFENSE COSTS OR THE AMOUNT OF ANY JUDGMENT OR SETTLEMENT IN EXCESS OF THE LIMIT OF INSURANCE. READ THE ENTIRE POLICY CAREFULLY.**

Policy Number: **EMN 056 41 27**

Named Insured is the same as it appears in the Common Policy Declarations unless another entry is made here.

| | | |
|---|---|---|
| Limit of Insurance: | $ 3,000,000 | in the aggregate |
| Investigative Costs Sublimit: | $ 100,000 | in the aggregate |
| Excess Benefit Transaction Tax Sublimit: | $ 20,000 | sublimit per **organizational manager** |

| | | |
|---|---|---|
| Additional Defense Limit of Insurance: | $ UNLIMITED | in the aggregate |

| | | |
|---|---|---|
| Excess Side A Limit of Insurance: | $ NOT COVERED | in the aggregate |

| | | |
|---|---|---|
| Deductibles: | $ 0 | each **claim** under Insuring Agreement **A** (Insured Persons) |
| | $ 25,000 | each **claim** under Insuring Agreement **B** (Indemnification) |
| | $ 25,000 | each **claim** under Insuring Agreement **C** (Organization) |

| | |
|---|---|
| Retroactive Date: | N/A |
| Prior or Pending Date: | 11-26-2012 |
| Continuity Date: | 11-26-2012 |

Forms and endorsements applicable to this coverage part:

| | | |
|---|---|---|
| ML105 | 01/18 | NONPROFIT ORGANIZATION DIRECTORS AND OFFICERS LIABILITY COVERAGE |
| IA450C | 11/87 | AMENDED DEFINITION OF CLAIMS |
| IA450D | 11/87 | AMENDED DEFINITION OF INSURED PERSON |
| IA450E | 11/87 | DEFINITION OF EXECUTIVE AMENDATORY |

EMN 056 41 27
Exhibit 3

```
IA450F      11/87 AMENDED SETTLEMENT PROVISION
IA450G      11/87 AMENDED CONDUCT EXCLUSION
ML312       01/16 ASSAULT EXCLUSION
```

01-06-2020 17:14

# NONPROFIT ORGANIZATION
# DIRECTORS AND OFFICERS LIABILITY COVERAGE

### TABLE OF CONTENTS

**Coverage Part Provision:**                                                          **Begins on Page:**

SECTION I - INSURING AGREEMENTS ...................................................................................2

SECTION II - DEFINITIONS............................................................................................................2

SECTION III - EXCLUSIONS .........................................................................................................5

SECTION IV - SEVERABILITY OF EXCLUSIONS ..................................................................6

SECTION V - LIMIT OF INSURANCE AND DEDUCTIBLES................................................6

SECTION VI - DEFENSE, INVESTIGATION AND SETTLEMENT .....................................7

# NONPROFIT ORGANIZATION
# DIRECTORS AND OFFICERS LIABILITY COVERAGE

**THIS COVERAGE PART PROVIDES CLAIMS-MADE COVERAGE, WHICH APPLIES ONLY TO CLAIMS FIRST MADE DURING THE POLICY PERIOD OR ANY APPLICABLE EXTENDED REPORTING PERIOD. TO THE EXTENT IT IS NOT OTHERWISE INDICATED, THE LIMIT OF INSURANCE TO PAY DAMAGES OR SETTLEMENTS WILL BE REDUCED AND MAY BE EXHAUSTED BY DEFENSE COSTS, AND DEFENSE COSTS WILL BE APPLIED AGAINST THE DEDUCTIBLE. IN NO EVENT WILL WE BE LIABLE FOR DEFENSE COSTS OR THE AMOUNT OF ANY JUDGMENT OR SETTLEMENT IN EXCESS OF THE LIMIT OF INSURANCE. READ THE ENTIRE POLICY CAREFULLY.**

## SECTION I - INSURING AGREEMENTS

**A.** We will pay on behalf of the **insured persons** all **loss** which they shall be legally obligated to pay, except for such **loss** which the **organization** actually pays as indemnification, resulting from any **claim** first made during the **policy period**, or any **extended reporting period** included in or endorsed to the policy, for a **wrongful act**.

**B.** We will pay on behalf of the **organization** all **loss** which the **organization** is required to pay as indemnification to the **insured persons** resulting from any **claim** first made during the **policy period**, or any **extended reporting period** included in or endorsed to the policy, for a **wrongful act**.

**C.** We will pay on behalf of the **organization** all **loss** which the **organization** is required to pay resulting from any **claim** first made during the **policy period**, or any **extended reporting period** included in or endorsed to the policy, against the **organization** for a **wrongful act**.

We will have the right and duty to select counsel and defend the **insureds** against any such **claim**.

## SECTION II - DEFINITIONS

Where set forth in bold type in this Coverage Part, whether in singular or in plural, the following terms shall have the meanings indicated.

**A.** **Claim** means:

    **1.** A written demand for monetary damages or non-monetary relief;

    **2.** A civil proceeding commenced by the filing of a complaint or similar pleading;

    **3.** A formal administrative or regulatory proceeding commenced by the filing of a complaint, charge, formal investigative order or similar document;

    **4.** An arbitration, mediation or similar alternative dispute resolution proceeding in which monetary damages are sought if the **insured**:

        **a.** Is required to participate in such proceeding; or

        **b.** Agrees to participate in such proceeding with our written consent, such consent not to be unreasonably withheld;

    **5.** A criminal proceeding commenced by the return of an indictment;

    **6.** A written request to toll or waive a statute of limitations related to a potential **claim** described in Definitions **A.1.** through **A.5.** above; or

    **7.** A civil, administrative, regulatory or criminal investigation of an **insured person** once such **insured person** is identified in writing by such investigating authority as a person against whom a proceeding described in Definitions **A.2.**, **A.3** or **A.5.** may be commenced. The maximum Limit of Insurance for all such investigations against any **insured persons** shall be the Investigative Costs Sublimit set forth in the Nonprofit Organization Directors and Officers Liability Coverage Part Declarations. This sublimit shall be part of and not in addition to the Limit of Insurance set forth in the Nonprofit Organization Directors and Officers Liability Coverage Part Declarations and does not increase our maximum aggregate liability under this Coverage Part;

against any **insured**, including any appeal therefrom.

Exhibit 3

**B.** **Defense costs** means reasonable and necessary fees, costs, and expenses incurred by us or with our consent on behalf of the **insureds** or reimbursed to any of the **insureds** by us, resulting solely from the investigation, adjustment, defense and appeal of any **claim**. **Defense costs** includes, but is not limited to, the cost of expert consultants and witnesses, and premiums for appeal, injunction, attachment or supersedeas bonds (but not the obligation to furnish such bonds).

**Defense costs** shall not include:

1. Salaries, wages, fees, overhead or expenses of our employees or any **insureds**, directors, officers, trustees or employees, other than that portion of our employed attorneys' fees, salaries and expenses allocated to a specific **claim**;

2. Any amount covered by the duty to defend obligation of any other insurer; or

3. Any pre-tender fees, costs or expenses.

**C.** **Directors and officers** means all natural persons who were, now are, or shall become an officer, a duly elected or appointed member of the board of directors, trustees, regents, managers, governors, a **LLC manager** or an equivalent position of the **organization**.

**D.** **Disqualified person** means a disqualified person as that term is defined in Section 4958 of the Internal Revenue Code of 1986, as amended.

**E.** **Employee** includes, but is not limited to, all natural persons who were, now are, or shall become full-time, part-time, seasonal, volunteer, contingent or leased workers of the **organization** as determined by federal, state or local law. **Employee** does not include independent contractors as determined by federal, state or local law.

**F.** **Employment related wrongful act** means a **wrongful act** arising from employment related activities including, but not limited to, hiring, training, supervision, evaluation, promotion, demotion, granting of tenure, and termination.

**G.** **Excess benefit transaction** means an excess benefit transaction as that term is defined in Section 4958 of the Internal Revenue Code of 1986, as amended.

**H.** **Excess benefit transaction tax** means any excise tax imposed by the Internal Revenue Service on any **insured** who is an **organizational manager** as a result of such **insured's** participation in an **excess benefit transaction**.

**I.** **Executive** means any natural person who was, now is or shall become the chief executive officer, chief financial officer, executive director or person of equivalent position to any of the foregoing of the **organization**.

**J.** **Financial impairment** means, with respect to the **organization** or any **outside organization**, the appointment of any receiver, conservator, liquidator, rehabilitator, trustee or similar official; or the **organization** or any **outside organization** becoming a **debtor in possession**.

**K.** **Insured** means the **organization** and the **insured persons**.

**L.** **Insured persons** means:

1. **Directors and officers**;

2. All natural persons who were, now are, or shall become an **employee** or committee member, whether or not they were, are or shall be compensated, of the **organization**;

3. All natural persons who were, now are, or shall become members or volunteers of the **organization** while acting on behalf of the **organization** in a voluntary capacity at the direction of the **directors and officers**; and

4. Any natural person who is an independent contractor as determined by federal, state or local law, but only while acting in the capacity as such for the **organization** pursuant to an express written agreement between the independent contractor, or any entity on behalf of the independent contractor, and the **organization** and only if the **organization** agrees in writing to provide indemnification to such independent contractor; provided, however, that any coverage under this Coverage Part for any such independent contractor shall be excess of any indemnification or insurance otherwise available to such independent contractor from any other source.

**M.** **LLC manager** means any natural person who is a manager, member of the board of managers or member of the **organization** that is a limited liability company, but only with respect to the conduct of the

limited liability company's business. However, any member of a limited liability company who is a passive investor not involved in the operations of the limited liability company is not a **LLC manager.**

**N.** **Loss** means **defense costs** and the total amount of monetary damages which the **insured** becomes legally obligated to pay on account of any **claim** for a **wrongful act** with respect to which coverage hereunder applies, including damages, judgments, settlements, prejudgment and postjudgment interest, and punitive or exemplary damages or the multiplied portion of any multiplied damage award if insurable under the applicable law most favorable to the insurability of punitive, exemplary or multiplied damages.

**Loss** shall also include:

Any **excess benefit transaction tax** an **insured** is obligated to pay as a result of a **claim**. The maximum Limit of Insurance per each **organizational manager** for any **excess benefit transaction tax** shall be the Excess Benefit Transaction Tax Sublimit set forth in the Nonprofit Organization Directors and Officers Liability Coverage Part Declarations. This sublimit shall be part of and not in addition to the Limit of Insurance set forth in the Nonprofit Organization Directors and Officers Liability Coverage Part Declarations and does not increase our maximum aggregate liability under this Coverage Part. The **excess benefit transaction tax** shall not include the 25% excise tax assessed against any **disqualified person** or the 200% tax assessed for failure to correct an **excess benefit transaction**.

**Loss** shall not include:

1. Taxes, criminal or civil fines or penalties imposed by law, except as noted above;

2. Any restitution, disgorgement or similar sums; or

3. Any matter deemed uninsurable under the law pursuant to which this Coverage Part shall be construed.

**O.** **Organization** means the **named insured** and any **subsidiary.**

**P.** **Organizational manager** means an organizational manager as that term is defined in Section 4958 of the Internal Revenue Code of 1986, as amended.

**Q.** **Outside organization** means any nonprofit corporation or organization other than the **organization**, which is described in Section 501(c)(2), (3), (4), (6), (7), (8), (10), (19), or 501(d) of the Internal Revenue Code of 1986, as amended, and is exempt from federal income taxation.

**R.** **Outside position** means the service of any **insured person** of the **organization** as an officer or member of the board of directors, trustees, regents, managers, governors, or equivalent position in any **outside organization** but only during the time that such service is performed at the direction of the **organization** or with the consent and knowledge of the **organization.**

**S.** **Personal injury** means invasion of privacy, wrongful entry, eviction, false arrest, false imprisonment, false detention, abuse of process, malicious prosecution, libel, slander, defamation, or disparaging of a person's or organization's goods, products or services.

**T.** **Property damage** means:

1. Injury or damage, of any nature, to tangible or intangible property, including all resulting loss of use of that property; or

2. Loss of or loss of use of tangible or intangible property that is not otherwise injured or damaged.

**U.** **Publishers liability** means infringement of copyright, trademark, service mark or trade name, unauthorized use of title, plagiarism or misappropriation of ideas.

**V.** **Third party** means any natural person who is not an **employee** of the **organization.**

**W.** **Wrongful act** means any actual or alleged error, misstatement, misleading statement, act, omission, neglect or breach of duty including any **personal injury** or **publishers liability** committed, attempted or allegedly committed or attempted on or after the Retroactive Date, if any, set forth in the Nonprofit Organization Directors and Officers Liability Coverage Part Declarations and prior to the end of the **policy period** by:

1. Any of the **insured persons** in the discharge of their duties solely in their capacity as **insured persons** of the **organization**;

2. Any of the **insured persons** of the **organization** in the discharge of their duties solely in their capacity in an **outside position** in any **outside organization**;

3. Any of the **insured persons** solely by reason of their status as such; or

4. The **organization**.

---

## SECTION III - EXCLUSIONS

The descriptions in the headings of these exclusions are solely for convenience and form no part of the terms and conditions of coverage.

**A.** Bodily Injury/Property Damage

We are not liable to pay, indemnify or defend any **claim** for actual or alleged:

**1.** Bodily injury, sickness, disease, or death of any person, mental anguish, or emotional distress; or

**2.** **Property damage**, including, but not limited to, physical injury, loss of or loss of use of currency or any negotiable or non-negotiable instruments or contracts representing money.

**B.** Conduct

We are not liable to pay, indemnify or defend any **claim** based upon, arising out of, or in consequence of any of the **insureds** or any person for whose actions the **insureds** are legally responsible:

**1.** Committing any deliberately fraudulent act or omission;

**2.** Committing any willful violation of any statute or regulation; or

**3.** Gaining any profit, remuneration or advantage to which they were not legally entitled;

if established by a final and non-appealable judgment or adjudication in any underlying action or proceeding adverse to the **insureds** as to such conduct.

With respect to determining the applicability of this exclusion, no conduct pertaining to any **insured person** shall be imputed to any other **insured person**; however, any conduct pertaining to any **executive** shall be imputed to the **organization** to determine if coverage is available.

**C.** Contract

We are not liable to pay, indemnify or defend any **claim** for any actual or alleged liability of any **insureds** under the terms, conditions or warranties of any oral or written contract or agreement, except to the extent the liability would have attached to any such **insureds** in the absence thereof; provided, however, that this exclusion shall not apply to **defense costs** with respect to any **claim** against any **insured persons**.

**D.** Cyber

We are not liable to pay, indemnify or defend any **claim** for any actual or alleged:

**1.** Improper dissemination of personally identifiable information or protected health information;

**2.** Liability of any **insured** arising out of internet and electronic services which are performed for or on behalf of any client or customer of the **organization** through the transmission of electronic data to or from the **organization's** internet website or through a private computer network controlled by the **organization**; or

**3.** Liability of any **insured** for internet professional services the **organization** provides to others which may include, but are not limited to, application service provider, domain name registration services, electronic exchange and auction services, internet hosting services, internet media services, internet service provider service, managed and network security services, public key infrastructure services, search engine services, web portal services, website development, software development and internet access provider;

provided, however, that this exclusion shall not apply to any **claim** to which Insuring Agreement **A.** solely applies.

**E.** Employment Practices

We are not liable to pay, indemnify or defend any **claim** for an **employment related wrongful act**.

**F.** ERISA

We are not liable to pay, indemnify or defend any **claim** for any actual or alleged violation of the Employee Retirement Income Security Act of 1974, as amended or any rules, regulations or orders promulgated thereunder or any similar provisions of any federal, state or local statutory or common law in connection with any pension or welfare plan established for the benefit of **employees** of the **organization**.

Exhibit 3

**G.** Insured vs. Insured

We are not liable to pay, indemnify or defend any **claim** brought or maintained by, on behalf of or at the behest of any of the **insureds** in any capacity and regardless of collusion; provided, however, that this exclusion does not apply to:

**1.** Any **claim** brought or maintained as a derivative action on behalf of the **organization** by one or more persons who are not **insured persons** and who bring and maintain the **claim** without the solicitation, assistance or participation of any of the **insureds**;

**2.** Any **claim** brought or maintained by any of the **insureds** for contribution or indemnity, if such **claim** for contribution or indemnity directly results from another **claim** covered by the Coverage Part;

**3.** Any **claim** brought or maintained by an examiner, trustee, receiver, liquidator, rehabilitator, bankruptcy trustee or similar official, or creditors' committee of the **organization** in connection with a bankruptcy proceeding of the **organization**;

**4.** Any **claim** brought or maintained by **insured persons** of the **organization**:

    **a.** Who are **executives** or **directors and officers** who have not served as such for at least a one year period prior to the date the **claim** is first made and who bring and maintain the **claim** without the solicitation, assistance or participation of any **insured persons** who have served as **insured persons** within such one year period; or

    **b.** Other than **executives** or **directors and officers** if such **claim** is brought and maintained without any active assistance or participation of, or solicitation by, any **executives** or **directors and officers**; or

**5.** Any **claim** brought by a whistleblower pursuant to any federal, state, or local statutory or common law.

**H.** Intellectual Property

We are not liable to pay, indemnify or defend any **claim** based upon, arising out of, or in consequence of any actual or alleged infringement of patent or misappropriation of trade secrets or other intellectual property rights; provided, however, that this exclusion shall not apply to any **publishers liability**. Furthermore, this exclusion shall not apply to any **claim** against any **insured persons**.

**I.** Outside Service

We are not liable to pay, indemnify or defend any **claim** for any **wrongful act** in the discharge of the duties of any of the **insured persons** as a director, officer, trustee, employee, volunteer or member of any entity other than the **organization**, even if directed or requested to serve such other entity by the **organization**; provided, however, that this exclusion shall not apply to the extent:

**1.** Such **claim** is based on the service of an **insured person** in an **outside position**; and

**2.** The **loss** resulting from such **claim** is not indemnified by the **outside organization** or any of its insurers.

**J.** Third Party Discrimination or Sexual Harassment

We are not liable to pay, indemnify or defend any **claim** for any discrimination against or sexual harassment of any **third party**.

## SECTION IV - SEVERABILITY OF EXCLUSIONS

With respect to determining the applicability of the above exclusions, no **wrongful act** or knowledge possessed by any one of the **insureds** shall be imputed to any other **insureds** to determine if coverage is available, unless indicated otherwise.

## SECTION V - LIMIT OF INSURANCE AND DEDUCTIBLES

**A.** We will pay 100% of **loss** in excess of the applicable Deductible amount set forth in the Nonprofit Organization Directors and Officers Liability Coverage Part Declarations up to the Limit of Insurance set forth in the Nonprofit Organization Directors and Officers Liability Coverage Part Declarations, subject to the Shared Annual Aggregate Limit of Liability, if so set forth in the Common Policy Declarations.

**B.** In the event a single **claim** is covered under more than one Insuring Agreement, the Deductibles set forth in the Nonprofit Organization Directors and Officers Liability Coverage Part Declarations shall be applied

Exhibit 3

separately to the part of the **loss** resulting from such **claim** covered by each Insuring Agreement and the sum of the Deductibles so applied shall constitute the Deductible for each single **claim**; provided, however, that the total Deductible as finally determined shall in no event exceed the largest of the applicable Deductibles. Notwithstanding the aforementioned, the Deductible applicable to Insuring Agreement **B.** shall apply to **loss** payable under any of the Insuring Agreements for which indemnification by the **organization** is legally permissible, whether or not actual indemnification is granted, unless the **organization** fails to indemnify any **insured person** due to the **financial impairment** of the **organization**. The Deductible shall be paid by the **organization**. Any **loss** paid by us within the Deductible shall be reimbursed by the **organization** within 30 days of our written request for such reimbursement.

**C.**   **Defense costs** shall be part of and not in addition to the Limit of Insurance set forth in the Nonprofit Organization Directors and Officers Liability Coverage Part Declarations and the Shared Annual Aggregate Limit of Liability, if so set forth in the Common Policy Declarations. **Defense costs** we pay shall reduce such Limits of Insurance. **Defense costs** paid by the **organization** shall be applied against the Deductible.

**D.**   Our maximum aggregate liability for all **loss** resulting from all **claims** under this Coverage Part shall be the Limit of Insurance set forth in the Nonprofit Organization Directors and Officers Liability Coverage Part Declarations, subject to the Shared Annual Aggregate Limit of Liability, if so set forth in the Common Policy Declarations.

**E.**   If an Additional Defense Limit of Insurance is set forth in the Nonprofit Organization Directors and Officers Liability Coverage Part Declarations, **defense costs** will apply first to and reduce the Additional Defense Limit of Insurance. The Additional Defense Limit of Insurance will be in addition to and not part of the Limit of Insurance set forth in the Nonprofit Organization Directors and Officers Liability Coverage Part Declarations. The Additional Defense Limit of Liability is applicable to **defense costs** only. **Defense costs** paid by the **organization** shall be applied against the Deductible.

Upon exhaustion of the Additional Defense Limit of Insurance, **defense costs** shall be part of and not in addition to the Limit of Insurance set forth in the Nonprofit Organization Directors and Officers Liability Coverage Part Declarations. **Defense costs** we pay shall reduce the Limit of Insurance.

**F.**   If an Excess Side A Limit of Insurance is set forth in the Nonprofit Organization Directors and Officers Liability Coverage Part Declarations and if the Limit of Insurance has been exhausted, we provide the **insured persons** with an excess limit of insurance under Insuring Agreement **A.** Such Excess Side A Limit of Insurance will not exceed the amount set forth in the Nonprofit Organization Directors and Officers Liability Coverage Part Declarations. The Excess Side A Limit of Insurance is in addition to and not part of the Limit of Insurance, and it applies solely to **loss** resulting from any **claim** against an **insured person** to which Insuring Agreement **A.** is applicable.

**G.**   It is agreed that:

**1.**   If a **loss** from any **claim** is payable but such payment would exceed the remaining applicable Limit of Insurance as set forth in the Nonprofit Organization Directors and Officers Liability Coverage Part Declarations, we will first pay the unpaid portion of such **loss** under Insuring Agreement **A.**; then to the extent that any amount of the applicable Limit of Insurance shall remain available, we will pay such **loss** to which Insuring Agreements **B.** and **C.** apply.

**2.**   Upon written request of the president, chairperson or equivalent position of the **named insured**, we shall withhold payment of a covered **loss** under Insuring Agreements **B.** and **C.** until the president, chairperson or equivalent position of the **named insured** directs us to pay such covered **loss**. Such request shall not delay any payment under Insuring Agreement **A.**

## SECTION VI - DEFENSE, INVESTIGATION AND SETTLEMENT

**A.**   We will have the right and duty to select counsel and defend the **insureds** against any **claim**; however, we will have no duty to defend the **insureds** against any **claim** to which this insurance does not apply.

**B.**   We may make any investigation we deem necessary and may, with the consent of the **insureds** named in connection with the **claim**, make any settlement of any **claim** we deem expedient. If the **insureds** withhold consent to such settlement, our liability for all **loss** in connection with such **claim** shall not exceed:

**1.**   The amount of the proposed settlement plus **defense costs** incurred up to the date of the **insured's** refusal to consent to the proposed settlement; plus

**2.**   90% of any settlement or judgment in excess of the proposed settlement amount referenced in **B.1.** above plus 90% of any **defense costs** incurred after the date the **insureds** refused to consent to the proposed settlement, subject in all events to the applicable Limit of Insurance and Deductible for such **claim**. The remaining 10% of any settlement or judgment in excess of the proposed settlement

amount referenced in **B.1.** above plus 10% of any **defense costs** incurred after the date the **insureds** refused to consent to the proposed settlement shall be borne by the **insureds**, uninsured and at their own risk.

**C.** Our right and duty to defend end when we have used up the applicable Limit of Insurance in the defense or payment of damages, judgments or settlements of covered **claims**.

---

Exhibit 3

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

<div style="border:1px solid black">

## AMENDED DEFINITION OF CLAIM ENDORSEMENT

</div>

This endorsement modifies insurance provided under the following:

**NONPROFIT ORGANIZATION DIRECTORS AND OFFICERS LIABILITY COVERAGE**

**SECTION II - DEFINITIONS**, **A.** is amended to include the following:

**A. Claim** means:

1. A written demand for monetary damages or non-monetary relief;

2. A civil proceeding commenced by the filing of a complaint or similar pleading;

3. A formal administrative or regulatory proceeding commenced by a filing of a complaint, charge, formal investigative order or similar document;

4. An arbitration, mediation or similar alternative dispute resolution proceeding in which monetary damages are sought if the **insured**:

    **a.**   Is required to participate in such proceeding; or
    **b.**   Agrees to participate in such proceeding with our written consent, such consent not to be unreasonably withheld;

5. A criminal proceeding commenced by the return of an indictment or any similar document;

6. A written request to toll or waive a statute of limitations relating to a potential **claim** described in Definitions **A.1.** through **A.5.** above; or

7. A civil, administrative, regulatory or criminal investigation of an **insured person** or of the **organization** once such **insured person** or the **organization** is identified in writing by such investigating authority as a person against whom a proceeding described in Definitions **A.2.**, **A.3** or **A.5.** may be commenced. The maximum Limit of Insurance for all such investigations against any **insured persons** shall be the Investigative Costs Sublimit set forth in the Privately Held Company Directors and Officers Liability Coverage Part Declarations. This sublimit shall be part of and not in addition to the Limit of Insurance set forth in the Privately Held Company Directors and Officers Liability Coverage Part Declarations and does not increase our maximum aggregate liability under this Coverage Part;

against any **insured**, including any appeal therefrom.

All other provisions of the policy remain unchanged except as herein expressly modified.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

---

## AMENDED DEFINITION OF INSURED PERSONS ENDORSEMENT

---

This endorsement modifies insurance provided under the following:

**NONPROFIT ORGANIZATION DIRECTORS AND OFFICERS LIABILITY COVERAGE**

**SECTION II - DEFINITIONS**, **L.** is amended to add the following:

    **5.** Students and interns

    **6**. Any natural person who is an independent contractor as determined by federal, state or local law, but only while acting in the capacity as such for the **organization** pursuant to an express written agreement between the independent contractor, or any entity on behalf of the independent contractor;

    but only for acts with respect to their duties for service to the **organization**

All other provisions of the policy remain unchanged except as herein expressly modified.

**IA 450 11 87 D**                                                                                      **Page 1 of 1**

Exhibit 3

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## DEFINITION OF EXECUTIVE AMENDATORY ENDORSEMENT

This endorsement modifies insurance provided under the following:

**NONPROFIT ORGANIZATION DIRECTORS AND OFFICERS LIABILITY COVERAGE**

**SECTION II - DEFINITIONS, I.** is deleted in its entirety and replaced by the following:

   **E.**   **Executive** means any natural person who was, now is or shall become the Chief Executive Officer, Chief Financial Officer or person of equivalent position to any of the foregoing of the **organization**.

All other provisions of the policy remain unchanged except as herein expressly modified.

**IA 450 11 87 E**

**Page 1 of 1**

Exhibit 3

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## AMENDED SETTLMENT PROVISION

This endorsement modifies insurance provided under the following:

**NONPROFIT ORGANIZATION DIRECTORS AND OFFICERS LIABILITY COVERAGE PARTS**

**SECTION VI – DEFENSE, INVESTIGATION AND SETTLEMENT.** is deleted in its entirety and replaced by the following:

**A.** We will have the right and duty to select counsel and defend the **insureds** against any **claim**; however, we will have no duty to defend the **insureds** against any **claim** to which this insurance does not apply.

**B.** We may make any investigation we deem necessary and may, with the consent of the **insureds** named in connection with the **claim**, make any settlement of any **claim** we deem expedient.

**C.** Our right and duty to defend end when we have used up the applicable Limit of Insurance in the defense or payment of damages, judgments or settlements of covered **claims**.

All other provisions of the policy remain unchanged except as herein expressly modified.

**IA 450 (11/87) F**

Exhibit 3

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

---

# AMENDED CONDUCT EXCLUSION

---

This endorsement modifies insurance provided under the following:

> **COMMUNITY ASSOCIATION DIRECTORS AND OFFICERS LIABILITY COVERAGE**
> **EDUCATORS LEGAL LIABILITY COVERAGE**
> **FINANCIAL INSTITUTIONS DIRECTORS AND OFFICERS LIABILITY COVERAGE**
> **NONPROFIT ORGANIZATION DIRECTORS AND OFFICERS LIABILITY COVERAGE**
> **PRIVATELY HELD COMPANY DIRECTORS AND OFFICERS LIABILITY COVERAGE**
> **PUBLICLY TRADED COMPANY DIRECTORS AND OFFICERS LIABILITY COVERAGE**

**SECTION III - EXCLUSIONS, B.** is deleted in its entirety and replaced by the following:

**B.**   Conduct

We are not liable to pay, indemnify or defend any **claim** based upon, arising out of, or in consequence of any of the **insureds** or any person for whose actions the **insureds** are legally responsible:

**1.**   Committing any deliberately fraudulent act or omission;

**2.**   Committing any willful violation of any statute or regulation; or

**3.**   Gaining any personal profit, remuneration or financial advantage to which they were not legally entitled;

if established by a final and non-appealable judgment or adjudication in the underlying action or proceeding adverse to the **insureds** as to such conduct.

With respect to determining the applicability of this exclusion, no conduct pertaining to any **insured person** shall be imputed to any other **insured person**; however, any conduct pertaining to any **executive** shall be imputed to the **organization** to determine if coverage is available.

All other provisions of the policy remain unchanged except as herein expressly modified.

IA 450 (11/87) G

Exhibit 3

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## ASSAULT EXCLUSION

This endorsement modifies insurance provided under the following:

> **COMMUNITY ASSOCIATION DIRECTORS AND OFFICERS LIABILITY COVERAGE**
> **EDUCATORS LEGAL LIABILITY COVERAGE**
> **FINANCIAL INSTITUTIONS DIRECTORS AND OFFICERS LIABILITY COVERAGE**
> **HEALTHCARE INSTITUTIONS DIRECTORS AND OFFICERS LIABILITY COVERAGE**
> **NONPROFIT ORGANIZATION DIRECTORS AND OFFICERS LIABILITY COVERAGE**
> **PRIVATELY HELD COMPANY DIRECTORS AND OFFICERS LIABILITY COVERAGE**
> **PUBLICLY TRADED COMPANY DIRECTORS AND OFFICERS LIABILITY COVERAGE**

**SECTION III - EXCLUSIONS** is amended to add the following:

We are not liable to pay, indemnify or defend any **claim** based upon, arising out of, or in consequence of any allegations of sexual assault, physical abuse or any threat of bodily harm or abuse.

All other provisions of the policy remain unchanged except as herein expressly modified.

**ML 312 01 16**

Exhibit 3

# The Cincinnati Insurance Company

A Stock Insurance Company

# EMPLOYMENT PRACTICES LIABILITY
# COVERAGE PART DECLARATIONS

**THIS COVERAGE PART PROVIDES CLAIMS-MADE COVERAGE, WHICH APPLIES ONLY TO CLAIMS FIRST MADE DURING THE POLICY PERIOD OR ANY APPLICABLE EXTENDED REPORTING PERIOD. TO THE EXTENT IT IS NOT OTHERWISE INDICATED, THE LIMIT OF INSURANCE TO PAY DAMAGES OR SETTLEMENTS WILL BE REDUCED AND MAY BE EXHAUSTED BY DEFENSE COSTS, AND DEFENSE COSTS WILL BE APPLIED AGAINST THE DEDUCTIBLE. IN NO EVENT WILL WE BE LIABLE FOR DEFENSE COSTS OR THE AMOUNT OF ANY JUDGMENT OR SETTLEMENT IN EXCESS OF THE LIMIT OF INSURANCE. READ THE ENTIRE POLICY CAREFULLY.**

Policy Number: **EMN 056 41 27**

Named Insured is the same as it appears in the Common Policy Declarations unless another entry is made here.

| | | | |
|---|---|---|---|
| Limit of Insurance: | $ | 3,000,000 | in the aggregate |
| Optional Third Party Liability Sublimit | $ | 3,000,000 | in the aggregate |
| Wage and Hour Defense Sublimit | $ | 250,000 | in the aggregate |
| Immigration Defense Sublimit | $ | 100,000 | in the aggregate |

| | | | |
|---|---|---|---|
| Additional Defense Limit of Insurance: | $ | UNLIMITED | in the aggregate |

| | | |
|---|---|---|
| Deductibles: | $ 25,000 | each **claim** under Insuring Agreement **A** (Employment Practices) |
| | $ 25,000 | each **claim** under Insuring Agreement **B** (Third Party) |

| | |
|---|---|
| Retroactive Date: | N/A |
| Prior or Pending Date: | 01-01-2020 |
| Continuity Date: | 01-01-2020 |

Forms and endorsements applicable to this coverage part:

| | | |
|---|---|---|
| ML112 | 01/18 | EMPLOYMENT PRACTICES LIABILITY COVERAGE |
| IA450H | 11/87 | AMENDED DEFINITION OF EMPLOYEE |
| IA450I | 11/87 | AMENDED DEFINITION OF INSURED PERSONS |
| IA450J | 11/87 | DEFINITION OF EXECUTIVE AMENDATORY |
| IA450K | 11/87 | AMENDED SETTLEMENT PROVISION |
| ML4195 | 09/18 | NOTICE OF POST-EVENT SERVICES - WORKPLACE VIOLENCE EXPENSE COVERAGE |
| ML205 | 01/18 | WORKPLACE VIOLENCE EXPENSE COVERAGE ENDORSEMENT |
| ML341 | 01/18 | THIRD PARTY LIABILITY ASSAULT EXCLUSION |

01-06-2020 17:14

EMN 056 41 27

Exhibit 3

# EMPLOYMENT PRACTICES LIABILITY COVERAGE

### TABLE OF CONTENTS

**Coverage Part Provision:**          **Begins on Page:**

**SECTION I - INSURING AGREEMENTS** ................................................................................2

**SECTION II - DEFINITIONS** ...........................................................................................2

**SECTION III - EXCLUSIONS** ..........................................................................................6

**SECTION IV - SEVERABILITY OF EXCLUSIONS** ..............................................................7

**SECTION V - LIMIT OF INSURANCE AND DEDUCTIBLE** ................................................7

**SECTION VI - DEFENSE, INVESTIGATION AND SETTLEMENT** .......................................8

**SECTION VII - SUPPLEMENTARY PAYMENTS** ................................................................8

# EMPLOYMENT PRACTICES LIABILITY COVERAGE

**THIS COVERAGE PART PROVIDES CLAIMS-MADE COVERAGE, WHICH APPLIES ONLY TO CLAIMS FIRST MADE DURING THE POLICY PERIOD OR ANY APPLICABLE EXTENDED REPORTING PERIOD. TO THE EXTENT IT IS NOT OTHERWISE INDICATED, THE LIMIT OF INSURANCE TO PAY DAMAGES OR SETTLEMENTS WILL BE REDUCED AND MAY BE EXHAUSTED BY DEFENSE COSTS, AND DEFENSE COSTS WILL BE APPLIED AGAINST THE DEDUCTIBLE. IN NO EVENT WILL WE BE LIABLE FOR DEFENSE COSTS OR THE AMOUNT OF ANY JUDGMENT OR SETTLEMENT IN EXCESS OF THE LIMIT OF INSURANCE. READ THE ENTIRE POLICY CAREFULLY.**

## SECTION I - INSURING AGREEMENTS

**A.** We will pay on behalf of the **insureds** all **loss** which they shall be legally obligated to pay resulting from any **employment claim** or **immigration claim** first made during the **policy period**, or any **extended reporting period** included in or endorsed to the policy, for an **employment wrongful act** or **immigration wrongful act**.

**B.** If Optional Third Party Liability is purchased as set forth in the Employment Practices Liability Coverage Part Declarations, we will pay on behalf of the **insureds** all **loss** which they shall be legally obligated to pay resulting from any **third party claim** first made during the **policy period**, or any **extended reporting period** included in or endorsed to the policy, for a **third party wrongful act**.

We will have the right and duty to select counsel and defend the **insureds** against any such **claim**.

## SECTION II - DEFINITIONS

Where set forth in bold type in this Coverage Part, whether in singular or in plural, the following terms shall have the meanings indicated.

**A.** **Benefits** means perquisites, fringe benefits, payments in connection with an employee benefit plan and any other payment, other than salary, wages or commissions to or for the benefit of an **employee** arising out of the employment relationship.

**B.** **Claim** means an **employment claim,** an **immigration claim** or a **third party claim**.

**C.** **Defense costs** means reasonable and necessary fees, costs, and expenses incurred by us or with our consent on behalf of the **insureds** or reimbursed to any of the **insureds** by us, resulting solely from the investigation, adjustment, defense and appeal of any **claim**. **Defense costs** includes, but is not limited to, the cost of expert consultants and witnesses, and premiums for appeal, injunction, attachment or supersedeas bonds (but not the obligation to furnish such bonds).

**Defense costs** shall not include:

**1.** Salaries, wages, fees, overhead or expenses of our employees or any **insureds**, directors, officers, trustees or employees, other than that portion of our employed attorneys' fees, salaries and expenses allocated to a specific **claim**;

**2.** Any amount covered by the duty to defend obligation of any other insurer; or

**3.** Any pre-tender fees, costs or expenses.

**D.** **Employee** includes, but is not limited to, full-time, part-time, seasonal, volunteer, contingent or leased workers as determined by the federal, state or local law. **Employee** does not include independent contractors as determined by federal, state or local law.

**E.** **Employment claim** means:

**1.** A written demand for monetary damages or non-monetary relief;

**2.** A civil proceeding commenced by the filing of a complaint or similar pleading;

**3.** A formal administrative or regulatory proceeding commenced by the filing of a complaint, charge, formal investigative order or similar document;

**4.** An arbitration, mediation or similar alternative dispute resolution proceeding (other than a labor or grievance arbitration or other proceeding pursuant to a collective bargaining agreement) if the **insured** is required or agrees to participate in such proceeding with our written consent;

5. In the context of an audit conducted by the Office of Federal Contract Compliance Programs, a Notice of Violation or Order to Show Cause or written demand for monetary or non-monetary relief, commenced by the receipt by an **insured** of such Notice, Order or written demand; or

6. A written request to toll or waive a statute of limitations relating to a potential **employment claim** described in Definitions **E.1.** through **E.5.** above;

which is brought by or on behalf of any past, present or prospective **employee(s)** of the **organization** against any of the **insureds**, including any appeal therefrom.

F. **Employment wrongful act** means any actual or alleged error, misstatement, misleading statement, act, omission, neglect or breach of duty committed for:

1. Wrongful discharge, dismissal or termination of employment, including constructive discharge;

2. Breach of any oral, written or implied employment contract or quasi-employment contract other than any labor or grievance arbitration or other proceeding pursuant to a collective bargaining agreement;

3. Employment related misrepresentation;

4. Violation of any federal, state or local law that concerns employment discrimination:

   a. Including:

      1. Sexual harassment involving unwelcome sexual advances, requests for sexual favors or other conduct of a sexual nature; or

      2. Workplace bullying or workplace harassment of a non-sexual nature;

   b. That:

      1. Are made a condition of employment;

      2. Are used as a basis for employment decisions; or

      3. Create a work environment that is intimidating, offensive, hostile or interferes with performance;

5. Wrongful failure to employ or promote;

6. Wrongful demotion;

7. Wrongful discipline;

8. Wrongful deprivation of a career opportunity;

9. Negligent hiring, supervision, promotion or retention;

10. Negligent evaluation;

11. Employment related **personal injury**;

12. Wrongful failure to grant tenure;

13. Employment related wrongful infliction of emotional distress;

14. Violation of the Family Medical Leave Act;

15. Wrongful **retaliation**;

16. Wrongful denial of training, denial or deprivation of seniority or evaluation;

17. Failure to adopt, create, provide or enforce adequate workplace or employment practices and procedures; or

18. Wrongful handling of any background check which is issued or expected to be used or collected in whole or in part for the purpose of serving as a factor in any employment related activities, including but not limited to any violation of the Fair Credit Reporting Act;

including any actual or alleged assault, battery, or loss of consortium in connection with Subparagraphs **1.** through **18.** above.

G. **Executive** means any natural person who was, now is or shall become the chairperson, president, chief executive officer, chief financial officer, executive director, in-house general counsel or person of equivalent position to any of the foregoing of the **organization**.

**H.** **Immigration claim** means any criminal investigation of any **insured** by any governmental agency for any actual or alleged hiring of illegal aliens.

**I.** **Immigration wrongful act** means any actual or alleged violation of the Immigration Reform and Control Act of 1986 or any amendments to or rules, regulations or orders promulgated pursuant to it, or similar provisions of any federal, state, or local statutory or common law.

**J.** **Insured** means the **organization** and the **insured persons**.

**K.** **Insured persons** means:

    **1.** All natural persons who were, now are, or shall become an officer or a duly elected or appointed member of the board of directors, trustees, regents, managers, governors, a **LLC manager** or an equivalent position of the **organization**;

    **2.** All natural persons who were, now are, or shall become an **employee** or committee member, whether or not they were, are or shall be compensated, of the **organization**;

    **3.** All natural persons who were, now are, or shall become members or volunteers of the **organization**, if the **organization** is nonprofit in nature,  while acting on behalf of the **organization** in a voluntary capacity at the direction of the board of directors, trustees, regents, managers, governors, or an equivalent position; and

    **4.** Any natural person who is an independent contractor as determined by federal, state or local law, but only while acting in the capacity as such for the **organization** pursuant to an express written agreement between the independent contractor, or any entity on behalf of the independent contractor, and the **organization** and only if the **organization** agrees in writing to provide indemnification to such independent contractor; provided, however, that any coverage under this Coverage Part for any such independent contractor shall be excess of any indemnification or insurance otherwise available to such independent contractor from any other source;

but only for acts with respect to their duties for or service to the **organization**.

**L.** **LLC manager** means any natural person who was, now is or shall become a manager, member of the board of managers or member of the **organization** that is a limited liability company but only with respect to the conduct of the limited liability company's business.  However, any member of a limited liability company who is a passive investor not involved in the operations of the limited liability company is not a **LLC manager.**

**M.** **Loss** means **defense costs** and the total amount of monetary damages which the **insured** becomes legally obligated to pay on account of any **claim** for a **wrongful act** with respect to which coverage hereunder applies, including damages (including back pay and front pay), judgments, settlements, prejudgment and postjudgment interest, and punitive or exemplary damages or the multiplied portion of any multiplied damage award if insurable under the applicable law most favorable to the insurability of punitive, exemplary or multiplied damages.

**Loss** shall not include any amount for which an **insured** is not financially liable, compensation earned in the course of employment but not paid by an **insured** or matters which are deemed uninsurable under the law pursuant to which this Coverage Part shall be construed.

**Loss** shall not include, (other than **defense costs**):

    **1.** **Benefits** or the equivalent value, however, this provision does not apply to **loss** resulting solely from wrongful termination of employment;

    **2.** Amounts, which arise out of, are based upon, or are attributable to the employment reinstatement of the claimant by an **insured** or the continued employment of the claimant;

    **3.** Future compensation, including salary or **benefits** for an **employee**, if the **insured** is ordered in accordance with a judgment or other final adjudication but fails to reinstate the claimant as an **employee**;

    **4.** That part of any express contract of employment or an express obligation to make payments in the event of the termination of employment;

    **5.** Salary, wages, commissions, **benefits** or other monetary payments which constitute severance payments or payments pursuant to a notice period;

    **6.** Civil or criminal fines or penalties imposed by law, liquidated damages (other than liquidated damages awarded under the Age Discrimination in Employment Act or the Equal Pay Act), payroll or other taxes, or damages, penalties or types of relief deemed uninsurable under applicable law;

7. Future compensation, including salary or **benefits** for an **employee** who has been or will be hired, promoted or reinstated to employment pursuant to a settlement, court order, judgment, award or other resolution of a **claim**; or

8. Medical, pension, disability, life insurance, stock option or other **employee** type **benefit**.

**N.** **Organization** means the **named insured** and any **subsidiary**.

**O.** **Personal injury** means injury, other than bodily injury, arising out of one or more of the following offenses:

1. False arrest, detention or imprisonment;

2. Oral or written publication of material that libels, slanders or defames a past, present or prospective **employee**;

3. Invasion of a past, present or prospective **employee's** right of privacy;

4. Malicious prosecution; or

5. Abuse of process.

**P.** **Property damage** means:

1. Injury or damage, of any nature, to tangible or intangible property, including all resulting loss of use of that property; or

2. Loss of or loss of use of tangible or intangible property that is not otherwise injured or damaged.

**Q.** **Retaliation** means any actual or alleged wrongful termination of employment or other adverse employment action against a claimant with respect to any person's exercise or attempted exercise of rights protected by law, refusal to violate any law, disclosure or threat of disclosure to a superior or to any governmental agency actual or alleged violations of the law, or having assisted or testified in or cooperated with a proceeding or investigation regarding alleged violations of law.

**R.** **Third party** means any natural person who is not an **employee** of the **organization**.

**S.** **Third party claim** means:

1. A written demand for monetary damages or non-monetary relief;

2. A civil proceeding commenced by the filing of a complaint or similar pleading;

3. A formal administrative or regulatory proceeding commenced by the filing of a complaint, charge, formal investigative order or similar document;

4. An arbitration, mediation or similar alternative dispute resolution proceeding (other than a labor or grievance arbitration or other proceeding pursuant to a collective bargaining agreement) if the **insured** is required or agrees to participate in such proceeding with our written consent; or

5. A written request to toll or waive a statute of limitations relating to a potential **third party claim** described in Definitions **S.1.** through **S.4.** above;

which is brought by or on behalf of any **third party** against any of the **insureds**, including any appeal therefrom.

**T.** **Third party wrongful act** means any actual or alleged error, misstatement, misleading statement, act, omission, neglect or breach of duty committed, attempted or allegedly committed or attempted on or after the Retroactive Date, if any, set forth in the Employment Practices Liability Coverage Part Declarations and prior to the end of the **policy period** by an **insured** or any person for whose acts the **insured** is legally liable for:

1. Discrimination by any **insured** against a **third party** in violation of any applicable federal, state or local statute, ordinance or common law;

2. Sexual or other harassment by any **insured**, including unwelcome sexual advances, requests for sexual favors or other conduct of a sexual nature against a **third party** which violates the civil rights of the **third party**; or

3. **Wrongful eviction** when arising out of discrimination or harassment by any **insured** against a **third party** in violation of any applicable federal, state or local statute, ordinance or common law.

**U.** **Wrongful act** means an **employment wrongful act**, an **immigration wrongful act** or a **third party wrongful act** attempted or allegedly committed or attempted on or after the Retroactive Date, if any, set

forth in the Employment Practices Liability Coverage Part Declarations and prior to the end of the **policy period** by an **insured** or any person for whose acts the **organization** is legally liable.

**V.** **Wrongful eviction** means the act of dispossessing or attempting to dispossess a **third party** of real property to which such **third party** claims a right to occupy, and such real property is owned, operated or controlled by the **organization**.

---

## SECTION III - EXCLUSIONS

The descriptions in the headings of these exclusions are solely for convenience and form no part of the terms and conditions of coverage.

**A.** Exclusions applicable to **loss** other than **defense costs**:

   **1.** Americans With Disabilities Act

     This insurance does not apply to **loss** incurred by the **insured** in making physical changes, modifications, alterations, or improvements as part of an accommodation pursuant to the Americans With Disabilities Act or similar provisions of any federal, state or local statutory or common law; provided, however, that this exclusion does not apply to **defense costs**.

   **2.** Wage and Hour (with Defense Sublimit)

     This insurance does not apply to any **claim** based upon, arising out of or in consequence of the Fair Labor Standards Act (except the Equal Pay Act) or any amendments to or rules, regulations or orders promulgated pursuant to it, or similar provisions of any federal, state, or local statutory or common law; except we shall reimburse the **insureds** for up to a maximum payment of the Wage and Hour Defense Sublimit set forth in the Employment Practices Liability Coverage Part Declarations in **defense costs** that exceed the Deductible amount as set forth in the Employment Practices Liability Coverage Part Declarations. Any payment of **defense costs** shall be part of and not in addition to the Limit of Insurance set forth in the Employment Practices Liability Coverage Part Declarations and such payment reduces the Limit of Insurance. However, this exclusion shall not apply to an **employment claim** for retaliatory treatment of a person with respect to actual or threatened disclosures by such person of any actual or alleged violation of the Fair Labor Standards Act by any **insured**.

   **3.** Immigration (with Defense Sublimit)

     This insurance does not apply to any **immigration claim** except we shall reimburse the **insureds** for up to a maximum payment of the Immigration Claim Defense Sublimit set forth in the Employment Practices Liability Coverage Part Declarations in **defense costs** that exceed the Deductible amount as set forth in the Employment Practices Liability Coverage Part Declarations. Any payment of **defense costs** shall be part of and not in addition to the Limit of Insurance set forth in the Employment Practices Liability Coverage Part Declarations and such payment reduces the Limit of Insurance. However, this exclusion shall not apply to an **employment claim** for retaliatory treatment of a person with respect to actual or threatened disclosures by such person of any actual or alleged violation of the Immigration Reform and Control Act of 1986 by any **insured**.

**B.** Exclusions applicable to all **loss**:

   **1.** Bodily Injury/Property Damage

     We are not liable to pay, indemnify or defend any **claim** for actual or alleged:

     **a.** Bodily injury, sickness, disease, or death of any person; or

     **b.** **Property damage**, including, but not limited to, physical injury, loss of or loss of use of currency or any negotiable or non-negotiable instruments or contracts representing money.

   **2.** COBRA, ERISA, NLRA, OSHA and WARN (with Retaliation Carve Back)

     This insurance does not apply to any **claim** based upon, arising out of or in consequence of the:

     **a.** Consolidated Omnibus Budget Reconciliation Act of 1985;

     **b.** Employee Retirement Income Security Act of 1974 (except Section 510 thereof);

     **c.** National Labor Relations Act (including the Labor Management Relations Act of 1947);

     **d.** Occupational Safety and Health Act;

**e.** Worker Adjustment and Retraining Notification Act; or

any amendments to or rules, regulations or orders promulgated pursuant to these laws, or similar provisions of any federal, state, or local statutory or common law. However, this exclusion shall not apply to any **employment claim** for retaliatory treatment of a person with respect to actual or threatened disclosures by such person of any actual or alleged violation of the acts described in **B.2.a.** through **B.2.e.** above by any **insured**.

**3.** Contractual (Other than Employment Contract)

We are not liable to pay, indemnify or defend any **claim** based upon, arising out of or in consequence of any actual or alleged liability of any **insureds** under the terms, conditions or warranties of any oral or written contract or agreement, except:

**a.** To the extent the liability would have attached to any such **insureds** in the absence thereof; or

**b.** With respect to any **claim** for breach of an employment contract.

**4.** Labor Relations

We are not liable to pay, indemnify or defend any **claim** based upon, arising out of or in consequence of any actual or alleged:

**a.** Labor or grievance arbitration or other proceeding pursuant to a collective bargaining agreement; or

**b.** **Wrongful act** committed, attempted, or allegedly committed or attempted concurrent with or after a lockout, strike, picket line, replacement or other similar actions resulting from labor disputes or labor negotiations.

**5.** Workers' Compensation, Unemployment, Social Security and Disability (with Retaliation Carve Back)

We are not liable to pay, indemnify or defend any **claim** based upon, arising out of or in consequence of any actual or alleged obligation of any **insured** under any workers' compensation, unemployment insurance, social security, disability benefits or similar law, or derivative actions arising out of any of these. However, this exclusion shall not apply to any **employment claim** for retaliatory treatment by an **insured** due to the exercise of rights granted under any such law.

## SECTION IV - SEVERABILITY OF EXCLUSIONS

With respect to determining the applicability of the above exclusions, no **wrongful act** or knowledge possessed by any one of the **insureds** shall be imputed to any other **insureds** to determine if coverage is available, unless indicated otherwise.

## SECTION V - LIMIT OF INSURANCE AND DEDUCTIBLE

**A.** The Limits of Insurance shown in the Employment Practices Liability Coverage Part Declarations and the rules below fix the most we will pay regardless of the number of:

**1.** **Insureds** under this Coverage Part;

**2.** **Claims** made or suits brought on account of **wrongful acts** or otherwise; or

**3.** Persons or organizations making **claims** or bringing suits.

**B.** Our liability shall apply only to that part of each covered **loss** which is excess of the Deductible amount specified in the Employment Practices Liability Coverage Part Declarations and such Deductible amount shall be borne by the **insureds**.

**C.** **Defense costs** incurred by us or by the **insured** with our written consent are part of and not in addition to the Limit of Insurance set forth in the Employment Practices Liability Coverage Part Declarations and the Shared Annual Aggregate Limit of Liability, if so set forth in the Common Policy Declarations. **Defense costs** we pay shall reduce such Limits of Insurance. **Defense costs** paid by the **insureds** shall be applied against the Deductible.

**D.** Our maximum aggregate liability for all **loss** resulting from all **claims** under this Coverage Part shall be the Limit of Insurance set forth in the Employment Practices Liability Coverage Part Declarations, subject to the Shared Annual Aggregate Limit of Liability, if so set forth in the Common Policy Declarations.

**E.**   If an Additional Defense Limit of Insurance is set forth in the Employment Practices Liability Coverage Part Declarations, **defense costs** will apply first to and reduce the Additional Defense Limit of Insurance. The Additional Defense Limit of Insurance will be in addition to, and not part of the Limit of Insurance set forth in the Employment Practices Liability Coverage Part Declarations. The Additional Defense Limit of Liability is applicable to **defense costs** only. **Defense costs** paid by the **insureds** shall be applied against the Deductible.

Upon exhaustion of the Additional Defense Limit of Insurance, **defense costs** shall be part of and not in addition to the Limit of Insurance set forth in the Employment Practices Liability Coverage Part Declarations. **Defense costs** we pay shall reduce the Limit of Insurance.

## SECTION VI - DEFENSE, INVESTIGATION AND SETTLEMENT

**A.**   We will have the right and duty to select counsel and defend the **insureds** against any **claim**; however, we will have no duty to defend the **insureds** against any **claim** to which this insurance does not apply.

**B.**   We may make any investigation we deem necessary and may, with the consent of the **insureds** named in connection with the **claim**, make any settlement of any **claim** we deem expedient. If the **insureds** withhold consent to such settlement, our liability for all **loss** in connection with such **claim** shall not exceed:

**1.**   The amount of the proposed settlement plus **defense costs** incurred up to the date of the **insured's** refusal to consent to the proposed settlement; plus

**2.**   90% of any settlement or judgment in excess of the proposed settlement amount referenced in **B.1.** above plus 90% of any **defense costs** incurred after the date the **insureds** refused to consent to the proposed settlement, subject in all events to the applicable Limit of Insurance and Deductible for such **claim**. The remaining 10% of any settlement or judgment in excess of the proposed settlement amount referenced in **B.1.** above plus 10% of any **defense costs** incurred after the date the **insureds** refused to consent to the proposed settlement shall be borne by the **insureds**, uninsured and at their own risk.

**C.**   Our right and duty to defend end when we have used up the applicable Limit of Insurance in the defense or payment of damages, judgments or settlements of covered **claims**.

## SECTION VII - SUPPLEMENTARY PAYMENTS

We will pay with respect to any **claim** we defend:

**A.**   The cost of any appeal bond, attachment bond, or any similar bond, but only for bond amounts within the applicable Limit of Insurance; provided, however, that we do not have to apply for or furnish these bonds; and

**B.**   All reasonable expenses incurred by the **insured** at our request to assist us in the investigation or defense of the **claim**, including actual loss of earnings up to $250 a day because of time off from work.

These payments will not reduce the Limits of Insurance.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

<div style="border:1px solid black;">

## AMENDED DEFINITION OF EMPLOYEE ENDORSEMENT

</div>

This endorsement modifies insurance provided under the following:

**EMPLOYMENT PRACTICES LIABILITY COVERAGE**

**SECTION II - DEFINITIONS**, **D.** is deleted in its entirety and replaced by the following:

**D. Employee** includes, but is not limited to, full-time, part-time, seasonal, volunteer, students, interns, contingent or leased workers as determined by the federal, state or local law. **Employee** does not include independent contractors as determined by federal, state or local law.

All other provisions of the policy remain unchanged except as herein expressly modified.

**IA 450 11 87 H**                                                         **Page 1 of 1**

Exhibit 3

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

---

### AMENDED DEFINITION OF INSURED PERSONS ENDORSEMENT

---

This endorsement modifies insurance provided under the following:

**EMPLOYMENT PRACTICES LIABILITY COVERAGE**

**SECTION II - DEFINITIONS, K. 4.** is deleted in its entirety and replaced by the following:

    **4.** Any natural person who is an independent contractor as determined by federal, state or local law, but only while acting in the capacity as such for the **organization** pursuant to an express written agreement between the independent contractor, or any entity on behalf of the independent contractor;

    but only for acts with respect to their duties for service to the **organization**

All other provisions of the policy remain unchanged except as herein expressly modified.

Exhibit 3

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

<div style="border: 2px solid black; text-align: center;">

## DEFINITION OF EXECUTIVE AMENDATORY ENDORSEMENT

</div>

This endorsement modifies insurance provided under the following:

**EMPLOYMENT PRACTICES LIABILITY COVERAGE**

**SECTION  II -  DEFINITIONS,  G.**  is deleted in its entirety and replaced by the following:

G. **Executive** means any natural person who was, now is or shall become the Chief Executive Officer, Chief Financial Officer or person of equivalent position to any of the foregoing of the **organization**.

All other provisions of the policy remain unchanged except as herein expressly modified.

**IA 450 11 87 J**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## AMENDED SETTLMENT PROVISION

This endorsement modifies insurance provided under the following:

**EMPLOYMENT PRACTICES LIABILITY COVERAGE PARTS**

**SECTION IV – DEFENSE, INVESTIGATION AND SETTLEMENT.** is deleted in its entirety and replaced by the following:

   **A.** We will have the right and duty to select counsel and defend the **insureds** against any **claim**; however, we will have no duty to defend the **insureds** against any **claim** to which this insurance does not apply.

   **B.** We may make any investigation we deem necessary and may, with the consent of the **insureds** named in connection with the **claim**, make any settlement of any **claim** we deem expedient. If the **insured's** withhold consent to such settlement, our liability for all **loss** in connection with such **claims** shall not exceed:

      1. The amount of the proposed settlement plus **defense costs** incurred up to the date of the **insured's** refusal to consent to the proposed settlement; plus

      2. 95% of any settlement or judgement in excess of the proposed settlement amount referenced in **B.1.** above plus 95% of any **defense costs** incurred after the date the **insureds** refused to consent to the proposed settlement, subject in all events to the applicable Limit of Insurance and Deductible for such **claim**. The remaining 5% of any settlement or judgment in excess of the proposed settlement amount referenced in **B.1.** above plus 5% of any **defense costs** incurred after the date the **insureds** refused to consent to the proposed settlement shall be borne by the **insureds**, uninsured and at their own risk.

   **C.** Our right and duty to defend end when we have used up the applicable Limit of Insurance in the defense or payment of damages, judgments or settlements of covered **claims**.

All other provisions of the policy remain unchanged except as herein expressly modified.

**IA 450 (11/87) K**

Exhibit 3

# NOTICE OF POST-EVENT SERVICES -
# WORKPLACE VIOLENCE EXPENSE COVERAGE

Your policy includes valuable workplace violence expense coverage from the Cincinnati Insurance Company. In the event of a workplace violence event, you may utilize an outside vendor to assist your organization. The associated workplace violence expenses may be covered by your policy. The Cincinnati Insurance Company has teamed with Black Swan Solutions. A crisis management service through Empathia, Inc., Black Swan is a leader in supporting organizations affected by crisis and can provide policyholders with services following a workplace violence event. While you have no obligation to use the services of Black Swan Solutions, they are available if you want to consult with an outside vendor. However, if you opt to use the services of another organization or choose not to utilize an outside vendor, it will not impact your coverage under the Workplace Violence Expense Coverage Endorsement.

Black Swan Solutions offers a variety of services. Some expenses related to these services may be covered by your policy and some may not. The final determination of any expense reimbursement coverage will come from the Cincinnati Insurance Company. Black Swan Solutions can also engage in pre-event consulting, but such an expense would be borne solely by you.

**The Cincinnati Insurance Company Workplace Violence Post-Event Hotline**, monitored by Black Swan Solutions, is available to help your organization and your employees after a workplace violence event. You can contact Black Swan Solutions any time of day or night by calling our 24 hour hotline: 877-841-1082.

**Use of Workplace Violence Post-Event Hotline will not be deemed to satisfy any notice of claim or notice of workplace violence event provision contained in any policy. The selection of a vendor is the independent choice of the policyholder. The Cincinnati Insurance Company makes no warranties and assumes no liability for services, products, or loss control measures provided by Black Swan Solutions.**

**ML 4195 09 18**

Exhibit 3

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

---

# WORKPLACE VIOLENCE EXPENSE COVERAGE ENDORSEMENT

---

This endorsement modifies insurance provided under the following:

**EMPLOYMENT PRACTICES LIABILITY COVERAGE**

**A.** **SECTION I - INSURING AGREEMENTS** is amended to include the following Insuring Agreement:

We will reimburse all **workplace violence expenses** sustained by the **organization** as a result of a **workplace violence event** occurring during the **policy period** and reported to us as soon as practicable but in no event after the expiration of the policy or any **extended reporting period** included in or endorsed to this Coverage Part.

**B.** **SECTION II - DEFINITIONS** is amended to include the following:

**1.** **Business interruption expense** means:

  **a.** The excess of revenues over expenses, if any, that would have been earned by the **organization** had no **workplace violence event** occurred; and

  **b.** The reasonable costs and expenses that would not have been incurred by the **organization** except for a **workplace violence event** with the sole purpose to:

  **(1)** Continue the activities necessary for the organization to resume operations to substantially the same level that existed immediately prior to the **workplace violence event**; or

  **(2)** Reduce any **business interruption expense**, not to exceed the amount of actual reduction of such **business interruption expense.**

  However, **business interruption expense** shall be reduced by all recoveries, other insurance, suretyship and other indemnity which cover **business interruption expense**. Additionally, **business interruption expense** shall be reduced by the amount by which the organization reasonably could have reduced **business interruption expense** but fails to do so.

**2.** **Premises** means any building, facility or property occupied by the **organization** in the conduct of its business.

**3.** **Workplace violence event** means any actual or alleged intentional and unlawful:

  **a.** Use of deadly force; or

  **b.** Threat of deadly force involving the display of a lethal weapon;

  which occurs on **premises** and which did or could result in bodily injury or death to an **insured person**.

**4.** **Workplace violence expenses** means the reasonable fees, costs and expenses for:

  **a.** The services of an independent security consultant for up to 90 days following a **workplace violence event**;

  **b.** The services of an independent public relations consultant for up to 90 days following a **workplace violence event**;

  **c.** Counseling services provided to **insured persons** by an independent counselor on **premises** for up to 120 days following a **workplace violence event**;

  **d.** Independent security guards and other reasonable costs to secure the **premises** for up to 30 days following a **workplace violence event**;

  **e.** The services of an independent forensic analyst for up to 120 days following a **workplace violence event**;

Exhibit 3

**f.** The salaries or wages for up to 90 days following a **workplace violence event** paid by the **organization** to **insured persons** victimized by a **workplace violence event** and unable to work because of such **workplace violence event**; and

**g.** **Business interruption expense** until the earlier of 90 days following a **workplace violence event** or until the organization restores operations to substantially the same level that existed immediately prior to the **workplace violence event.**

**C. SECTION III - EXCLUSIONS, B.** is amended to include the following:

**1.** Robbery

This insurance does not apply to any **workplace violence event** based upon, arising out of or in consequence of a purpose of demanding money, securities or property.

**2.** Riot

This insurance does not apply to any **workplace violence event** based upon, arising out of or in consequence of riot, civil upheaval or civil unrest.

**D. SECTION V - LIMIT OF INSURANCE AND DEDUCTIBLE** is amended to include the following:

**1.** The Aggregate Limit of Insurance for all **workplace violence expenses** paid under this endorsed Insuring Agreement shall be $ 250,000_____ per **policy year** and shall apply as indicated by ☒ below:

☒ This separate limit shall be in addition to and not part of the Limit of Insurance set forth in the Employment Practices Liability Coverage Part Declarations.

☐ This sublimit shall be part of and not in addition to the Limit of Insurance set forth in the Employment Practices Liability Coverage Part Declarations.

**2.** No deductible shall apply to **workplace violence expenses** paid under this endorsed Insuring Agreement.

All other provisions of the policy remain unchanged except as herein expressly modified.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

---

# THIRD PARTY LIABILITY
# ASSAULT EXCLUSION

---

This endorsement modifies insurance provided under the following:

**EMPLOYMENT PRACTICES LIABILITY COVERAGE**

**A.** **SECTION II - DEFINITIONS, T.2.** is deleted in its entirety and replaced by the following:

   **2.** Sexual or other harassment solely and entirely of a verbal or **nonphysical** nature by any **insured** against any **third party** which violates the civil rights of the **third party**, including unwelcome verbal or **nonphysical** sexual advances or requests for sexual favors; or

**B.** **SECTION II - DEFINITIONS** is amended to include the following:

   **Nonphysical** means not involving any physical touching or bodily contact.

**C.** **SECTION III - EXCLUSIONS** amended to include the following:

   Exclusion applicable to **INSURING AGREEMENT B.** only:

   We are not liable to pay, indemnify or defend any **claim** based upon, arising out of, in consequence of, or in any way involving any actual or alleged physical touching or bodily contact of a **third party** by any **insured**.

All other provisions of the policy remain unchanged except as herein expressly modified.

**ML 341 01 18**

Exhibit 3

# The Cincinnati Insurance Company

## PILLAR POLICY APPLICATION
## FOR NONPROFIT ORGANIZATIONS

(other than Community Associations, Healthcare Institutions & Educational Institutions)

**THIS POLICY PROVIDES CLAIMS-MADE COVERAGE, WHICH APPLIES ONLY TO CLAIMS FIRST MADE DURING THE POLICY PERIOD OR ANY APPLICABLE EXTENDED REPORTING PERIOD. TO THE EXTENT IT IS NOT OTHERWISE INDICATED, THE LIMIT OF INSURANCE TO PAY DAMAGES OR SETTLEMENTS WILL BE REDUCED AND MAY BE EXHAUSTED BY DEFENSE COSTS, AND DEFENSE COSTS WILL BE APPLIED AGAINST THE DEDUCTIBLE. IN NO EVENT WILL WE BE LIABLE FOR DEFENSE COSTS OR THE AMOUNT OF ANY JUDGMENT OR SETTLEMENT IN EXCESS OF THE LIMIT OF INSURANCE. READ THE ENTIRE POLICY CAREFULLY.**

| General Information |
|---|
| This section must be completed. |

1. Name of Applicant: Sikh Dharma International

2. Physical Street Address: 21B East Sombrillo Road
   City: Espanola   State: NM   Zip: 87532

3. Mailing Address (☐ same as physical): PO Box 2213
   City: Espanola   State: NM   Zip: 87532

4. Website: www.sikhdharma.org   Phone Number: (505) 629-1562

5. Year Established: 1973

6. Nature of Business: Non-profit religious organization

7. Tax Exempt Status: ☒ Exempt   ☐ Nonexempt

8. Tax Code: ☒ 501(c)   ☐ Other

9. What is the number of locations occupied by the Applicant and subsidiaries? 1

10. Does the Applicant have any subsidiaries of which their ownership or management control is greater than 50%? *If yes, please complete table below:*   ☐ Yes ☒ No

| Name of Subsidiary | Description of Operations | Year Established | Non-Profit (NP) or For-Profit (FP) | Percent Owned |
|---|---|---|---|---|
| | | | | % |
| | | | | % |
| | | | | % |
| | | | | % |

11. If annual revenues are less than $500,000, fully complete the table below or attach most recent annual financials:

| | Most Recent Fiscal Year Ending 12 / 31 / 20 19 | Previous Fiscal Year Ending 12 / 31 / 20 18 |
|---|---|---|
| **Total Assets** | $ 2,319,448 | $ 2,066,506 |
| **Total Liabilities** | $ 61,970 | $ 68,092 |
| **Net Assets or Equity** | $ 2,257,477 | $ 1,998,413 |
| **Total Annual Revenues** | $ 1,583,088 | $ 1,205,899 |
| **Net Income or (Net Loss)** | $ 266,802 | $ (103,4180 |

Exhibit 4

12. Please provide the following information regarding the employee count (*do not include Independent Contractors*) of the Applicant and subsidiaries:

|  | Currently | One Year Ago |
|---|---|---|
| **Full-Time Employees** | 8 | 8 |
| **Part-Time Employees** | 4 | 4 |
| **Temporary/Seasonal** |  |  |
| **Volunteers** |  |  |

---

## Coverages Requested
### This section must be completed.

1. Requested effective date of coverage (if known): _____

2. Please indicate coverage(s) desired in the table below:

| Coverage Part | Desired Limits | Desired Deductible |
|---|---|---|
| ☒ Directors and Officers Liability | $ | $ |
| ☒ Employment Practices Liability | $ | $ |
| ☐ Fiduciary Liability | $ | $ |
| ☐ Cyber | Complete Cyber Section on Page 4. | |
| ☐ Crime | Complete Crime Section on Page 5. | |

3. Desired Pay Plan:

| Installment Options | Agency Bill | Direct Bill |
|---|---|---|
| Annual | ☒ | ☒ |
| Semi-Annual | ☐ | ☐ |
| Quarterly | ☐ | ☐ |
| Monthly | N/A | ☐ |

---

## Directors & Officers Liability Coverage
### This section should only be completed if coverage is desired.

1. Does the charter or by-laws provide indemnification to its directors and officers as permitted by law? ☒ Yes ☐ No

2. Does the Applicant have a formal Conflict of Interest Policy? ☒ Yes ☐ No

3. Has the Applicant or any subsidiary completed or been involved in the following:
*If yes, please attach details.*

|  | In the past 3 years | Contemplating in the future |
|---|---|---|
| Actual or proposed merger, acquisition, divestment, consolidation, closing or purchase/sale of assets? | ☐ Yes ☒ No | ☐ Yes ☒ No |
| Offering of securities of any kind (including stocks or bonds)? | ☐ Yes ☒ No | ☐ Yes ☒ No |
| Reorganization, bankruptcy proceeding or material change in any arrangement with creditors? | ☐ Yes ☒ No | ☐ Yes ☒ No |
| Operations outside of the United States of America, Puerto Rico and Canada? | ☐ Yes ☒ No | ☐ Yes ☒ No |
| Engage in any business transaction with any business controlled by any board member? | ☒ Yes ☐ No | ☐ Yes ☐ No |

4. In the past 5 years, has the Applicant or any subsidiary completed or been involved in the following:
*If yes, please provide details.*

   a. Copyright, patent or other intellectual property litigation? ☐ Yes ☒ No
   b. Antitrust litigation? ☐ Yes ☒ No
   c. Breach of any debt covenant, loan agreement or contractual obligations? ☐ Yes ☒ No

---

5. Does the Applicant or any subsidiary:
*If yes, please provide details.*

   a. Promote, sponsor or provide any type of insurance to its members or non-members? ☐ Yes ☒ No

   b. Provide any professional services? ☐ Yes ☒ No

   c. Provide any form of financing or lending? ☐ Yes ☒ No

   d. Conduct peer review or accreditation/ licensing activities? ☐ Yes ☒ No

   e. Conduct lobbying activities or sponsor a political action committee? ☐ Yes ☒ No

   f. Publishing, other than the Applicant's newsletters? ☐ Yes ☒ No

6. Is Employed Lawyers Professional Liability Coverage desired? ☒ Yes ☐ No
*If yes, please complete supplemental questionnaire ML 023 A.*

---

## Employment Practices Liability Coverage
### This section should only be completed if coverage is desired.

1. List the Applicant's total number of employees in the following locations:

CA: __2__   WV: _____   Foreign Countries: _____

2. Please indicate the number of employee terminations in the table below:

|  | Last 12 Months | Previous 12 Months |
|---|---|---|
| **Voluntary** | 0 | 1 |
| **Involuntary** (excluding layoffs) | 0 |  |
| **Layoffs** | 0 |  |

3. Have there been any layoffs in the last 24 months? *If yes, complete 3.a.-3.c.* ☐ Yes ☒ No

   a. Was a severance package available to the affected employees? ☐ Yes ☒ No

   b. Was a signed release required to receive a severance package? ☐ N/A ☐ Yes ☐ No

   c. Did anyone refuse to sign the severance package release? ☐ N/A ☐ Yes ☐ No

4. Do you anticipate any layoffs in the future? *If yes, please provide complete details.* ☐ Yes ☒ No

5. How many of the Applicant's employees receive a salary of $100,000 or more? __1__

6. Does the Applicant have a human resources department or manager? ☐ Yes ☐ No

7. Does the Applicant distribute an employee handbook to all employees? ☒ Yes ☐ No

8. Does the Applicant have written guidelines, procedures or training for the following:

   a. Grievances ☒ Yes ☐ No

   b. Performance evaluations ☒ Yes ☐ No

   c. Sexual/Workplace harassment ☒ Yes ☐ No

   d. FMLA ☐ Yes ☒ No

   e. Hiring/Interviewing ☒ Yes ☐ No

   f. Terminations ☒ Yes ☐ No

   g. Discipline ☒ Yes ☐ No

   h. Discrimination ☒ Yes ☐ No

   i. Workplace violence ☒ Yes ☐ No

   j. Potentially hostile situations ☒ Yes ☐ No

9. Does the Applicant provide Employee Assistance Programs to all employees? ☐ Yes ☒ No

10. Is Third Party Liability Coverage desired? *If yes, complete 10.a.-10.d.* ☐ Yes ☒ No

   a. Are there written policies and procedures regarding the conduct of employees when interacting with third parties (customers, vendors, visitors, independent contractors and other third parties)? ☐ Yes ☐ No

   b. What percent of employees deal with the general public? _____ %

   c. Does the Applicant have Independent Contractors that are used on a regular basis? ☐ Yes ☐ No
      *If yes, how many?* _____

   d. Is the Applicant's website compliant with the Web Content Accessibility Guidelines (WCAG)? ☐ Yes ☐ No
      *If no, please advise time frame in which the website will be compliant.* _____

Exhibit 4

## Fiduciary Liability Coverage
This section should only be completed if coverage is desired.

1. Complete the table below for any employee benefit plan(s) sponsored by the Applicant and its subsidiaries:

| Plan Name | Year Established | Total Plan Assets | Plan Type* (DC, DB or ESOP) | Number of Participants |
|---|---|---|---|---|
| | | $ | | |
| | | $ | | |
| | | $ | | |
| | | $ | | |

*Plan Type: DC-Defined Contribution, DB-Defined Benefit, ESOP-Employee Stock Ownership Plan

2. Are the plan(s) listed above audited by a CPA?  ☐ Yes ☐ No

3. Are any of the above plan(s) frozen? (*If yes, please provide details.*)  ☐ Yes ☐ No

4. If any plan is a Multi-Employer Plan, does the Applicant administer the entire plan?  ☐ N/A ☐ Yes ☐ No

5. What is the funding percentage for the Applicant's defined benefit retirement plan(s)?  ☐ N/A _____ %

6. Does any plan provide the option to invest in securities of the Applicant or any subsidiary?  ☐ Yes ☐ No

7. Please answer the following regarding any ESOP and/or KSOP and attach the most recent plan valuation:  ☐ N/A

   a. When was the plan last appraised? _____

   b. What was the share value?  Current Year $ _____  One Year Ago $ _____

8. Are employee benefit plans reviewed periodically to ensure there are no violations of ERISA including, but not limited to, compliance with eligibility, participation, vesting or other provisions?  ☐ Yes ☐ No
   *If no, please attach complete details.*

9. In the past 3 years, regarding their employee benefit plans, has the Applicant or any subsidiary:
   *If yes, please attach complete details.*

   a. Received an adverse opinion on financial condition?  ☐ Yes ☐ No

   b. Reduced benefits, merged, terminated, restructured or contemplate doing so?  ☐ Yes ☐ No

   c. Been assessed fees, fines or penalties, under any voluntary compliance resolution program or voluntary settlement program?  ☐ Yes ☐ No

   d. Been investigated by the IRS, DOL or other governmental authority?  ☐ Yes ☐ No

## Cyber Coverage
This section should only be completed if coverage is desired.

Indicate below if either of the following Cyber options is desired. *Please note that both options cannot be selected*.

☐  Option 1 - **Cincinnati Data Defender™** and/or **Cincinnati Network Defender™** - Please check desired coverages, if any. *If higher limits are desired, please complete supplemental questionnaire ML 002*.

| Cincinnati Data Defender™ | ☐ |
|---|---|
| Response Expenses Limit | $50,000 |
| Defense and Liability Limit | $50,000 |
| Identity Recovery Limit | $25,000 |

| Cincinnati Network Defender™ | ☐ |
|---|---|
| Computer Attack Limit | $100,000 |
| Network Security Liability Limit | $100,000 |

☐  Option 2 - **Cincinnati Cyber Defense™** - Application **ML 004** must be completed if this coverage is desired.

Exhibit 4

**Crime Coverage**
This section should only be completed if coverage is desired.

**1.**

| Requested Insuring Agreements | Limit of Insurance | Deductible Amount |
|---|---|---|
| Employee Theft   ☐ *Include ERISA*  ☐ *ERISA Only* | $ | $ |
| Forgery or Alteration   ☐ *Include Credit/Debit Card Forgery* | $ | $ |
| Inside the Premises | $ | $ |
| Outside the Premises | $ | $ |
| Computer Fraud | $ | $ |
| Funds Transfer Fraud | $ | $ |
| Money Orders and Counterfeit Money | $ | $ |
| Clients' Property | $ | $ |
| Claim Expense | $ | $ |
| Social Engineering Fraud Endorsement | $ | $ |

**2.**  Name of employee benefit plan(s) to be included for coverage, if any: _____

_____

**3.**  Please complete the table below with regard to classification of employees of the Applicant and subsidiaries:

| Employee Classifications | Total Number |
|---|---|
| Officers and employees who handle, have custody of or maintain records of money, securities or other property (including that of ERISA plans). | |
| All other employees not included above. | |

**4.**  If Credit/Debit Card Forgery is desired, what is the number of cardholders?  _____

**5.**  Does the Applicant perform regular audits? *If yes, complete 5.a. and 5.b.*  ☐ Yes ☐ No

    **a.**  By whom?  _____

    **b.**  How frequently?  _____

**6.**  Please answer the following regarding the Applicant's and subsidiaries' internal controls:

    **a.**  Are bank statements reconciled at least monthly?  ☐ Yes ☐ No

    **b.**  Are accounts reconciled by someone not authorized to withdraw and deposit?  ☐ Yes ☐ No

    **c.**  Are countersignatures required?  ☐ Yes ☐ No

        *If yes, for checks over what amount? $*  _____

    **d.**  Is there a fraud policy and procedure in place?  ☐ Yes ☐ No

    **e.**  Are criminal histories reviewed in the hiring/screening process?  ☐ Yes ☐ No

    **f.**  Are all employees who handle or maintain records of money or securities required to take annual leave of at least 5 consecutive days?  ☐ Yes ☐ No

    **g.**  Are the same internal controls in place at all locations?  ☐ N/A ☐ Yes ☐ No

    **h.**  Are there regular physical inventories made?  ☐ N/A ☐ Yes ☐ No

    **i.**  Are deposits made on a daily basis?  ☐ N/A ☐ Yes ☐ No

*Only complete questions 7-15 if Computer Fraud, Funds Transfer Fraud or Social Engineering Fraud coverage is desired.*

**7.**  Does the Applicant use electronic wire transfers? *If yes, complete 7.a.-7.c.*  ☐ N/A ☐ Yes ☐ No

    **a.**  Approximately how many transfers do they process per month?  _____

    **b.**  What is the average dollar amount of each transfer?  $ _____

    **c.**  What is the maximum dollar amount for a single transfer?  $ _____

**8.**  Does the Applicant require dual authorization for all wire transfers?  ☐ N/A ☐ Yes ☐ No

Exhibit 4

9.  Are the Applicant's computer systems protected by the following:

    **a.**  Firewall?     ☐ Yes ☐ No

    **b.**  Intrusion detection software?     ☐ Yes ☐ No

    **c.**  Antivirus software?     ☐ Yes ☐ No

    **d.**  Software system to detect fraudulent computer usage?     ☐ Yes ☐ No

10. Are passwords and access codes changed at regular intervals and when users are terminated?     ☐ Yes ☐ No

11. Does the Applicant give vendors access to their proprietary systems or databases?     ☐ Yes ☐ No

12. Has an internal EDP security audit been conducted in the last year?     ☐ Yes ☐ No

    *If yes, have deficiencies been corrected?*     ☐ N/A ☐ Yes ☐ No

13. Does the Applicant accept funds transfer instructions from customers over the phone, email, text message or other similar method of communications? *If yes, do you authenticate the instructions prior to processing:*     ☐ Yes ☐ No

    **a.**  Call the customer at a predetermined number?     ☐ Yes ☐ No

    **b.**  Send a text message to a predetermined number?     ☐ Yes ☐ No

    **c.**  Require a receipt of a code known only by the customer to confirm identity?     ☐ Yes ☐ No

    **d.**  Some other method or combination of the above?     ☐ Yes ☐ No

14. For internal transactions, is there a record kept of the verification process and is it conducted by someone other than the person receiving the transfer request before the transfer is completed?     ☐ Yes ☐ No

15. When a vendor or supplier requests any changes to their account details (including, but not limited to, bank routing number, account numbers, telephone number, or contact information), does the Applicant:

    **a.**  Confirm all requests by a direct call to the vendor or supplier using only a contact number provided by the vendor or supplier before the request was received?     ☐ Yes ☐ No

    **b.**  Send notice of receipt of the requests to someone other than the person who sent the request before making the change?     ☐ Yes ☐ No

---

**Crime Expanded Coverage**
This section should only be completed if coverage is desired.

---

1.  Please check one of the following in the table below if either Crime Expanded Coverage (XC®) or Crime Expanded Coverage Plus (XC+®) is desired. The limits and coverages in Crime XC and Crime XC+ are excess of any other crime forms forming part of the same policy, if any.

| Insuring Agreements | ☐ Crime XC | ☐ Crime XC+ |
|---|---|---|
| Employee Theft | $10,000 | $25,000 |
| Forgery or Alteration | $2,500 | $25,000 |
| Inside the Premises | $10,000 | $25,000 |
| Outside the Premises | $2,500 | $5,000 |
| Money Orders and Counterfeit Money | $10,000 | $25,000 |

---

**History**
This section must be completed.

---

1.  Regarding any coverage being requested, in the past 3 years, has the Applicant or any subsidiary: *If yes, please provide details.*

    **a.**  Had any claim or notice of circumstance which could give rise to a claim reported to any current or previous carrier? *If yes, attach loss runs.*     ☐ Yes ☒ No

    **b.**  Been made aware of any fact, circumstance or situation which may result in a claim being filed against the Applicant for this insurance?     ☐ Yes ☒ No

| Prior Coverage |
| --- |
| This section must be completed. |

1. Please complete the table below with regard to prior coverage:

| Coverage | None | Insurer | Limits | Deductible | Premium |
| --- | --- | --- | --- | --- | --- |
| Directors & Officers Liability | ☐ | Scottsdale Indemnity | $ 3,000,000 | $ 1,000 | $ 1,203 |
| Employment Practices Liability | ☐ | | $ | $ | $ |
| Fiduciary Liability | ☐ | | $ | $ | $ |
| Cyber | ☐ | | $ | $ | $ |
| Crime | ☐ | | $ | $ | $ |

2. Has any application for similar insurance been declined or any policy cancelled in the past 5 years?   ☐ Yes  ☒ No
(This question is not applicable in Missouri.)

| Required Attachments |
| --- |

- Most Recent Annual Financials or IRS 990 Tax Form if the table in **General Information**, question **11.** is not completed
- Current List of Directors & Officers *(if requesting Directors & Officers Liability)*
- Employee Handbook *(if requesting Employment Practices Liability)*
- Blank Employment Application *(if requesting Employment Practices Liability)*
- Most Recent IRS Form 5500 for each employee benefit plan *(if requesting Fiduciary Liability)*
- If continuity of coverage is desired, please include 5 year loss runs and previous declarations page(s)

| Prior Knowledge/Representation Declarations |
| --- |
| This section must be completed. |

1. Has the applicant given written notice under any prior policy(ies) (with coverage similar to what is being applied for under this application) of specific facts or circumstances which might give rise to a claim, which would have fallen within the scope of such insurance, against any insured proposed for insurance under this application?
*If yes, provide details below:*                                                                                    ☐ Yes  ☒ No

_____

_____

2. Is any person proposed for this insurance cognizant of any act, error, or omission which he/she has reason to suppose might afford valid grounds for any future claim such as would fall within the scope of the proposed insurance?
*If yes, provide details below:*                                                                                    ☐ Yes  ☒ No

_____

_____

No fact, circumstance or situation indicating the probability of a claim or action against which indemnification would be afforded by the proposed insurance is now known by any person(s) or entity(ies) proposed for this insurance other than that which is disclosed in this application. It is agreed by all concerned that if there be knowledge of any such fact, circumstance, or situation, any claim subsequently emanating therefrom shall be excluded from coverage under the proposed insurance.

The undersigned authorized agent of the person(s) and entity(ies) proposed for this insurance for the purpose of this application represents that to the best of his knowledge the statements herein are true; and it is agreed that this application shall be the basis of the contract and be incorporated therein should the insurer evidence its acceptance of this application by issuance of a policy. This application will be attached to and will become part of such policy, if issued.

Exhibit 4

| Signature Section |
|---|
| This section must be completed. |

The Cincinnati Insurance Company is hereby authorized to make any investigation and inquiry in connection with this application as it deems necessary.

The undersigned authorizes the release of claim information from any prior insurer to The Cincinnati Insurance Company. Signing this application does not bind the Applicant or The Cincinnati Insurance Company to complete the insurance.

PLEASE REVIEW CAREFULLY. Except to such extent as may be otherwise in the policy, the policy for which this application is being made is limited for ONLY CLAIMS THAT ARE FIRST MADE AGAINST THE INSURED WHILE THE POLICY IS IN FORCE.

*Gurujot Kaur Khalsa*

_____          02/19/20
**Applicant's Signature (President, Chairperson, or Equivalent Position)**          **Date**


Gurujot Kaur Khalsa                                                                    CEO
_____          _____
**Printed Name**                                                                      **Title**



_____          _____
**Agent's Signature**                                                                 **Date**



_____          _____
**Agency Name**                                                                       **Agency Code Number**



_____
**Agent's Name and License Number (Florida only)**


Refer to the following page for the current version of ACORD 63 FRAUD STATEMENTS.

Exhibit 4



AGENCY CUSTOMER ID: _____

# FRAUD STATEMENTS

| AGENCY | CARRIER | NAIC CODE |
|---|---|---|
| | | |

| POLICY NUMBER | EFFECTIVE DATE | APPLICANT / NAMED INSURED |
|---|---|---|
| | | |

**Applicable in AL, AR, DC, LA, MD, NM, RI and WV**
Any person who knowingly (or willfully)* presents a false or fraudulent claim for payment of a loss or benefit or knowingly (or willfully)* presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.  *Applies in MD Only.

**Applicable in CO**
It is unlawful to knowingly provide false, incomplete, or misleading facts or information to an insurance company for the purpose of defrauding or attempting to defraud the company.  Penalties may include imprisonment, fines, denial of insurance and civil damages.  Any insurance company or agent of an insurance company who knowingly provides false, incomplete, or misleading facts or information to a policyholder or claimant for the purpose of defrauding or attempting to defraud the policyholder or claimant with regard to a settlement or award payable from insurance proceeds shall be reported to the Colorado Division of Insurance within the Department of Regulatory Agencies.

**Applicable in FL and OK**
Any person who knowingly and with intent to injure, defraud, or deceive any insurer files a statement of claim or an application containing any false, incomplete, or misleading information is guilty of a felony (of the third degree)*.  *Applies in FL Only.

**Applicable in KS**
Any person who, knowingly and with intent to defraud, presents, causes to be presented or prepares with knowledge or belief that it will be presented to or by an insurer, purported insurer, broker or any agent thereof, any written, electronic, electronic impulse, facsimile, magnetic, oral, or telephonic communication or statement as part of, or in support of, an application for the issuance of, or the rating of an insurance policy for personal or commercial insurance, or a claim for payment or other benefit pursuant to an insurance policy for commercial or personal insurance which such person knows to contain materially false information concerning any fact material thereto; or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act.

**Applicable in KY, NY, OH and PA**
Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties (not to exceed five thousand dollars and the stated value of the claim for each such violation)*.  *Applies in NY Only.

**Applicable in ME, TN, VA and WA**
It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company.  Penalties (may)* include imprisonment, fines and denial of insurance benefits.  *Applies in ME Only.

**Applicable in NJ**
Any person who includes any false or misleading information on an application for an insurance policy is subject to criminal and civil penalties.

**Applicable in OR**
Any person who knowingly and with intent to defraud or solicit another to defraud the insurer by submitting an application containing a false statement as to any material fact may be violating state law.

**Applicable in PR**
Any person who knowingly and with the intention of defrauding presents false information in an insurance application, or presents, helps, or causes the presentation of a fraudulent claim for the payment of a loss or any other benefit, or presents more than one claim for the same damage or loss, shall incur a felony and, upon conviction, shall be sanctioned for each violation by a fine of not less than five thousand dollars ($5,000) and not more than ten thousand dollars ($10,000), or a fixed term of imprisonment for three (3) years, or both penalties.  Should aggravating circumstances [be] present, the penalty thus established may be increased to a maximum of five (5) years, if extenuating circumstances are present, it may be reduced to a minimum of two (2) years.

_____        _____
APPLICANT'S SIGNATURE                                                                   DATE (MM/DD/YYYY)

 © 1997-2016 ACORD CORPORATION.  All rights reserved.
The ACORD name and logo are registered marks of ACORD

Exhibit 4

# e-CLAS Banner Page

## Environment: PRODUCTION

**Policy Number:**     EMN 057 09 06

**Effective Date:**     04-09-2020

**Named Insured:**     SIKH DHARMA INTERNATIONAL

30-005

USI SOUTHWEST, INC.
4100 OSUNA RD NE STE 2-203
ALBUQUERQUE, NM 87109-4442

Exhibit 5

# THE
# CINCINNATI INSURANCE COMPANIES

☒ THE CINCINNATI INSURANCE COMPANY   ☐ THE CINCINNATI INDEMNITY COMPANY
☐ THE CINCINNATI CASUALTY COMPANY

**Named Insured:**   SIKH DHARMA INTERNATIONAL

**Policy Number:**   EMN 057 09 06

**Policy Period:**   03-08-2020 to 03-08-2023

**Effective Date of Change:**   04-09-2020

**Endorsement Number:**   1

**Agency Name:**   USI SOUTHWEST, INC. 30-005
ALBUQUERQUE, NM

### Explanation of Billing

A change was recently made to your policy with The Cincinnati Insurance Companies.   Attached to this summary is the endorsement that amends your policy.

**The additional premium for this endorsement is $**   NONE

This premium   is for the time period of   04-09-2020   to   03-08-2021. You will receive a statement based on the payment option you have selected.

Please contact your agency if you have any questions concerning your policy or statement:
USI SOUTHWEST, INC.
4100 OSUNA RD NE STE 2-203
ALBUQUERQUE, NM 87109-4442

505-262-2621

### This is not a bill. No payment is necessary at this time.

**IA 4319 08 07**

Exhibit 5

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## GENERAL CHANGE ENDORSEMENT

Attached to and forming part of:

Effective Date

Policy Number   **EMN 057 09 06**     of Endorsement   **04-09-2020**

Issued to   **SIKH DHARMA INTERNATIONAL**

Agent **USI SOUTHWEST, INC. 30-005**
     **ALBUQUERQUE, NM**

Endorsement #  **1**

**PREMIUM INFORMATION**

Additional Premium        Due at Endorsement Effective Date **REFER TO IA4319**

Subsequent ANNUAL          Installments Increased      by    $ _____

Revised              Installment Payment(s)       $ _____

**It is agreed that the policy is amended as indicated by   [X]**

☐ **Policy Installment Premium Amended to:**
   ☐ Annual      ☐ Semi-Annual      ☐ Quarterly
☐ **Named Insured**

☐ **Mailing Address**

☐ **Form(s) Added**

☐ **Form(s) Deleted**

**All Other Reasons for Change**

AMEND NAMED INSURED TO READ: SIKH DHARMA INTERNATIONAL
04-09-2020 11:56

**ML 460 01 16**                                      **Page  1 of  1**
                                                  Exhibit 5



**The Cincinnati Insurance Company**
A Stock Insurance Company

**Headquarters**: 6200 S. Gilmore Road, Fairfield, OH 45014-5141
**Mailing address**: P.O. Box 145496, Cincinnati, OH 45250-5496
*www.cinfin.com* ■ 513-870-2000

# PILLAR
# COMMON POLICY DECLARATIONS

Billing Method: DIRECT BILL

Policy Number: **EMN 057 09 06**

Named Insured:   **SIKH DHARMA INTERNATIONAL**

Mailing Address:   **PO BOX 2213**
**ESPANOLA, NM 87532-2213**

Principal Address: **21B SOMBRILLO LN**
**ESPANOLA, NM 87532-9039**

Previous Policy Number: **NEW**

Policy Period:   (At 12:01 AM standard time at your principal address shown above.)

FROM: **04-09-2020**     TO: **03-08-2023**

Agency: **USI SOUTHWEST, INC. 30-005**
City, State: **ALBUQUERQUE, NM**

Shared Annual Aggregate Limit of Liability: **N/A**

Applicable to all **claims** under the following liability coverage parts:

In return for the payment of the premium and subject to all the terms and conditions of this policy, we agree with you to provide the insurance as stated in this policy.

Forms applicable to all coverage parts:

| | | |
|---|---|---|
| IA4319 | 08/07 | EXPLANATION OF BILLING |
| ML460 | 01/16 | GENERAL CHANGE ENDORSEMENT |
| ML400 | 01/16 | SUMMARY OF PREMIUMS CHARGED |
| ML101 | 01/18 | GENERAL PROVISIONS |
| IA4234 | 01/15 | POLICYHOLDER NOTICE TERRORISM INSURANCE COVERAGE |

```
ML458      01/16  CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM
ML490NM    03/16  NEW MEXICO CHANGES - CANCELLATION AND NONRENEWAL
ML491NM    03/16  NEW MEXICO CHANGES - PILLAR POLICY PROGRAM
IA4427     02/13  NOTICE OF LOSS CONTROL SERVICES
IP446      08/01  NOTICE TO POLICYHOLDERS
IA4338     05/11  SIGNATURE ENDORSEMENT
```

Coverage part declarations:

```
ML505 01/16      NONPROFIT ORGANIZATION DIRECTORS AND OFFICERS LIABILITY COVERAGE
                 PART DECLARATIONS

ML512 01/16      EMPLOYMENT PRACTICES LIABILITY COVERAGE PART DECLARATIONS
```

04-09-2020 11:56

**ML 501 01 16**

EMN_057_09_06
Exhibit 5

| Policy Number: | **EMN 057 09 06** | Effective Date: **04-09-2020** |
|---|---|---|

# SUMMARY OF PREMIUMS CHARGED

### THIS POLICY CONSISTS OF THE FOLLOWING COVERAGE PARTS FOR WHICH A PREMIUM CHARGE IS INDICATED

| | |
|---|---|
| NONPROFIT ORGANIZATION DIRECTORS & OFFICERS LIABILITY | $ 1,575 |
| EMPLOYMENT PRACTICES LIABILITY | $ 734 |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| Installment Charge | $ |
| Total | $ 2,309 |

| Payment Plan | First Installment | Remaining Installments |
|---|---|---|
| ANNUAL | $ | $ SEE ML460 |

SEE BILLING STATEMENT MAILED SEPARATELY

**ALL OTHER TERMS AND CONDITIONS REMAINS UNCHANGED**

ML 400 01 16

Exhibit 5

# e-CLAS Banner Page

## Environment: PRODUCTION

**Policy Number:**     EMN 057 09 06

**Effective Date:**     03-08-2020

**Named Insured:**     SIKH DHAMA INTERNATIONAL

```
30-005

USI SOUTHWEST, INC.
4100 OSUNA RD NE STE 2-203
ALBUQUERQUE, NM 87109-4442
```

**Thank you for placing this coverage with The Cincinnati Insurance Companies!**

Exhibit 5

# Commission Schedule

**Policy Number:**   EMN 057 09 06              **Effective Date:** 03-08-2020

**Named Insured:**

SIKH DHAMA INTERNATIONAL

**Premium**                                    **Commission**

$2,309 ANNUAL                                  15%

**IA 4991 06 17**

Exhibit 5



The Cincinnati Insurance Companies

**Management Liability**

# TOOLS TO HELP YOU MANAGE RISK

Along with the superior Pillar™ management liability insurance you purchase to protect your organization, you receive access to risk management tools at no additional cost to help you with the complex issues covered by your policy. These practical tools can help mitigate potential claims, possibly eliminate them altogether or provide help in the event claims occur.

Depending on the coverage options you purchase, you may also gain access to services provided by risk management specialists who can answer questions related to managing your community association, employment practices issues, cyber liability exposures or workplace violence incidents. Most of these services are also available at no additional cost.

☐ **Community Association Helpline:** As a Pillar policyholder, you can call a toll-free helpline, 844-458-9556, for assistance reducing or avoiding a potential wrongful acts loss related to managing your community association. Please have your Pillar Directors & Officers policy number ready before you call. When you place your call, leave a message including your name, complete contact information, policy number and your question or concern. A helpline lawyer will call you back, usually within one business day. Please be advised that each helpline call is limited to one hour. There is no additional charge for using this policyholder helpline.

☒ **Employment Practices Helpline:** Do you have questions about how to handle employment situations? Pillar policyholders whose coverage includes Cincinnati's employment practices liability insurance may call our toll-free Employment Connection helpline, 888-811-3427, for guidance from an attorney prior to making employment-related decisions. We offer eligible policyholders an unlimited number of calls seeking advice on employment policies and procedures.

☐ **Cyber Risk Management Portal:** Cincinnati's cyber policyholders may access eRiskHub, an online portal that provides news, information and tools to help mitigate a breach or hacking event, virus infection or other cyberattack. On eRiskHub, you will find information about privacy laws, compliance and breach response guides including compliance resources, notification letter examples, and credit bureau and government agency notifications. Other data risk management expertise may be engaged to help diagnose and repair virus infections and other common computer problems. Some services offered may extend beyond what the policy covers and include an additional charge. Please visit *https://eriskhub.com/cic* to set up an account using the access code provided with your policy or available from your agent to begin exploring this valuable resource.

For information, coverage availability in your state, quotes or policy service, please contact your local independent agent recommending coverage.

Exhibit 5



*Everything Insurance Should Be®*

☒ **Workplace Violence Hotline:** After a covered workplace violence event, Pillar policyholders who have added Cincinnati's optional workplace violence expense coverage to their EPLI policy can receive help to create a response and begin the recovery process. Simply call the toll-free, 24-hour hotline, 877-841-1082. It's monitored by Black Swan Solutions, a business unit of Empathia, Inc., which is an industry-leading crisis support organization. Coverage also reimburses recovery expenses for security, public relations, counselors and lost salaries, wages and business income. While policyholders are not obligated to use Black Swan Solutions, this resource is available if you need them.

☐ **Kidnap, Ransom and Extortion:** Success attracts respect, recognition and rewards, yet may leave you vulnerable to kidnapping and extortion attempts. This policy option pays for the vital services of Control Risks Group, a kidnap extortion and crisis management consulting firm. Experts help manage all aspects of the situation, work toward the safe return of the victim and negotiate ransom requests. They also try to identify those responsible, assess the circumstances and search for a motive.

## Selecting the right company

With Cincinnati's Pillar management liability coverage, know that you have an exceptional insurance program from a company offering:

- A management team specifically dedicated to keeping your program on the leading edge
- Superior claims service provided by Cincinnati professionals
- High financial strength rating from A.M. Best Co., reflecting our ability to pay claims and keep our promises.
- For qualifying accounts, multi-year policy terms are available in most states for many coverages, saving you the added time and expense of annual renewals

Your agent recommending Cincinnati can provide more details, answer questions and add the coverage you need.

Thank you for trusting your agent and Cincinnati to protect your business.



*Everything Insurance Should Be®*

Our loss control service is advisory only. We assume no responsibility for management or control of customer loss control activities or for implementation of recommended corrective measures. These materials were gathered from trade services and public information. We have not tried to identify all exposures. We do not warrant that this information is consistent with the underwriting guidelines of The Cincinnati Insurance Company and its subsidiaries or with any federal, state or local law, regulation or ordinance.

This is not a policy. For a complete statement of the coverages and exclusions, please see the policy contract. "The Cincinnati Insurance Companies", "Cincinnati Insurance" and "Cincinnati" refer to member companies of the insurer group providing property and casualty coverages through The Cincinnati Insurance Company or one of its wholly owned subsidiaries – The Cincinnati Indemnity Company or The Cincinnati Casualty Company. Each insurer has sole financial responsibility for its own products. Not all subsidiaries operate in all states. Do not reproduce or post online, in whole or in part, without written permission. Best's ratings are under continuous review and subject to change and/or affirmation. To confirm the current rating, please visit *www.ambest.com*. © 2019 The Cincinnati Insurance Company. 6200 S. Gilmore Road, Fairfield, OH 45014-5141.

Exhibit 5

cinfin.com 

# NOTICE TO POLICYHOLDERS
# DIRECT BILL ACCOUNT CREDIT PROCEDURE

This is a notice of how an account credit will be applied to your policy or to all of the policies being billed as single account.

**Account Credits**

**A.** If your account is comprised of **a single policy** and an endorsement or premium audit results in a credit (return premium), the credit is applied to that policy. If your account does not have a future installment due at the time the endorsement or audit is processed, the credit is refunded to the payor listed for your account. If you do not wish for credits to be automatically applied to future unpaid installments, please contact us to request a refund. Please note that the amount of the refund may vary based upon the date you contact us and your billing schedule.

**B.** If your account is comprised of **more than one policy** and an endorsement or premium audit results in a credit (return premium), the credit is applied in the following manner:

- Payments previously applied to your account are deferred.

- The credit that results from the endorsement or audit is applied to the policy generating the credit.

- The payments that were deferred are then reapplied to the account in order to satisfy the amount due.

- Any excess payment that results from the credit is applied proportionately to your policies with a future payment or installment due.

- If you do not wish for credits to be automatically applied to future unpaid installments, please contact us to request a refund. Please note that the amount of the refund may vary based upon the date you contact us and your billing schedule.

- If your account does not have a future installment or payment due at the time the endorsement or audit is processed, the credit is refunded to the payor listed for your account.

(Does not apply to audit return premium for payors located in New York; Does not apply to premiums due more than 30 days from the date of processing for payors located in New Hampshire. These credits are automatically refunded to the payor)

To request a refund, contact us at:

| Mailing Address | Toll free phone number | Electronic mail |
|---|---|---|
| The Cincinnati Insurance Company<br>PO Box 14529<br>Cincinnati, OH 45250-0529 | 877-942-2455 | CinciBill@cinfin.com |

**IA 4407 03 13**

Exhibit 5

# DISCLOSURE OF DIRECT BILL FEES AND CHARGES

NO COVERAGE IS PROVIDED BY THIS DISCLOSURE, nor can it be construed to replace any provision of your policy. YOU SHOULD READ YOUR POLICY AND REVIEW YOUR DECLARATIONS PAGE CAREFULLY for complete information on the coverages provided.

Your insurance premium is being paid directly to us rather than to your insurance agency. We appreciate your prompt payment of the premium. Please note that these fees apply only in the event your payment is late, is returned to us for insufficient funds, or if your policy was previously canceled for nonpayment of premium and has been reinstated at either your or your agents request. We are not required to reinstate a policy once cancellation for nonpayment of premium has become effective. The decision to reinstate coverage is solely at the discretion of the company.

Not all fees are applicable in all states. The types of fees are listed below.  Following the description of each fee, we list the states where the fee applies and the amount of the fee.  Fees are not levied in KY, MD, MT and NC.

**Non-Sufficient Funds (NSF) Charge:** The first time a premium payment is returned due to Non-Sufficient Funds (NSF), the premium due is the installment amount. For each succeeding return of payment while continuously insured with The Cincinnati Insurance Companies, a charge is added to your next account statement. The amount of the charge is determined by the fees filed with and approved by the state where the payor of your account is located.

$10 AK, FL, NJ, RI, and SC;

$15 MA;

$20 NY; and

$25 AL, AZ, AR, CA, CO, CT, DE, DC, GA, HI, ID, IL, IN, IA, KS, LA, ME, MI, MN, MS, MO, NE, NV, NH, NM, ND, OH, OK, OR, PA, SD, TN, TX, UT, VT, VA, WA, WI, WV and WY.

**Reinstatement Charge:** The first time your account is reinstated for nonpayment of premium, the premium due is the installment amount. For each succeeding reinstatement due to nonpayment of premium while continuously insured with The Cincinnati Insurance Companies, a charge is added to your next account statement. The amount of the charge is determined by the fees filed with and approved by the state where the payor of your account is located.

$10 AK, RI, and SC;

$15 MA;

$20 NY; and

$25 AL, AZ, AR, CA, CO, CT, DE, DC, GA, HI, ID, IL, IN, IA, KS, LA, ME, MI, MN, MS, MO, NE, NV, NH, NM, ND, OH, OK, OR, PA, SD, TN, TX, UT, VT, VA, WA and WY.

**Late Charge:** A charge is added to your next account statement each time your payment is received and processed after the due date as shown on the account statement. This fee will not apply to Electronic Funds Transfer (EFT). The amount of the charge is determined by the fees filed with and approved by the state where the payor of your account is located.

$10 AK, FL, RI, and SC;

$15 MA; and

$25 AL, AZ, AR, CA, CO, CT, DE, DC, GA, HI, ID, IL, IN, IA, KS, LA, ME, MI, MN, MS, MO, NE, NV, NH, NM, ND, OH, OK, OR, PA, SD, TN, TX, UT, VT, VA, WA, WI and WY.

**IA 4421 03 13**

Exhibit 5



# The Cincinnati Insurance Company
A Stock Insurance Company

**Headquarters**: 6200 S. Gilmore Road, Fairfield, OH 45014-5141
**Mailing address**: P.O. Box 145496, Cincinnati, OH 45250-5496
*www.cinfin.com* ■ 513-870-2000

# PILLAR
# COMMON POLICY DECLARATIONS

Billing Method: **DIRECT BILL**

Policy Number: **EMN 057 09 06**

Named Insured: **SIKH DHAMA INTERNATIONAL**

Mailing Address: **PO BOX 2213**
**ESPANOLA, NM 87532-2213**

Principal Address: **21B SOMBRILLO LN**
**ESPANOLA, NM 87532-9039**

Previous Policy Number: **NEW**

Policy Period: (At 12:01 AM standard time at your principal address shown above.)

FROM: **03-08-2020**            TO: **03-08-2023**

Agency: **USI SOUTHWEST, INC. 30-005**
City, State: **ALBUQUERQUE, NM**

Shared Annual Aggregate Limit of Liability: **N/A**

Applicable to all **claims** under the following liability coverage parts:

In return for the payment of the premium and subject to all the terms and conditions of this policy, we agree with you to provide the insurance as stated in this policy.

Forms applicable to all coverage parts:

| | | |
|---|---|---|
| ML400 | 01/16 | SUMMARY OF PREMIUMS CHARGED |
| ML101 | 01/18 | GENERAL PROVISIONS |
| IA4234 | 01/15 | POLICYHOLDER NOTICE TERRORISM INSURANCE COVERAGE |
| ML458 | 01/16 | CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM |
| ML490NM | 03/16 | NEW MEXICO CHANGES - CANCELLATION AND NONRENEWAL |

```
ML491NM    03/16  NEW MEXICO CHANGES - PILLAR POLICY PROGRAM
IA4427     02/13  NOTICE OF LOSS CONTROL SERVICES
IP446      08/01  NOTICE TO POLICYHOLDERS
IA4338     05/11  SIGNATURE ENDORSEMENT
```
Coverage part declarations:
```
ML505 01/16     NONPROFIT ORGANIZATION DIRECTORS AND OFFICERS LIABILITY COVERAGE
                PART DECLARATIONS

ML512 01/16     EMPLOYMENT PRACTICES LIABILITY COVERAGE PART DECLARATIONS
```

---

03-05-2020 17:32

**ML 501 01 16**

EMN_057_09_06

Exhibit 5

| Policy Number: | **EMN 057 09 06** | Effective Date: **03-08-2020** |
|---|---|---|

# SUMMARY OF PREMIUMS CHARGED

**THIS POLICY CONSISTS OF THE FOLLOWING COVERAGE PARTS FOR WHICH A PREMIUM CHARGE IS INDICATED**

| | |
|---|---|
| NONPROFIT ORGANIZATION DIRECTORS & OFFICERS LIABILITY | $ 1,575 |
| EMPLOYMENT PRACTICES LIABILITY | $ 734 |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| Installment Charge | $ |
| Total | $ 2,309 |

| Payment Plan | First Installment | Remaining Installments |
|---|---|---|
| ANNUAL | $ * | $ * |

SEE BILLING STATEMENT MAILED SEPARATELY

**ALL OTHER TERMS AND CONDITIONS REMAINS UNCHANGED**

ML 400 01 16

Exhibit 5

# GENERAL PROVISIONS APPLICABLE TO
# ALL LIABILITY COVERAGE PARTS

These General Provisions apply only to those Coverage Parts which include a liability coverage, which shall include all Coverage Parts other than Crime Coverage. Furthermore, any reference to the "policy" in these General Provisions refers to all Coverage Parts other than Crime Coverage.

Throughout this policy, the words "we", "us" and "our" refer to the Company providing this insurance.

In consideration of the payment of the premium, in reliance on all statements in the **application** and all other information provided to us and subject to all the provisions of this policy, including the Declarations, we and the **insureds** agree as set forth below.

## SECTION I - DEFINITIONS

Where set forth in bold type in this policy, whether in singular or in plural, the following terms shall have the meanings indicated.

**A.** **Application** means:

   **1.** The Application Form for this policy;

   **2.** Any materials submitted with the Application Form which shall be maintained on file with us and shall be deemed to be attached hereto as if physically attached; and

   **3.** Any warranty or representation provided to us within the last three years in connection with any policy of which this policy is a renewal or replacement.

**B.** **Claim** has the meaning set forth in the applicable coverage part.

**C.** **Debtor in possession** means a "debtor in possession" as that term is defined in Title 11 of the United States Code, as amended.

**D.** **Defense costs** has the meaning set forth in the applicable coverage part.

**E.** **Domestic partner** means a natural person who is not otherwise an insured, in a committed relationship with an **insured person**, which is legally recognizable as a marriage, civil union or domestic partnership in the state where the **claim** is made or suit is filed and the legal existence of the relationship is verifiable by legal, government documentation existing prior to the date of the **wrongful act** complained of in the **claim**.

**F.** **Executive** has the meaning set forth in the applicable coverage part.

**G.** **Extended reporting period** means the periods of time described in Section **XIX** of the General Provisions.

**H.** **Insured persons** has the meaning set forth in the applicable coverage part.

**I.** **Insured** has the meaning set forth in the applicable coverage part.

**J.** **Interrelated** means all events or incidents which have as a common nexus any:

   **1.** Fact, circumstance, situation, event, transaction, or cause; or

   **2.** Series of causally connected facts, circumstances, situations, events, transactions or causes.

**K.** **Loss** has the meaning set forth in the applicable coverage part.

**L.** **Named insured** means the entity or entities shown in the applicable Declarations as a Named Insured and any such entity in its capacity as a **debtor in possession**.

**M.** **Organization** has the meaning set forth in the applicable coverage part.

**N.** **Personal injury** has the meaning set forth in the applicable coverage part.

**O.** **Policy period** means the period from the inception date to the expiration date as set forth in the Declarations, or to the earlier date of cancellation of the applicable Coverage Part.

Exhibit 5

**P.** **Policy year** means the period within the **policy period** from the inception date as set forth in the Declarations to the succeeding anniversary date exactly 1 year later at 12:01 AM standard time, and **policy year** means any subsequent annual period between anniversary dates at 12:01 AM standard time thereafter. In the event of a **policy period** less than 1 year, the **policy year** will be the same as the **policy period**.

In the event of an odd term **policy period** longer than 1 year, the **policy year** is the period from the inception date to the next chronological date which precedes the expiration date by exactly 1 or more years at 12:01 AM standard time. If there are subsequent annual periods remaining in the **policy period** after that date at 12:01 AM standard time, such annual periods will each be a **policy year**.

However, if after the issuance of this Coverage Part, any **policy year** is extended for an additional period of less than 12 months, that additional period of time will be deemed to be part of the last preceding **policy year**.

**Q.** **Pollutants** mean any solid, liquid, gaseous or thermal irritant or contaminant including smoke, vapor, soot, fumes, acid, alkalis, chemicals, asbestos products, petroleum products and their by-products and waste. Waste includes material to be recycled, reconditioned or reclaimed. **Pollutants** does not mean noise. **Pollutants** include but are not limited to substances that are generally recognized in industry or government to be harmful or toxic to persons, property or the environment. regardless of whether the injury or damage is caused directly or indirectly by the **pollutants** and whether:

**1.** The insured is regularly or otherwise engaged in activities which taint or degrade the environment; or

**2.** The insured uses, generates or produces the **pollutant**.

**R.** **Subsidiary** means any entity in which the **named insured** owns, directly or indirectly, more than 50% of the outstanding securities or voting rights representing the present right to vote for election of directors, trustees, managers (if a limited liability company) or equivalent positions and any such entity in its capacity as a **debtor in possession**.

**S.** **Wrongful Act** has the meaning set forth in the applicable coverage part.

---

## SECTION II – EXCLUSIONS

**A.** Nuclear

We are not liable to pay, indemnify or defend any **claim** based upon, arising out of, in consequence of, or in any way involving the hazardous properties, including radioactive, toxic or explosive properties, of any nuclear material. Nuclear material means any source material, special nuclear material, or by-product materials as those terms are defined under the Atomic Energy Act of 1954 or any amendments thereto.

**B.** Pollution

We are not liable to pay, indemnify or defend any **claim** for:

**1.** The actual, alleged, or threatened exposure to discharge, generation, storage, transportation, discharge, dispersal, seepage, migration, emission, release, treatment, removal, disposal or escape of **pollutants**; or

**2.** Any request, demand, order or statutory or regulatory requirement that the **named insured** or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, **pollutants**; or

**3.** Any demand by or on behalf of any governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, **pollutants**.

However, as it applies to any Directors and Officers Liability Coverage (including Educators Legal Liability), this exclusion shall not apply to any **claim** to which Insuring Agreement **A.** solely applies.

**C.** Prior Knowledge

We are not liable to pay, indemnify or defend any **claim** based upon, arising out of, or in consequence of, or in any way involving any **wrongful act** committed, attempted or allegedly committed or attempted prior to the **policy period** of the applicable Coverage Part if:

**1.** Prior to the earlier of the following dates:

**a.** The inception of the applicable Coverage Part;

**b.** The inception of the original Coverage Part of which the applicable Coverage Part is a renewal or replacement; or

**c.** The Continuity Date, if any, stated in the Declarations for the applicable Coverage Part;

any **executive** knew that such **wrongful act** is or would reasonably be regarded as the basis of a **claim**; or

**2.** There is a previous policy under which the **insureds** are entitled to coverage for such **claim**.

**D.** Prior Notice

We are not liable to pay, indemnify or defend any **claim** based upon, arising out of, in consequence of, or in any way involving:

**1.** Any **wrongful act** or any fact, circumstance or situation which has been the subject of any accepted notice given prior to the **policy period** under any policy or coverage part of which this policy is a direct or indirect renewal or replacement; or

**2.** Any other **wrongful act** whenever occurring, which, together with a **wrongful act** which has been the subject of such accepted notice, would constitute **interrelated wrongful acts**.

**E.** Prior or Pending Proceeding

We are not liable to pay, indemnify or defend any **claim** based upon, arising out of, or in consequence of, or in any way involving any prior or pending demand or civil, criminal, administrative or regulatory proceeding against any **Insured** as of the Prior or Pending Date stated in the Declarations of the applicable coverage part or any fact, circumstance, situation, transaction or event underlying or alleged in such litigation, regardless of the legal theory asserted in such **claim**.

**F.** Telephone Consumer Protection Act

We are not liable to pay, indemnify or defend any **claim** for any actual or alleged violation of:

**1.** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law; or

**2.** The CAN-SPAM Act of 2003, including any amendment of or addition to such law; or

**3.** Any statute, ordinance or regulation, other than the TCPA or CAN-SPAM Act of 2003, that prohibits or limits the sending, transmitting, communicating or distribution of material or information.

**G.** War and Military Action

We are not liable to pay, indemnify or defend any **claim** based upon, arising out of, in consequence of, or in any way involving:

**1.** War, including undeclared or civil war; or

**2.** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**3.** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these;

regardless of any other cause or event that contributes concurrently or in any sequence to the injury or damage.

With respect to any action that comes within the terms of this exclusion and involves nuclear reaction or radiation, or radioactive contamination, this War and Military Action Exclusion supersedes Exclusion **A.** above.

---

## SECTION III - SEVERABILITY OF EXCLUSIONS

With respect to determining the applicability of the above Exclusions, no **wrongful act** or knowledge possessed by any one of the **insureds** shall be imputed to any other **insureds** to determine if coverage is available, unless indicated otherwise.

**SECTION IV - LIMITS OF INSURANCE, DEDUCTIBLES, MULTIPLE CLAIMS AND EXHAUSTION**

**A.** If a single **claim** is covered under more than one Coverage Part, then our maximum liability for all **loss** resulting from such **claim** shall be the largest applicable Limit of Insurance available under any one of the applicable Coverage Parts.

**B.** The Deductibles for each Coverage Part apply separately to the respective Coverage Parts. If a single **claim** is covered under more than one Coverage Part, the applicable Deductibles shall be applied separately to the part of the **claim** covered by each Coverage Part but the sum of such Deductibles shall not exceed the largest applicable Deductible. The Deductibles shall be borne by the **insureds** uninsured and at their own risk.

**C.** If the aggregate Limit of Insurance for a particular Coverage Part is exhausted, then all of our obligations under that Coverage Part shall be deemed to be completely fulfilled and extinguished as of the date of such exhaustion. If the Shared Annual Aggregate Limit of Liability, if so set forth on the Common Policy Declarations, is exhausted, then all of our obligations under the policy for the remainder of the annual period as described in **SECTION IV.D.** below shall be deemed to be completely fulfilled and extinguished as of the date of such exhaustion.

**D.** The Limits of Insurance of each Coverage Part and the Shared Annual Aggregate Limit of Liability, if so set forth on the Common Policy Declarations, apply separately to each **policy year**. If the **policy period** of the respective Coverage Part is extended after issuance for an additional period of less than 12 months, the additional period will be deemed part of the last preceding period of the respective Coverage part for purposes of determining the Limits of Insurance.

**E.** Regardless of the number of policies or Coverage Parts involved, all **claims** based upon or arising out of the same **wrongful act** or any **interrelated wrongful acts** shall be considered a single **claim**. Each **claim** shall be deemed to be first made at the earliest of the following times:

    **1.** When notice of the earliest **claim** arising out of such **wrongful act** or **interrelated wrongful acts** is received in writing by an **insured** or by us, whichever comes first; or

    **2.** When notice of a **wrongful act** giving rise to such **claim** is given pursuant to Section **VI** of the General Provisions.

**F.** In the event that more than one of the **insureds** is included in the same **claim**, the total amount of **loss** resulting from such **claim** and the Deductible shall be apportioned pro-rata among the **insureds** in proportion to their respective **loss** unless otherwise mutually agreed upon by the **insureds** and us.

**SECTION V - DUTIES OF THE INSUREDS IN THE EVENT OF A CLAIM**

As conditions precedent to coverage under this policy:

**A.** The **insureds** shall give us written notice of any **claim** made against any of the **insureds** for a **wrongful act** as soon as practicable after any **executive** of the **named insured** has knowledge of such **claim**, and shall cooperate and provide information as we may reasonably require, including but not limited to providing a description of the **claim**, the nature of the alleged **wrongful act**, the nature of the alleged injury, the names of the claimants, and the manner in which the **insureds** first became aware of the **claim**. As soon as practicable, the **insureds** shall furnish us with copies of reports, investigations, pleadings and other papers in connection with the **claim**.

**B.** The **insureds** shall provide us with all information, assistance and cooperation which we reasonably request and agree that in the event of a **claim** the **insureds** will do nothing which may prejudice our position or our potential or actual rights of recovery. The failure of any **insured person** to do so shall not impair the rights of any other **insured person** under this policy.

**C.** The **insureds** shall not settle any **claim**, incur any **defense costs** or otherwise assume any obligation or admit any liability with respect to any **claim** without our prior written consent. We shall be entitled to full information and all particulars we may request in order to reach a decision as to such consent. We shall not be liable for any settlement, **defense costs**, assumed obligation or admission to which we have not consented.

If the **insureds** fail to provide notice of any **claim** to us as required under this Section, we shall not be entitled to deny coverage for the **claim** based solely upon late notice unless we can demonstrate that our interests were materially prejudiced by reason of such late notice.

Exhibit 5

This Section does not apply to the Cincinnati Data Defender™ Coverage Form, the Cincinnati Network Defender™ Coverage Form or the Cincinnati Cyber Defense™ Coverage Form.

## SECTION VI - NOTICE OF A WRONGFUL ACT

If prior to the end of the **policy period** of the applicable Coverage Part, any of the **insureds** first become aware of a specific **wrongful act** they believe is likely to give rise to a **claim**, and if any of the **insureds** give us written notice as soon as practicable, but prior to the end of the **policy period** of the applicable Coverage Part, of:

**A.** The specific **wrongful act**;

**B.** The injury or damage which has or may result therefrom; and

**C.** The circumstances by which the **insureds** first became aware thereof;

then any **claim** subsequently made arising out of such **wrongful act** shall be deemed to have been made when notice of the **wrongful act** was first given.

## SECTION VII - DIRECTION OF CORRESPONDENCE TO US

All notices and other materials provided to us pursuant to the terms of this policy shall be directed to the Management Liability Claims Manager at one of the following addresses:

**A.** claimsmaindesk@cinfin.com

**B.** The Cincinnati Insurance Company
P.O. Box 145496
Cincinnati, OH 45250-5496

## SECTION VIII - APPLICATION

The **application** is the basis of this policy and is incorporated into and constitutes a part of this policy. It is agreed by the **insureds** that the statements in the **application** are their representations, that they are material and that this policy is issued in reliance upon the truth of such representations provided.

In the event that the **application** contains any misrepresentation or omission with respect to a specific **wrongful act** or the knowledge of any of the **insureds** of any matter which such **insured** has reason to believe may give rise to a future **claim** made with the intent to deceive or which materially affects the acceptability of the risk or hazard assumed by us, then no coverage shall be afforded for any **claim** based upon, arising from or in consequence of any such misrepresentation or omission. Such misrepresentation or omission shall not be imputed to any other **insureds** for purposes of determining the validity of this policy to such other **insureds** except:

**1.** Any **insured person** who knew that the statement or representation was not true as of the inception date of coverage;

**2.** The **organization** with respect to any **executive** who knew that the statement or representation was not true as of the inception date of coverage; and

**3.** The **organization** if the signer of the **application** knew that the statement or representation was untrue.

We shall not be entitled under any circumstances to void or rescind this policy with respect to any **insured**.

## SECTION IX - CHANGES IN EXPOSURE

### A. Change in Ownership of Named Insured

If during the **policy period** of the applicable Coverage Part:

**1.** The **named insured** consolidates with or merges into another entity such that such **named insured** is not the surviving entity;

**2.** Another entity or person or group of entities and/or persons acting in concert acquires more than 50% ownership of the **named insured** or voting rights which result in ownership or voting control by the other organization(s) or person(s) of more than 50% of the outstanding securities or voting rights

ML 101 01 18

representing the present right to vote for the election of directors, trustees or managers (if a limited liability company) of the **named insured**;

then, subject to all the other provisions of this policy, coverage under the applicable Coverage Part shall continue to apply to such **named insured** and its **insureds** until the end of the applicable **policy period** or any applicable **extended reporting period**, but only with respect to **claims** for **wrongful acts** committed, attempted or allegedly committed or attempted prior to such transaction. The **named insured** shall give written notice to us as soon as practicable, but in no event later than 90 days after such transaction.

## B. Cessation of Subsidiaries

If during the **policy period** of the applicable Coverage Part any entity ceases to be a **subsidiary** as defined in the applicable Coverage Part, then, subject to all the other provisions of this policy, coverage under the applicable Coverage Part shall continue to apply to such entity and its **insureds** until the end of the applicable **policy period** or any applicable **extended reporting period**, but only with respect to **claims** for **wrongful acts** committed, attempted or allegedly committed or attempted prior to the date such entity ceases to be a **subsidiary**. The **named insured** shall give written notice to us as soon as practicable, but in no event later than 90 days after the entity ceases to be a **subsidiary**.

## C. Acquisition or Formation of Entity

If during the **policy period** of the applicable Coverage Part the **named insured** newly acquires or forms another entity over which such **named insured** maintains more than 50% ownership for the purpose of coverage under the Coverage Part applicable to such **named insured**, the newly acquired or formed entity shall be deemed to be a **subsidiary**; however, coverage shall be excess of any indemnification or insurance otherwise available to such newly acquired or formed entity from any other source. Furthermore, coverage does not apply to **claims** for **wrongful acts** committed, attempted or allegedly committed or attempted prior to the date the **named insured** acquired or formed the entity unless we agree, after presentation of a complete application and all appropriate information, to provide coverage by endorsement for such **claims** and the **named insured** pays any additional premium we require for the endorsement.

## SECTION X - OTHER INSURANCE ISSUED BY ANOTHER INSURER

This insurance is primary except when all or any part of **loss** is also insured under any other valid and collectible prior or current policy. If any other insurance issued by another insurer (with the exception of insurance issued by us, any of our affiliated companies, or any of our predecessors or their affiliated companies) applies to any **claim**, then this insurance is excess over that other insurance, whether primary, excess, contingent or on any other basis, unless that other insurance was purchased specifically to apply excess over the limits provided in this policy. Furthermore, with respect to any coverage that may be provided for any **claim** for actual or alleged **personal injury**, such **claims** shall be specifically excess of any similar coverage provided by the **organization's** General Liability Policy.

When this policy is excess:

**A.** We will have no duty to defend any **claim** when any other insurer has that duty. If another insurer fails to defend and we incur costs as a result of such failure, we will be entitled to the **insureds'** rights against such other insurer; and

**B.** We will pay only our share of the amount of the **loss**, if any, that exceeds the sum of:

**1.** The total amount that all such other insurance would pay for the **loss** in the absence of this policy; and

**2.** The total of all deductible and self-insured amounts under all such other insurance.

## SECTION XI - SPOUSE AND LEGAL REPRESENTATIVE EXTENSION

The liability coverage parts in this policy will, subject to all other terms, conditions and exclusions of the applicable Coverage Part and the General Provisions, be extended to apply to **claims** for the **wrongful acts** of an **insured person** made against:

**A.** The spouse or **domestic partner** of an **insured person** but only to the extent such person is a party to any **claim** solely in such person's capacity as a spouse or **domestic partner** of an **insured person** and only if the **claim** seeks damages recoverable from marital community property jointly held by the **insured person** and the spouse or **domestic partner**, or property transferred from the **insured person** to the spouse; or

**B.** Their estates, heirs, legal representatives or assigns in the event of their death, incapacity or bankruptcy.

We have no obligation to make any payment for **loss** in connection with any **claim** against a spouse, **domestic partner**, estates, heirs, legal representatives or assigns of an **insured person** for any actual or alleged, error, misstatement, misleading statement, act, omission, neglect or breach of duty committed, attempted or allegedly committed or attempted by such spouse, **domestic partner**, estates, heirs, legal representatives or assigns.

## SECTION XII - MEDIATION AND ALLOCATION

**A.** Any dispute including but not limited to tort claims or contract claims between an **insured** and us arising out of or relating to this policy shall be submitted to non-binding mediation prior to commencement of an action between the parties. The mediator shall be chosen by agreement. If the parties cannot agree upon a mediator, the mediator shall be chosen by the American Arbitration Association.

**B.** If both **loss** covered by this policy and loss not covered by this policy are incurred in a **claim** for which coverage is afforded, either because a **claim**:

    **1.** Against an **insured** includes both covered and uncovered matters, we will pay 100% of **defense costs** and all remaining loss will be allocated between covered **loss** and uncovered loss based upon the relative legal exposure to the parties to such matters; or

    **2.** Is made against both an **insured** and others, we will pay **defense costs** for our **insured**, and all remaining loss will be allocated between covered **loss** and uncovered loss based upon the relative legal exposure to the parties to such matters.

**C.** If we and the **insureds** cannot agree as to matters in **B.** above prior to a judgment or finding in the civil or administrative proceeding dealing with **claims** against the **insureds**, the parties agree that they will, to the extent it is within their control, require that the allocation between covered **loss** and uncovered loss is made in such civil or administrative proceeding. Such efforts shall include but are not limited to the submission of special interrogatories to the finder of fact in such proceeding. Such efforts shall not require us to become a party to such civil or administrative proceeding.

**D.** Notwithstanding **C.** above, if we and the **insureds** cannot agree as to matters in Section **B.** above prior to a judgment or finding in any civil or administrative proceeding in which such issues are decided, we may at any time before or after mediation under **A.** above settle all **claims** against any or all **insureds**. Following such settlement, any dispute between us and the **insureds** as to the proper allocation of covered and uncovered matters under **B.** above shall be submitted to non-binding mediation prior to the commencement of an action between the parties. In any event, only one mediation as to the same issues shall be required.

## SECTION XIII - ACTION AGAINST US

**A.** No action shall be taken against us unless, as a condition precedent thereto, there has been full compliance with all of the terms of this policy and until the obligation of the **insureds** to pay shall have been finally determined, either by an adjudication against them or by written agreement of the **insureds**, the claimant and us. Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this policy to the extent of the insurance afforded by this policy. Bankruptcy or insolvency of an **insured** or of an **insured's** estate shall not relieve us of any of our obligations hereunder.

**B.** No person or organization shall have any right under this policy to join us as a party to any **claim**. Neither the **insureds** nor their legal representative shall implead us in any **claim**.

This Section does not apply to the Cincinnati Data Defender™ Coverage Form, the Cincinnati Network Defender™ Coverage Form or the Cincinnati Cyber Defense™ Coverage Form.

## SECTION XIV - SUBROGATION

In the event of any payment under this policy, we shall be subrogated to all of the rights to recovery of the **insureds** to the extent of such payment. The **insureds** shall execute all papers required and shall do everything that may be necessary to secure and preserve such rights, including the execution of such documents as may be necessary to enable us to effectively bring suit in the name of the **insureds**.

## SECTION XV - CHANGES IN THIS POLICY

No change or modification of, or assignment of interest under this policy shall be effective except when made by us through a written endorsement to this policy.

## SECTION XVI - CONFORMITY TO STATUTE

Any terms of this policy which are in conflict with the terms of any applicable laws construing this policy are hereby amended to conform to such laws.

## SECTION XVII - ENTIRE AGREEMENT

By acceptance of this policy, we and the **insureds** agree that this policy (including the **application**) and any written endorsements attached hereto constitute the entire agreement between the parties.

## SECTION XVIII - REPRESENTATION BY NAMED INSURED

The first **named insured** shall act on behalf of all of the **insureds** in purchasing this policy and for any purposes under the policy.

## SECTION XIX - EXTENDED REPORTING PERIODS

**A.** Upon termination of any Coverage Parts for any reason, other than nonpayment of premium, the **named insured** shall be provided a 90 day Automatic Extended Reporting Period and have the option to replace the 90 day Automatic Extended Reporting Period with a 12 month Optional Extended Reporting Period. The **named insured** may also request an Optional Extended Reporting Period with a term longer than 12 months, which may be provided solely at our discretion.

    **1.** Automatic Extended Reporting Period

    A 90 day Automatic Extended Reporting Period is automatically provided without additional charge. The Automatic Extended Reporting Period starts immediately after the end of the **policy period** of the applicable Coverage Part.

    **2.** Optional Extended Reporting Periods

      **a.** The **named insured** shall have the option to purchase a 12 month Extended Reporting Period to replace the 90 day Automatic Extended Reporting Period for an additional premium equal to 75% of the expiring annual premium for the applicable Coverage Part.

      **b.** Additional Optional Extended Reporting Periods may be available for an additional premium charge if an Extended Reporting Period longer than 12 months is desired. It is solely our decision whether to permit the first **named insured** to purchase an Extended Reporting Period with a term longer than 12 months.

    The first **named insured** must give us a written request of their intent to purchase an Optional Extended Reporting Period within 60 days after the **policy period** of the applicable Coverage Part or that option shall terminate. The Optional Extended Reporting Period will not go into effect unless the first **named insured** pays the additional premium promptly when due.

**B.** The Extended Reporting Periods do not extend the **policy period** or change the scope of coverage provided. They extend the **claims** reporting period.

**C.** The Extended Reporting Periods extend coverage to **claims** first made during the length of time covered by the applicable Extended Reporting Period provided the **wrongful act** was committed, attempted or allegedly committed or attempted prior to the end of the **policy period** of the applicable Coverage Part, and all such **claims** shall be subject to all other terms, conditions and exclusions of the applicable Coverage Part and the General Provisions. Such **claims** must be reported in writing to us prior to the expiration of the applicable Extended Reporting Period.

**D.** The Extended Reporting Period, regardless of length does not reinstate or increase the Limits of Insurance of the applicable Coverage Part or the Shared Annual Aggregate Limit of Liability, if so set forth on the Common Policy Declarations. Our total liability shall not exceed the Limit of Insurance shown in the applicable Declarations for the last **policy year** in which coverage is provided hereunder.

Exhibit 5

**E.** Any Extended Reporting Period will immediately terminate on the effective date and time of any other insurance issued to the **insureds** which replaces this insurance. The entire premium for any Extended Reporting Period shall be fully earned at the commencement of any Extended Reporting Period.

**F.** If the terms under this section are invoked under the Cincinnati Data Defender™ Coverage Part, the Cincinnati Network Defender™ Coverage Part or the Cincinnati Cyber Defense™ Coverage Part, the provisions contained in this Section shall apply only to the following Insuring Agreements:

    **1.** Insuring Agreement **B** - Defense and Liability of the Cincinnati Data Defender™ Coverage Part;

    **2.** Insuring Agreement **B** - Network Security and Electronic Media Liability of the Cincinnati Network Defender™ Coverage Part; or

    **3.** Insuring Agreements **E** - Data Compromise Liability, **F** - Network Security Liability and **G** - Electronic Media Liability of the Cincinnati Cyber Defense™ Coverage Part.

## SECTION XX - COVERAGE TERRITORY

This policy applies to any **claim** for a **wrongful act** committed, attempted or allegedly committed or attempted anywhere in the world unless indicated otherwise. However, if insurance provided by this policy would be in violation of any United States economic or trade sanctions, such insurance shall be null and void.

This Section does not apply to the Cincinnati Data Defender™ Coverage Form, the Cincinnati Network Defender™ Coverage Form or the Cincinnati Cyber Defense™ Coverage Form.

## SECTION XXI - LIBERALIZATION

If we adopt any revision that would broaden the coverage under this insurance and would be effective during the **policy period** without additional premium, the broadened coverage will immediately apply to this insurance as of the latter of:

    **1.** The date we implemented the change in the headquarters state which is the basis upon which the policy was issued; or

    **2.** The date the applicable Coverage Part became effective.

## SECTION XXII - PARENT COMPANY FRANCHISOR EXTENSION

Upon written request of the president, chairperson or equivalent position of the **named insured,** we shall extend coverage under this policy to **defense costs** resulting from any **claim** made against a parent company or franchisor of the **named insured** or any **subsidiary** but only if and so long as:

    **1.** The **claim** arises out of a **wrongful act** actually or allegedly committed solely by an **insured**;

    **2.** The **insured** is included as a co-defendant in addition to the parent company or franchisor; and

    **3.** The **insured** as well as the parent company or franchisor are represented by the same counsel in connection with such **claim**.

For the purposes of this extension, a parent company or franchisor shall include:

    **1.** Any entity other than a natural person which owns more than 50% of the outstanding securities or voting rights representing the present right to vote for election of directors, trustees, managers (if a limited liability company) or equivalent of a **named insured** or **subsidiary**; or

    **2.** Any franchisor who has granted to an **insured** under a franchise agreement any franchise or franchise rights to allow the **insured** to operate as a franchisee or a franchised dealer.

This Section does not apply to the Cincinnati Data Defender™ Coverage Form, the Cincinnati Network Defender™ Coverage Form or the Cincinnati Cyber Defense™ Coverage Form.

Exhibit 5

# POLICYHOLDER NOTICE
# TERRORISM INSURANCE COVERAGE

Your policy (or the policy proposed to you) contains coverage for certain losses caused by terrorism.

**Premium:**

In accordance with the federal Terrorism Risk Insurance Act, we are required to notify you of the portion of the premium, if any, attributable to the coverage for terrorist acts certified under the Terrorism Risk Insurance Act.

* The portion of your premium that is attributable to coverage for terrorist acts certified under the Act is

  $ 0                .

**Federal Participation:**

The Act also requires us to provide disclosure of federal participation in payment of terrorism losses.

* Under your policy, any losses caused by certified acts of terrorism would be partially reimbursed by the United States Government, Department of Treasury, under a formula established by federal law. Under this formula, the federal share equals a percentage, as specified in the Schedule below, of that portion of the amount of such insured losses that exceeds the applicable insurer retention. However, if aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year, the Treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion.

* **Schedule:**

| Federal Share of Terrorism Losses | |
| --- | --- |
| Percentage | Calendar Year |
| 85% | 2015 |
| 84% | 2016 |
| 83% | 2017 |
| 82% | 2018 |
| 81% | 2019 |
| 80% | 2020 |

**Cap on Insurer Participation:**

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

**NOTE:** **THIS NOTICE IS PROVIDED TO SATISFY THE REQUIREMENTS UNDER THE TERRORISM RISK INSURANCE ACT FOR POLICYHOLDER DISCLOSURE: (1) AT THE TIME OF OUR OFFER OF COVERAGE AND (2) AT THE TIME COVERAGE IS ISSUED.**

**IA 4234 01 15**

Exhibit 5

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

**GENERAL PROVISIONS APPLICABLE TO ALL LIABILITY COVERAGE PARTS**

**A.** **SECTION I - DEFINITIONS** is amended to add the following:

**Certified act of terrorism** means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act. The criteria contained in the Terrorism Risk Insurance Act for a **certified act of terrorism** include the following:

   **1.** The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

   **2.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**B.** **CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM**

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

**C.** **APPLICATION OF OTHER EXCLUSIONS**

The terms and limitations of any terrorism exclusion, or the inapplicability, omission or absence of a terrorism exclusion does not serve to create coverage for any **loss** which would otherwise be excluded under this policy, such as **losses** excluded by:

   **1.** Exclusions that address war, warlike action, insurrection, rebellion, revolution, military action, nuclear hazard, nuclear materials, nuclear reaction, radiation, or radioactive contamination;

   **2.** Exclusions that address pollutants, contamination, deterioration, fungi or bacteria; or

   **3.** Any other exclusion,

regardless if the **certified act of terrorism** contributes concurrently or in any sequence to the **loss**.

**D.** **SUNSET CLAUSE**

If the federal Terrorism Risk Insurance Act expires or is repealed, then this endorsement is null and void for any act of terrorism that takes place after the expiration or repeal of the Act.

All other provisions of the policy remain unchanged except as herein expressly modified.

Includes copyrighted material of Insurance Services Office, Inc., and American Association of Insurance Services, Inc., with their permission.

**ML 458 01 16**

Exhibit 5

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

<div style="border:1px solid black; text-align:center">

# NEW MEXICO CHANGES - CANCELLATION AND NONRENEWAL

</div>

This endorsement modifies insurance provided under the following:

**PILLAR POLICY PROGRAM**

The following provision is added:

**CANCELLATION AND NONRENEWAL**

**A.** The first **named insured** may cancel this policy or any of its Coverage Parts by mailing or delivering to us advance written notice of cancellation.

**B.** **Permissible Reasons and Notice Period**

   **1.** If this policy is in effect less than 60 days, we may cancel for any reason by mailing or delivering to the first **named insured** written notice of cancellation at least 10 days before the effective date of cancellation.

   **2.** If this policy is in effect 60 days or more, we may cancel only for one or more of the following reasons:

      **a.** Nonpayment of premium.

      **b.** There has been a substantial change in the risk assumed by us since the policy was issued.

      **c.** The policy was obtained through material misrepresentation, fraudulent statements, omissions or concealment of fact material to the acceptance of the risk or to the hazard assumed by us.

      **d.** Willful and negligent acts or omission by the **insured** have substantially increased the hazards insured against.

      **e.** The **named insured** presented a claim based on fraud or material misrepresentation.

   **3.** If we cancel subject to **B.2.** above, we will mail or deliver to the first **named insured** written notice of Cancellation at least:

      **a.** 10 days before the effective date of cancellation, for the reason set forth in **B.2.a.**

      **b.** 60 days before the effective date of cancellation, for a reason set forth in **B.2.b.**, **B.2.c.**, **B.2.d.** or **B.2.e.** Such notice may only be sent for cancellation effective at a policy anniversary at the end of a **policy year.**

      The written notice will state the reason for cancellation, except that such statement may be omitted from a notice mailed to an additional insured or lien holder under this policy.

**C.** We will mail or deliver our notice to the first **named insured's** last mailing address known to us.

**D.** Notice of cancellation will state the effective date of cancellation. The **policy period** will end on that date.

**E.** If this policy is cancelled, we will send the first n**amed insured** any premium refund due. The refund will be pro rata. The cancellation will be effective even if we have not made or offered a refund.

**F.** If notice is mailed, proof of mailing will be sufficient proof of notice.

**G.** If we decide not to renew this policy or a particular Coverage Part, we will mail or deliver to the first **named insured** written notice of the nonrenewal not less than 30 days before:

   **1.** The expiration date of this policy; or

   **2.** The end of a **policy year**, if the policy is written for a term of more than one year.

All other provisions of the policy remain unchanged except as herein expressly modified.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

Exhibit 5

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

<div style="border: 2px solid black; text-align: center;">

# NEW MEXICO CHANGES -
# PILLAR POLICY PROGRAM

</div>

This endorsement modifies insurance provided under the following:

> **BANKERS PROFESSIONAL LIABILITY COVERAGE**
> **COMMUNITY ASSOCIATION DIRECTORS AND OFFICERS LIABILITY COVERAGE**
> **EDUCATORS LEGAL LIABILITY COVERAGE**
> **EMPLOYMENT PRACTICES LIABILITY COVERAGE**
> **FIDUCIARY LIABILITY COVERAGE**
> **FINANCIAL INSTITUTIONS DIRECTORS AND OFFICERS LIABILITY COVERAGE**
> **GENERAL PROVISIONS APPLICABLE TO ALL LIABILITY COVERAGE PARTS**
> **HEALTHCARE INSTITUTIONS DIRECTORS AND OFFICERS LIABILITY COVERAGE**
> **NONPROFIT ORGANIZATION DIRECTORS AND OFFICERS LIABILITY COVERAGE**
> **PRIVATELY HELD COMPANY DIRECTORS AND OFFICERS LIABILITY COVERAGE**
> **TRUST SERVICES ERRORS AND OMISSIONS COVERAGE**

**A.** Paragraph **D.** of **SECTION XIX - EXTENDED REPORTING PERIODS** of the **GENERAL PROVISIONS APPLICABLE TO ALL LIABILITY COVERAGE PARTS** is deleted in its entirety and replaced by the following:

> **D.** If the Optional Extended Reporting Period endorsement is in effect, we will provide a Supplemental Aggregate Limit of Insurance, but only for **claims** first made during the Optional Extended Reporting Period. The Supplemental Aggregate Limit of Insurance will be equal to the dollar amount of the aggregate Limit of Insurance shown in the Declarations for the applicable Coverage Part or the Shared Annual Aggregate Limit of Liability, if so set forth on the Common Policy Declarations.

**B.** The following provision is added to **GENERAL PROVISIONS APPLICABLE TO ALL LIABILITY COVERAGE PARTS**:

> **ACCOUNTING**
>
> We shall, upon written request, provide to the first **named insured** an accounting of **defense costs** actually expended.

**C.** **SECTION VI - DEFENSE, INVESTIGATION AND SETTLEMENT** of all Coverage Parts is deleted in its entirety and replaced by the following:

> **SECTION VI - DEFENSE, INVESTIGATION AND SETTLEMENT**
>
> **A.** We defend the **insureds** against any **claim**; however, we will have no duty to defend the **insureds** against any **claim** to which this insurance does not apply. The **insureds** may select defense counsel with our consent, which consent shall not be unreasonably withheld, or the **insureds** may consent to our choice of defense counsel, which consent shall not be unreasonably withheld. The **insureds** may participate in and assist in the direction of any **claim**.
>
> **B.** We may make any investigation we deem necessary and may, with the consent of the **insureds** named in connection with the **claim**, which consent shall not be unreasonably withheld, make any settlement of any **claim** we deem expedient. If the **insureds** withhold consent to such settlement, our liability for all **loss** in connection with such **claim** shall not exceed:
>
> > **1.** The amount of the proposed settlement plus **defense costs** incurred up to the date of the **insured's** refusal to consent to the proposed settlement; plus
> >
> > **2.** 90% of any settlement or judgment in excess of the proposed settlement amount referenced in **B.1.** above plus 90% of any **defense costs** incurred after the date the **insureds** refused to consent to the proposed settlement, subject in all events to the applicable Limit of Insurance and Deductible for such **claim**. The remaining 10% of any settlement or judgment in excess of the proposed settlement amount referenced in **B.1.** above plus 10% of any **defense costs** incurred after the date the **insureds** refused to consent to the proposed settlement shall be borne by the **insureds**, uninsured and at their own risk.

Exhibit 5

**C.** Our right and duty to defend end when we have used up the applicable Limit of Insurance in the defense or payment of damages, judgments or settlements of covered **claims**.

All other provisions of the policy remain unchanged except as herein expressly modified.

# NOTICE OF LOSS CONTROL SERVICES

The Cincinnati Insurance Companies provide certain loss prevention services to policyholders at no additional cost. These services are designed to prevent or reduce the impact of potential loss causing events or conditions related to the type(s) of insurance coverage you have purchased from us. One of these services that you can receive is described below:

Employment Practices Liability (EPL) Toll-Free Hot Line

Have a question on how to handle an employment situation? Simply call The Cincinnati Insurance Companies Employment Connection at 1-888-811-3427 for assistance. We offer policyholders an unlimited number of calls seeking advice on employment policies and procedures.

The services provided are advisory in nature. While this program is offered as a resource in developing or maintaining a loss prevention program, you should consult competent legal counsel to design and implement your own program. No liability is assumed by reason of the services, access or information provided. All services are subject to change without notice. Use of the EPL Toll-Free Hot Line will not be deemed to satisfy any notice of claim or notice of wrongful act provision contained in any policy.

IA 4427 02 13

Exhibit 5

# THE CINCINNATI INSURANCE COMPANY
# THE CINCINNATI CASUALTY COMPANY
# THE CINCINNATI INDEMNITY COMPANY

## NOTICE TO POLICYHOLDERS

Please be advised that in your application for insurance you disclosed information to The Cincinnati Insurance Company, The Cincinnati Casualty Company and The Cincinnati Indemnity Company.  The information disclosed in the application and all information subsequently collected by any of these companies may be shared among all three.

**IP 446 08 01**

Exhibit 5

# SIGNATURE ENDORSEMENT

IN WITNESS WHEREOF, this policy has been signed by our President and Secretary in the City of Fairfield, Ohio, but this policy shall not be binding upon us unless countersigned by an authorized representative of ours. The failure to countersign does not void coverage in Arizona, Virginia and Wisconsin.

Secretary                                      President

The signature on any form, endorsement, policy, declarations, jacket or application other than the signature of the President or Secretary named above is deleted and replaced by the above signatures.

IA 4338 05 11

Exhibit 5

# The Cincinnati Insurance Company

A Stock Insurance Company

# NONPROFIT ORGANIZATION
# DIRECTORS AND OFFICERS LIABILITY
# COVERAGE PART DECLARATIONS

**THIS COVERAGE PART PROVIDES CLAIMS-MADE COVERAGE, WHICH APPLIES ONLY TO CLAIMS FIRST MADE DURING THE POLICY PERIOD OR ANY APPLICABLE EXTENDED REPORTING PERIOD. TO THE EXTENT IT IS NOT OTHERWISE INDICATED, THE LIMIT OF INSURANCE TO PAY DAMAGES OR SETTLEMENTS WILL BE REDUCED AND MAY BE EXHAUSTED BY DEFENSE COSTS, AND DEFENSE COSTS WILL BE APPLIED AGAINST THE DEDUCTIBLE. IN NO EVENT WILL WE BE LIABLE FOR DEFENSE COSTS OR THE AMOUNT OF ANY JUDGMENT OR SETTLEMENT IN EXCESS OF THE LIMIT OF INSURANCE. READ THE ENTIRE POLICY CAREFULLY.**

Policy Number: EMN 057 09 06

Named Insured is the same as it appears in the Common Policy Declarations unless another entry is made here.

| | | |
|---|---|---|
| Limit of Insurance: | $ 3,000,000 | in the aggregate |
| Investigative Costs Sublimit: | $ 100,000 | in the aggregate |
| Excess Benefit Transaction Tax Sublimit: | $ 20,000 | sublimit per **organizational manager** |

| | | |
|---|---|---|
| Additional Defense Limit of Insurance: | $ UNLIMITED | in the aggregate |

| | | |
|---|---|---|
| Excess Side A Limit of Insurance: | $ NOT COVERED | in the aggregate |

| | | |
|---|---|---|
| | $ 0 | each **claim** under Insuring Agreement **A** (Insured Persons) |
| Deductibles: | $ 2,500 | each **claim** under Insuring Agreement **B** (Indemnification) |
| | $ 2,500 | each **claim** under Insuring Agreement **C** (Organization) |

| | |
|---|---|
| Retroactive Date: | N/A |
| Prior or Pending Date: | 03-08-2010 |
| Continuity Date: | 03-08-2010 |

Forms and endorsements applicable to this coverage part:

| | | |
|---|---|---|
| ML105 | 01/18 | NONPROFIT ORGANIZATION DIRECTORS AND OFFICERS LIABILITY COVERAGE |
| IA450C | 11/87 | AMENDED DEFINITION OF CLAIMS- NONOPROFIT D&O |
| IA450D | 11/87 | AMENDED DEFINITION OF INSURED PERSON- NONPROFIT D&O |
| IA450E | 11/87 | DEFINITION OF EXECUTIVE AMENDATORY- NONPROFIT D&O |

ML 505 01 16

```
IA450F     11/87 AMENDED SETTLEMENT PROVISION- NONPROFIT D&O
IA450G     11/87 AMENDED CONDUCT EXCLUSION- NONPROFIT D&O
ML312      01/16 ASSAULT EXCLUSION
ML340      01/18 SPORTS RELATED BRAIN INJURY EXCLUSION
```

03-05-2020 17:32

# NONPROFIT ORGANIZATION
# DIRECTORS AND OFFICERS LIABILITY COVERAGE

### TABLE OF CONTENTS

**Coverage Part Provision:**                                                     **Begins on Page:**

SECTION I - INSURING AGREEMENTS ..................................................................................2

SECTION II - DEFINITIONS ................................................................................................2

SECTION III - EXCLUSIONS ..............................................................................................5

SECTION IV - SEVERABILITY OF EXCLUSIONS ...................................................................6

SECTION V - LIMIT OF INSURANCE AND DEDUCTIBLES ......................................................6

SECTION VI - DEFENSE, INVESTIGATION AND SETTLEMENT ...............................................7

Exhibit 5

# NONPROFIT ORGANIZATION
# DIRECTORS AND OFFICERS LIABILITY COVERAGE

**THIS COVERAGE PART PROVIDES CLAIMS-MADE COVERAGE, WHICH APPLIES ONLY TO CLAIMS FIRST MADE DURING THE POLICY PERIOD OR ANY APPLICABLE EXTENDED REPORTING PERIOD. TO THE EXTENT IT IS NOT OTHERWISE INDICATED, THE LIMIT OF INSURANCE TO PAY DAMAGES OR SETTLEMENTS WILL BE REDUCED AND MAY BE EXHAUSTED BY DEFENSE COSTS, AND DEFENSE COSTS WILL BE APPLIED AGAINST THE DEDUCTIBLE. IN NO EVENT WILL WE BE LIABLE FOR DEFENSE COSTS OR THE AMOUNT OF ANY JUDGMENT OR SETTLEMENT IN EXCESS OF THE LIMIT OF INSURANCE. READ THE ENTIRE POLICY CAREFULLY.**

---

## SECTION I - INSURING AGREEMENTS

**A.** We will pay on behalf of the **insured persons** all **loss** which they shall be legally obligated to pay, except for such **loss** which the **organization** actually pays as indemnification, resulting from any **claim** first made during the **policy period**, or any **extended reporting period** included in or endorsed to the policy, for a **wrongful act**.

**B.** We will pay on behalf of the **organization** all **loss** which the **organization** is required to pay as indemnification to the **insured persons** resulting from any **claim** first made during the **policy period**, or any **extended reporting period** included in or endorsed to the policy, for a **wrongful act**.

**C.** We will pay on behalf of the **organization** all **loss** which the **organization** is required to pay resulting from any **claim** first made during the **policy period**, or any **extended reporting period** included in or endorsed to the policy, against the **organization** for a **wrongful act**.

We will have the right and duty to select counsel and defend the **insureds** against any such **claim**.

---

## SECTION II - DEFINITIONS

Where set forth in bold type in this Coverage Part, whether in singular or in plural, the following terms shall have the meanings indicated.

**A. Claim** means:

1. A written demand for monetary damages or non-monetary relief;

2. A civil proceeding commenced by the filing of a complaint or similar pleading;

3. A formal administrative or regulatory proceeding commenced by the filing of a complaint, charge, formal investigative order or similar document;

4. An arbitration, mediation or similar alternative dispute resolution proceeding in which monetary damages are sought if the **insured**:

   a. Is required to participate in such proceeding; or

   b. Agrees to participate in such proceeding with our written consent, such consent not to be unreasonably withheld;

5. A criminal proceeding commenced by the return of an indictment;

6. A written request to toll or waive a statute of limitations related to a potential **claim** described in Definitions **A.1.** through **A.5.** above; or

7. A civil, administrative, regulatory or criminal investigation of an **insured person** once such **insured person** is identified in writing by such investigating authority as a person against whom a proceeding described in Definitions **A.2.**, **A.3** or **A.5.** may be commenced. The maximum Limit of Insurance for all such investigations against any **insured persons** shall be the Investigative Costs Sublimit set forth in the Nonprofit Organization Directors and Officers Liability Coverage Part Declarations. This sublimit shall be part of and not in addition to the Limit of Insurance set forth in the Nonprofit Organization Directors and Officers Liability Coverage Part Declarations and does not increase our maximum aggregate liability under this Coverage Part;

against any **insured**, including any appeal therefrom.

Exhibit 5

**B.** **Defense costs** means reasonable and necessary fees, costs, and expenses incurred by us or with our consent on behalf of the **insureds** or reimbursed to any of the **insureds** by us, resulting solely from the investigation, adjustment, defense and appeal of any **claim**. **Defense costs** includes, but is not limited to, the cost of expert consultants and witnesses, and premiums for appeal, injunction, attachment or supersedeas bonds (but not the obligation to furnish such bonds).

**Defense costs** shall not include:

**1.** Salaries, wages, fees, overhead or expenses of our employees or any **insureds**, directors, officers, trustees or employees, other than that portion of our employed attorneys' fees, salaries and expenses allocated to a specific **claim**;

**2.** Any amount covered by the duty to defend obligation of any other insurer; or

**3.** Any pre-tender fees, costs or expenses.

**C.** **Directors and officers** means all natural persons who were, now are, or shall become an officer, a duly elected or appointed member of the board of directors, trustees, regents, managers, governors, a **LLC manager** or an equivalent position of the **organization**.

**D.** **Disqualified person** means a disqualified person as that term is defined in Section 4958 of the Internal Revenue Code of 1986, as amended.

**E.** **Employee** includes, but is not limited to, all natural persons who were, now are, or shall become full-time, part-time, seasonal, volunteer, contingent or leased workers of the **organization** as determined by federal, state or local law. **Employee** does not include independent contractors as determined by federal, state or local law.

**F.** **Employment related wrongful act** means a **wrongful act** arising from employment related activities including, but not limited to, hiring, training, supervision, evaluation, promotion, demotion, granting of tenure, and termination.

**G.** **Excess benefit transaction** means an excess benefit transaction as that term is defined in Section 4958 of the Internal Revenue Code of 1986, as amended.

**H.** **Excess benefit transaction tax** means any excise tax imposed by the Internal Revenue Service on any **insured** who is an **organizational manager** as a result of such **insured's** participation in an **excess benefit transaction**.

**I.** **Executive** means any natural person who was, now is or shall become the chief executive officer, chief financial officer, executive director or person of equivalent position to any of the foregoing of the **organization**.

**J.** **Financial impairment** means, with respect to the **organization** or any **outside organization**, the appointment of any receiver, conservator, liquidator, rehabilitator, trustee or similar official; or the **organization** or any **outside organization** becoming a **debtor in possession**.

**K.** **Insured** means the **organization** and the **insured persons**.

**L.** **Insured persons** means:

**1.** **Directors and officers**;

**2.** All natural persons who were, now are, or shall become an **employee** or committee member, whether or not they were, are or shall be compensated, of the **organization**;

**3.** All natural persons who were, now are, or shall become members or volunteers of the **organization** while acting on behalf of the **organization** in a voluntary capacity at the direction of the **directors and officers**; and

**4.** Any natural person who is an independent contractor as determined by federal, state or local law, but only while acting in the capacity as such for the **organization** pursuant to an express written agreement between the independent contractor, or any entity on behalf of the independent contractor, and the **organization** and only if the **organization** agrees in writing to provide indemnification to such independent contractor; provided, however, that any coverage under this Coverage Part for any such independent contractor shall be excess of any indemnification or insurance otherwise available to such independent contractor from any other source.

**M.** **LLC manager** means any natural person who is a manager, member of the board of managers or member of the **organization** that is a limited liability company, but only with respect to the conduct of the

limited liability company's business. However, any member of a limited liability company who is a passive investor not involved in the operations of the limited liability company is not a **LLC manager.**

**N.   Loss** means **defense costs** and the total amount of monetary damages which the **insured** becomes legally obligated to pay on account of any **claim** for a **wrongful act** with respect to which coverage hereunder applies, including damages, judgments, settlements, prejudgment and postjudgment interest, and punitive or exemplary damages or the multiplied portion of any multiplied damage award if insurable under the applicable law most favorable to the insurability of punitive, exemplary or multiplied damages.

**Loss** shall also include:

Any **excess benefit transaction tax** an **insured** is obligated to pay as a result of a **claim**. The maximum Limit of Insurance per each **organizational manager** for any **excess benefit transaction tax** shall be the Excess Benefit Transaction Tax Sublimit set forth in the Nonprofit Organization Directors and Officers Liability Coverage Part Declarations. This sublimit shall be part of and not in addition to the Limit of Insurance set forth in the Nonprofit Organization Directors and Officers Liability Coverage Part Declarations and does not increase our maximum aggregate liability under this Coverage Part. The **excess benefit transaction tax** shall not include the 25% excise tax assessed against any **disqualified person** or the 200% tax assessed for failure to correct an **excess benefit transaction**.

**Loss** shall not include:

1.   Taxes, criminal or civil fines or penalties imposed by law, except as noted above;

2.   Any restitution, disgorgement or similar sums; or

3.   Any matter deemed uninsurable under the law pursuant to which this Coverage Part shall be construed.

**O.   Organization** means the **named insured** and any **subsidiary**.

**P.   Organizational manager** means an organizational manager as that term is defined in Section 4958 of the Internal Revenue Code of 1986, as amended.

**Q.   Outside organization** means any nonprofit corporation or organization other than the **organization**, which is described in Section 501(c)(2), (3), (4), (6), (7), (8), (10), (19), or 501(d) of the Internal Revenue Code of 1986, as amended, and is exempt from federal income taxation.

**R.   Outside position** means the service of any **insured person** of the **organization** as an officer or member of the board of directors, trustees, regents, managers, governors, or equivalent position in any **outside organization** but only during the time that such service is performed at the direction of the **organization** or with the consent and knowledge of the **organization**.

**S.   Personal injury** means invasion of privacy, wrongful entry, eviction, false arrest, false imprisonment, false detention, abuse of process, malicious prosecution, libel, slander, defamation, or disparaging of a person's or organization's goods, products or services.

**T.   Property damage** means:

1.   Injury or damage, of any nature, to tangible or intangible property, including all resulting loss of use of that property; or

2.   Loss of or loss of use of tangible or intangible property that is not otherwise injured or damaged.

**U.   Publishers liability** means infringement of copyright, trademark, service mark or trade name, unauthorized use of title, plagiarism or misappropriation of ideas.

**V.   Third party** means any natural person who is not an **employee** of the **organization**.

**W.   Wrongful act** means any actual or alleged error, misstatement, misleading statement, act, omission, neglect or breach of duty including any **personal injury** or **publishers liability** committed, attempted or allegedly committed or attempted on or after the Retroactive Date, if any, set forth in the Nonprofit Organization Directors and Officers Liability Coverage Part Declarations and prior to the end of the **policy period** by:

1.   Any of the **insured persons** in the discharge of their duties solely in their capacity as **insured persons** of the **organization**;

2.   Any of the **insured persons** of the **organization** in the discharge of their duties solely in their capacity in an **outside position** in any **outside organization**;

3.   Any of the **insured persons** solely by reason of their status as such; or

4. The **organization**.

---

## SECTION III - EXCLUSIONS

The descriptions in the headings of these exclusions are solely for convenience and form no part of the terms and conditions of coverage.

**A.** Bodily Injury/Property Damage

We are not liable to pay, indemnify or defend any **claim** for actual or alleged:

**1.** Bodily injury, sickness, disease, or death of any person, mental anguish, or emotional distress; or

**2.** **Property damage**, including, but not limited to, physical injury, loss of or loss of use of currency or any negotiable or non-negotiable instruments or contracts representing money.

**B.** Conduct

We are not liable to pay, indemnify or defend any **claim** based upon, arising out of, or in consequence of any of the **insureds** or any person for whose actions the **insureds** are legally responsible:

**1.** Committing any deliberately fraudulent act or omission;

**2.** Committing any willful violation of any statute or regulation; or

**3.** Gaining any profit, remuneration or advantage to which they were not legally entitled;

if established by a final and non-appealable judgment or adjudication in any underlying action or proceeding adverse to the **insureds** as to such conduct.

With respect to determining the applicability of this exclusion, no conduct pertaining to any **insured person** shall be imputed to any other **insured person**; however, any conduct pertaining to any **executive** shall be imputed to the **organization** to determine if coverage is available.

**C.** Contract

We are not liable to pay, indemnify or defend any **claim** for any actual or alleged liability of any **insureds** under the terms, conditions or warranties of any oral or written contract or agreement, except to the extent the liability would have attached to any such **insureds** in the absence thereof; provided, however, that this exclusion shall not apply to **defense costs** with respect to any **claim** against any **insured persons**.

**D.** Cyber

We are not liable to pay, indemnify or defend any **claim** for any actual or alleged:

**1.** Improper dissemination of personally identifiable information or protected health information;

**2.** Liability of any **insured** arising out of internet and electronic services which are performed for or on behalf of any client or customer of the **organization** through the transmission of electronic data to or from the **organization's** internet website or through a private computer network controlled by the **organization**; or

**3.** Liability of any **insured** for internet professional services the **organization** provides to others which may include, but are not limited to, application service provider, domain name registration services, electronic exchange and auction services, internet hosting services, internet media services, internet service provider service, managed and network security services, public key infrastructure services, search engine services, web portal services, website development, software development and internet access provider;

provided, however, that this exclusion shall not apply to any **claim** to which Insuring Agreement **A.** solely applies.

**E.** Employment Practices

We are not liable to pay, indemnify or defend any **claim** for an **employment related wrongful act**.

**F.** ERISA

We are not liable to pay, indemnify or defend any **claim** for any actual or alleged violation of the Employee Retirement Income Security Act of 1974, as amended or any rules, regulations or orders promulgated thereunder or any similar provisions of any federal, state or local statutory or common law in connection with any pension or welfare plan established for the benefit of **employees** of the **organization**.

Exhibit 5

**G.**   Insured vs. Insured

We are not liable to pay, indemnify or defend any **claim** brought or maintained by, on behalf of or at the behest of any of the **insureds** in any capacity and regardless of collusion; provided, however, that this exclusion does not apply to:

**1.**   Any **claim** brought or maintained as a derivative action on behalf of the **organization** by one or more persons who are not **insured persons** and who bring and maintain the **claim** without the solicitation, assistance or participation of any of the **insureds**;

**2.**   Any **claim** brought or maintained by any of the **insureds** for contribution or indemnity, if such **claim** for contribution or indemnity directly results from another **claim** covered by the Coverage Part;

**3.**   Any **claim** brought or maintained by an examiner, trustee, receiver, liquidator, rehabilitator, bankruptcy trustee or similar official, or creditors' committee of the **organization** in connection with a bankruptcy proceeding of the **organization**;

**4.**   Any **claim** brought or maintained by **insured persons** of the **organization**:

**a.**   Who are **executives** or **directors and officers** who have not served as such for at least a one year period prior to the date the **claim** is first made and who bring and maintain the **claim** without the solicitation, assistance or participation of any **insured persons** who have served as **insured persons** within such one year period; or

**b.**   Other than **executives** or **directors and officers** if such **claim** is brought and maintained without any active assistance or participation of, or solicitation by, any **executives** or **directors and officers**; or

**5.**   Any **claim** brought by a whistleblower pursuant to any federal, state, or local statutory or common law.

**H.**   Intellectual Property

We are not liable to pay, indemnify or defend any **claim** based upon, arising out of, or in consequence of any actual or alleged infringement of patent or misappropriation of trade secrets or other intellectual property rights; provided, however, that this exclusion shall not apply to any **publishers liability**. Furthermore, this exclusion shall not apply to any **claim** against any **insured persons**.

**I.**   Outside Service

We are not liable to pay, indemnify or defend any **claim** for any **wrongful act** in the discharge of the duties of any of the **insured persons** as a director, officer, trustee, employee, volunteer or member of any entity other than the **organization**, even if directed or requested to serve such other entity by the **organization**; provided, however, that this exclusion shall not apply to the extent:

**1.**   Such **claim** is based on the service of an **insured person** in an **outside position**; and

**2.**   The **loss** resulting from such **claim** is not indemnified by the **outside organization** or any of its insurers.

**J.**   Third Party Discrimination or Sexual Harassment

We are not liable to pay, indemnify or defend any **claim** for any discrimination against or sexual harassment of any **third party**.

## SECTION IV - SEVERABILITY OF EXCLUSIONS

With respect to determining the applicability of the above exclusions, no **wrongful act** or knowledge possessed by any one of the **insureds** shall be imputed to any other **insureds** to determine if coverage is available, unless indicated otherwise.

## SECTION V - LIMIT OF INSURANCE AND DEDUCTIBLES

**A.**   We will pay 100% of **loss** in excess of the applicable Deductible amount set forth in the Nonprofit Organization Directors and Officers Liability Coverage Part Declarations up to the Limit of Insurance set forth in the Nonprofit Organization Directors and Officers Liability Coverage Part Declarations, subject to the Shared Annual Aggregate Limit of Liability, if so set forth in the Common Policy Declarations.

**B.**   In the event a single **claim** is covered under more than one Insuring Agreement, the Deductibles set forth in the Nonprofit Organization Directors and Officers Liability Coverage Part Declarations shall be applied

separately to the part of the **loss** resulting from such **claim** covered by each Insuring Agreement and the sum of the Deductibles so applied shall constitute the Deductible for each single **claim**; provided, however, that the total Deductible as finally determined shall in no event exceed the largest of the applicable Deductibles. Notwithstanding the aforementioned, the Deductible applicable to Insuring Agreement **B.** shall apply to **loss** payable under any of the Insuring Agreements for which indemnification by the **organization** is legally permissible, whether or not actual indemnification is granted, unless the **organization** fails to indemnify any **insured person** due to the **financial impairment** of the **organization**. The Deductible shall be paid by the **organization**. Any **loss** paid by us within the Deductible shall be reimbursed by the **organization** within 30 days of our written request for such reimbursement.

**C.** **Defense costs** shall be part of and not in addition to the Limit of Insurance set forth in the Nonprofit Organization Directors and Officers Liability Coverage Part Declarations and the Shared Annual Aggregate Limit of Liability, if so set forth in the Common Policy Declarations. **Defense costs** we pay shall reduce such Limits of Insurance. **Defense costs** paid by the **organization** shall be applied against the Deductible.

**D.** Our maximum aggregate liability for all **loss** resulting from all **claims** under this Coverage Part shall be the Limit of Insurance set forth in the Nonprofit Organization Directors and Officers Liability Coverage Part Declarations, subject to the Shared Annual Aggregate Limit of Liability, if so set forth in the Common Policy Declarations.

**E.** If an Additional Defense Limit of Insurance is set forth in the Nonprofit Organization Directors and Officers Liability Coverage Part Declarations, **defense costs** will apply first to and reduce the Additional Defense Limit of Insurance. The Additional Defense Limit of Insurance will be in addition to and not part of the Limit of Insurance set forth in the Nonprofit Organization Directors and Officers Liability Coverage Part Declarations. The Additional Defense Limit of Liability is applicable to **defense costs** only. **Defense costs** paid by the **organization** shall be applied against the Deductible.

Upon exhaustion of the Additional Defense Limit of Insurance, **defense costs** shall be part of and not in addition to the Limit of Insurance set forth in the Nonprofit Organization Directors and Officers Liability Coverage Part Declarations. **Defense costs** we pay shall reduce the Limit of Insurance.

**F.** If an Excess Side A Limit of Insurance is set forth in the Nonprofit Organization Directors and Officers Liability Coverage Part Declarations and if the Limit of Insurance has been exhausted, we provide the **insured persons** with an excess limit of insurance under Insuring Agreement **A.** Such Excess Side A Limit of Insurance will not exceed the amount set forth in the Nonprofit Organization Directors and Officers Liability Coverage Part Declarations. The Excess Side A Limit of Insurance is in addition to and not part of the Limit of Insurance, and it applies solely to **loss** resulting from any **claim** against an **insured person** to which Insuring Agreement **A.** is applicable.

**G.** It is agreed that:

   **1.** If a **loss** from any **claim** is payable but such payment would exceed the remaining applicable Limit of Insurance as set forth in the Nonprofit Organization Directors and Officers Liability Coverage Part Declarations, we will first pay the unpaid portion of such **loss** under Insuring Agreement **A.**; then to the extent that any amount of the applicable Limit of Insurance shall remain available, we will pay such **loss** to which Insuring Agreements **B.** and **C.** apply.

   **2.** Upon written request of the president, chairperson or equivalent position of the **named insured**, we shall withhold payment of a covered **loss** under Insuring Agreements **B.** and **C.** until the president, chairperson or equivalent position of the **named insured** directs us to pay such covered **loss**. Such request shall not delay any payment under Insuring Agreement **A.**

---

## SECTION VI - DEFENSE, INVESTIGATION AND SETTLEMENT

**A.** We will have the right and duty to select counsel and defend the **insureds** against any **claim**; however, we will have no duty to defend the **insureds** against any **claim** to which this insurance does not apply.

**B.** We may make any investigation we deem necessary and may, with the consent of the **insureds** named in connection with the **claim**, make any settlement of any **claim** we deem expedient. If the **insureds** withhold consent to such settlement, our liability for all **loss** in connection with such **claim** shall not exceed:

   **1.** The amount of the proposed settlement plus **defense costs** incurred up to the date of the **insured's** refusal to consent to the proposed settlement; plus

   **2.** 90% of any settlement or judgment in excess of the proposed settlement amount referenced in **B.1.** above plus 90% of any **defense costs** incurred after the date the **insureds** refused to consent to the proposed settlement, subject in all events to the applicable Limit of Insurance and Deductible for such **claim**. The remaining 10% of any settlement or judgment in excess of the proposed settlement

amount referenced in **B.1.** above plus 10% of any **defense costs** incurred after the date the **insureds** refused to consent to the proposed settlement shall be borne by the **insureds**, uninsured and at their own risk.

**C.**  Our right and duty to defend end when we have used up the applicable Limit of Insurance in the defense or payment of damages, judgments or settlements of covered **claims**.

---

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

---

## AMENDED DEFINITION OF CLAIM ENDORSEMENT

---

This endorsement modifies insurance provided under the following:

**NONPROFIT ORGANIZATION DIRECTORS AND OFFICERS LIABILITY COVERAGE**

**SECTION II - DEFINITIONS**, **A.** is amended to include the following:

**A. Claim** means:

1. A written demand for monetary damages or non-monetary relief;

2. A civil proceeding commenced by the filing of a complaint or similar pleading;

3. A formal administrative or regulatory proceeding commenced by a filing of a complaint, charge, formal investigative order or similar document;

4. An arbitration, mediation or similar alternative dispute resolution proceeding in which monetary damages are sought if the **insured**:

    **a.**    Is required to participate in such proceeding; or
    **b.**    Agrees to participate in such proceeding with our written consent, such consent not to be unreasonably withheld;

5. A criminal proceeding commenced by the return of an indictment or any similar document;

6. A written request to toll or waive a statute of limitations relating to a potential **claim** described in Definitions **A.1.** through **A.5.** above; or

7. A civil, administrative, regulatory or criminal investigation of an **insured person** or of the **organization** once such **insured person** or the **organization** is identified in writing by such investigating authority as a person against whom a proceeding described in Definitions **A.2.**, **A.3** or **A.5.** may be commenced. The maximum Limit of Insurance for all such investigations against any **insured persons** shall be the Investigative Costs Sublimit set forth in the Privately Held Company Directors and Officers Liability Coverage Part Declarations. This sublimit shall be part of and not in addition to the Limit of Insurance set forth in the Privately Held Company Directors and Officers Liability Coverage Part Declarations and does not increase our maximum aggregate liability under this Coverage Part;

against any **insured**, including any appeal therefrom.

All other provisions of the policy remain unchanged except as herein expressly modified.

Exhibit 5

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

---

## AMENDED DEFINITION OF INSURED PERSONS ENDORSEMENT

---

This endorsement modifies insurance provided under the following:

**NONPROFIT ORGANIZATION DIRECTORS AND OFFICERS LIABILITY COVERAGE**

**SECTION II - DEFINITIONS**, **L.** is amended to add the following:

**5.** Students and interns

**6.** Any natural person who is an independent contractor as determined by federal, state or local law, but only while acting in the capacity as such for the **organization** pursuant to an express written agreement between the independent contractor, or any entity on behalf of the independent contractor;

but only for acts with respect to their duties for service to the **organization**

All other provisions of the policy remain unchanged except as herein expressly modified.

**IA 450 11 87 D**

Exhibit 5

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

<div style="border:1px solid black; text-align:center">

## DEFINITION OF EXECUTIVE
## AMENDATORY ENDORSEMENT

</div>

This endorsement modifies insurance provided under the following:

**NONPROFIT ORGANIZATION DIRECTORS AND OFFICERS LIABILITY COVERAGE**

**SECTION II - DEFINITIONS, I.** is deleted in its entirety and replaced by the following:

**E.** **Executive** means any natural person who was, now is or shall become the Chief Executive Officer, Chief Financial Officer or person of equivalent position to any of the foregoing of the **organization**.

All other provisions of the policy remain unchanged except as herein expressly modified.

**IA 450 11 87 E**

**Page 1 of 1**
Exhibit 5

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## AMENDED SETTLMENT PROVISION

This endorsement modifies insurance provided under the following:

**NONPROFIT ORGANIZATION DIRECTORS AND OFFICERS LIABILITY COVERAGE PARTS**

**SECTION VI – DEFENSE, INVESTIGATION AND SETTLEMENT.** is deleted in its entirety and replaced by the following:

**A.** We will have the right and duty to select counsel and defend the **insureds** against any **claim**; however, we will have no duty to defend the **insureds** against any **claim** to which this insurance does not apply.

**B.** We may make any investigation we deem necessary and may, with the consent of the **insureds** named in connection with the **claim**, make any settlement of any **claim** we deem expedient.

**C.** Our right and duty to defend end when we have used up the applicable Limit of Insurance in the defense or payment of damages, judgments or settlements of covered **claims**.

All other provisions of the policy remain unchanged except as herein expressly modified.

**IA 450 (11/87) F**

Exhibit 5

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## AMENDED CONDUCT EXCLUSION

This endorsement modifies insurance provided under the following:

> **COMMUNITY ASSOCIATION DIRECTORS AND OFFICERS LIABILITY COVERAGE**
> **EDUCATORS LEGAL LIABILITY COVERAGE**
> **FINANCIAL INSTITUTIONS DIRECTORS AND OFFICERS LIABILITY COVERAGE**
> **NONPROFIT ORGANIZATION DIRECTORS AND OFFICERS LIABILITY COVERAGE**
> **PRIVATELY HELD COMPANY DIRECTORS AND OFFICERS LIABILITY COVERAGE**
> **PUBLICLY TRADED COMPANY DIRECTORS AND OFFICERS LIABILITY COVERAGE**

**SECTION III - EXCLUSIONS, B.** is deleted in its entirety and replaced by the following:

**B.**   Conduct

We are not liable to pay, indemnify or defend any **claim** based upon, arising out of, or in consequence of any of the **insureds** or any person for whose actions the **insureds** are legally responsible:

**1.**   Committing any deliberately fraudulent act or omission;

**2.**   Committing any willful violation of any statute or regulation; or

**3.**   Gaining any personal profit, remuneration or financial advantage to which they were not legally entitled;

if established by a final and non-appealable judgment or adjudication in the underlying action or proceeding adverse to the **insureds** as to such conduct.

With respect to determining the applicability of this exclusion, no conduct pertaining to any **insured person** shall be imputed to any other **insured person**; however, any conduct pertaining to any **executive** shall be imputed to the **organization** to determine if coverage is available.

All other provisions of the policy remain unchanged except as herein expressly modified.

**IA 450 (11/87) G**

Exhibit 5

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## ASSAULT EXCLUSION

This endorsement modifies insurance provided under the following:

**COMMUNITY ASSOCIATION DIRECTORS AND OFFICERS LIABILITY COVERAGE**
**EDUCATORS LEGAL LIABILITY COVERAGE**
**FINANCIAL INSTITUTIONS DIRECTORS AND OFFICERS LIABILITY COVERAGE**
**HEALTHCARE INSTITUTIONS DIRECTORS AND OFFICERS LIABILITY COVERAGE**
**NONPROFIT ORGANIZATION DIRECTORS AND OFFICERS LIABILITY COVERAGE**
**PRIVATELY HELD COMPANY DIRECTORS AND OFFICERS LIABILITY COVERAGE**
**PUBLICLY TRADED COMPANY DIRECTORS AND OFFICERS LIABILITY COVERAGE**

**SECTION III - EXCLUSIONS** is amended to add the following:

We are not liable to pay, indemnify or defend any **claim** based upon, arising out of, or in consequence of any allegations of sexual assault, physical abuse or any threat of bodily harm or abuse.

All other provisions of the policy remain unchanged except as herein expressly modified.

**ML 312 01 16**

Exhibit 5

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

<div style="border:2px solid black; text-align:center;">

# SPORTS RELATED
# BRAIN INJURY EXCLUSION

</div>

This endorsement modifies insurance provided under the following:

> **COMMUNITY ASSOCIATION DIRECTORS AND OFFICERS LIABILITY COVERAGE**
> **EDUCATORS LEGAL LIABILITY COVERAGE**
> **FINANCIAL INSTITUTIONS DIRECTORS AND OFFICERS LIABILITY COVERAGE**
> **HEALTHCARE INSTITUTIONS DIRECTORS AND OFFICERS LIABILITY COVERAGE**
> **NONPROFIT ORGANIZATION DIRECTORS AND OFFICERS LIABILITY COVERAGE**
> **PRIVATELY HELD COMPANY DIRECTORS AND OFFICERS LIABILITY COVERAGE**
> **PUBLICLY TRADED COMPANY DIRECTORS AND OFFICERS LIABILITY COVERAGE**

**A.  SECTION II - DEFINITIONS** is amended to add the following:

1.  **Neurodegenerative injury** means any actual or alleged brain injury, neurological injury, neurocognitive disorder, disease, condition or dysfunction, including, but not limited to, Alzheimer's disease, Parkinson's disease, amyotrophic lateral sclerosis, mild traumatic brain injury, repetitive brain trauma, cumulative brain trauma, chronic traumatic encephalopathy, dementia, cognitive injury or disorder, memory loss, anxiety disorder, mood disorder, depression, sleeplessness, impulse control problems, headaches, post-concussion syndrome, second-impact syndrome, or single or repetitive concussive or sub-concussive injury or trauma.

2.  **Participant** means any person engaged in athletic activities. **Participant** does not include spectators, referees, umpires or coaching staff.

**B.  SECTION III - EXCLUSIONS** is amended to add the following:

We are not liable to pay, indemnify or defend any **claim** based upon, arising out of or in consequence of any **neurodegenerative injury** to a **participant** resulting from, arising out of or in any way relating to the participation in, observance of or monitoring of any athletic or sports game, contest, practice, scrimmage, exhibition or activity.

All other provisions of the policy remain unchanged except as herein expressly modified.

**ML 340 01 18**

Exhibit 5

# The Cincinnati Insurance Company

A Stock Insurance Company

# EMPLOYMENT PRACTICES LIABILITY
# COVERAGE PART DECLARATIONS

**THIS COVERAGE PART PROVIDES CLAIMS-MADE COVERAGE, WHICH APPLIES ONLY TO CLAIMS FIRST MADE DURING THE POLICY PERIOD OR ANY APPLICABLE EXTENDED REPORTING PERIOD. TO THE EXTENT IT IS NOT OTHERWISE INDICATED, THE LIMIT OF INSURANCE TO PAY DAMAGES OR SETTLEMENTS WILL BE REDUCED AND MAY BE EXHAUSTED BY DEFENSE COSTS, AND DEFENSE COSTS WILL BE APPLIED AGAINST THE DEDUCTIBLE. IN NO EVENT WILL WE BE LIABLE FOR DEFENSE COSTS OR THE AMOUNT OF ANY JUDGMENT OR SETTLEMENT IN EXCESS OF THE LIMIT OF INSURANCE. READ THE ENTIRE POLICY CAREFULLY.**

Policy Number: **EMN 057 09 06**

Named Insured is the same as it appears in the Common Policy Declarations unless another entry is made here.

| | | | |
|---|---|---|---|
| Limit of Insurance: | $ | 1,000,000 | in the aggregate |
| Optional Third Party Liability Sublimit | $ | 1,000,000 | in the aggregate |
| Wage and Hour Defense Sublimit | $ | 250,000 | in the aggregate |
| Immigration Defense Sublimit | $ | 100,000 | in the aggregate |

| | | | |
|---|---|---|---|
| Additional Defense Limit of Insurance: | $ | UNLIMITED | in the aggregate |

| | | |
|---|---|---|
| Deductibles: | $ 2,500 | each **claim** under Insuring Agreement **A** (Employment Practices) |
| | $ 2,500 | each **claim** under Insuring Agreement **B** (Third Party) |

| | |
|---|---|
| Retroactive Date: | N/A |
| Prior or Pending Date: | 03-08-2020 |
| Continuity Date: | 03-08-2020 |

Forms and endorsements applicable to this coverage part:

| | | |
|---|---|---|
| ML112 | 01/18 | EMPLOYMENT PRACTICES LIABILITY COVERAGE |
| IA450H | 11/87 | AMENDED DEFINITION OF EMPLOYEE- EPL |
| IA450I | 11/87 | AMENDED DEFINITION OF INSURED PERSONS- EPL |
| IA450J | 11/87 | DEFINITION OF EXECUTIVE AMENDATORY- EPL |
| IA450K | 11/87 | AMENDED SETTLEMENT PROVISION- EPL |
| ML4195 | 09/18 | NOTICE OF POST-EVENT SERVICES - WORKPLACE VIOLENCE EXPENSE COVERAGE |
| ML205 | 01/18 | WORKPLACE VIOLENCE EXPENSE COVERAGE ENDORSEMENT |
| ML341 | 01/18 | THIRD PARTY LIABILITY ASSAULT EXCLUSION |

03-05-2020 17:32

EMN 057 09 06

Exhibit 5

# EMPLOYMENT PRACTICES LIABILITY COVERAGE

## TABLE OF CONTENTS

**Coverage Part Provision:** **Begins on Page:**

**SECTION I - INSURING AGREEMENTS** .................................................................................................2

**SECTION II - DEFINITIONS**.............................................................................................................2

**SECTION III - EXCLUSIONS** ..........................................................................................................6

**SECTION IV - SEVERABILITY OF EXCLUSIONS** ..............................................................................7

**SECTION V - LIMIT OF INSURANCE AND DEDUCTIBLE** ..................................................................7

**SECTION VI - DEFENSE, INVESTIGATION AND SETTLEMENT** ..........................................................8

**SECTION VII - SUPPLEMENTARY PAYMENTS**...................................................................................8

# EMPLOYMENT PRACTICES LIABILITY COVERAGE

**THIS COVERAGE PART PROVIDES CLAIMS-MADE COVERAGE, WHICH APPLIES ONLY TO CLAIMS FIRST MADE DURING THE POLICY PERIOD OR ANY APPLICABLE EXTENDED REPORTING PERIOD. TO THE EXTENT IT IS NOT OTHERWISE INDICATED, THE LIMIT OF INSURANCE TO PAY DAMAGES OR SETTLEMENTS WILL BE REDUCED AND MAY BE EXHAUSTED BY DEFENSE COSTS, AND DEFENSE COSTS WILL BE APPLIED AGAINST THE DEDUCTIBLE. IN NO EVENT WILL WE BE LIABLE FOR DEFENSE COSTS OR THE AMOUNT OF ANY JUDGMENT OR SETTLEMENT IN EXCESS OF THE LIMIT OF INSURANCE. READ THE ENTIRE POLICY CAREFULLY.**

## SECTION I - INSURING AGREEMENTS

**A.** We will pay on behalf of the **insureds** all **loss** which they shall be legally obligated to pay resulting from any **employment claim** or **immigration claim** first made during the **policy period**, or any **extended reporting period** included in or endorsed to the policy, for an **employment wrongful act** or **immigration wrongful act**.

**B.** If Optional Third Party Liability is purchased as set forth in the Employment Practices Liability Coverage Part Declarations, we will pay on behalf of the **insureds** all **loss** which they shall be legally obligated to pay resulting from any **third party claim** first made during the **policy period**, or any **extended reporting period** included in or endorsed to the policy, for a **third party wrongful act**.

We will have the right and duty to select counsel and defend the **insureds** against any such **claim**.

## SECTION II - DEFINITIONS

Where set forth in bold type in this Coverage Part, whether in singular or in plural, the following terms shall have the meanings indicated.

**A.** **Benefits** means perquisites, fringe benefits, payments in connection with an employee benefit plan and any other payment, other than salary, wages or commissions to or for the benefit of an **employee** arising out of the employment relationship.

**B.** **Claim** means an **employment claim,** an **immigration claim** or a **third party claim**.

**C.** **Defense costs** means reasonable and necessary fees, costs, and expenses incurred by us or with our consent on behalf of the **insureds** or reimbursed to any of the **insureds** by us, resulting solely from the investigation, adjustment, defense and appeal of any **claim**. **Defense costs** includes, but is not limited to, the cost of expert consultants and witnesses, and premiums for appeal, injunction, attachment or supersedeas bonds (but not the obligation to furnish such bonds).

**Defense costs** shall not include:

**1.** Salaries, wages, fees, overhead or expenses of our employees or any **insureds**, directors, officers, trustees or employees, other than that portion of our employed attorneys' fees, salaries and expenses allocated to a specific **claim**;

**2.** Any amount covered by the duty to defend obligation of any other insurer; or

**3.** Any pre-tender fees, costs or expenses.

**D.** **Employee** includes, but is not limited to, full-time, part-time, seasonal, volunteer, contingent or leased workers as determined by the federal, state or local law. **Employee** does not include independent contractors as determined by federal, state or local law.

**E.** **Employment claim** means:

**1.** A written demand for monetary damages or non-monetary relief;

**2.** A civil proceeding commenced by the filing of a complaint or similar pleading;

**3.** A formal administrative or regulatory proceeding commenced by the filing of a complaint, charge, formal investigative order or similar document;

**4.** An arbitration, mediation or similar alternative dispute resolution proceeding (other than a labor or grievance arbitration or other proceeding pursuant to a collective bargaining agreement) if the **insured** is required or agrees to participate in such proceeding with our written consent;

Exhibit 5

**5.** In the context of an audit conducted by the Office of Federal Contract Compliance Programs, a Notice of Violation or Order to Show Cause or written demand for monetary or non-monetary relief, commenced by the receipt by an **insured** of such Notice, Order or written demand; or

**6.** A written request to toll or waive a statute of limitations relating to a potential **employment claim** described in Definitions **E.1.** through **E.5.** above;

which is brought by or on behalf of any past, present or prospective **employee(s)** of the **organization** against any of the **insureds**, including any appeal therefrom.

**F.** **Employment wrongful act** means any actual or alleged error, misstatement, misleading statement, act, omission, neglect or breach of duty committed for:

**1.** Wrongful discharge, dismissal or termination of employment, including constructive discharge;

**2.** Breach of any oral, written or implied employment contract or quasi-employment contract other than any labor or grievance arbitration or other proceeding pursuant to a collective bargaining agreement;

**3.** Employment related misrepresentation;

**4.** Violation of any federal, state or local law that concerns employment discrimination:

    **a.** Including:

        **1.** Sexual harassment involving unwelcome sexual advances, requests for sexual favors or other conduct of a sexual nature; or

        **2.** Workplace bullying or workplace harassment of a non-sexual nature;

    **b.** That:

        **1.** Are made a condition of employment;

        **2.** Are used as a basis for employment decisions; or

        **3.** Create a work environment that is intimidating, offensive, hostile or interferes with performance;

**5.** Wrongful failure to employ or promote;

**6.** Wrongful demotion;

**7.** Wrongful discipline;

**8.** Wrongful deprivation of a career opportunity;

**9.** Negligent hiring, supervision, promotion or retention;

**10.** Negligent evaluation;

**11.** Employment related **personal injury**;

**12.** Wrongful failure to grant tenure;

**13.** Employment related wrongful infliction of emotional distress;

**14.** Violation of the Family Medical Leave Act;

**15.** Wrongful **retaliation**;

**16.** Wrongful denial of training, denial or deprivation of seniority or evaluation;

**17.** Failure to adopt, create, provide or enforce adequate workplace or employment practices and procedures; or

**18.** Wrongful handling of any background check which is issued or expected to be used or collected in whole or in part for the purpose of serving as a factor in any employment related activities, including but not limited to any violation of the Fair Credit Reporting Act;

including any actual or alleged assault, battery, or loss of consortium in connection with Subparagraphs **1.** through **18.** above.

**G.** **Executive** means any natural person who was, now is or shall become the chairperson, president, chief executive officer, chief financial officer, executive director, in-house general counsel or person of equivalent position to any of the foregoing of the **organization**.

H.  **Immigration claim** means any criminal investigation of any **insured** by any governmental agency for any actual or alleged hiring of illegal aliens.

I.  **Immigration wrongful act** means any actual or alleged violation of the Immigration Reform and Control Act of 1986 or any amendments to or rules, regulations or orders promulgated pursuant to it, or similar provisions of any federal, state, or local statutory or common law.

J.  **Insured** means the **organization** and the **insured persons**.

K.  **Insured persons** means:

1.  All natural persons who were, now are, or shall become an officer or a duly elected or appointed member of the board of directors, trustees, regents, managers, governors, a **LLC manager** or an equivalent position of the **organization**;

2.  All natural persons who were, now are, or shall become an **employee** or committee member, whether or not they were, are or shall be compensated, of the **organization**;

3.  All natural persons who were, now are, or shall become members or volunteers of the **organization**, if the **organization** is nonprofit in nature,  while acting on behalf of the **organization** in a voluntary capacity at the direction of the board of directors, trustees, regents, managers, governors, or an equivalent position; and

4.  Any natural person who is an independent contractor as determined by federal, state or local law, but only while acting in the capacity as such for the **organization** pursuant to an express written agreement between the independent contractor, or any entity on behalf of the independent contractor, and the **organization** and only if the **organization** agrees in writing to provide indemnification to such independent contractor; provided, however, that any coverage under this Coverage Part for any such independent contractor shall be excess of any indemnification or insurance otherwise available to such independent contractor from any other source;

but only for acts with respect to their duties for or service to the **organization**.

L.  **LLC manager** means any natural person who was, now is or shall become a manager, member of the board of managers or member of the **organization** that is a limited liability company but only with respect to the conduct of the limited liability company's business.  However, any member of a limited liability company who is a passive investor not involved in the operations of the limited liability company is not a **LLC manager.**

M.  **Loss** means **defense costs** and the total amount of monetary damages which the **insured** becomes legally obligated to pay on account of any **claim** for a **wrongful act** with respect to which coverage hereunder applies, including damages (including back pay and front pay), judgments, settlements, prejudgment and postjudgment interest, and punitive or exemplary damages or the multiplied portion of any multiplied damage award if insurable under the applicable law most favorable to the insurability of punitive, exemplary or multiplied damages.

**Loss** shall not include any amount for which an **insured** is not financially liable, compensation earned in the course of employment but not paid by an **insured** or matters which are deemed uninsurable under the law pursuant to which this Coverage Part shall be construed.

**Loss** shall not include, (other than **defense costs**):

1.  **Benefits** or the equivalent value, however, this provision does not apply to **loss** resulting solely from wrongful termination of employment;

2.  Amounts, which arise out of, are based upon, or are attributable to the employment reinstatement of the claimant by an **insured** or the continued employment of the claimant;

3.  Future compensation, including salary or **benefits** for an **employee**, if the **insured** is ordered in accordance with a judgment or other final adjudication but fails to reinstate the claimant as an **employee**;

4.  That part of any express contract of employment or an express obligation to make payments in the event of the termination of employment;

5.  Salary, wages, commissions, **benefits** or other monetary payments which constitute severance payments or payments pursuant to a notice period;

6.  Civil or criminal fines or penalties imposed by law, liquidated damages (other than liquidated damages awarded under the Age Discrimination in Employment Act or the Equal Pay Act), payroll or other taxes, or damages, penalties or types of relief deemed uninsurable under applicable law;

7. Future compensation, including salary or **benefits** for an **employee** who has been or will be hired, promoted or reinstated to employment pursuant to a settlement, court order, judgment, award or other resolution of a **claim**; or

8. Medical, pension, disability, life insurance, stock option or other **employee** type **benefit**.

**N. Organization** means the **named insured** and any **subsidiary**.

**O. Personal injury** means injury, other than bodily injury, arising out of one or more of the following offenses:

1. False arrest, detention or imprisonment;

2. Oral or written publication of material that libels, slanders or defames a past, present or prospective **employee**;

3. Invasion of a past, present or prospective **employee's** right of privacy;

4. Malicious prosecution; or

5. Abuse of process.

**P. Property damage** means:

1. Injury or damage, of any nature, to tangible or intangible property, including all resulting loss of use of that property; or

2. Loss of or loss of use of tangible or intangible property that is not otherwise injured or damaged.

**Q. Retaliation** means any actual or alleged wrongful termination of employment or other adverse employment action against a claimant with respect to any person's exercise or attempted exercise of rights protected by law, refusal to violate any law, disclosure or threat of disclosure to a superior or to any governmental agency actual or alleged violations of the law, or having assisted or testified in or cooperated with a proceeding or investigation regarding alleged violations of law.

**R. Third party** means any natural person who is not an **employee** of the **organization**.

**S. Third party claim** means:

1. A written demand for monetary damages or non-monetary relief;

2. A civil proceeding commenced by the filing of a complaint or similar pleading;

3. A formal administrative or regulatory proceeding commenced by the filing of a complaint, charge, formal investigative order or similar document;

4. An arbitration, mediation or similar alternative dispute resolution proceeding (other than a labor or grievance arbitration or other proceeding pursuant to a collective bargaining agreement) if the **insured** is required or agrees to participate in such proceeding with our written consent; or

5. A written request to toll or waive a statute of limitations relating to a potential **third party claim** described in Definitions **S.1.** through **S.4.** above;

which is brought by or on behalf of any **third party** against any of the **insureds**, including any appeal therefrom.

**T. Third party wrongful act** means any actual or alleged error, misstatement, misleading statement, act, omission, neglect or breach of duty committed, attempted or allegedly committed or attempted on or after the Retroactive Date, if any, set forth in the Employment Practices Liability Coverage Part Declarations and prior to the end of the **policy period** by an **insured** or any person for whose acts the **insured** is legally liable for:

1. Discrimination by any **insured** against a **third party** in violation of any applicable federal, state or local statute, ordinance or common law;

2. Sexual or other harassment by any **insured**, including unwelcome sexual advances, requests for sexual favors or other conduct of a sexual nature against a **third party** which violates the civil rights of the **third party**; or

3. **Wrongful eviction** when arising out of discrimination or harassment by any **insured** against a **third party** in violation of any applicable federal, state or local statute, ordinance or common law.

**U. Wrongful act** means an **employment wrongful act**, an **immigration wrongful act** or a **third party wrongful act** attempted or allegedly committed or attempted on or after the Retroactive Date, if any, set

forth in the Employment Practices Liability Coverage Part Declarations and prior to the end of the **policy period** by an **insured** or any person for whose acts the **organization** is legally liable.

**V. Wrongful eviction** means the act of dispossessing or attempting to dispossess a **third party** of real property to which such **third party** claims a right to occupy, and such real property is owned, operated or controlled by the **organization**.

---

## SECTION III - EXCLUSIONS

The descriptions in the headings of these exclusions are solely for convenience and form no part of the terms and conditions of coverage.

**A.** Exclusions applicable to **loss** other than **defense costs**:

**1.** Americans With Disabilities Act

This insurance does not apply to **loss** incurred by the **insured** in making physical changes, modifications, alterations, or improvements as part of an accommodation pursuant to the Americans With Disabilities Act or similar provisions of any federal, state or local statutory or common law; provided, however, that this exclusion does not apply to **defense costs**.

**2.** Wage and Hour (with Defense Sublimit)

This insurance does not apply to any **claim** based upon, arising out of or in consequence of the Fair Labor Standards Act (except the Equal Pay Act) or any amendments to or rules, regulations or orders promulgated pursuant to it, or similar provisions of any federal, state, or local statutory or common law; except we shall reimburse the **insureds** for up to a maximum payment of the Wage and Hour Defense Sublimit set forth in the Employment Practices Liability Coverage Part Declarations in **defense costs** that exceed the Deductible amount as set forth in the Employment Practices Liability Coverage Part Declarations. Any payment of **defense costs** shall be part of and not in addition to the Limit of Insurance set forth in the Employment Practices Liability Coverage Part Declarations and such payment reduces the Limit of Insurance. However, this exclusion shall not apply to an **employment claim** for retaliatory treatment of a person with respect to actual or threatened disclosures by such person of any actual or alleged violation of the Fair Labor Standards Act by any **insured**.

**3.** Immigration (with Defense Sublimit)

This insurance does not apply to any **immigration claim** except we shall reimburse the **insureds** for up to a maximum payment of the Immigration Claim Defense Sublimit set forth in the Employment Practices Liability Coverage Part Declarations in **defense costs** that exceed the Deductible amount as set forth in the Employment Practices Liability Coverage Part Declarations. Any payment of **defense costs** shall be part of and not in addition to the Limit of Insurance set forth in the Employment Practices Liability Coverage Part Declarations and such payment reduces the Limit of Insurance. However, this exclusion shall not apply to an **employment claim** for retaliatory treatment of a person with respect to actual or threatened disclosures by such person of any actual or alleged violation of the Immigration Reform and Control Act of 1986 by any **insured**.

**B.** Exclusions applicable to all **loss**:

**1.** Bodily Injury/Property Damage

We are not liable to pay, indemnify or defend any **claim** for actual or alleged:

**a.** Bodily injury, sickness, disease, or death of any person; or

**b. Property damage**, including, but not limited to, physical injury, loss of or loss of use of currency or any negotiable or non-negotiable instruments or contracts representing money.

**2.** COBRA, ERISA, NLRA, OSHA and WARN (with Retaliation Carve Back)

This insurance does not apply to any **claim** based upon, arising out of or in consequence of the:

**a.** Consolidated Omnibus Budget Reconciliation Act of 1985;

**b.** Employee Retirement Income Security Act of 1974 (except Section 510 thereof);

**c.** National Labor Relations Act (including the Labor Management Relations Act of 1947);

**d.** Occupational Safety and Health Act;

**e.**   Worker Adjustment and Retraining Notification Act; or

any amendments to or rules, regulations or orders promulgated pursuant to these laws, or similar provisions of any federal, state, or local statutory or common law. However, this exclusion shall not apply to any **employment claim** for retaliatory treatment of a person with respect to actual or threatened disclosures by such person of any actual or alleged violation of the acts described in **B.2.a.** through **B.2.e.** above by any **insured**.

**3.**   Contractual (Other than Employment Contract)

We are not liable to pay, indemnify or defend any **claim** based upon, arising out of or in consequence of any actual or alleged liability of any **insureds** under the terms, conditions or warranties of any oral or written contract or agreement, except:

**a.**   To the extent the liability would have attached to any such **insureds** in the absence thereof; or

**b.**   With respect to any **claim** for breach of an employment contract.

**4.**   Labor Relations

We are not liable to pay, indemnify or defend any **claim** based upon, arising out of or in consequence of any actual or alleged:

**a.**   Labor or grievance arbitration or other proceeding pursuant to a collective bargaining agreement; or

**b.**   **Wrongful act** committed, attempted, or allegedly committed or attempted concurrent with or after a lockout, strike, picket line, replacement or other similar actions resulting from labor disputes or labor negotiations.

**5.**   Workers' Compensation, Unemployment, Social Security and Disability (with Retaliation Carve Back)

We are not liable to pay, indemnify or defend any **claim** based upon, arising out of or in consequence of any actual or alleged obligation of any **insured** under any workers' compensation, unemployment insurance, social security, disability benefits or similar law, or derivative actions arising out of any of these. However, this exclusion shall not apply to any **employment claim** for retaliatory treatment by an **insured** due to the exercise of rights granted under any such law.

## SECTION IV - SEVERABILITY OF EXCLUSIONS

With respect to determining the applicability of the above exclusions, no **wrongful act** or knowledge possessed by any one of the **insureds** shall be imputed to any other **insureds** to determine if coverage is available, unless indicated otherwise.

## SECTION V - LIMIT OF INSURANCE AND DEDUCTIBLE

**A.**   The Limits of Insurance shown in the Employment Practices Liability Coverage Part Declarations and the rules below fix the most we will pay regardless of the number of:

**1.**   **Insureds** under this Coverage Part;

**2.**   **Claims** made or suits brought on account of **wrongful acts** or otherwise; or

**3.**   Persons or organizations making **claims** or bringing suits.

**B.**   Our liability shall apply only to that part of each covered **loss** which is excess of the Deductible amount specified in the Employment Practices Liability Coverage Part Declarations and such Deductible amount shall be borne by the **insureds**.

**C.**   **Defense costs** incurred by us or by the **insured** with our written consent are part of and not in addition to the Limit of Insurance set forth in the Employment Practices Liability Coverage Part Declarations and the Shared Annual Aggregate Limit of Liability, if so set forth in the Common Policy Declarations. **Defense costs** we pay shall reduce such Limits of Insurance. **Defense costs** paid by the **insureds** shall be applied against the Deductible.

**D.**   Our maximum aggregate liability for all **loss** resulting from all **claims** under this Coverage Part shall be the Limit of Insurance set forth in the Employment Practices Liability Coverage Part Declarations, subject to the Shared Annual Aggregate Limit of Liability, if so set forth in the Common Policy Declarations.

**E.**   If an Additional Defense Limit of Insurance is set forth in the Employment Practices Liability Coverage Part Declarations, **defense costs** will apply first to and reduce the Additional Defense Limit of Insurance. The Additional Defense Limit of Insurance will be in addition to, and not part of the Limit of Insurance set forth in the Employment Practices Liability Coverage Part Declarations. The Additional Defense Limit of Liability is applicable to **defense costs** only. **Defense costs** paid by the **insureds** shall be applied against the Deductible.

Upon exhaustion of the Additional Defense Limit of Insurance, **defense costs** shall be part of and not in addition to the Limit of Insurance set forth in the Employment Practices Liability Coverage Part Declarations. **Defense costs** we pay shall reduce the Limit of Insurance.

## SECTION VI - DEFENSE, INVESTIGATION AND SETTLEMENT

**A.**   We will have the right and duty to select counsel and defend the **insureds** against any **claim**; however, we will have no duty to defend the **insureds** against any **claim** to which this insurance does not apply.

**B.**   We may make any investigation we deem necessary and may, with the consent of the **insureds** named in connection with the **claim**, make any settlement of any **claim** we deem expedient. If the **insureds** withhold consent to such settlement, our liability for all **loss** in connection with such **claim** shall not exceed:

   **1.**   The amount of the proposed settlement plus **defense costs** incurred up to the date of the **insured's** refusal to consent to the proposed settlement; plus

   **2.**   90% of any settlement or judgment in excess of the proposed settlement amount referenced in **B.1.** above plus 90% of any **defense costs** incurred after the date the **insureds** refused to consent to the proposed settlement, subject in all events to the applicable Limit of Insurance and Deductible for such **claim**. The remaining 10% of any settlement or judgment in excess of the proposed settlement amount referenced in **B.1.** above plus 10% of any **defense costs** incurred after the date the **insureds** refused to consent to the proposed settlement shall be borne by the **insureds**, uninsured and at their own risk.

**C.**   Our right and duty to defend end when we have used up the applicable Limit of Insurance in the defense or payment of damages, judgments or settlements of covered **claims**.

## SECTION VII - SUPPLEMENTARY PAYMENTS

We will pay with respect to any **claim** we defend:

**A.**   The cost of any appeal bond, attachment bond, or any similar bond, but only for bond amounts within the applicable Limit of Insurance; provided, however, that we do not have to apply for or furnish these bonds; and

**B.**   All reasonable expenses incurred by the **insured** at our request to assist us in the investigation or defense of the **claim**, including actual loss of earnings up to $250 a day because of time off from work.

These payments will not reduce the Limits of Insurance.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## AMENDED DEFINITION OF EMPLOYEE ENDORSEMENT

This endorsement modifies insurance provided under the following:

**EMPLOYMENT PRACTICES LIABILITY COVERAGE**

**SECTION  II -  DEFINITIONS**,  **D.**  is deleted in its entirety and replaced by the following:

**D. Employee** includes, but is not limited to, full-time, part-time, seasonal, volunteer, students, interns, contingent or leased workers as determined by the federal, state or local law. **Employee** does not include independent contractors as determined by federal, state or local law.

All other provisions of the policy remain unchanged except as herein expressly modified.

Exhibit 5

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

---

# AMENDED DEFINITION OF INSURED PERSONS ENDORSEMENT

---

This endorsement modifies insurance provided under the following:

**EMPLOYMENT PRACTICES LIABILITY COVERAGE**

**SECTION  II -  DEFINITIONS**, **K.  4.** is deleted in its entirety and replaced by the following:

**4.** Any natural person who is an independent contractor as determined by federal, state or local law, but only while acting in the capacity as such for the **organization** pursuant to an express written agreement between the independent contractor, or any entity on behalf of the independent contractor;

but only for acts with respect to their duties for service to the **organization**

All other provisions of the policy remain unchanged except as herein expressly modified.

IA 450 11 87 I                                                                                          Page 1 of 1

Exhibit 5

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

---

## DEFINITION OF EXECUTIVE
## AMENDATORY ENDORSEMENT

---

This endorsement modifies insurance provided under the following:

**EMPLOYMENT PRACTICES LIABILITY COVERAGE**

**SECTION II - DEFINITIONS, G.** is deleted in its entirety and replaced by the following:

    **G. Executive** means any natural person who was, now is or shall become the Chief Executive Officer, Chief Financial Officer or person of equivalent position to any of the foregoing of the **organization**.

All other provisions of the policy remain unchanged except as herein expressly modified.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## AMENDED SETTLMENT PROVISION

This endorsement modifies insurance provided under the following:

**EMPLOYMENT PRACTICES LIABILITY COVERAGE PARTS**

**SECTION IV – DEFENSE, INVESTIGATION AND SETTLEMENT.** is deleted in its entirety and replaced by the following:

 **A.** We will have the right and duty to select counsel and defend the **insureds** against any **claim**; however, we will have no duty to defend the **insureds** against any **claim** to which this insurance does not apply.

 **B.** We may make any investigation we deem necessary and may, with the consent of the **insureds** named in connection with the **claim**, make any settlement of any **claim** we deem expedient. If the **insured's** withhold consent to such settlement, our liability for all **loss** in connection with such **claims** shall not exceed:

  1. The amount of the proposed settlement plus **defense costs** incurred up to the date of the **insured's** refusal to consent to the proposed settlement; plus

  2. 95% of any settlement or judgement in excess of the proposed settlement amount referenced in **B.1.** above plus 95% of any **defense costs** incurred after the date the **insureds** refused to consent to the proposed settlement, subject in all events to the applicable Limit of Insurance and Deductible for such **claim**. The remaining 5% of any settlement or judgment in excess of the proposed settlement amount referenced in **B.1.** above plus 5% of any **defense costs** incurred after the date the **insureds** refused to consent to the proposed settlement shall be borne by the **insureds**, uninsured and at their own risk.

 **C.** Our right and duty to defend end when we have used up the applicable Limit of Insurance in the defense or payment of damages, judgments or settlements of covered **claims**.

All other provisions of the policy remain unchanged except as herein expressly modified.

**IA 450 (11/87) K**

Exhibit 5

# NOTICE OF POST-EVENT SERVICES -
# WORKPLACE VIOLENCE EXPENSE COVERAGE

Your policy includes valuable workplace violence expense coverage from the Cincinnati Insurance Company. In the event of a workplace violence event, you may utilize an outside vendor to assist your organization. The associated workplace violence expenses may be covered by your policy. The Cincinnati Insurance Company has teamed with Black Swan Solutions. A crisis management service through Empathia, Inc., Black Swan is a leader in supporting organizations affected by crisis and can provide policyholders with services following a workplace violence event. While you have no obligation to use the services of Black Swan Solutions, they are available if you want to consult with an outside vendor. However, if you opt to use the services of another organization or choose not to utilize an outside vendor, it will not impact your coverage under the Workplace Violence Expense Coverage Endorsement.

Black Swan Solutions offers a variety of services. Some expenses related to these services may be covered by your policy and some may not. The final determination of any expense reimbursement coverage will come from the Cincinnati Insurance Company. Black Swan Solutions can also engage in pre-event consulting, but such an expense would be borne solely by you.

**The Cincinnati Insurance Company Workplace Violence Post-Event Hotline**, monitored by Black Swan Solutions, is available to help your organization and your employees after a workplace violence event. You can contact Black Swan Solutions any time of day or night by calling our 24 hour hotline: 877-841-1082.

**Use of Workplace Violence Post-Event Hotline will not be deemed to satisfy any notice of claim or notice of workplace violence event provision contained in any policy. The selection of a vendor is the independent choice of the policyholder. The Cincinnati Insurance Company makes no warranties and assumes no liability for services, products, or loss control measures provided by Black Swan Solutions.**

**ML 4195 09 18**

Exhibit 5

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# WORKPLACE VIOLENCE EXPENSE COVERAGE ENDORSEMENT

This endorsement modifies insurance provided under the following:

**EMPLOYMENT PRACTICES LIABILITY COVERAGE**

**A.** **SECTION I - INSURING AGREEMENTS** is amended to include the following Insuring Agreement:

We will reimburse all **workplace violence expenses** sustained by the **organization** as a result of a **workplace violence event** occurring during the **policy period** and reported to us as soon as practicable but in no event after the expiration of the policy or any **extended reporting period** included in or endorsed to this Coverage Part.

**B.** **SECTION II - DEFINITIONS** is amended to include the following:

1. **Business interruption expense** means:

    a. The excess of revenues over expenses, if any, that would have been earned by the **organization** had no **workplace violence event** occurred; and

    b. The reasonable costs and expenses that would not have been incurred by the **organization** except for a **workplace violence event** with the sole purpose to:

        (1) Continue the activities necessary for the organization to resume operations to substantially the same level that existed immediately prior to the **workplace violence event**; or

        (2) Reduce any **business interruption expense**, not to exceed the amount of actual reduction of such **business interruption expense.**

    However, **business interruption expense** shall be reduced by all recoveries, other insurance, suretyship and other indemnity which cover **business interruption expense**. Additionally, **business interruption expense** shall be reduced by the amount by which the organization reasonably could have reduced **business interruption expense** but fails to do so.

2. **Premises** means any building, facility or property occupied by the **organization** in the conduct of its business.

3. **Workplace violence event** means any actual or alleged intentional and unlawful:

    a. Use of deadly force; or

    b. Threat of deadly force involving the display of a lethal weapon;

    which occurs on **premises** and which did or could result in bodily injury or death to an **insured person**.

4. **Workplace violence expenses** means the reasonable fees, costs and expenses for:

    a. The services of an independent security consultant for up to 90 days following a **workplace violence event**;

    b. The services of an independent public relations consultant for up to 90 days following a **workplace violence event**;

    c. Counseling services provided to **insured persons** by an independent counselor on **premises** for up to 120 days following a **workplace violence event**;

    d. Independent security guards and other reasonable costs to secure the **premises** for up to 30 days following a **workplace violence event**;

    e. The services of an independent forensic analyst for up to 120 days following a **workplace violence event**;

**f.** The salaries or wages for up to 90 days following a **workplace violence event** paid by the **organization** to **insured persons** victimized by a **workplace violence event** and unable to work because of such **workplace violence event**; and

**g.** **Business interruption expense** until the earlier of 90 days following a **workplace violence event** or until the organization restores operations to substantially the same level that existed immediately prior to the **workplace violence event.**

**C. SECTION III - EXCLUSIONS, B.** is amended to include the following:

**1.** Robbery

This insurance does not apply to any **workplace violence event** based upon, arising out of or in consequence of a purpose of demanding money, securities or property.

**2.** Riot

This insurance does not apply to any **workplace violence event** based upon, arising out of or in consequence of riot, civil upheaval or civil unrest.

**D. SECTION V - LIMIT OF INSURANCE AND DEDUCTIBLE** is amended to include the following:

**1.** The Aggregate Limit of Insurance for all **workplace violence expenses** paid under this endorsed Insuring Agreement shall be $ 250,000            per **policy year** and shall apply as indicated by ☒ below:

☒ This separate limit shall be in addition to and not part of the Limit of Insurance set forth in the Employment Practices Liability Coverage Part Declarations.

☐ This sublimit shall be part of and not in addition to the Limit of Insurance set forth in the Employment Practices Liability Coverage Part Declarations.

**2.** No deductible shall apply to **workplace violence expenses** paid under this endorsed Insuring Agreement.

All other provisions of the policy remain unchanged except as herein expressly modified.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

---

# THIRD PARTY LIABILITY
# ASSAULT EXCLUSION

---

This endorsement modifies insurance provided under the following:

**EMPLOYMENT PRACTICES LIABILITY COVERAGE**

**A.** **SECTION II – DEFINITIONS, T.2.** is deleted in its entirety and replaced by the following:

**2.** Sexual or other harassment solely and entirely of a verbal or **nonphysical** nature by any **insured** against any **third party** which violates the civil rights of the **third party**, including unwelcome verbal or **nonphysical** sexual advances or requests for sexual favors; or

**B.** **SECTION II – DEFINITIONS** is amended to include the following:

**Nonphysical** means not involving any physical touching or bodily contact.

**C.** **SECTION III – EXCLUSIONS** amended to include the following:

Exclusion applicable to **INSURING AGREEMENT B.** only:

We are not liable to pay, indemnify or defend any **claim** based upon, arising out of, in consequence of, or in any way involving any actual or alleged physical touching or bodily contact of a **third party** by any **insured**.

All other provisions of the policy remain unchanged except as herein expressly modified.

**ML 341 01 18**

Exhibit 5

1

GREENE BROILLET & WHEELER, LLP
LAWYERS
100 WILSHIRE BOULEVARD, SUITE 2100
P.O. BOX 2131
SANTA MONICA, CALIFORNIA 90407-2131
TEL. (310) 576-1200
FAX. (310) 576-1220
TAYLOR RAYFIELD, STATE BAR NO. 272300
*trayfield@gbw.law*
AARON OSTEN, STATE BAR NO. 281315
*aosten@gbw.law*

ZOHAR LAW FIRM, P.C.
1100 GLENDON AVENUE, SUITE 1500
LOS ANGELES, CALIFORNIA 90024
TEL. (213) 689-1300
FAX. (213) 689-1305
DANIEL Y. ZOHAR, STATE BAR NO. 177866
*dzohar@zoharlawfirm.com*

2

3

4

5

6

7

8

Attorneys for ___Plaintiff_____

9

(SPACE BELOW FOR FILING STAMP ONLY)

**FILED**
Superior Court of California
County of Los Angeles

12/02/2020

Sherri R. Carter, Executive Officer / Clerk of Court

By: _____A. Flores_____ Deputy

10

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

11

## FOR THE COUNTY OF LOS ANGELES, UNLIMITED CIVIL

12

13

SATSUNDERTA KHALSA,

Plaintiff,

14

vs.

15

16

SIKH DHARMA INT.; SIRI SINGH SAHIB OF SIKH DHARMA; SIRI SINGH SAHIB CORPORATION; UNTO INFINITY LLC; AKAL SECURITY INC.; 3HO FOUNDATION; and DOES 7 through 100, inclusive,

17

18

19

Defendants.

CASE NO. 20STCV29859
[Assigned to Honorable Richard L. Fruin, Department 15]

**FIRST AMENDED COMPLAINT FOR DAMAGES:**

1. Child Sexual Abuse/Battery;
2. Intentional Infliction of Emotional Distress;
3. Negligence;
4. *Civil Code* §§ 51.9, 52;
5. Violation of Bane Act (Cal. *Civ. Code* §§ 52.1, 52);
6. Breach of Mandatory Duty-Failure to Report Child Sexual Abuse;

**DEMAND FOR JURY TRIAL**

[Amount in Controversy Exceeds $25,000.00]

20

21

22

23

24

///

25

///

26

///

27

///

28

///

Electronically Received 12/02/2020 11:08 AM    GREENE BROILLET & WHEELER, LLP    P.O. BOX 2131    SANTA MONICA, CA 90407-2131

[935530]

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

COMES NOW the Plaintiff SATSUNDERTA KHALSA and for causes of action against Defendants, and each of them, alleges:

## GENERAL ALLEGATIONS

1.   The true names and capacities, whether individual, corporate, associate or otherwise, of defendants DOES 7 through 100, inclusive, and each of them, are unknown to plaintiffs, who therefore sue said defendants by such fictitious names.  Plaintiff is informed and believes and thereupon alleges that each of the defendants fictitiously named herein as a DOE is legally responsible, negligently or in some other actionable manner, for the events and happenings referred to, and thereby proximately caused the injuries to Plaintiff as hereinafter alleged.  Plaintiff will seek leave of court to amend this Complaint and state the true names and/or capacities of said fictitiously named defendants when the same have been ascertained.

2.   Plaintiff is informed and believes and thereupon alleges that at all times mentioned herein, Defendants, and each of them, including DOES 7 through 100, inclusive, and each of them, were the agents, servants, employees and/or joint venturers of their co-defendants, and each was, as such, acting within the course, scope and authority of said agency, employment and/or venture, and that each and every defendant, as aforesaid, when acting as a principal, was negligent in the selection and hiring of each and every other defendant as an agent, employee and/or joint venture.

3.   Plaintiff SATSUNDERTA KHALSA (hereinafter "Sunny") is a resident of the County of San Bernardino, California.  At the time of the incidents alleged herein, Plaintiff was a minor, under the age of 18 and incapable of consent.

4.   Upon information and belief, Harbhajan Singh Khalsa, also known as Yogi Bhajan and Siri Singh Sahib and Siri Singh Sahib Harbhajan Singh Khalsa Yogiji, (hereinafter "Bhajan"), was an Indian-born American.  Bhajan claimed to have created a version of yoga which he called Kundalini Yoga and that the poses were part of an ancient and secret tradition.  In fact he simply created his method by combining techniques from two teachers.  He further posed as a religious leader and a well-known holy man in India.  Bhajan claimed he was a guru of the Sikh religion,

First Amended Complaint for Damages

[935530]

Attachment 1_000002

Exhibit 6

but he twisted the Sikh religion for his own means. Bhajan was nothing more than a customs inspector.

5.   The method by which Bhajan induced others to follow him was to pose as a religious leader of the Sikh Dharma religion and Yoga master and teacher, and then covertly subject followers and students to a process of mental and emotional conditioning in which their personalities were disrupted and ultimately destroyed., The personality was then supplanted with a "reformed" personality ("reformed" in this context having its most literal meaning of "making over" or "forming again"). This reformed personality is, by design, intellectually, emotionally and ideologically committed exclusively to Bhajan and the service of Bhajan. Once a follower is in this condition, he or she becomes part of Bhajans cult following, and is invariably exploited by Bhajan for whatever Bhajan can get out of the follower, be that money, property, sex, labor, administrative or business skill or assistance, or social or political contacts, prestige or credibility.

6.   Plaintiff is informed and believes that Bhajan formed Sikh Dharma International as a California nonprofit religious corporation "organized to advance the religion of Sikh Dharma and as an association of religious organizations teaching principles of Sikh Dharma, including by ordination of ministers of divinity and operation of places of worship."  During Bhajan's lifetime, Sikh Dharma International (SDI), along with related legal entities Siri Singh Sahib Corporation (SSSC) and Unto Infinity LLC, were held and controlled by Siri Singh Sahib of Sikh Dharma (SSSSD), a California corporation, of which Bhajan was the only shareholder.

7.   SDI is and was at all times relevant herein a California nonprofit organization organized and incorporated under the laws of California and does business within the State of California with its principal place of business in Los Angeles County.

8.   SSSSD was a California corporation.  The purpose of the corporation was to administer and manage the affairs, property and temporalities of Sikh Dharma.  The principal office for the transaction of the business was located in Los Angeles County, State of California.

///

///

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

[935530]

Attachment 1_000003
Exhibit 6

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

9.   SSSC[1] was incorporated as an Oregon Nonprofit Corporation in September of 1997. SSSC has regularly done and is doing business in the State of California and has systematically conducted business on a regular basis in the State of California with its principal place of business within the State of California located in Los Angeles County.  The Articles of Incorporation states:

(a)   The corporation shall operate exclusively for charitable, religious, educational and scientific purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code or the corresponding section(s) of any future tax code.

(b)   The corporation is organized to act as sole member of Sikh Dharma following the death or incapacity of Siri Singh Sahib Khalsa Yogiji, and in such capacity to conduct and/or facilitate religious, charitable and educational activities.

(c)   Following the death or incapacity of Siri Singh Sahib Harbhajan Singh Khalsa Yogiji, the directors shall be those persons designated in writing by Siri Singh Sahib Harbhajan Singh Khalsa Yogiji.  The written designation, and any amendment or supplement to it, shall be dated upon execution and shall be delivered to, and held in confidence by, the attorney for the corporation and Sikh Dharma designated in the corporation's Bylaws.

10.   On October 1, 2004 an Articles of Restatement of SSSC  was adopted.  The original Articles of Incorporation were modified as follows:

(a)   The corporation is organized to act as the successor legal organization to the Siri Singh Sahib of Sikh Dharma, a California corporation sole, following the death or incapacity of Siri Singh Sahib Harbhajan Singh Khalsa Yogiji, and in such capacity to conduct and/or facilitate religious, charitable and educational activities.

(b)   Following the death or incapacity of Siri Singh Sahib Harbhajan Singh Khalsa Yogiji, the directors shall be those persons designated in writing by Siri Singh Sahib Harbhajan Singh Khalsa Yogiji. The written designation, and any amendment or supplement to it, shall be dated upon execution and shall be delivered to, and held in confidence by, the attorney for the corporation and the Siri Singh Sahib of Sikh Dharma designated in the corporation's Bylaws.

---

[1] The original name was Siri Sikdar Sahib Corporation and the name was changed to Siri Singh Sahib Corporation in December of 2001.

[935530]

Attachment 1_000004

Exhibit 6

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

11. 3HO Foundation (Healthy, Happy, Holy Organization) (hereinafter "3HO") is an organization that started in about 1970. It was founded by Yogi Bhajan. It is and was a California nonprofit corporation with its principal place of business in Los Angeles County.

12. 3HO has one member, Unto Infinity, LLC (hereinafter "Unto"), an Oregon limited liability company, which has regularly done, and is doing, business in the State of California, and has systematically conducted business on a regular basis in the State of California, under and by virtue of the laws of the State of California.

13. Akal Security, Inc. is a corporation organized and existing under the laws of New Mexico and has regularly done, and is doing, business in the State of California, and has systematically conducted business on a regular basis in the State of California, under and by virtue of the laws of the State of California, and its principal place of business within the State of California is located in Los Angeles County.

14. Bhajan died October 6, 2004.

15. Plaintiff is informed and believes, and thereupon alleges, that at all times relevant herein, Bhajan was the president/owner and a representative/agent of DOES 1 through 100 (hereinafter referred to collectively as Defendants) and in that capacity, Defendants had the ability to exercise control over Bhajan's business and personal affairs. Plaintiff is further informed and believes, and thereon alleges, that Bhajan, with Defendants' full knowledge, consent, and assistance, exploited this relationship with Defendants to gain access to Plaintiff, and to set up, facilitate and arrange meetings and encounters between Bhajan and the Plaintiff and other women for the purpose of Bhajan's engaging in sexual and verbal abuse of Plaintiff and others.

16. The Defendants served dual purposes. The thinly-veiled, covert second purpose of these businesses was to operate as a cult to lure people in to take all of their assets and money as well as place Bhajan in a place where he had unfettered access to women that he could abuse both verbally, emotionally, spiritually and sexually.

17. Bhajan did not do this alone. He cultivated other people in his organization who assisted him in breaking down people to turn them into devotees to Bhajan. They would verbally, physically, and sexually abuse people. They would hold out Bhajan as a spiritual guru, like a

[935530]

"God", so that everything he did was for a reason.  These other people of the organization would tell the victims that they need to do anything Bhajan said because he would save them.  They would tell victims that they were sluts, prostitutes and whores and would never be able to live on their own, so they all relied and depended upon Bhajan.

18.   All of the acts of the defendants described in this Complaint were carried out using the resources, facilities, and personnel of the corporate defendants, with the full knowledge and approval of all corporate officers and directors, as part of and pursuant to an established and ongoing corporate policy of carrying out the commands and directives of Bhajan, no matter what those demands and directive may be. Each of the corporate defendants is associated in fact with each of the other corporate defendants, under the common control of Bhajan, and with the common purpose and objective of carrying out Bhajans wishes, including but not limited to the tortious conduct set forth below.

19.   As a result thereof, Defendants are liable for Bhajan's acts of abuse, including child sex abuse as perpetrated against Plaintiff within the meaning of *Code of Civil Procedure* section 340.1, in that said entities owed a duty of care to the Plaintiff, and their wrongful, intentional and/or negligent acts, as well as knowing failure to take reasonable steps and implement reasonable safeguards to avoid acts of unlawful sexual conduct by Bhajan, were a legal cause of the childhood sexual abuse which resulted in injury to Plaintiff as alleged herein.

20.   Plaintiff is informed and believes, and on that basis alleges, that at all times mentioned herein, there existed a unity of interest and ownership among Defendants and each of them, such that any individuality and separateness between Defendants, and each of them, ceased to exist. Defendants and each of them, were the successors-in-interest and/or alter egos of the other Defendants, and each of them, in that they purchased, controlled, dominated and operated each other without any separate identity, observation of formalities, or other manner of division.  To continue maintaining the façade of separate and individual existence between and among Defendants, and each of them, would serve to perpetrate a fraud and an injustice.

21.   At all times mentioned here, Bhajan was held out as a religious guru by Defendants.  In doing so, Defendants held Bhajan out to the public, including Plaintiff and Plaintiff's family, to be

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

[935530]

Attachment 1_000006
Exhibit 6

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

safe and of high ethical and moral repute, and to be in good standing with Defendants, the State of California, and the public in general.  In this capacity, Bhajan was placed into contact with persons so he could to prey on their general emotional and psychological issues.  Plaintiff and her family reasonably relied upon these representations and reasonably assumed that Bhajan was a person worthy of their complete trust.

22.   Plaintiff is informed and believes, and on that basis alleges, that at all times mentioned herein, Defendants and each of them and Bhajan were the agents, representatives and/or employees of each and every other Defendant.  In doing the things hereinafter alleged, Defendants and each of them, and Bhajan, were acting within the course and scope of said alternative personality, capacity, identity, agency, representation, and/or employment and were within the scope of their authority, whether actual or apparent.  Plaintiff is informed and believes, and on that basis alleges, that all times mentioned herein, Defendants and each of them and Bhajan were the trustees, partners, servants, joint venturers, shareholders, contractors, and/or employees of each and every other Defendants, and the acts and omissions herein alleged were done by them, acting individually, through such capacity and within the scope of their authority, and with the permission and consent of each and every other Defendant and that said conduct was thereafter ratified by each and every other Defendants, and that each of them is jointly and severally liable to Plaintiff.

23.   Plaintiff was born into this cult/religious organization as her mother and father were part of it prior to her birth.  She was brought up, through the Defendants, to believe that Bhajan was a God-like figure who was all-knowing and was to never be questioned.  He was held out to be a leader of Sikhism and in close contact with the respective "God."

24.   Plaintiff is informed and believes, Bhajan was known to heavily pressure his followers to send their children to live with families other than their own or to be sent to his special training schools in India where many were physically and emotionally abused.  The children were discouraged from attending college and pressured to work for free for Bhajan's organizations.  It was all a calculated effort to break down the family, exploit labor and indoctrinate and groom the children for Bhajan's personal and sexual gratification.  This was all done with the knowledge and

assistance of Defendants.   Everything Bhajan did, from the yoga poses to the schools was designed to destroy, disrupt and diminish his followers so he could better control them.

25.   Plaintiff grew up in New Mexico and spent her days at the Hacienda de Guru Ram Das Ranch (hereinafter "Ranch").   The Ranch was owned, operated, controlled, and/or managed by Defendants.   Bhajan had a home on the ranch that was guarded by members of Defendants. Plaintiff's  mother worked multiple jobs and the Ranch was where people who were part of the cult would live and "take care" of one another, including other people's children.   There were horse stables where Plaintiff would take care of Bhajan and Guru Amrit's horses in exchange for riding lessons.   She was surrounded by Secretaries (what women employees of Defendants were called who were devoted to Bhajan).   Bhajan took a liking to Plaintiff and summoned her to his house on the Ranch.   Secretaries knew that Plaintiff had been summoned as did other employees of Defendants.   After Plaintiff had entered his home, and while Defendants watched, Bhajan grabbed her vagina.   She was only 8 years old.   Bhajan verbally abused her and screamed at her demanding to know if she wanted to be a prostitute or if she was a pervert.

26.   When Plaintiff would attend "Sunday service" she always felt Bhajan was staring at her.   She was required to touch and bow at Bhajan's feet, as that was the way of showing reverence to the almighty Bhajan.   After one of these services, when she was around 10 years old, Shanti Kaur Khalsa, who was and is an employee of Defendants, one of the heads of Akal Security, Inc., and was and is on the board of SSSC, told her that Bhajan wanted to take her on a $1,000 shopping spree.   Plaintiff was then taken on this shopping spree by Shanti Kaur Khalsa.

27.   Soorya Kaur, one of Bhajan's secretaries, who was an employee of Defendants, would call Plaintiff to her residence and come out in highly provocative sexualized clothing.   These gifts of money and oversexualization was all part of the mental manipulation.   Defendants would manipulate members into believing that they were sluts and prostitutes and that only Bhajan could save them and provide for them, but that they needed to be sexy in order to be wanted by Bhajan.

28.   When Plaintiff was a young teen she was sent by Bhajan and Defendants to stay with a family in the Millis Massachusetts Ashram, which was owned, operated, controlled and/or managed by Defendants.   While there the man, who was employed by Defendants, and who she

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

First Amended Complaint for Damages

was sent to live would "tickle" Plaintiff until she fell on the floor and then he would place his mouth on her vagina

29.   When Plaintiff was a young teen she would attend events put on by the Defendants, and Bhajan had her stand in front of him and turn around for him while other people, including Defendants, watched and he squeezed her breasts and butt saying she was looking sexy.

30.   When Plaintiff was 16 and working for Defendants, she was informed by Siri Hari Angleton, employee of Defendants that Plaintiff was moving to LA to become one of his "secretaries".   Siri Hari Angleton verbally attacked Plaintiff reinforcing that Plaintiff is worth nothing and can only be saved by Bhajan and if she did not go she would end up being nothing and out on the streets.   She lived at one of the properties owned, operated, controlled and/or managed by Defendants and worked in the corporate office in Los Angeles County for the Defendants.

31.   In addition to working at the corporate office she also was brought to work in a home where Bhajan would stay in Los Angeles, that was owned, operated, controlled and/or managed by Defendants.   Here she would have to stay late into the evening, making special juices, giving foot massages and keeping Bhajan company.   Bhajan, in front of employees of Defendants, would tell Plaintiff to sit by his feet and massage his feet while he watched graphic pornography.   He'd ask Plaintiff questions about having sex, if she liked sex, or ask if she was a slut.   Bhajan would ask Plaintiff what she thought about the pornography and tell her what the people were doing on the screen in his own perspective.   Bhajan routinely sexually harassed Plaintiff in this house.   His vulgar language and continual discussion of sex as well as yelling at Plaintiff that she wanted to have sex with him, continued to tear Plaintiff down mentally.   Plaintiff found herself thinking that Bhajan was only doing this to test her to see if she is actually the morally corrupt and sexual deviant that she had been told she was since her early years.

///

///

///

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

[935530]

Attachment 1_000009
Exhibit 6

32.   At parties thrown by Bhajan and Defendants, and on properties owned, operated, controlled, and/or managed by Defendants in Los Angeles, Bhajan would routinely grab Plaintiff's breasts, buttocks, and verbally abuse her.

33.   Plaintiff told Bhajan that she wanted to leave Los Angeles but Bhajan and Defendants repeatedly told her that if she left she would become a prostitute on the street.   This further terrified Plaintiff and based on everything that had occurred over the years she believed him.

34.   At a summer solstice gathering at Ram Das Puri, in the Jemez Mountains in New Mexico, which is owned, operated, controlled and/or managed by Defendants, Bhajan called Plaintiff to a meeting in his cabin with Guru Amrit Kaur Khalsa (who is the head of SSSC, and on the board of directors for SSSC and SDI), Dr. Sat Kaur, Siri Hari, Guruke Kaur Khalsa to name a few of the employees and/or directors of Defendants.   Bhajan, in front of these people and other employees of Defendants, told Plaintiff that her problem was that she was in love with him and that she needed to be fucked.   He was intense and horrifying saying this over and over.   He told her that he had the world's biggest cock and he would fuck her with it.   Plaintiff sat there sobbing while all watched and did nothing.   It was after this event that Plaintiff finally broke and ran away.   When she tried to tell employees of Defendants what had happened they all told her she was lying and a slut and a prostitute.

35.   As a minor employee and guest of Defendants, where Bhajan was employed and worked, Plaintiff was under Bhajan's and Defendants direct supervision, care and control, thus creating a special relationship, fiduciary relationship, and/or special care relationship with Defendants, and each of them.   Additionally, as a minor child under the custody, care and control of Defendants, Defendants stood *in loco parentis* with respect to Plaintiff while she was attending events and functions at locations run and controlled by Defendants.   As the responsible parties and/or employers controlling Bhajan, Defendants were also in a special relationship with Plaintiff, and owed special duties to Plaintiff.   Due to this special relationship between Defendants and Plaintiff, Defendants had an affirmative duty to protect her from foreseeable harm, including sexual assault by a member and/or director and/or owner of Defendants, specifically Bhajan.

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

- 9 -

First Amended Complaint for Damages

36.   As institutions entrusted with the care of minors, where staff, employees, agents and management, such as Bhajan were placed in contact with minors Defendants expressly and implicitly represented that these individuals, including Bhajan, were not a sexual threat to children and others who would fall under Bhajan's influence, control, direction, and guidance.

37.   Plaintiff is informed and believes, and on that basis alleges, that Defendants knew or had reason to know, or were otherwise on notice, that Bhajan had engaged in unlawful sexually-related conduct with minors in the past, and/or was continuing to engage in such conduct with Plaintiff, and failed to take reasonable steps, and to implement reasonable safeguards, to avoid acts of unlawful sexual conduct in the future by Bhajan, such as that which occurred with Plaintiff. Defendants had a duty to disclose these facts to Plaintiff, her parents and others, but negligently and/or intentionally suppressed, concealed or failed to disclose this information for the express purpose of facilitating Bhajan's sexual abuse of children and others, maintaining Bhajan's image as an ethical and wholesome guru, and securing their insured employment and giving of wealth to Defendants.   The duty to disclose this information arose by the special, trusting, confidential, fiduciary, and/or in loco parentis relationship between Defendants and Plaintiff.

38.   Accordingly, at the time Bhajan and Defendants, inclusive, performed the acts alleged herein, it was or should have been reasonably foreseeable to Defendants that by continuously exposing and making Plaintiff available to Bhajan, Defendants were placing Plaintiff in grave risk of being sexually abused by Bhajan.   By knowingly subjecting Plaintiff to such foreseeable danger, and by subsequently assuming the position of Plaintiff's employer, Defendants were duty-bound to take reasonable steps and implement reasonable safeguards to protect Plaintiff from Bhajan.   Furthermore, as alleged herein, Defendants, inclusive, at all times exercised a sufficient degree of control over Bhajan's personal and business affairs to prevent the acts of abuse by keeping Bhajan away from Plaintiff.   However, Defendants, inclusive, failed to take any reasonable steps or implement any reasonable safeguards for Plaintiff's protection whatsoever.

39.   Defendants condoned Bhajan's conduct and assisted him in continually sexually abusing people.   In 1978 Bhajan conducted a lecture, on behalf and with the knowledge of Defendants, where he stated, "First of all nobody can be raped until you do not invite it.   Rape is

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

always invited it never happens, a person who is raped is always providing subconsciously the environments and the arrangements.   If you do not provide the circumstances and the arrangements it is impossible."   In fact this lecture is still on a website owned, operated, managed, and controlled by Defendants.

40.   Defendants knew about the rampant Sexual abuse and harassment performed by Bhajan over the years, and before the first abuse of Plaintiff.   Senior teachers, employees of Defendants, have played a central role in covering them up and attacking the victims.   They witnessed the abuse and did nothing to stop it.   In fact they attacked and disparaged the victims in an effort to keep them silent and to keep others from believing their stories.   As a result of this cover-up, Plaintiff was routinely sexually assaulted and entitled to treble damages under C.C.P. §340.1

41.   Bhajan and the Defendants, inclusive, are involved in a deceptive-web of sexual, mental, emotional, and spiritual abuse, lies and corruption.   Defendants are complicit in the abuse and aid, abed, and ratify Bhajan's conduct by hiding information, turning a blind eye, slandering and harassing victims.

42.   The conduct alleged above included intentional, outrageous, malicious, despicable and oppressive acts beyond the bounds of decent behavior, which were undertaken, wantonly, oppressively and with conscious disregard for Plaintiff's rights as a child.   Plaintiff is therefore entitled to an award of punitive damages in an amount sufficient to punish, deter and make an example of those Defendants engaging in such behavior according to proof at trial.

## FIRST CAUSE OF ACTION

### CHILD SEXUAL ABUSE/SEXUAL BATTERY

### (On Behalf of Plaintiff and Against All Defendants, including DOES 1-100)

43.   Plaintiff repeats, re-alleges and incorporates herein by reference all the paragraphs above, inclusive, as though fully set forth herein.

44.   For the reasons set forth in the incorporated paragraphs of this Complaint, the sexual abuse of Plaintiff by Bhajan arose from, was incidental to, Bhajan's employment with Defendants, and each of these Defendants ratified or approved Bhajan's sexual abuse of person, including

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

[935530]

Attachment 1_000012
Exhibit 6

Plaintiff who was a minor. Plaintiff alleges on information and belief that Defendants ratified and/or approved of the sexual misconduct by failing to adequately investigate, discharge, discipline or supervise Bhajan. Defendants ratified Bhajan's abuse by concealing evidence of sexual abuse of other persons and failing to report it. Defendants ratified Bhajan's abuse by concealing evidence of sexual abuse of other persons from Plaintiff, Plaintiff's parents, other families with children, other members of Defendants, law enforcement, and other persons who could have been in a position to prevent the abuse of Plaintiff.

45. As more fully alleged above Bhajan repeatedly sexually assaulted Plaintiff, intended to place Plaintiff in great apprehension of offensive contact with sexual organ, buttocks and/or groin and did in fact place Plaintiff in great apprehension of an offensive contact, and it was done with the intent to harm and/or offend Plaintiff. An offensive contact repeatedly occurred to Plaintiff's sexual organs, buttocks and/or groin. Plaintiff was harmed and/or offended.

46. Upon information and belief, Defendants had advance knowledge of Bhajan's inappropriate conduct towards others, and yet continued to employ him. Defendants despite their knowledge of Bhajan's history of misconduct and propensity to engage in that conduct continued to employ him and/or failed to supervise him. Defendants, despite their knowledge of Bhajan's history of misconduct and propensity to continue to engage in that conduct provided Bhajan assistance in continuing to perform wrongful acts, including those perpetrated against Plaintiff. Defendants, continued to employee Bhajan, continued to allow him to be alone with employees, and failed to supervise him, which constituted ratification and aiding and abetting. Defendants further aided and abetted and ratified Bhajan's conduct by watching the assaults and taking no action, as well as verbally abusing Plaintiff as described above.

47. As a result of the above-described conduct, Plaintiff suffered and continues to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; have suffered and continue to suffer and was prevented and will continue to be prevented from obtaining the full enjoyment of life; will sustain loss of earnings and earning capacity, and have

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

48.   In subjecting the Plaintiff to the wrongful treatment herein described, Defendants acted willfully and maliciously with the intent to harm Plaintiff, and in conscious disregard of Plaintiff's rights, so as to constitute malice and oppression under California *Civil Code* section 3294. Plaintiff is therefore entitled to the recovery of punitive damages, in an amount to be determined by the court, against Defendants, inclusive, in a sum to be shown according to proof.

## SECOND CAUSE OF ACTION

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

**(On Behalf of Plaintiff and Against All Defendants, including DOES 1-100)**

49.   Plaintiff repeats, re-alleges and incorporates herein by reference all the paragraphs above, inclusive, as though fully set forth herein.

50.   Defendants' conduct towards Plaintiff, as described above, was outrageous and extreme and performed on a routine and repeated basis.

51.   A reasonable person would not expect or tolerate Defendants' putting Bhajan in positions of authority  which enabled Bhajan to have access to minor children, including Plaintiff, so that he could sexually abuse them, including the conduct described above.  Plaintiff held great trust, faith and confidence in Defendants, which, by virtue of Defendants' wrongful conduct, turned to fear.

52.   A reasonable person would not expect or tolerate Defendants to be incapable of supervising and preventing employees of Defendants, including Bhajan, from committing wrongful sexual acts with minor children in their charge, including Plaintiff, or to be incapable of properly supervising Bhajan to prevent such abuse from occurring.

53.   Defendants' conduct described herein was intentional and malicious and done for the purpose of causing, or with the substantial certainty that it would cause Plaintiff to suffer humiliation, mental anguish and emotional and physical distress.

54.   As a result of the above-described conduct, Plaintiff suffered and continues to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional

[935530]

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

Attachment 1_000014

Exhibit 6

distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; have suffered and continue to suffer and was prevented and will continue to be prevented from obtaining the full enjoyment of life; will sustain loss of earnings and earning capacity, and have incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

55.   In subjecting the Plaintiff to the wrongful treatment herein described, Defendants acted willfully and maliciously with the intent to harm Plaintiff, and in conscious disregard of Plaintiff's rights, so as to constitute malice and oppression under California *Civil Code* section 3294. Plaintiff is therefore entitled to the recovery of punitive damages, in an amount to be determined by the court, against Defendants, inclusive, in a sum to be shown according to proof.

### THIRD CAUSE OF ACTION

### NEGLIGENCE

### (On Behalf of Plaintiff and Against All Defendants, including DOES 1-100)

56.   Plaintiff repeats, re-alleges, and incorporate herein by reference all paragraphs above, inclusive, as though fully set forth herein.

57.   As more fully set forth above, the conduct and actions of Bhajan and Defendants, inclusive, served to create an environment in which Bhajan was afforded continuous access to Plaintiff over a period of more than 10 years.

58.   As more fully set forth above, Defendants, inclusive, were aware and/or on notice of Bhajan's proclivities for engaging in sexual acts with minors prior to the events with Plaintiff alleged herein.  Accordingly, at the time Bhajan and Defendants, inclusive, performed the acts alleged herein, it was or should have been reasonably foreseeable to Defendants that by continuously exposing and making Plaintiff available to Bhajan, Defendants were placing Plaintiff in grave risk of being sexually abused by Bhajan.  By knowingly subjecting Plaintiff to such foreseeable danger, and by subsequently assuming the position of Plaintiff's employer, Defendants were duty-bound to take reasonable steps and implement reasonable safeguards to protect Plaintiff from Bhajan.  Furthermore, as alleged herein, Defendants, inclusive, at all times exercised a sufficient degree of control over Bhajan's personal and business affairs to prevent the acts of

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

abuse by keeping Bhajan away from Plaintiff.  However, Defendants, inclusive, failed to take any reasonable steps or implement any reasonable safeguards for Plaintiff's protection whatsoever.

59.   By virtue of Plaintiff's special relationship with Defendants, inclusive, as set more fully above, and Defendants' relation to Bhajan, Defendants, inclusive, owed Plaintiff a duty to provide reasonable supervision of Bhajan, to use reasonable care in investigating Bhajan's background, and to provide adequate warning to the Plaintiff, and other children, of Bhajan's dangerous propensities and unfitness.

60.   By virtue of Plaintiff's special relationship with Defendants, inclusive, as set more fully above, and Defendants' relation to Bhajan, Defendants, inclusive, owed Plaintiff a duty to not hire and/or retain Bhajan, given his dangerous and exploitive propensities, which Defendants, knew or had reason to know had they engaged in a meaningful and adequate investigation of Bhajan's background prior to his hiring.

61.   Plaintiff is informed and believes, and on that basis alleges, that Defendants, inclusive, by and through their respective agents, servants and employees, knew or had reason to know of Bhajan's dangerous and exploitive propensities and/or that Bhajan was an unfit agent.  Despite such knowledge, Defendants, inclusive, negligently failed to supervise Bhajan in his position of trust and authority as an authority figure and supervisor of children, where he was able to commit wrongful acts against the Plaintiff.  Defendants, inclusive, failed to provide reasonable supervision of Bhajan, failed to use reasonable care in investigating Bhajan, and failed to provide adequate warning to Plaintiff of Bhajan's dangerous propensities and unfitness.  Defendants, inclusive, further failed to take reasonable measures to prevent sexual abuse harassment and molestation of children, including Plaintiff.

62.   Even though Defendants, inclusive, knew or had reason to know of these activities by Bhajan, Defendants did nothing to investigate, supervise or monitor Bhajan to ensure the safety of the guests, including Plaintiff.

63.   As institutions entrusted with the care of minors, where staff, employees, agents and management, such as Bhajan, were placed in contact with minors, Defendants expressly and

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

[935530]

implicitly represented that these individuals, including Bhajan, were not a sexual threat to children and others who would fall under Bhajan's influence, control, direction, and guidance.

64.   Plaintiff is informed and believes on that basis alleges other children and/or employees of Defendants complained and witnessed Bhajan's sexual improprieties prior to the sexual abuse of Plaintiff.

65.   Plaintiff is informed, and believes, and on that basis alleges, that the Defendants, inclusive, were put on notice and/or should have known that Bhajan had previously engaged and continued to engage in unlawful sexual conduct with patrons and other felonies, for his own personal gratification, and that it was, or should have been foreseeable that he was engaging or would engage in illicit sexual activities with Plaintiff, and others, under the cloak of his authority, confidence, and trust, bestowed upon him through Defendants' actions.

66.   Defendants, inclusive, negligently failed to supervise Bhajan in his positions of trust and authority as an employee, agent, counselor and mentor, and/or other authority figure, where Bhajan was able to commit wrongful acts against Plaintiff.   Defendants, inclusive, failed to provide reasonable supervision of Bhajan.   Defendants further failed to take reasonable measures to prevent sexual harassment, molestation and abuse of minors, including Plaintiff.

67.   As a result of the above-described conduct, Plaintiff suffered and continues to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; have suffered and continue to suffer and was prevented and will continue to be prevented from obtaining the full enjoyment of life; will sustain loss of earnings and earning capacity, and have incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

### FOURTH CAUSE OF ACTION

### CIVIL RIGHTS-CAL. *CIVIL CODE* §§51.9, 52

**(On Behalf of Plaintiff and Against All Defendants, including DOES 1-100)**

68.   Plaintiff repeats, re-alleges, and incorporate herein by reference all paragraphs above, inclusive, as though fully set forth herein.

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

- 16 -

69.   A business, service and/or professional relationship existed between Plaintiff and Defendants and Bhajan.

70.   Bhajan was acting within the course and scope of his employment and/or agency with Defendants where he engaged in the conduct alleged herein.

71.   Bhajan made sexual advances, solicitations, demands for sexual compliance by Plaintiff, and engaged in other verbal, visual, or physical conduct of a sexual nature and/or hostile nature with Plaintiff, based on her gender that was unwelcome and pervasive and/or severe.

72.   Plaintiff was unable to easily terminate her relationship with Bhajan and Defendants as Plaintiff was under the exclusive control and custody of Bhajan and Defendants at the time of the harassment and abuse.  Bhajan held a position of authority, trust and control of Plaintiff and h used the context of the relationship to sexually exploit and abuse her.

73.   Defendants knew or should have known of Bhajan's propensity to engage in and his history of engaging in sexual misconduct, and in conscious disregard for the safety of others, including Plaintiff, failed to adequately warn and protect Plaintiff against Bhajan.

74.   Upon information and belief, Defendants had advance knowledge of Bhajan's inappropriate conduct towards others, and yet continued to employ him and provide him access to young women such as Plaintiff.  Defendants, despite their knowledge of Bhajan's history of misconduct and propensity to engage in that conduct continued to employ him and/or failed to supervise him.

75.   Defendants are also liable for punitive damages because said Defendants had advance knowledge of the unfitness of their employee, Bhajan, and continued to employ him with a conscious disregard of the rights and safety of others, including Plaintiff, and said Defendants were otherwise personally guilty of oppression, fraud, or malice, and otherwise ratified Bhajan's acts, and aided and abetted Bhajan in performing these acts.

76.   As a result of the above-described conduct, Plaintiff suffered and continues to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; have suffered and continue to suffer and was prevented and will continue to be prevented from

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

obtaining the full enjoyment of life; will sustain loss of earnings and earning capacity, and have incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

77.   Defendants, and each of them, by engaging in the acts discussed above, and/or in authorizing and/or ratifying such acts, engaged in willful, malicious, intentional, oppressive and despicable conduct, and acted with willful and conscious disregard of the rights, welfare and safety of Plaintiff.

78.   As a result of Defendants' acts and conduct, Plaintiff is entitled to an award of actual damages as provided in Section 52(b) of the California *Civil Code*.

79.   As a result of Defendants' acts and conduct, Plaintiff is entitled to all applicable civil penalties and damages as provided in California *Civil Code* § 52(b)(1).

80.   As a result of Defendants' acts and conduct, Plaintiff is entitled to reasonable attorneys' fees and costs of suit as provided in Section 52(b)(3) of the California *Civil Code*.

## FIFTH CAUSE OF ACTION

### VIOLATION OF BANE ACT-CAL. *CIVIL CODE* §§52.1, 52

### (On Behalf of Plaintiff and Against All Defendants, including DOES 1-100)

81.   Plaintiff repeats, re-alleges, and incorporate herein by reference all paragraphs above, inclusive, as though fully set forth herein.

82.   Plaintiff is informed and believes that Bhajan intentionally interfered with or attempted to interfere, by threats, intimidation and coercion, with Plaintiff's rights secured by the Constitution as well as the laws of this state, including the right to be free from sexual harassment and assault.

83.   In addition, Defendants, acted with reckless disregard for the rights and safety of Plaintiff and others, and with knowledge of Bhajan's propensity and pattern of engaging in inappropriate conduct.  Defendants aided, allowed, incited and/or conspired with the denial or attempted denial of Plaintiff's rights as secured by the Constitution and the laws of this state.

84.   By virtue of their relationship, Bhajan held a position of authority, trust and control of Plaintiff and he used the context of the relationship to threaten, intimidate and/or coerce Plaintiff

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

[935530]

in order to interfere with, or attempt to interfere with, Plaintiff's right to be free from sexual harassment, sexual assault, and sexual battery. The circumstances surrounding the abuse entailed Bhajan using his relationship with and position of control and authority over Plaintiff to threaten, intimidate and coerce her so that he could then separately interfere with or attempt to interfere with her right to be free from sexual harassment, sexual assault, and sexual battery. His conduct and actions were unwelcome, pervasive, severe, and offensive.

85.    Bhajan intended to cause a harmful and offensive contact with Plaintiff, and did in fact cause a harmful and offensive contact with an intimate part of Plaintiff. Bhajan committed a sexual battery on Plaintiff. The sexual battery itself was intimidating and threatening. Bhajan's intentional, harmful misconduct constituted the constitutional violation, sexual battery, and was itself threatening and intimidating. *Rodriguez v. Cnty. of L.A.*, 96 F.Supp.3d 990 (C.D. Cal. May 29, 2014).

86.    Defendants knew, or should have known, of Bhajan's propensity to engage in and his history of engaging in sexual misconduct, and in conscious disregard for the safety of others, including Plaintiff, failed to adequately warn and protect Plaintiff against Bhajan.

87.    Upon information and belief, Defendants had advance knowledge of Bhajan's inappropriate conduct towards others, and yet continued to employ him. Defendants despite their knowledge of Bhajan's history of misconduct and propensity to engage in that conduct continued to employ him and/or failed to supervise him. Defendants, despite their knowledge of Bhajan's history of misconduct and propensity to continue to engage in that conduct provided Bhajan assistance in continuing to perform wrongful acts, including those perpetrated against Plaintiff. Defendants, continued to employee Bhajan, continued to allow him to be alone with employees, and failed to supervise him, which constituted ratification and aiding and abetting. Defendants further aided and abetted and ratified Bhajan's conduct by watching the assaults and taking no action, as well as verbally abusing Plaintiff as described above.

88.    As a result of the above-described conduct, Plaintiff suffered and continues to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life;

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

have suffered and continue to suffer and was prevented and will continue to be prevented from obtaining the full enjoyment of life; will sustain loss of earnings and earning capacity, and have incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

89.   Defendants, and each of them, by engaging in the acts discussed above, and/or in authorizing and/or ratifying such acts, engaged in willful, malicious, intentional, oppressive and despicable conduct, and acted with willful and conscious disregard of the rights, welfare and safety of Plaintiff.

90.   As a result of Defendants' acts and conduct, Plaintiff is entitled to actual damages for each and every offense and is further entitled to an award of treble damages and reasonable attorneys' fees and costs of suit and exemplary damages as provided in Section 52 of the California *Civil Code*.

### SIXTH CAUSE OF ACTION

### BREACH OF MANDATORY DUTY: FAILURE TO REPORT SUSPECTED CHILD ABUSE - *PENAL CODE* 11166

### (On Behalf of Plaintiff and Against All Defendants, including DOES 1-100)

91.   Plaintiff repeats, re-alleges, and incorporate herein by reference all paragraphs above, inclusive, as though fully set forth herein.

92.   Defendants, acting through its employees and agents were at all times "mandated reporters" pursuant to the provision of *Penal Code* section 11166, *et seq.*, also known as the Child Abuse and Neglect Reporting Act.  As mandated reporters of suspected child abuse, Defendants were legally obligated to personally report reasonably suspected incidents of child abuse to the police and/or child protective services within a very short period of time.

93.   Defendants acting through its employees, had or should have had a reasonable suspicion that Bhajan was engaged in sexual misconduct yet failed to report the suspected abuse to the authorities.

94.   Defendants' employees violated the Child Abuse and Neglect Reporting Act, *Penal Code* section 11166, *et seq.*  They were acting within the course and scope of their employment

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

[935530]
Attachment 1_000021
Exhibit 6

when they violated the reporting requirements, and therefore Defendants is vicariously liable for their negligence.   These employees were mandated reporters as defined in *Penal Code* section 11165.7, as they were clergy members, custodian of records of clergy members, and/or mental health professional

95.   By failing to report suspected child abuse, Defendants allowed Bhajan to continue unhindered in his abuse of persons, including minors, including Plaintiff.

96.   As a result of the above-described conduct, Plaintiff suffered and continues to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; have suffered and continue to suffer and was prevented and will continue to be prevented from obtaining the full enjoyment of life; will sustain loss of earnings and earning capacity, and have incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

## **PRAYER**

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

1.   For past, present, and future general damages in an amount to be determined at trial;

2.   For past, present and future special damages, including but not limited to past, present and future lost earnings, economic damages and others, in an amount to be determined at trial;

3.   Punitive damages;

4.   Treble damages;

5.   For costs of suit;

6.   For damages under *Civil Code* §52; and

7.   For such other and further relief as the court may deem proper.

DATED: November 6, 2020                    GREENE BROILLET & WHEELER, LLP

*[signature: Taylor Rayfield]*

Taylor Rayfield, Esq.
Attorneys for Plaintiff

**DEMAND FOR TRIAL BY JURY**

Plaintiff SATSUNDERTA KHALSA hereby demands trial of all causes of action by jury.

DATED: November 6, 2020                    GREENE BROILLET & WHEELER, LLP

_Taylor Rayfield_
_____
Taylor Rayfield, Esq.
Aaron Osten, Esq.
Attorneys for Plaintiff

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

[935530]

- 22 -
First Amended Complaint for Damages

**CM-010**

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): | FOR COURT USE ONLY |
|---|---|

Daniel L. Varon, Esq (#245318)
The Zalkin Law Firm, P.C. 10590 W. Ocean Air Dr. #125, San Diego, CA 92130

TELEPHONE NO.: 858-259-3011    FAX NO. (Optional): 858-259-3015
E-MAIL ADDRESS: daniel@zalkin.com
ATTORNEY FOR (Name): Plaintiffs

**Electronically FILED by
Superior Court of California,
County of Los Angeles
12/14/2023 3:11 PM
David W. Slayton,
Executive Officer/Clerk of Court,
By Y. Ayala, Deputy Clerk**

SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
STREET ADDRESS: 111 North Hill Street
MAILING ADDRESS:
CITY AND ZIP CODE: Los Angeles, 90012
BRANCH NAME: Stanley Mosk Courthouse

CASE NAME:
KATHLEEN HAYES, et al. v. KIIT COMPANY, INC, et al.

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER: 23STCV30533 |
|---|---|---|---|---|
| [x] **Unlimited** (Amount demanded exceeds $25,000) | [ ] **Limited** (Amount demanded is $25,000 or less) | [ ] Counter [ ] Joinder Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | | JUDGE: DEPT.: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[x] Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)
**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)
**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)
**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)
**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
[ ] Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint (not specified above) (42)
**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition (not specified above) (43)

2. This case [ ] is [x] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [ ] Substantial amount of documentary evidence
   d. [ ] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought (check all that apply): a. [x] monetary b. [ ] nonmonetary; declaratory or injunctive relief c. [ ] punitive
4. Number of causes of action (specify): 5
5. This case [ ] is [x] is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. (You may use form CM-015.)

Date: December 14, 2023

Daniel L. Varon
(TYPE OR PRINT NAME)

*Daniel L Varon*
(SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev.September 1, 2021] — CIVIL CASE COVER SHEET — Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courts.ca.gov

Exhibit 7

**INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET**

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the Civil Case Cover Sheet contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the Civil Case Cover Sheet to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

**CASE TYPES AND EXAMPLES**

**Auto Tort**
Auto (22)–Personal Injury/Property Damage/Wrongful Death
Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
Asbestos (04)
  Asbestos Property Damage
  Asbestos Personal Injury/ Wrongful Death
Product Liability *(not asbestos or toxic/environmental)* (24)
Medical Malpractice (45)
  Medical Malpractice– Physicians & Surgeons
Other Professional Health Care Malpractice
Other PI/PD/WD (23)
  Premises Liability (e.g., slip and fall)
  Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
  Intentional Infliction of Emotional Distress
  Negligent Infliction of Emotional Distress
  Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business Practice (07)
Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
  Legal Malpractice
  Other Professional Malpractice *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
  Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
  Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
  Negligent Breach of Contract/ Warranty
  Other Breach of Contract/Warranty
Collections (e.g., money owed, open book accounts) (09)
  Collection Case–Seller Plaintiff
  Other Promissory Note/Collections Case
Insurance Coverage *(not provisionally complex)* (18)
  Auto Subrogation
  Other Coverage
Other Contract (37)
  Contractual Fraud
  Other Contract Dispute

**Real Property**
Eminent Domain/Inverse Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
  Writ of Possession of Real Property
  Mortgage Foreclosure
  Quiet Title
  Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
  Writ–Administrative Mandamus
  Writ–Mandamus on Limited Court Case Matter
  Writ–Other Limited Court Case Review
Other Judicial Review (39)
  Review of Health Officer Order
  Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
  Abstract of Judgment (Out of County)
  Confession of Judgment *(non-domestic relations)*
  Sister State Judgment
  Administrative Agency Award *(not unpaid taxes)*
  Petition/Certification of Entry of Judgment on Unpaid Taxes
  Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified above)* (42)
  Declaratory Relief Only
  Injunctive Relief Only *(non-harassment)*
  Mechanics Lien
  Other Commercial Complaint Case *(non-tort/non-complex)*
  Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate Governance (21)
Other Petition *(not specified above)* (43)
  Civil Harassment
  Workplace Violence
  Elder/Dependent Adult Abuse
  Election Contest
  Petition for Name Change
  Petition for Relief From Late Claim
  Other Civil Petition

**CIVIL CASE COVER SHEET**

Exhibit 7

| SHORT TITLE | CASE NUMBER |
|---|---|
| KATHLEEN HAYES, et al. v. KIIT COMPANY, INC., et al. | 23STCV30533 |

## CIVIL CASE COVER SHEET ADDENDUM AND STATEMENT OF LOCATION

### (CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO COURTHOUSE LOCATION)

This form is required pursuant to Local Rule 2.3 in all new civil case filings in the Los Angeles Superior Court

**Step 1:** After completing the Civil Case Cover Sheet (Judicial Council form CM-010), find the exact case type in Column A that corresponds to the case type indicated in the Civil Case Cover Sheet.

**Step 2:** In Column B, check the box for the type of action that best describes the nature of the case.

**Step 3:** In Column C, circle the number which explains the reason for the court filing location you have chosen.

### Applicable Reasons for Choosing Courthouse Location (Column C)

| | | | |
|---|---|---|---|
| 1. | Class Actions must be filed in the Stanley Mosk Courthouse, Central District. | 7. | Location where petitioner lives. |
| 2. | Permissive filing in Central District. | 8. | Location wherein defendant/respondent functions wholly. |
| 3. | Location where cause of action arose. | 9. | Location where one or more of the parties reside. |
| 4. | Mandatory personal injury filing in North District. | 10. | Location of Labor Commissioner Office. |
| 5. | Location where performance required, or defendant resides. | 11. | Mandatory filing location (Hub Cases – unlawful detainer, limited non-collection, limited collection, or personal injury). |
| 6. | Location of property or permanently garaged vehicle. | | |

| | A<br>Civil Case Cover Sheet<br>Case Type | B<br>Type of Action<br>(check only one) | C<br>Applicable Reasons<br>(See Step 3 above) |
|---|---|---|---|
| | **Personal Injury Cases Assigned to the Personal Injury Hub Courts** | | |
| **Auto Tort** | Auto (22) | ☐ 2201 Motor Vehicle – Personal Injury/Property Damage/Wrongful Death | 1, 4, 11 |
| | Uninsured Motorist (46) | ☐ 4601 Uninsured Motorist – Personal Injury/Property Damage/Wrongful Death | 1, 4, 11 |
| | Other Personal Injury/ Property Damage/ Wrongful Death (23) | ☐ 2301 Premise Liability (e.g., dangerous conditions of property, slip/trip and fall, dog attack, etc.) | 1, 4, 11 |
| | | ☐ 2302 Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, battery, vandalism, etc.) | 1, 4, 11 |
| | | ☐ 2303 Intentional Infliction of Emotional Distress | 1, 4, 11 |
| | | ☐ 2304 Other Personal Injury/Property Damage/Wrongful Death | 1, 4, 11 |
| | | ☐ 2307 Construction Accidents | 1, 4, 11 |

LASC CIV 109 Rev. 05/22
For Mandatory Use

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

LASC Local Rule 2.3

Exhibit 7

| SHORT TITLE | CASE NUMBER |
|---|---|
| KATHLEEN HAYES, et al. v. KIIT COMPANY, INC., et al. | |

| | A<br>Civil Case Cover Sheet<br>Case Type | B<br>Type of Action<br>(check only one) | C<br>Applicable Reasons<br>(See Step 3 above) |
|---|---|---|---|
| **Personal Injury Cases Assigned to the Independent Calendar Courts** | | | |
| **Other Personal Injury/Property Damage/Wrongful Death Tort** | Product Liability (24) | ☐ 2401 Product Liability (not asbestos or toxic/ environmental) | 1, 3, 5 |
| | | ☐ 2402 Product Liability – Song-Beverly Consumer Warranty Act (CA Civil Code §§1790-1795.8) (Lemon Law) | 1, 3, 5 |
| | Medical Malpractice (45) | ☐ 4501 Medical Malpractice – Physicians & Surgeons | 1, 3, 5 |
| | | ☐ 4502 Other Professional Health Case Malpractice | 1, 3, 5 |
| | Other Personal Injury / Property Damage / Wrongful Death (23) | ☐ 2305 Elder/Dependent Adult Abuse/Claims Against Skilled Nursing Facility | 1, 3, 5 |
| | | ☑ 2306 Intentional Conduct – Sexual Abuse Case (in any form) | 1, 3, 5 |
| | | ☐ 2308 Landlord – Tenant Habitability (e.g., bed bugs, mold, etc.) | 1, 3, 5 |
| **Other Civil Cases Assigned to Independent Calendar Courts** | | | |
| **Non-Personal Injury/Property Damage /Wrongful Death Tort** | Business Tort (07) | ☐ 0701 Other Commercial/Business Tort (not fraud or breach of contract) | 1, 2, 3 |
| | Civil Rights (08) | ☐ 0801 Civil Rights/Discrimination | 1, 2, 3 |
| | Defamation (13) | ☐ 1301 Defamation (slander/libel) | 1, 2, 3 |
| | Fraud (16) | ☐ 1601 Fraud (no contract) | 1, 2, 3 |
| | Professional Negligence (25) | ☐ 2501 Legal Malpractice | 1, 2, 3 |
| | | ☐ 2502 Other Professional Malpractice (not medical or legal) | 1, 2, 3 |
| | Other (35) | ☐ 3501 Other Non-Personal Injury/Property Damage Tort | 1, 2, 3 |
| **Employment** | Wrongful Termination (36) | ☐ 3601 Wrongful Termination | 1, 2, 3 |
| | Other Employment (15) | ☐ 1501 Other Employment Complaint Case | 1, 2, 3 |
| | | ☐ 1502 Labor Commissioner Appeals | 10 |
| **Contract** | Breach of Contract / Warranty (06) (not insurance) | ☐ 0601 Breach of Rental/Lease Contract (not unlawful detainer or wrongful eviction) | 2, 5 |
| | | ☐ 0602 Contract/Warranty Breach – Seller Plaintiff (no fraud/negligence) | 2, 5 |
| | | ☐ 0603 Negligent Breach of Contract/Warranty (no fraud) | 1, 2, 5 |

CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION

LASC Local Rule 2.3

Exhibit 7

| SHORT TITLE | CASE NUMBER |
|---|---|
| KATHLEEN HAYES, et al. v. KIIT COMPANY, INC., et al. | |

| | A<br>Civil Case Cover Sheet<br>Case Type | B<br>Type of Action<br>(check only one) | C<br>Applicable Reasons<br>(See Step 3 above) |
|---|---|---|---|
| **Contract** | Breach of Contract/<br>Warranty (06)<br>(not insurance) | ☐ 0604 Other Breach of Contract/Warranty (no fraud/<br>negligence) | 1, 2, 5 |
| | | ☐ 0605 Breach of Rental/Lease Contract (COVID-19 Rental<br>Debt) | 2, 5 |
| | Collections (09) | ☐ 0901 Collections Case – Seller Plaintiff | 5, 6, 11 |
| | | ☐ 0902 Other Promissory Note/Collections Case | 5, 11 |
| | | ☐ 0903 Collections Case – Purchased Debt (charged off<br>consumer debt purchased on or after January 1, 2014) | 5, 6, 11 |
| | | ☐ 0904 Collections Case – COVID-19 Rental Debt | 5, 11 |
| | Insurance Coverage (18) | ☐ 1801 Insurance Coverage (not complex) | 1, 2, 5, 8 |
| | Other Contract (37) | ☐ 3701 Contractual Fraud | 1, 2, 3, 5 |
| | | ☐ 3702 Tortious Interference | 1, 2, 3, 5 |
| | | ☐ 3703 Other Contract Dispute (not breach/insurance/fraud/<br>negligence) | 1, 2, 3, 8, 9 |
| **Real Property** | Eminent Domain/ Inverse<br>Condemnation (14) | ☐ 1401 Eminent Domain/Condemnation<br><br>              Number of Parcels _____ | 2, 6 |
| | Wrongful Eviction (33) | ☐ 3301 Wrongful Eviction Case | 2, 6 |
| | Other Real Property (26) | ☐ 2601 Mortgage Foreclosure | 2, 6 |
| | | ☐ 2602 Quiet Title | 2, 6 |
| | | ☐ 2603 Other Real Property (not eminent domain,<br>landlord/tenant, foreclosure) | 2, 6 |
| **Unlawful Detainer** | Unlawful Detainer –<br>Commercial (31) | ☐ 3101 Unlawful Detainer – Commercial (not drugs or<br>wrongful eviction) | 6, 11 |
| | Unlawful Detainer –<br>Residential (32) | ☐ 3201 Unlawful Detainer – Residential (not drugs or<br>wrongful eviction) | 6, 11 |
| | Unlawful Detainer – Post<br>Foreclosure (34) | ☐ 3401 Unlawful Detainer – Post Foreclosure | 2, 6, 11 |
| | Unlawful Detainer –<br>Drugs (38) | ☐ 3801 Unlawful Detainer – Drugs | 2, 6, 11 |
| **Judicial Review** | Asset Forfeiture (05) | ☐ 0501 Asset Forfeiture Case | 2, 3, 6 |
| | Petition re Arbitration<br>(11) | ☐ 1101 Petition to Compel/Confirm/Vacate Arbitration | 2, 5 |
| | Writ of Mandate (02) | ☐ 0201 Writ – Administrative Mandamus | 2, 8 |
| | | ☐ 0202 Writ – Mandamus on Limited Court Case Matter | 2 |
| | | ☐ 0203 Writ – Other Limited Court Case Review | 2 |

**CIVIL CASE COVER SHEET ADDENDUM<br>AND STATEMENT OF LOCATION**

Exhibit 7

| SHORT TITLE | CASE NUMBER |
|---|---|
| KATHLEEN HAYES, et al. v. KIIT COMPANY, INC., et al. | |

| | A<br>Civil Case Cover Sheet<br>Case Type | B<br>Type of Action<br>(check only one) | C<br>Applicable Reasons<br>(See Step 3 above) |
|---|---|---|---|
| **Judicial Review** | Other Judicial Review (39) | ☐ 3901 Other Writ/Judicial Review | 2, 8 |
| | | ☐ 3902 Administrative Hearing | 2, 8 |
| | | ☐ 3903 Parking Appeal | 2, 8 |
| **Provisionally Complex Litigation** | Antitrust/Trade Regulation (03) | ☐ 0301 Antitrust/Trade Regulation | 1, 2, 8 |
| | Asbestos (04) | ☐ 0401 Asbestos Property Damage | 1, 11 |
| | | ☐ 0402 Asbestos Personal Injury/Wrongful Death | 1, 11 |
| | Construction Defect (10) | ☐ 1001 Construction Defect | 1, 2, 3 |
| | Claims Involving Mass Tort (40) | ☐ 4001 Claims Involving Mass Tort | 1, 2, 8 |
| | Securities Litigation (28) | ☐ 2801 Securities Litigation Case | 1, 2, 8 |
| | Toxic Tort Environmental (30) | ☐ 3001 Toxic Tort/Environmental | 1, 2, 3, 8 |
| | Insurance Coverage Claims from Complex Case (41) | ☐ 4101 Insurance Coverage/Subrogation (complex case only) | 1, 2, 5, 8 |
| **Enforcement of Judgment** | Enforcement of Judgment (20) | ☐ 2001 Sister State Judgment | 2, 5, 11 |
| | | ☐ 2002 Abstract of Judgment | 2, 6 |
| | | ☐ 2003 Confession of Judgment (non-domestic relations) | 2, 9 |
| | | ☐ 2004 Administrative Agency Award (not unpaid taxes) | 2, 8 |
| | | ☐ 2005 Petition/Certificate for Entry of Judgment Unpaid Tax | 2, 8 |
| | | ☐ 2006 Other Enforcement of Judgment Case | 2, 8, 9 |
| **Miscellaneous Civil Complaints** | RICO (27) | ☐ 2701 Racketeering (RICO) Case | 1, 2, 8 |
| | Other Complaints (not specified above) (42) | ☐ 4201 Declaratory Relief Only | 1, 2, 8 |
| | | ☐ 4202 Injunctive Relief Only (not domestic/harassment) | 2, 8 |
| | | ☐ 4203 Other Commercial Complaint Case (non-tort/non-complex) | 1, 2, 8 |
| | | ☐ 4304 Other Civil Complaint (non-tort/non-complex) | 1, 2, 8 |
| **Miscellaneous Civil Petitions** | Partnership Corporation Governance (21) | ☐ 2101 Partnership and Corporation Governance Case | 2, 8 |
| | Other Petitions (not specified above) (43) | ☐ 4301 Civil Harassment with Damages | 2, 3, 9 |
| | | ☐ 4302 Workplace Harassment with Damages | 2, 3, 9 |

CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION

LASC Local Rule 2.3

Exhibit 7

| SHORT TITLE | CASE NUMBER |
|---|---|
| KATHLEEN HAYES, et al. v. KIIT COMPANY, INC., et al. | |

| | **A**<br>Civil Case Cover Sheet<br>Case Type | **B**<br>Type of Action<br>(check only one) | **C**<br>Applicable Reasons<br>(See Step 3 above) |
|---|---|---|---|
| **Miscellaneous Civil Petitions** | Other Petitions<br>(not specified above) (43) | ☐ 4303 Elder/Dependent Adult Abuse Case with Damages | 2, 3, 9 |
| | | ☐ 4304 Election Contest | 2 |
| | | ☐ 4305 Petition for Change of Name/Change of Gender | 2, 7 |
| | | ☐ 4306 Petition for Relief from Late Claim Law | 2, 3, 8 |
| | | ☐ 4307 Other Civil Petition | 2, 9 |

**Step 4:  Statement of Reason and Address:**  Check the appropriate boxes for the numbers shown under Column C for the type of action that you have selected.  Enter the address, which is the basis for the filing location including zip code.  (No address required for class action cases).

| REASON:<br>☑ 1. ☐ 2. ☑ 3. ☐ 4. ☑ 5. ☐ 6. ☐ 7. ☐ 8. ☐ 9. ☐ 10. ☐ 11. | ADDRESS:<br>1620 Preuss Rd. |
|---|---|
| CITY:<br>Los Angeles | STATE:<br>CA | ZIP CODE:<br>90035 | |

**Step 5: Certification of Assignment:**  I certify that this case is properly filed in the  Central  District of the Superior Court of California, County of Los Angeles [Code of Civ. Proc., 392 et seq., and LASC Local Rule 2.3(a)(1)(E)]

Dated:  12/14/2023

*Daniel L. Varon*

(SIGNATURE OF ATTORNEY/FILING PARTY)

**PLEASE HAVE THE FOLLOWING ITEMS COMPLETED AND READY TO BE FILED IN ORDER TO PROPERLY COMMENCE YOUR NEW COURT CASE:**

1.  Original Complaint or Petition.

2.  If filing a Complaint, a completed Summons form for issuance by the Clerk.

3.  Civil Case Cover Sheet Judicial Council form CM-010.

4.  Civil Case Cover Sheet Addendum and Statement of Location form LASC CIV 109 (05/22).

5.  Payment in full of the filing fee, unless there is a court order for waiver, partial or schedule payments.

6.  A signed order appointing a Guardian ad Litem, Judicial Council form CIV-010, if the plaintiff or petitioner is a minor under 18 years of age will be required by Court to issue a Summons.

7.  Additional copies of documents to be conformed by the Clerk.  Copies of the cover sheet and this addendum must be served along with the Summons and Complaint, or other initiating pleading in the case.

**CIVIL CASE COVER SHEET ADDENDUM**
**AND STATEMENT OF LOCATION**

LASC Local Rule 2.3

Exhibit 7

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

| | |
|---|---|
| | *FOR COURT USE ONLY*<br>*(SOLO PARA USO DE LA CORTE)* |

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

KIIT COMPANY, INC.,; UNTO INFINITY, LLC; SIRI SINGH SAHIB OF SIKH DHARMA; SIRI SINGH SAHIB CORP.; SIKH DHARMA INTERNATIONAL; EAST/WEST TEA COMPANY, LLC; Additional Parties Attachment form attached

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

KATHLEEN HAYES, SUMPURAN KHALSA, MAHAN KIRN KHALSA, JANE PSS ROE, individually

Electronically FILED by
Superior Court of California,
County of Los Angeles
12/14/2023 4:11 PM
David W. Slayton,
Executive Officer/Clerk of Court,
By J. Barrientos, Deputy Clerk

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.
*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| | |
|---|---|
| The name and address of the court is:<br>*(El nombre y dirección de la corte es):* Los Angeles Superior Court<br><br>Stanley Mosk Courthouse 111 North Hill Street, Los Angeles, 90012 | CASE NUMBER:<br>*(Número del Caso):*<br><br>23STCV30533 |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Daniel L. Varon, Esq. (#245318) 10590 W. Ocean Air Dr. #125 San Diego, CA 92130 858-259-3011

| | | |
|---|---|---|
| DATE: December 14, 2023<br>*(Fecha)* 12/14/2023 | Clerk, by David W. Slayton, Executive Officer/Clerk of Court<br>*(Secretario)* J. Barrientos | , Deputy<br>*(Adjunto)* |

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served

1. ☐ as an individual defendant.

2. ☐ as the person sued under the fictitious name of *(specify)*:

3. ☐ on behalf of *(specify)*:

   under: ☐ CCP 416.10 (corporation)            ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)    ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
          ☐ other *(specify)*:

4. ☐ by personal delivery on *(date)*:

**Page 1 of 1**

| | | |
|---|---|---|
| Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUM-100  [Rev. July 1, 2009] | **SUMMONS** | Code of Civil Procedure §§ 412.20, 465<br>*www.courts.ca.gov* |

Exhibit 7

**SUM-200(A)**

| SHORT TITLE:<br>KATHLEEN HAYES, et al. v. KIIT COMPANY, INC., et al. | CASE NUMBER: |
|---|---|

## INSTRUCTIONS FOR USE

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.

→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

**List additional parties** *(Check only one box. Use a separate page for each type of party.)*:

☐ Plaintiff   ☒ Defendant   ☐ Cross-Complainant   ☐ Cross-Defendant

AKAL, INC.; 3HO FOUNDATION INTERNATIONAL; KUNDALINI RESEARCH INSTITUTE; and DOES 10 through 100, inclusive,

Page _____ of _____

**Page 1 of 1**

Form Adopted for Mandatory Use
Judicial Council of California
SUM-200(A) [Rev. January 1, 2007]

**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**

Exhibit 7

DEVIN M. STOREY, ESQ. (#234271)
DANIEL L. VARON, ESQ. (#245318)
LYNDSEY A. GALLAGHER, ESQ. (#284293)
TALLIS M. RADWICK, ESQ. (#334924)
The Zalkin Law Firm, P.C.
10590 W. Ocean Air Drive, Suite 125
San Diego CA  92130
Tel:  858-259-3011
Fax:  858-259-3015
Email: dms@zalkin.com
          daniel@zalkin.com
          Lyndsey@zalkin.com
          tallis@zalkin.com

Attorneys for Plaintiffs

Electronically FILED by
Superior Court of California,
County of Los Angeles
12/14/2023 3:11 PM
David W. Slayton,
Executive Officer/Clerk of Court,
By Y. Ayala, Deputy Clerk

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| KATHLEEN HAYES, SUMPURAN KHALSA, MAHAN KIRN KHALSA, JANE PSS ROE, individually | CASE NO.: 23STCV30533 |
| Plaintiffs, | COMPLAINT FOR DAMAGES FOR: |
| v. | 1. **NEGLIGENCE**<br>2. **NEGLIGENT HIRING, RETENTION, AND SUPERVISION**<br>3. **SEXUAL HARASSMENT**<br>4. **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**<br>5. **SEXUAL BATTERY** |
| KIIT COMPANY, INC.; UNTO INFINITY, LLC; SIRI SINGH SAHIB OF SIKH DHARMA; SIRI SINGH SAHIB CORP.; SIKH DHARMA INTERNATIONAL; EAST / WEST TEA COMPANY, LLC; AKAL, INC.; 3HO FOUNDATION INTERNATIONAL; KUNDALINI RESEARCH INSTITUTE; and DOES 10 through 100, inclusive, | |
| Defendants | |

## **GENERAL ALLEGATIONS AS TO THE PARTIES**

1.  In this action, four Plaintiffs seek to vindicate their rights arising out of exploitation and sexual abuse within the controlling and cult-like framework of Yogi Bhajan's network, referred to interchangeably herein as the 3HO community and Sikh Dharma community.

2.  Beginning in the mid-1970s, Yogi Bhajan (born Harbhajan Singh Puri) created and organized a convoluted series of interconnected organizations and entities supposedly devoted to religious and spiritual endeavors, various non-profit enterprises, various for-profit enterprises, operation of school and training facilities, a religious compound, and the promulgation of Kundalini yoga.   Yogi Bhajan maintained exclusive central authority of the organizations within his network.

3.  During his forty-year reign, Yogi Bhajan used his position of power and authority as both the spiritual and functional leader of these entities to manipulate, exploit, abuse, sexually assault, and sexually mutilate women under his influence.  Plaintiffs are four such women.

4.  This Complaint seeks recourse on behalf of four Plaintiffs whose lives have been permanently scarred by Yogi Bhajan's sadistic sexual abuse and the failure of the entities herein to prevent, investigate, and respond to the sexual abuse.  Yogi Bhajan's tendencies were widely known and persisted for decades, but nobody protected the women in his midst.  Plaintiffs seek recourse from the specific entities that failed to protect them during Yogi Bhajan's reign of abuse, as well as from the successor entities of Yogi Bhajan's Estate created for the purpose of shielding Yogi Bhajan's assets entities from liability.

## **THE PLAINTIFFS**

5.  Plaintiff **Kathleen Hayes** (hereinafter "Kathleen") induced into Yogi Bhajan's orbit in approximately 1984 when she was twenty-nine years old.  Thereafter, Yogi Bhajan sexually assaulted and raped her repeatedly.  Yogi Bhajan's violent sexual assaults

Exhibit 7

continued on a regular basis through 1995.  After 1995, the sexual assaults decreased in frequency, but occurred on several occasions through 2000.

6. Plaintiff **Sumpuran Khalsa** (hereinafter "Sumpuran") was born in February 1967. She was raised in the 3HO community.  After being isolated from her family as a minor, Yogi Bhajan brought Sumpuran into his immediate orbit as a young adult. Thereafter, Yogi Bhajan sexually assaulted and raped Sumpuran on multiple occasions between 1991 and 1998.

7. Plaintiff **Mahan Kirn Khalsa** (herein after "Mahan Kirn") was born in June 1975. She grew up in the 3HO community.  Yogi Bhajan brought Mahan Kirn onto his staff and repeatedly sexually assaulted and raped her between 1995 and 2004.

8. Plaintiff **Jane PSS Roe** was born in 1981.  She was raised within the 3HO community and brought into Yogi Bhajan's inner orbit at the age of eighteen.  Yogi Bhajan groomed and repeatedly sexually assaulted and raped Jane PSS Roe between 1999 and 2004.

## THE DEFENDANTS

9. Plaintiffs are informed and believe **KIIT Company, Inc.** (hereinafter "**KIIT**") is a Nevada holding company.  It was created for the purpose of holding shares of 3HO-affiliated entities, including shares of Golden Temple and AKAL Security, Inc.  KIIT is a wholly owned subsidiary of Unto Infinity.  KIIT conducts business in several states, including California and New Mexico.

10. Plaintiffs are informed and believe **Unto Infinity, LLC** (hereinafter "**Unto Infinity**") is an Oregon nonprofit limited liability company.  Unto Infinity was the administrative authority of Yogi Bhajan's religious movement.  It owned all shares of KIIT and retained the power and authority to appoint the boards of the religious and nonprofit organizations within Yogi Bhajan's network.  Unto Infinity's principal place of business is 01-A Ram Das Guru Place, Espanola, NM, 87532, and it conducts business in several states, including California.

**COMPLAINT FOR DAMAGES**

Exhibit 7

11. Plaintiffs are informed and believe **Siri Sikh Sahib of Sikh Dharma** (hereinafter "**SSS of SD**") is a California corporation sole.  SSS of SD held title to the property controlled by Yogi Bhajan and his temples.  SSS of SD was designed to dissolve upon Yogi Bhajan's death, and to transfer all assets it held to Defendant SSSC.

12. Plaintiffs are informed and believe **Siri Singh Sahib Corporation** (hereinafter "**SSSC**") is an Oregon religious corporation with principal place of business in New Mexico.  **SSSC's** principal place of business is 01-A Ram Das Guru Place, Espanola, New Mexico, 87532.  **SSSC** was designated to be the legal successor organization of the **SSS of SD** at the time of Yogi Bhajan's death in 2004.  According to its Restated Articles of Incorporation, **SSSC** was designated to be the "guardian of those assets of the **SSS of SD** which are conveyed to it, and **Unto Infinity, LLC**."  **SSSC** was also the sole member of **Unto Infinity**.  **SSSC** conducts business, in part, in Los Angeles, California, including providing oversight of the Sikh Dharma International and Kundalini Research Institute, both registered California Non-Profit Organizations.

13. Plaintiffs are informed and believe **Sikh Dharma International** (hereinafter "**SDI**") is a California nonprofit religious corporation.  Its sole member is **Unto Infinity.  SDI** was organized to advance the teaching and principles of Sikh Dharma, including through the ordination of clergy and the operation of places of worship.

14. Plaintiffs are informed and believe **East/West Tea Company, LLC** (formerly **Golden Temple of Oregon, LLC)** is an Oregon-based for-profit entity.  Its principal place of business is 1325 Westec Dr, Eugene, OR 97402.  Golden Temple sells products under various brands, including "Yogi Tea."  It produces food products and herbal teas, which it sells nationally, including in California.  At times relevant to the allegations herein, East/West Tea Company maintained offices and conducted business in California.  All shares of Golden Temple were passed to **KIIT** (Unto Infinity's holding company).

15. Plaintiffs are informed and believe **Akal, Inc.** (hereinafter "AKAL") is a New Mexico based for-profit company whose primary business is to provide contract security

Exhibit 7

services.   It conducted business in several states, including California, at all times relevant to the allegations in this complaint.   AKAL was founded by a 3HO community member.   The member donated the company to Sikh Dharma of New Mexico, Inc. (an affiliate of Defendant SDI).  Sikh Dharma of New Mexico transferred AKAL to Unto Infinity which, in turn, transferred AKAL to KIIT (Unto Infinity's holding company).

16. Plaintiffs are informed and believe **3HO Foundation International** (hereinafter "3HO Foundation") is a California nonprofit.  Its principal address is 1401 21st Street, Suite R, Sacramento, CA 95811.  3HO Foundation was founded by Yogi Bhajan in 1969 with the stated purpose of promoting health and wellness though Kundalini Yoga.

17. Plaintiffs are informed and believe **Kundalini Research Institute** (hereinafter "KRI") is a California nonprofit.  It conducts business in California and maintains a registered agent in California.  KRI was founded by Yogi Bhajan in or around 1976 and, during his lifetime, provided training and certification to teachers approved by Yogi Bhajan to teach courses approved of by Yogi Bhajan.

18. Yogi Bhajan was often and commonly referred to as "upper management" or "chief management authority" of the entities named herein.   It was common knowledge within the cult that Yogi Bhajan was the ultimate authority figure of the entirety of the cult and had the power to move people between jobs and entities, and commonly did so.  He utilized a "Chief Management Authority" (CMA) to whom each entity reported on Yogi Bhajan's behalf.    All entities herein reported to the CMA, who, in turn, reported directly to Yogi Bhajan.   Through this arrangement, Defendants herein, collectively, had total control over Plaintiffs, and each of them, during their respective time in the Sikh Darma community.   Defendants, by and through their agents and employees were the employers, landlords, supervisors, or bosses over each Defendant. At Yogi Bhajan's direction, Defendants had total authority over each Plaintiff and, as such, had a special relationship with each Plaintiff.

**BACKGROUND FACTS APPLICABLE TO ALL CAUSES OF ACTION**

19. Yogi Bhajan was an Indian-born American who posed as a religious leader and a well-known holy man in India. He proclaimed himself the Siri Singh Sahib (head religious authority in the western hemisphere) for the Sikh religion. Yogi Bhajan claimed to be a master Kundalini Yoga, which he maintained included poses of an ancient and secret tradition.

20. Yogi Bhajan emigrated to Toronto, Canada in 1968 and quickly became a household name. Less than a year later, in 1969, Yogi Bhajan established 3HO (Healthy, Happy, Holy Organization) in Los Angeles, California, which attracted thousands of followers who would make up the first generation of his conglomeration. Members of the 3HO community referred to Yogi Bhajan as "The Siri Singh Sahib" meaning "the official religious and administrative leader of all Sikhs in the Western World."

21. 3HO expanded rapidly under the oversight of Yogi Bhajan, who instructed 3HO to run dozens of organizations, including all Defendants named herein, a boarding school in India, and SSSC compound in Espanola, New Mexico that Yogi Bhajan used as his own personal headquarters. Yogi Bhajan oversaw all Defendant entities throughout the time period of the abuse of Plaintiffs.

22. Yogi Bhajan controlled some of the most significant life decisions of members of his "community" including whom to marry and whether to have children. Those who joined Yogi Bhajan's conglomerate are often referred to as "first generation" and children born into the existing 3HO community are referred to as "second generation." Yogi Bhajan had significantly more control over second generation members, as they had no sense of independence prior to joining 3HO. The children were especially vulnerable.

23. After members converted, Yogi Bhajan would then covertly subject followers and students to a process of mental and emotional conditioning in which their personalities were disrupted and ultimately destroyed, making them intellectually, emotionally, and ideologically committed exclusively to Yogi Bhajan and furthering the purpose, wants,

and needs of Yogi Bhajan. Second generation members were indoctrinated from birth to serving Yogi Bhajan's every need.

24. Yogi Bhajan used his position as the self-proclaimed leader of the Sikh Darma community to create a veritable personal empire wherein the entities that existed to fund his initiatives, including Defendants, operated at his direction, and adherents were inculcated to serve him above all else.

25. Yogi Bhajan held himself out as a spiritual master. Central to his persona was his supposedly strict adherence to Sikh principles, such as not cutting any body hair, monogamy, and not having sex outside of marriage. Yogi Bhajan also held himself out to the public as not having worldly desires, including sexual desires. At various times, he proclaimed himself to be celibate.

26. Yogi Bhajan was held out by Defendants as safe and of high ethical and moral repute. Plaintiffs and their families relied upon these representations and reasonably assumed that Yogi Bhajan was a person worthy of their complete trust. In this capacity, Yogi Bhajan was placed into contact with vulnerable persons whereby he could prey on their general emotional and psychological issues.

27. Yogi Bhajan was known to heavily pressure his followers to send their children to live with families other than their own or to be sent to his special training schools in India where many were physically and emotionally abused. The children were discouraged from attending college and pressured to work for Yogi Bhajan's organizations. It was all a calculated effort to break down the family, exploit labor and indoctrinate and groom the children for Yogi Bhajan's personal and sexual gratification.

28. Yogi Bhajan maintained a group of women to be his close personal staff, including some who just turned 18. Many of the women who worked on his staff were instructed to work at one or more of the entities, including several Defendant entities, at Yogi Bhajan's direction. He would select who worked for each entity and in which department within each entity. The staff lived in small dwellings near Yogi Bhajan's. A staff member was always required to be on "night duty" to attend to his "needs"

Exhibit 7

including tasks such as placing blankets over him or massaging his body.  Yogi Bhajan would often stop by the house of any staff member he chose at night to demand sexual activity, or he would call the staff member of his choice to his private space to demand sexual activity.  There was no choice but to comply with his demands.

29. Yogi Bhajan manipulated and controlled the women on his close personal staff.  He isolated them from their families and the outside world and made them dependent upon him and the entities he controlled for their daily needs such as income (although nominal), housing, food, companionship, and spiritual needs.

30. Yogi Bhajan manipulated his religious and spiritual adherents into becoming completely dependent upon Yogi Bhajan and his organization for all their spiritual, financial, social and communal needs.  Yogi Bhajan used the dependence he created to systematically sexually assault Plaintiffs by force, fear, coercion, duress and submission.  Over a period of decades, Yogi Bhajan created a cult-like environment that elevated himself over the entirely of the Sikh Darma community and created a series of interrelated subordinate entities over which he exercised ultimate control. Using his influence as the ultimately leader, Yogi Bhajana relentlessly manipulated, brainwashed, controlled, coerced and forced women under his control to engage in the nonconsensual sexual behavior described herein.

## THE SEXUAL ABUSE

31. After manipulating women into submission, Yogi Bhajan relentlessly sexually assaulted the women on his personal staff.  He directed them to shave parts of their bodies and cut their hair in contravention of Sikh practices and repeatedly engaged in unwanted and nonconsensual sexual encounters with them at his whim.

32. Yogi Bhajan instructed some women on his personal staff, referred to as "bulldogs" to "initiate" the newer members, often commanding the bulldogs to shave the pubic hair of the newer additions and perform sex acts on new members to prepare them for Yogi Bhajan's "service." When Yogi Bhajan was unable to get an erection while playing out his sadistic sexual fantasies, he forced members of his female staff to perform sex acts

**COMPLAINT FOR DAMAGES**

Exhibit 7

on each other while he watched. Yogi Bhajan also showed his personal staff pornography on a regular basis.

33. Yogi Bhajan engaged in devious sexual behaviors with the women, including, biting their face, tongue, neck and nipples, and pinching, hitting, grabbing, and in some cases, painfully biting the clitoris.

34. Yogi Bhajan demanded sexual activity from female members of his personal staff at his whim.  He engaged in violent sexual encounters upon demand.  He would sadistically hit, grab, and pinch women when he wanted sexual activity.

35. Yogi Bhajan would sometimes chew on the labia of some women, drawing blood and permanently scarring their genitals.  Over the span of nearly 20 years, Yogi Bhajan viciously assaulted and raped the Plaintiffs referred to herein countless times.

## JURISDICTION AND VENUE

36. Yogi Bhajan's activities, by and through Defendant entities, were conducted nationally, including in California.  Yogi Bhajan sexually assaulted each Plaintiff in Los Angeles, California, in addition to sexually assaulting them in locations outside of California.  As such, this case is properly venued in Los Angeles.

## TIMELINESS

37. This Complaint is brought timely under Code of Civil Procedure § 340.16(e).  Specifically, each Plaintiff herein seeks to recover damages suffered as a result of a sexual assault that occurred after each Plaintiff's respective 18th birthday.  None of the Plaintiffs have previously filed any claim arising out of the sexual abuse herein prior to January 1, 2023.  Defendants herein are legally responsible for the sexual assaults and engaged or attempted to engage in a cover up of at least one prior instance or allegation of sexual assault by a perpetrator of such assault.

38. Plaintiffs are informed and believe, and on that basis allege, Yogi Bhajan sexually assaulted and abused at least one other adult female prior to 1986.  When the abuse was brought to light in or around 1987, the victim of Yogi Bhajan's sexual abuse was falsely accused of being mentally ill and of fabricating the allegation.  Yogi Bhajan,

and the 3HO community leadership and the leaders of Defendants 1-9 and Does 10-100 herein, derided any complaints or accusations against his being "slanderous." They indoctrinated adherents to believe that the penalty for slandering Yogi Bhajan is spiritual death. Defendants attempted to cover up the prior abuse but publicly discredited the accuser or any supporter of the accuser, removing the accuser from all positions within the 3HO community, and dissuading any person from offering support or providing evidence related to the sexual assaults. As a result of the concerted effort to cover up the prior sexual assaults, Yogi Bhajan was empowered and free to commit and continue to commit the sexual assaults of Plaintiffs described herein. Thereafter, up until Yogi Bhajan's death in 2004, Defendants 1-9 and Does 10-100 continuously covered up known sexual abuse, including the sexual abuse of each Plaintiff herein. Leadership within each Defendant entity and were specifically and continuously aware of Yogi Bhajan's sexually assaultive behavior towards each Plaintiff, and in many cases the leadership of each entity specifically participated in the sexual abuse of each Plaintiff. Despite their knowledge, Defendants covered up the ongoing sexual assaults and abuse by actively dissuading witnesses from coming forwarding, and by shunning, shaming and publicly humiliating any person who produced evidence of sexual abuse. These actions constituted ongoing cover up and led to the continued abuse.

## PLAINTIFF KATHLEEN HAYES

39. Kathleen was born in Wisconsin in 1954. In her early adult years, Kathleen embarked on a career as an opera singer. In the early 1980s, she was introduced to Kundalini Yoga and began attending classes, seminars and retreats.

40. Kathleen met Yogi Bhajan at several yoga retreats around the country. Yogi Bhajan held himself out as the spiritual leader to his followers such that they were encouraged to follow his direction without question.

41. In March 1985, Yogi Bhajan met with Kathleen after a yoga retreat and told her to move to New Mexico, so he could become her "spiritual master." Kathleen agreed and moved to New Mexico.

**COMPLAINT FOR DAMAGES**

Exhibit 7

42. Yogi Bhajan used New Mexico as a means to isolate Kathleen from her prior life. She was placed in a trailer with two other people. She had no car or phone and did not know anyone there. She had no means of caring for herself, shopping for her own groceries, or leaving. Yogi Bhajan used this form of isolation to ensure his would-be victims, including Kathleen, became completely dependent upon him and the vast array of organizations, including Defendant Entities, over which he maintained iron-fisted control.

43. As part of the effort to isolate Kathleen and make her dependent, she was given a job at AKAL Security in the bookkeeping department, despite having no background or education in accounting or bookkeeping.

44. While in New Mexico, Kathleen was kept in Yogi Bhajan's inner circle, but was never provided with her own house. Instead, she was always placed to live in someone else's house. Yogi Bhajan did so as a tactic to indoctrinate Kathleen into the lifestyle he demanded. It deprived Kathleen of any independence, inculcated her into a cult environment in which Yogi Bhajan was elevated above all, and indoctrinated her into a world in which tending to his every demand – even the most painful and sadistic – was normal.

45. Kathleen was sexually groomed by a female senior staff member. For example, the senior staff member entered Kathleen's trailer uninvited, and made sexual advances at Yogi Bhajan's direction. Yogi Bhajan employed a combination of threats fear, duress, manipulation and coercion to induce Kathleen, and others, to engage in sexual activity.

46. After her indoctrination period, in the Fall of 1985, Kathleen was moved to Los Angeles.

47. Once in Los Angeles, Kathleen was trained by another bookkeeper.

48. Kathleen was initially placed on the 3HO payroll. In the early 1990s, Kathleen was added to the AKAL Security payroll. Throughout her time within the cult, Kathleen was directed to do bookkeeping work for various small businesses owned or operated by 3HO Members.

49. Yogi Bhajan began sexually assaulting Kathleen soon after she arrived in Los Angeles.

50. As a member of Yogi Bhajan's personal staff, Kathleen was required to look after Yogi Bhajan's everyday needs, and to be submissive to Yogi Bhajan at all times.

51. Yogi Bhajan began his sexual exploitation and assaults of Hayes abruptly.  Though he falsely claimed to be celibate, Yogi Bhajan demanded that Kathleen "show [him] [her] pussy."  Shocked, but spiritually, emotionally, and economically dependent on Yogi Bhajan, Kathleen complied.  Yogi Bhajan directed Kathleen to shave her pubic hair and told her that "I'm going to fuck you and I'll fuck you as much as I want."

52. Approximately one week later, Yogi Bhajan called Kathleen into his quarters, forced himself onto Kathleen, and sexually assaulted and raped her.

53. Yogi Bhajan would sadistically hit and grab women, including Kathleen, when he wanted sexual activity.  During his sexual encounters, Yogi Bhajan would often leave Kathleen bruised and swollen.

54. During the course of her 10 years on Yogi Bhajan's personal staff, Yogi Bhajan sexually assaulted her countless times – on average approximately 1-2 times per week. The overwhelming majority of Yogi Bhajan's sexually assaults took place in California.  The nature of sexual assaults varied but involved various sexual activity including touching of the breasts, buttocks, and Yogi Bhajan's anus and penis; kissing and painfully biting the tongue, nipples and clitoris, oral copulation; forcible and coerced sexual intercourse; and forced and coerced sexual activity with other females. Kathleen suffered various injuries as a result of Yogi Bhajan's sexual assaults.  As examples, she had severely swollen tongue, bruised feet and frequent infections.

55. Yogi Bhajan forced Kathleen to engage in group sexual activity with him and other women.  He instructed Kathleen to pursue them sexually and that if she did not engage ins sexual activity with them "they will come for you and they will kill you."

56. Following 1995, Yogi Bhajan's sexual assaults decreased considerably in frequency. Between 1996 and 2001, Yogi Bhajan sexually assaulted Kathleen approximately once per year.

57. As a result of the sexual assaults and Defendants' failures to protect Kathleen from the sexual assaults described herein, she suffered, and continues to suffer, physical injury, great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life.  She suffered, and continues to suffer, with trouble trusting others, employment performance, maintaining healthy relationships, anxiety, depression, and symptoms of post-traumatic stress disorder.  Plaintiff was prevented, and will continue to be prevented, from performing daily activities and obtaining the full enjoyment of life and/or have incurred and will continue to incur expenses for medical and psychological treatment, therapy and counseling.

## **PLAINTIFF SUMPURAN KHALSA**

58.  Sumpuran Khalsa was born February 14, 1967.  In 1971 when Sumpuran was four years old her mother joined an Ashram in Orlando, FL. Some of her earliest memories are attending gatherings with dancing and singing where Yogi Bhajan was the central figure of the event.

59. As early as she can recall, Sumpuran was indoctrinated to believe that Yogi Bhajan was a man of god, a master with supernatural powers and knowledge of the future. The 3HO community Sumpuran was raised in propagated the image of Yogi Bhajan as all-seeing and all-knowing.

60. Yogi Bhajan preached a particular method of child discipline he referred to as "Baby Kriya" where adults would manipulate a child, so the legs were extended straight out in front and the arms were crossed, hands resting on opposite shoulders and then the head bent down to press against the knees so that the body was essentially folded in half. Sumpuran remembers being forced into this position, causing her excruciating pain.

61. In 1974 when Sumpuran was seven years old, she was separated from her parents and sent to a school in Arizona run by other 3HO members.  Despite repeated pleas to call her mother, the 3HO workers refused, leaving Sumpuran feeling helpless and dependent on her new caretakers.

**COMPLAINT FOR DAMAGES**

Exhibit 7

62. The school system within the 3HO community was used to indoctrinate children. Various forms of discipline, punishment, isolation, and deprivation were utilized as part of the indoctrination process.

63. In 1980 when Sumpuran was just 12 years old, she was sent to the Guru Nanak 5th Centenary School in India where she remained for six years.

64. Sumpuran returned to the United States in 1986 when she turned 18 years old. She moved to Los Angeles to live in the 3HO community where Yogi Bhajan was headquartered.

65. At 20 years old, Sumpuran told Yogi Bhajan she wanted to apply to medical school, but Yogi Bhajan forbade her, and arranged for her to marry instead. Though she initially refused, Sumpuran submitted to Yogi Bhajan's control.

66. Sumpuran was married to the man Yogi Bhajan selected and immediately slipped into depression, refusing to have sexual intercourse with her husband until Yogi Bhajan told her to "get it over with." Sumpuran began having suicidal thoughts.   She attempted to flee the 3HO community.

67. Yogi Bhajan caught her as she attempted to leave and forced her to return. Upon her return Yogi Bhajan berated Sumpuran, accused her of being "a lesbian" (homosexuality was forbidden in the cult).

68. In the summer of 1989, Sumpuran fell in love with a woman in the 3HO community. When Yogi Bhajan found out he shamed Sumpuran relentlessly and sent her to India to be with her husband, instructing her to have sexual intercourse with him for 40 straight days.  (In the cult doctrine, 40 days was required to change a "bad habit".)

69. For two weeks Sumpuran lay in her bed while her husband had sex with her under the direction of Yogi Bhajan. Sumpuran never consented.

70. After fulfilling her obligation to have sex with her husband, Sumpuran would spend time with the woman she had fallen in love with. When Yogi Bhajan discovered this, he ordered Sumpuran to Hamburg, Germany to meet with him.

**COMPLAINT FOR DAMAGES**

Exhibit 7

71. Sumpuran met with Yogi Bhajan in a small room in a house in Hamberg where he forbade her from being in a relationship with the woman she loved and required Sumpuran to go with him to New Mexico. Though uncomfortable and resistant, Sumpuran was conditioned to view Bhajan as a deity.

72. Sumpuran was immature and unexposed due to the manipulation and control she was subjected to. Yogi Bhajan instructed Sumpuran to lay on the bed beside him while he held her. Yogi Bhajan told her to touch his penis, which she resisted but obeyed. She was just 22 years old, and Yogi Bhajan was 61.

73. Yogi Bhajan then told Sumpuran she would be relocating to the Ranch in New Mexio to study and train under him. Sumpuran was assigned to work under another individual who was to train her while serving on Yogi Bhajan's personal staff. Upon arriving in Espanola, Sumpuran was given a small room in a trailer and tasked with preparing Yogi Bhajan's breakfast and teas every morning, grocery shopping for all workers on the Ranch, washing and ironing all of Yogi Bhajan's clothes, sheets, and bedding.

74. One night, another staff member went into Sumpuran's room in the middle of the night, got into her bed and groped her. Sumpuran was scared and reported the incident to Yogi Bhajan the next day.

75. After this incident, Yogi Bhajan continued to groom Sumpuran by pulling her closer into his inner circle, bringing her with him on outings and relieving her of her daily chores. As part of his personal staff Sumpuran trailed Yogi Bhajan and took notes, connected his phone line to whomever he, needed to speak to; served him his meals and his special supplements, teas and tonics, carried his bags around, his purse and personal items, coordinated with his security team and drivers when he was heading out; arranged food and hosted the myriad guests that came through. She was expected to do whatever was needed to meet Yogi Bhajan's needs at all times.

76. Within the cult, it was considered a great honor to be on Yogi Bhajan's personal staff.

77. One morning Yogi Bhajan called Sumpuran into his bedroom which he used to conduct business meetings, hold counseling sessions and perform interviews. He told

Sumpuran she and another female (who was the Chief Business Secretary was responsible for overseeing all business entities, including East West Tea Company, on Yogi Bhajan's behalf and reported directly to Yogi Bhajan) would stay in his room for the next 10 nights together while he was away so that the executive could "train" Sumpuran to be a staff member.

78. The first night, the executive shaved Sumpuran's pubic hair with a razor, as directed by Yogi Bhajan. She spent the next 10 days teaching her how to perform oral sex.

79. When Yogi Bhajan returned, he summoned Sumpuran into his room where he and the executive were waiting. Yogi Bhajan directed Sumpuran to perform oral sex on the executive while Yogi Bhajan groped the executive's breasts. Yogi Bhajan then had sexual intercourse with the executive and made Sumpuran watch. The next day Sumpuran was again summoned into Yogi Bhajan's room and the executive performed oral sex on her while Yogi Bhajan groped her breasts. Yogi Bhajan had sexual intercourse with Sumpuran against her will while the executive watched. This pattern repeated over and over, too many times to count. Yogi Bhajan told Sumpuran these encounters were their "sacred secret" and that their souls were connected.

80. Yogi Bhajan's sexual assaults were accomplished through actual force, implied force, coercion and duress. Sumpuran did not freely and voluntarily consent to any sexual act with Yogi Bhajan. Sumpuran was brainwashed and groomed from an early age to believe Yogi Bhajan was all-powerful. She was taught to be obedient to Yogi Bhajan and to put his needs above her own. When she was brought to live in Yogi Bhajan's inner circle, she had no access to the outside world. She was completely dependent upon Yogi Bhajan for housing, care, companionship, food, and all her daily necessities.

81. The executive told Sumpuran that Yogi Bhajan serves the world and they needed to serve him so he could complete his mission- Yogi Bhajan needed sex because he was "so heavenly" it "anchored him" to the earth so he could "function properly."

82. Yogi Bhajan was violent and sadistic. He would bite, suck, and pinch Sumpuran's tongue, lips, cheeks, and genitals until they bruised. After a sex act was completed,

Yogi Bhajan would painfully bite the back of Sumpuran's neck, often leaving visible marks.

83. In one instance of rape, Yogi Bhajan stacked pillows on his bed and instructed Sumpuran to lay on the pillows. He then attempted to sodomize Sumpuran, who cried out for him to stop. He then pressed his penis into Sumpuran's rectum and urinated. He then sent her to the bathroom to "clean herself up."

84. Yogi Bhajan used Sumpuran's sense of duty and her fundamental fear to coerce her into performing oral sex on his other staff members in the name of self-development. He instructed Sumpuran to engage in sexual activity with female staff members. Yogi Bhajan said things to the effect of, "You need to be aggressive and assert yourself." "You need to be like a man and conquer her." Sumpuran was ultimately forced to have sexual encounters with five other women under the direction of Yogi Bhajan for nine years.

85. As a result of the sexual assaults and Defendants' failures to protect Sumpuran from the sexual assaults described herein, she suffered, and continues to suffer, physical injury, great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, sexual dysfunction, embarrassment, loss of self-esteem, disgrace, humiliation, PTSD stress responses, and loss of enjoyment of life.   Plaintiff was prevented, and will continue to be prevented, from performing daily activities and obtaining the full enjoyment of life and/or have incurred and will continue to incur expenses for medical and psychological treatment, therapy and counseling.

## PLAINTIFF MAHAN KIRN KHALSA

86.  Mahan Kirn was born June 11, 1975, to a family entrenched in the 3HO community in Florida. Exemplary of this is deep-rooted embedment is the fact that only days after meeting, her parents were placed into an arranged marriage by Yogi Bhajan and married in a 3HO Ashram. Mahan Kirn was born soon after. From as early as she can remember Yogi Bhajan controlled every aspect of her daily existence, including where

she slept and where she went to school. To say Mahan Kirn was conditioned to serve Yogi Bhajan since birth is a trivialization.

87. She was brought up, through the Defendants, to believe that Yogi Bhajan was a deity who was all-knowing and was to never be questioned.

88. In 1984 when Mahan Kirn was nine years old Yogi Bhajan separated her from her family and sent her to India to attend a boarding school where she was overseen by 3HO employees and remained for seven years.  She was isolated from her family and subjected to daily physical and emotional abuse from the very beginning.  Mahan Kirn began suffering from separation anxiety, fear, and stress which caused her to begin wetting the bed. Staff did not investigate or address her bedwetting nor ensure she had a clean place to sleep and as a result, Mahan Kirn was forced to sleep in her own urine night after night for years, with no ability to bathe or wash her clothing with the exception of a set time to bathe once per week.

89. While in the boarding school Mahan Kirn was subjected to daily abuses by female 3HO employees called "Matrons." The Matrons slapped Mahan Kirn and other students in the face, made them kneel on gravel for long periods of time and beat them with canes leaving bruises all over their bodies. Despite not having access to basic hygiene resources, the Matrons would slap Mahan Kirn or beat her with a cane in front of the entire school for having a dirty face or fingernails.

90. During her time at the boarding school in India, Mahan Kirn was sent to 3HO camps, including the New Mexico Ranch, yearly.  Mahan Kirn was emotionally abused by Yogi Bhajan at the 3HO camps.  When she was a young teen, she noticed Yogi Bhajan's interest in her intensified, particularly when he asked her to dance in front of him during one of these camps.  While she was still a minor, Yogi Bhajan repeatedly told Mahan Kirn that she would "work" for him directly one day.

91. In 1991, when she was 16 years old, 3HO sent Mahan Kirn to attend a school in New Mexico. During her time at the school, Mahan Kirn and her Sikh classmates were

**COMPLAINT FOR DAMAGES**

Exhibit 7

required to drive to meet with Yogi Bhajan. During these meetings, he verbally abused them, calling Mahan Kirn and the other females "sluts" and "whores."

92. Mahan Kirn graduated from the school when she was 17 years old and enrolled in college. As soon as Yogi Bhajan discovered this, he demanded that she quit college and return to school in India. Unable to refuse, she submitted to his demands and remained there until 1995.

93. In 1995 when Mahan Kirn was 20 years old, Yogi Bhajan selected Mahan Kirn to serve him on his personal staff at the Ranch in Espanola, New Mexico.  He told her that he had hand-picked her to come to the New Mexico compound under the false premise that he was going to protect her. AKAL employee Harinam Khalsa took Mahan Kirn's phone upon her arrival, cutting off her only source of communication to the outside world.

94. When Mahan Kirn initially arrived in New Mexico to join his personal staff, Yogi Bhajan had her stay in the living room of his residence.  At Yogi Bhajan's behest, Harinam also took away Mahan Kirn's access to money and he forbade her from calling her parents, further isolating her, and making her dependent upon Yogi Bhajan. Mahan Kirn was directed to serve Yogi Bhajan and tend to his daily needs.  As an example, she would be woken in the middle of night and forced to engage in sexual activity.

95. Mahan Kirn was subjected to horrific and sadistic abuse.  For example, Yogi Bhajan would force Mahan Kirn to drink his urine, claiming it had healing properties.

96. Shortly after joining Yogi Bhajan's personal staff, Yogi Bhajan brought her to an event in Los Angeles at Yogi Bhajan's private residence. During the event, Yogi Bhajan told Harinam, his personal staff member (and Akal Security executive) that he needed to adjust Mahan Kirn's back.  They led her into a bedroom at the residence.  He told her to remove her clothes and lay down then put her legs behind her head. He got on top of her, pulled down his pants and raped her.  Harinam waited outside at the door while this occurred.

**COMPLAINT FOR DAMAGES**

Exhibit 7

97. An East West Tea Company executive (who was also Mahan Kirn's boss) was one of the people who helped Yogi Bhajan maintain control of the women who were required to serve him.   At Yogi Bhajan's direction, she shaved Mahan Kirn's vagina and sexually violated her as part of her initiation.

98. Yogi Bhajan would force his female staff, including Mahan Kirn, to perform sexual acts with one another while he watched. Other times he would force multiple female staff to engage in sex acts with him at the same time. For example, another East West Tea Company employee worked nights as Yogi Bhajan's personal servant with Mahan Kirn, and sexually abused Mahan Kirn countless times over the course of 9 years, including dozens of occasions (including rape, and severe sexual abuse) in California.

99. Mahan Kirn was told that members of Yogi Bhajan's personal staff were required to perform sexual services for him. Mahan Kirn and other women were required to act as Yogi Bhajan's sexual servants, and to indoctrinate and train other women to do the same.   For the next nine years, Yogi Bhajan raped, assaulted, bruised, groped, beat, humiliated, and emotionally abused Mahan Kirn hundreds of times.

100. In a typical act of sexual "service" to Yogi Bhajan, he would mutilate Mahan Kirn's genitals - chewing on her vulva breaking skin and drawing blood.  He would do this while receiving oral sex from another female staff member.  As a result, Yogi Bhajan permanently mutilated Mahan Kirn's vulva and labia and he infected her with HPV.

101. Mahan Kirn was sexually assaulted and emotionally manipulated by women who were her bosses and superiors at the 3HO businesses.

102. In order to gain her compliance in the long-term abuse and sexual violence, Yogi Bhajan praised, groomed, manipulated, and brainwashed Mahan Kirn, telling her that she held a special status as his spiritual successor. Specifically, Yogi Bhajan promised Mahan Kirn that upon his passing, she would own and run the companies and entities that he controlled.

103. Yogi Bhajan's sexual assaults were accomplished through actual force, implied force, coercion and duress.

**COMPLAINT FOR DAMAGES**

Exhibit 7

104. Mahan Kirn and the other women were taught that by servicing him sexually, they were doing something good for the 3HO community and for the world. They were taught that by servicing Yogi Bhajan and sacrificing themselves for his pleasure, that he could continue to serve humanity. Mahan Kirn feared that if she refused to comply with Yogi Bhajan's orders and desires, she would be beaten and exiled from the 3HO community – the only life she knew.

105. During the period of sexual abuse, Mahan Kirn held positions at SSSC Corp (Board Member), East West Tea Company (Senior Financial Officer, Treasurer), KIIT (Management Director), Akal Security (Chief Financial Officer), Kundalini Research Institute (Board Member and Trainer) and Sikh Dharma Education International (Board Member).

106. As a result of the sexual assaults and Defendants' failures to protect Mahan Kirn from the sexual assaults described herein, she suffered, and continues to suffer, physical injury, great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life.  She suffered, and continues to suffer, with trouble trusting others, maintaining employment, maintaining healthy intimate relationships, confusion regarding sexual orientation, sexual dysfunction, anxiety, depression, and post-traumatic stress disorder.  Plaintiff was prevented, and will continue to be prevented, from performing daily activities and obtaining the full enjoyment of life and/or have incurred and will continue to incur expenses for medical and psychological treatment, therapy and counseling.

**PLAINTIFF JANE PSS ROE**

107. Plaintiff Jane PSS Roe was born in 1981 to a family deeply steeped in Yogi Bhajan's 3HO community.  Jane PSS Roe spent her early childhood living in her family's one-bedroom allotment at a communal "ashram" (communal house) in Tucson, Arizona.

108. Plaintiff Jane PSS Roe was sent to the 3HO sleep away camp operated by Yogi Bhajan's Ram Das Puri 3HO community in Espanola, New Mexico during each

summer until she turned 12-years-old.  At age 12, Plaintiff Jane PSS Roe was directed to work at the various 3HO entities during the summer months.

109. Yogi Bhajan targeted Jane PSS Roe from an early age.  He told Plaintiff Jane PSS Roe's mother when she was just a toddler that she would one day be on his personal staff.

110. Yogi Bhajan maintained complete control over his adherents.  For example, at age 7 in 1989, Plaintiff Jane PSS Roe was sent to the 3HO community boarding school, GRD Academy, in Dehradun, India.  Her years in India were distressing, marked by dysfunction, filth, illness, and physical abuse.  Plaintiff Jane PSS Roe repeatedly requested to go home but was not allowed to until – at the age of 9 – Yogi Bhajan approved her return.

111. Beginning at age 12, Jane PSS Roe was sent to Espanola, New Mexico, to work with Yogi Bhajan's entities. Jane PSS Roe was initially placed with a nonprofit office and worked as a receptionist and general office assistant.  When she was in high school, Jane PSS Roe was placed in Yogi Bhajan's personal residence as an assistant.  In that capacity, she was required to care for Yogi Bhajan's personal needs, such as laundry, menial labor, and looking after his personal quarters.

112. Jane PSS Roe's proximity to Yogi Bhajan and the women on his personal staff during her formative high school years was instrumental in Yogi Bhajan's manipulation, brainwashing, and control of Jane PSS Roe.  As was his pattern, he made Jane PSS Roe dependent upon him and his organizations for spiritual, financial and communal support.  Yogi Bhajan worked to separate Jane PSS Roe from her parents, as a result of which Jane PSS Roe became more emotionally dependent upon Yogi Bhajan.  In turn, Yogi Bhajan lavished Jane PSS Roe with attention and praise while she was a child to foster her dependence upon him.  Once fully indoctrinated into Yogi Bhajan's orbit, Yogi Bhajan told Jane PSS Roe "when you turn 18, you're mine."

113. Yogi Bhajan interfered with Jane PSS Roe's educational opportunities.  While she was still a minor, he told her she wanted her to remain with him when she turned 18.

He pushed her to forego college opportunities outside of New Mexico as a ploy to keep Jane PSS Roe close to him.  When she was just 17 years old, Yogi Bhajan placed her on the Golden Temple payroll.  He also took her to France and pressed Jane PSS Roe to remain with him.  Yogi Bhajan promised to take care of all Jane PSS Roe's needs.  He also pushed Jane PSS Roe to break off contact with her father.

114. At Yogi Bhajan's urging, Jane PSS Roe remained in New Mexico.  A few months after her 18th birthday, Jane PSS Roe was moved into Yogi Bhajan's Ranch, where she was assigned to share living quarters with a more senior women on Yogi Bhajan's personal staff who became instrumental at indoctrinating Jane PSS Roe into her new role.  Jane PSS Roe was forced to change her college class schedule to ensure she was able to devote maximal time serving Yogi Bhajan.

115. At Yogi Bhajan's direction, Jane PSS Roe was instructed to work for Yogi Bhajan's various non-profit entities and placed on the payroll of Golden Temple. However, at all times, Jane PSS Roe served at Yogi Bhajan's direction and control.  In addition, Jan PSS Roe attended multiple KRI classes and ultimately received certification as directed by Yogi Bhajan.

116. At Yogi Bhajan's direction, Jane PSS Roe was required to, and did, spend virtually all free time outside of class working for, and serving Yogi Bhajan.

117. Yogi Bhajan started sexually assaulting Jane PSS Roe soon after she turned 18 years old. He began by, repeatedly, touching Jane PSS Roe's breast against her will while hugging her.  Given Yogi Bhajan's total control over the 3HO community and its affiliated entities, as well as the god-like figure he embodied within this community, Jane PSS Roe was not free to resist, complain or react.  As the ultimate authority figure in the community, Jane PSS Roe was required to accept his actions without question.  For his part, Yogi Bhajan used these first unlawful and sexual assaults as a means of exerting control and breaking Jane PSS Roe into sexual submission.

118. Yogi Bhajan was seventy years old when Jane PSS Roe turned 18.  He demanded a personal assistant accompany him everywhere, including the bathroom.  During

bathroom trips, Yogi Bhajan began demanding more sexually from Jane PSS Roe. It began with him kissing Jane PSS Roe on the mouth under the continued threat that disobedience would bring eternal damnation.  In addition, Yogi Bhajan was known to have publicly disciplined and shamed disobedient members.

119. Yogi Bhajan's escalating sexual assaults were accomplished by force, coercion and duress.  He began grabbing Jane PSS Roe's hand and placing it on his exposed penis and directed her to fondle it.  Later, he demanded Jane PSS Roe remove her clothes. He would fondle her breasts, digitally penetrate her vagina, and force Jane PSS Roe to orally copulate him.

120. As was his practice, and in contradiction to Sikh religious practice and Yogi Bhajan's own teachings, Yogi Bhajan directed Jane PSS Roe to shave her body hair.

121. Yogi Bhajan routinely forced his female senior staff to engage in sexual orgies for his own sexual gratification.  He began pulling Jane PSS Roe into these orgies several times per week.  He forced the women to perform sexual acts on each other without their consent, including Jane PSS Roe. In addition to the coercion, duress, manipulation and control described herein, Yogi Bhajan used physical force and violence to accomplish his will.  He regularly hit women for failing to follow his direction.

122. During sexual encounters, he would painfully and sadistically suck and bite his victims' face, neck, tongue, nipples and clitoris to the point of injury, including bleeding and scabbing. When Yogi Bhajan forced Jane PSS Roe to perform oral sex on him simultaneous to performing oral sex on her he would bite her clitoris so hard she would cry and beg for him to stop, to no avail.

123. The bruises, cuts, and marks left by Yogi Bhajan's sadistic sexual acts were so visible that Jane PSS Roe was provided stage makeup to cover the wounds out of concern Jane PSS Roe would be asked about her health and wellbeing.

124. Yogi Bhajan's sexual assaults were accomplished through actual force, implied force, coercion and duress.

125. Between 1999 and 2004, as a member of Yogi Bhajan's personal staff Jane PSS Roe was required to travel with Yogi Bhajan wherever he went.  Yogi Bhajan relentlessly sexually assaulted Jane PSS Roe on these trips. Jane PSS Roe estimated she was raped in this manner by Yogi Bhajan hundreds of times.

126. As a result of the sexual assaults and Defendants' failures to protect her from the sexual assaults described herein, Jane PSS Roe suffered, and continues to suffer, physical injury, great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life.  Plaintiff was prevented, and will continue to be prevented, from performing daily activities and obtaining the full enjoyment of life and/or have incurred and will continue to incur expenses for medical and psychological treatment, therapy and counseling.

## FIRST CAUSE OF ACTION

## NEGLIGENCE

### (Against all Defendants)

127. Plaintiffs incorporate by reference all paragraphs above as though fully set forth herein.

128. Defendants and Does 10-100 had a duty to protect Plaintiffs but virtue of their special relationships with each Plaintiff.  Defendants and Does 10-100 exerted a level of control over each Plaintiff which made Plaintiffs reliant on Defendants for their welfare, safety, security and livelihood.  Defendants employed, supervised and controlled each.  As such, and by virtue of their special relationships with each Plaintiff giving rise to a duty to protect them from foreseeable harm, including harm by third parties.  Defendants and Does 10-100 had a special relationship with Yogi Bhajan and had the legal right and authority to supervise him.

129. Defendants were aware and/or on notice of Yogi Bhajan's proclivities for using force, violence, coercion and duress to engage in sexual with women prior to the events with Plaintiffs alleged herein. Accordingly, at the time Yogi Bhajan and Defendants

performed the acts alleged herein, it was or should have been reasonably foreseeable to Defendants that by continuously exposing and making Plaintiffs available to Yogi Bhajan, Defendants were placing Plaintiffs in grave risk of being sexually abused by Yogi Bhajan.

130. Even though Defendants knew or had reason to know of these activities by Yogi Bhajan, Defendants did nothing to investigate, supervise or monitor Yogi Bhajan to ensure the safety of the community, including Plaintiffs.

131. Plaintiffs are informed, and believe, and on that basis allege, that the Defendants were put on notice and/or should have known that Yogi Bhajan had previously engaged and continued to engage in unlawful sexual conduct with women, and that it was, or should have been foreseeable that he was engaging or would engage in illicit sexual activities with Plaintiffs, and others, under the cloak of his authority, confidence, and trust, bestowed upon him through Defendants' actions.

132. By knowingly subjecting Plaintiffs to such foreseeable danger, and by subsequently assuming the positions of Plaintiffs' employers, Defendants were duty-bound to take reasonable steps and implement reasonable safeguards to protect Plaintiffs from Yogi Bhajan. Furthermore, as alleged herein, Defendants at all times exercised a sufficient degree of control over Yogi Bhajan's personal and business affairs to prevent the acts of abuse by keeping Yogi Bhajan away from Plaintiffs. However, Defendants failed to take any reasonable steps or implement any reasonable safeguards for Plaintiffs protection whatsoever.

133. As a result of the sexual assaults and Defendants' failures to protect Plaintiffs from the sexual assaults described herein, they have suffered, and continue to suffer, physical injury, great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life.  Plaintiffs were prevented, and will continue to be prevented, from performing daily activities and obtaining the full

enjoyment of life and/or have incurred and will continue to incur expenses for medical and psychological treatment, therapy and counseling.

134. In subjecting the Plaintiffs to the wrongful treatment herein described, Defendants acted willfully and maliciously with the intent to harm Plaintiffs, and in conscious disregard of Plaintiffs rights, so as to constitute malice and oppression under California Civil Code section 3294. Plaintiffs are therefore entitled to the recovery of punitive damages, in an amount to be determined by the court, against Defendants.

## SECOND CAUSE OF ACTION

## NEGLIGENT HIRING/RETENTION/SUPERVISION

### (Against All Defendants)

135. Plaintiffs incorporate by reference all paragraphs above as though fully set forth herein.

136. Defendants and Does 10-100 had a duty to provide reasonable supervision of Yogi Bhajan, to use reasonable care in investigating Yogi Bhajan's background, and to provide adequate warning to Plaintiffs of Yogi Bhajan's dangerous propensities and unfitness.

137. Defendants and Does 10-100 had a duty to not hire and/or retain Yogi Bhajan, given his dangerous and exploitive propensities, which Defendants, knew or had reason to know had they engaged in a meaningful and adequate supervision of Yogi Bhajan.

138. Plaintiffs are informed and believe, and on that basis allege, that Defendants by and through their respective agents, servants and employees, knew or had reason to know of Yogi Bhajan's dangerous and exploitive propensities and/or that Yogi Bhajan was an unfit agent. Despite such knowledge, Defendants negligently failed to supervise Yogi Bhajan in his position of trust and authority as an authority figure and supervisor of children and young adults where he was able to commit wrongful acts against Plaintiffs. Defendants failed to provide reasonable supervision of Yogi Bhajan, failed to use reasonable care in investigating Yogi Bhajan, and failed to provide adequate warning to Plaintiffs of Yogi Bhajan's dangerous propensities and

unfitness. Defendants further failed to take reasonable measures to prevent sexual abuse, harassment and molestation of children and young adults including Plaintiffs.

139. Even though Defendants knew or had reason to know of these activities by Yogi Bhajan, Defendants did nothing to investigate, supervise or monitor Yogi Bhajan to ensure the safety of members of the community, including Plaintiffs.

140. Plaintiffs are informed, and believe, and on that basis allege, that the Defendants were put on notice and/or should have known that Yogi Bhajan had previously engaged and continued to engage in unlawful sexual conduct with women, and that it was, or should have been foreseeable that he was engaging or would engage in illicit sexual activities with Plaintiffs, and others, under the cloak of his authority, confidence, and trust, bestowed upon him through Defendants' actions.

141. Defendants, inclusive, negligently failed to supervise Yogi Bhajan in his positions of trust and authority as an employee, agent, counselor and mentor, and/or other authority figure, where Yogi Bhajan was able to commit wrongful acts against Plaintiffs. Defendants failed to provide reasonable supervision of Yogi Bhajan. Defendants further failed to take reasonable measures to prevent sexual harassment, molestation and abuse of Plaintiffs.

142. As a result of the sexual assaults and Defendants' failures to protect Plaintiffs from the sexual assaults described herein, they have suffered, and continue to suffer, physical injury, great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life.  Plaintiffs were prevented, and will continue to be prevented, from performing daily activities and obtaining the full enjoyment of life and/or have incurred and will continue to incur expenses for medical and psychological treatment, therapy and counseling.

143. In subjecting the Plaintiffs to the wrongful treatment herein described, Defendants acted willfully and maliciously with the intent to harm Plaintiffs, and in conscious disregard of Plaintiffs rights, so as to constitute malice and oppression under

California Civil Code section 3294. Plaintiffs are therefore entitled to the recovery of punitive damages, in an amount to be determined by the court, against Defendants.

### THIRD CAUSE OF ACTION

### SEXUAL HARASSMENT

### (Civ. Cod. § 51.9)

### Against all defendants

144. Plaintiffs incorporate by reference all paragraphs above as though fully set forth herein.

145. A business, service, and/or professional relationship existed between Plaintiffs, Defendants, and Yogi Bhajan. Yogi Bhajan was acting within the course and scope of his employment and/or agency with Defendants when he engaged in the sexual conduct alleged herein.

146. Yogi Bhajan made sexual advances, solicitations, demands for sexual compliance by Plaintiffs, and engaged in other verbal, visual, or physical conduct of a sexual nature and/or hostile nature with Plaintiffs based on their gender that was unwelcome, pervasive, and severe.

147. During their association with Defendants, Yogi Bhajan and Defendant employees and or agents intentionally, recklessly and wantonly made sexual advances, sexual solicitations, sexual comments and / or sexual requests and engaged in other visual, verbal or physical conduct of a sexual nature based on Plaintiffs gender that were unwelcome, pervasive and severe, including but not limited to engaging in sexually humiliating and insulting speech with Plaintiffs, and/or assaulting Plaintiffs in sexually motivated and illegal manner including rape, all while acting in the course and scope of his/their agency with Defendants.

148. These instances of sexual misconduct outlined herein took place while Plaintiffs were under the control and supervision of Yogi Bhajan and Defendants while Yogi Bhajan and Defendant agent/employees were acting on behalf of Defendants and during the course and scope of their employment.

149. Plaintiffs were unable to easily terminate their relationship with Yogi Bhajan and Defendants as Plaintiffs were under the exclusive control and custody of Yogi Bhajan and Defendants at the time of the harassment and abuse. Yogi Bhajan held positions of authority, trust and control of Plaintiffs and he used the context of those relationships to sexually exploit and abuse them.

150. Defendants knew or should have known of Yogi Bhajan's propensity to engage in, and his history of engaging in sexual misconduct, and acted in conscious disregard for the safety of others, including Plaintiffs, and failed to adequately warn and protect Plaintiffs against Yogi Bhajan. Defendants had advanced knowledge of Yogi Bhajan's inappropriate conduct towards others, and yet continued to employ him and provide him access to minors and young adults such as Plaintiffs.

151. Even though Defendants knew, should have known, and had an opportunity to learn of Yogi Bajhan's sexual assaults, Defendants and Does 10-100 did nothing to investigate, supervise, or monitor Yogi Bhajan to ensure the safety of their employees brought into contact with Yogi Bhajan. Worse, Defendants and Does 10-100 ratified and adopted and ratified Yogi Bhajan's sexual harassment and sexual assaults by failing to adequately investigate, respond, discipline or terminate Yogi Bhajan.

152. As a result of the sexual assaults and Defendants' failures to protect Plaintiffs from the sexual assaults described herein, they have suffered, and continue to suffer, physical injury, great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life. Plaintiffs were prevented, and will continue to be prevented, from performing daily activities and obtaining the full enjoyment of life and/or have incurred and will continue to incur expenses for medical and psychological treatment, therapy and counseling.

153. In subjecting the Plaintiffs to the wrongful treatment herein described, Defendants acted willfully and maliciously with the intent to harm Plaintiffs, and in conscious disregard of Plaintiffs rights, so as to constitute malice and oppression under

California Civil Code section 3294. Plaintiffs are therefore entitled to the recovery of punitive damages, in an amount to be determined by the court, against Defendants.

## FOURTH CAUSE OF ACTION

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### Against all Defendants

154. Plaintiffs incorporate by reference all paragraphs above as though fully set forth herein.

155. Defendants' conduct towards Plaintiffs, as described above, was extreme and outrageous and was intentional and directed at Plaintiffs and/or done recklessly while Plaintiffs were present and performed on a routine and repeated basis.

156. As noted herein, Defendants agents and/or employees were aware of Yogi Bhajan's sexual misconduct. Yogi Bhajan instructed employees and/or agents of Defendant entities to perform sexual acts with one another while he watched, or he would force multiple female staff to engage in sex acts with him at the same time. Agents and/or employees of Defendants would go so far as to "prepare" new females, including Plaintiffs, for the sexual abuse. Despite Yogi Bhajan's continued manipulation, abuse and sexual assault of women in his charge, Defendants and Does 10-100 continued to maintain Yogi Bhajan in a position of high position within and atop their organizations, and continued to actively solicit and recruit women, including Plaintiffs, into his charge, and agents and employees of Defendants and Does 10-100 engaged in manipulation, abuse and sexual assault against Plaintiffs with and at the direction of Yogi Bhajan.

157. As a result of the sexual assaults and Defendants' failures to protect Plaintiffs from the sexual assaults described herein, they have suffered, and continue to suffer, physical injury, great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life. Plaintiffs were prevented, and will continue to be prevented, from performing daily activities and obtaining the full

enjoyment of life and/or have incurred and will continue to incur expenses for medical and psychological treatment, therapy and counseling.

158. In subjecting the Plaintiffs to the wrongful treatment herein described, Defendants acted willfully and maliciously with the intent to harm Plaintiffs, and in conscious disregard of Plaintiffs rights, so as to constitute malice and oppression under California Civil Code section 3294. Plaintiffs are therefore entitled to the recovery of punitive damages, in an amount to be determined by the court, against Defendants.

## FIFTH CAUSE OF ACTION

### SEXUAL BATTERY

**Against All Defendants**

159. Plaintiffs incorporate by reference all paragraphs above as though fully set forth herein.

160. The sexual abuse of Plaintiffs by Yogi Bhajan arose from, and was incidental to, Yogi Bhajan's employment with Defendants, and each of these Defendants ratified or approved Yogi Bhajan's sexual abuse of Plaintiffs.

161. Plaintiffs allege on information and belief that Defendants ratified and/or approved of the sexual misconduct by failing to adequately investigate, discharge, discipline or supervise Yogi Bhajan. Defendants ratified Yogi Bhajan's abuse by concealing evidence of sexual abuse of other persons and failing to report it. Defendants ratified Yogi Bhajan's abuse by concealing evidence of sexual abuse of other persons from Plaintiffs, Plaintiffs' parents, other families with children, other members of Defendants, law enforcement, and other persons who could have been in a position to prevent the abuse of Plaintiffs.

162. Yogi Bhajan repeatedly sexually assaulted Plaintiffs, intended to place Plaintiffs in great apprehension of offensive contact with sexual organs, buttocks and/or groins and did in fact place Plaintiffs in great apprehension of offensive contact, and it was done with the intent to harm and/or offend Plaintiffs. Offensive contact repeatedly occurred to Plaintiffs sexual organs, buttocks and/or groins.

Exhibit 7

163. Upon information and belief, Defendants had advanced knowledge of Yogi Bhajan's inappropriate conduct towards others, and yet continued to employ him. Defendants despite their knowledge of Yogi Bhajan's history of misconduct and propensity to engage in that criminal conduct continued to employ him and/or failed to supervise him. Defendants, despite their knowledge, provided Yogi Bhajan assistance in continuing to perform wrongful acts, including those perpetrated against Plaintiffs. Defendants continued to employe Yogi Bhajan, continued to allow him to be alone with employees, and failed to supervise him, which constituted ratification and aiding and abetting. Defendants further aided and abetted and ratified Yogi Bhajan's conduct by watching the assaults and taking no action.

164. As a result of the sexual assaults and Defendants' failures to protect Plaintiffs from the sexual assaults described herein, they have suffered, and continue to suffer, physical injury, great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life.  Plaintiffs were prevented, and will continue to be prevented, from performing daily activities and obtaining the full enjoyment of life and/or have incurred and will continue to incur expenses for medical and psychological treatment, therapy and counseling.

165. In subjecting the Plaintiffs to the wrongful treatment herein described, Defendants acted willfully and maliciously with the intent to harm Plaintiffs, and in conscious disregard of Plaintiffs rights, so as to constitute malice and oppression under California Civil Code section 3294. Plaintiffs are therefore entitled to the recovery of punitive damages, in an amount to be determined by the court, against Defendants.

## PRAYER

WHEREFORE, Plaintiffs pray for damages; costs; interest; punitive damages, and other such relief the court deems appropriate and just.

## JURY DEMAND

Plaintiffs demand a jury trial on all issues so triable.

**COMPLAINT FOR DAMAGES**

Exhibit 7

THE ZALKIN LAW FIRM, P.C.

Dated: <u>December 14, 2023</u>

By: <u>*Daniel L. Varon*</u>

Daniel L. Varon, Esq.
Attorneys for Plaintiff

| SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF LOS ANGELES | |
|---|---|
| COURTHOUSE ADDRESS:<br>Spring Street Courthouse<br>312 North Spring Street, Los Angeles, CA 90012 | **FILED**<br>Superior Court of California<br>County of Los Angeles<br>**12/14/2023**<br>David W. Slayton, Executive Officer / Clerk of Court<br>By: _____ Y. Ayala _____ Deputy |
| **NOTICE OF CASE ASSIGNMENT -**<br>**UNLIMITED PERSONAL INJURY CIVIL CASES**<br>**ASSIGNED TO THE PERSONAL INJURY HUB COURTS** | |
| Your case is assigned to the judicial officer indicated below in the Personal Injury Hub Court for all purposes, except for trial. | CASE NUMBER:<br>23STCV30533 |

### THIS FORM IS TO BE SERVED WITH THE SUMMONS AND COMPLAINT

| | ASSIGNED JUDICIAL OFFICER | DEPT. |
|---|---|---|
| ✔ | Michelle C. Kim | 31 |

| | |
|---|---|
| **FINAL STATUS CONFERENCE:**<br>        DATE: _____05/29/2025_____ at 10:00 a.m. | |
| **TRIAL DATE:**<br>        DATE: _____06/12/2025_____ at 8:30 a.m. | |
| **ORDER TO SHOW CAUSE RE: DISMISSAL (Code of Civil Procedure, section 583.210)**<br>        DATE: _____12/11/2025_____ at 8:30 a.m. | |

Given to the Plaintiff / Attorney of Record

On _12/14/2023_____
        (Date)

David W. Slayton, Executive Officer / Clerk of Court

By _Y. Ayala_____ Deputy Clerk

### NOTICE OF CASE ASSIGNMENT – UNLIMITED CIVIL PERSONAL INJURY CASES

LASC CIV 295 NEW 05/22
For Mandatory Use

Exhibit 7

## INSTRUCTIONS FOR HANDLING UNLIMITED PERSONAL INJURY CIVIL CASES

The following critical provisions of the California Rules of Court, Title 3, Division 7, as applicable in the Superior Court are summarized for your assistance.

### APPLICATION
The Division 7 Rules were effective January 1, 2007.  They apply to all general civil cases.

### PRIORITY OVER OTHER RULES
The Division 7 Rules shall have priority over all other Local Rules to the extent the others are inconsistent.

### CHALLENGE TO ASSIGNED JUDICIAL OFFICER
A challenge under Code of Civil Procedure Section 170.6 must be made within **15** days after notice of assignment for all purpose to a judicial officer, or if a party has not yet appeared, within 15 days of the first appearance.

### TIME STANDARDS
Cases assignment to the Personal Injury Hub Courts will be subjected to processing under the standards listed below.

### COMPLAINTS
All complaints shall be served within 60 days of filing and proof of service shall be filed within 90 days. Failure to do so may result in the imposition of sanctions.

### CROSS-COMPLAINTS
Without leave of court first being obtained, no cross-complaint may be filed by any party after their answer is filed.  Cross-complaints shall be served within 30 days of the filing date and a proof of service filed within 60 days of the filing date.

### FINAL STATUS CONFERENCE
The Court will require the parties to attend a final status conference not more than eight court days before the scheduled trial date.  All parties shall have motions in limine, bifurcation motions, statements of major evidentiary issues, dispositive motions, requested form jury instructions, special jury instructions, and special jury verdicts timely filed and served prior to the conference. These matters may be heard and resolved at this conference. At least five days before this conference, counsel must also have exchanged lists of exhibits and witnesses and have submitted to the court a brief statement of the case to be read to the jury panel as required by Chapter Three of the Los Angeles Superior Court Rules.

### SANCTIONS
The court will impose appropriate sanctions for the failure or refusal to comply with Chapter Three Rules, orders made by the Court and time standards, or deadlines established by the Court or by Chapter Three Rules.  Such sanctions may be on a party, or if appropriate on counsel for a party.

**This is not a complete delineation of the Division 7 or Chapter Three Rules, and adherence only to the above provisions is therefore not a guarantee against the imposition of sanctions under Trial Court Delay Reduction. Careful reading and compliance with the actual Chapter Rules is imperative.**

### Class Actions
Pursuant to Local Rule 2.3, all class actions shall be filed at the Stanley Mosk Courthouse and are randomly assigned to a complex judge at the designated complex courthouse. If the case is found not to be a class action it will be returned to a PI Hub Court for all purposes except for trial or an Independent Calendar Courtroom for all purposes depending on the PI Case Type.

### *Provisionally Complex Cases
Cases filed as provisionally complex are initially assigned to the Supervising Judge of complex litigation for determination of complex status. If the case is deemed to be complex within the meaning of California Rules of Court 3.400 et seq., it will be randomly assigned to a complex judge at the designated complex courthouse. If the case is found not to be complex, it will be returned to a PI Hub Court for all purposes except for trial or an Independent Calendar Courtroom for all purposes depending on the PI Case Type.

## NOTICE OF CASE ASSIGNMENT – UNLIMITED CIVIL PERSONAL INJURY CASES

LASC CIV 295 NEW 05/22
For Mandatory Use

Exhibit 7